**John Kaempf**, OSB No. 925391
**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue, Suite 1414
Portland, Oregon 97204
Phone: (503) 224-5006
john@kaempflawfirm.com

Attorney for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ANITA NOELLE GREEN**, an individual,<br><br>Plaintiff,<br><br>v.<br><br>**MISS UNITED STATES OF AMERICA, LLC**, a Nevada limited liability corporation, d.b.a. United States of America Pageants,<br><br>Defendant. | Case No. 3:19-CV-02048-MO<br><br>**DEFENDANT'S MOTION TO DISMISS AND SUPPORTING MEMORADUM OF LAW**<br><br>Oral Argument Requested |

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ iii

LOCAL RULE 7-1 COMPLIANCE ....................................................................................... 1

INTRODUCTION .................................................................................................................. 2

ALLEGED FACTS ................................................................................................................. 3

ARGUMENT ......................................................................................................................... 6

I.    The Complaint fails to state a claim under the Act. ...................................................... 8

    A.    Plaintiff filed the Complaint more than a year after the alleged conduct occurred. 8

    B.    Plaintiff never alleges that Defendant declined Plaintiff's application because of "gender identity." .......................................................................................................... 8

II.   Applying the Act to Defendant would violate its First Amendment free speech and free association rights under the U.S. Supreme Court's holdings in *Hurley* and *Dale*. ........... 10

    A.    The Act would violate the First Amendment by compelling Defendant to speak a message it disagrees with. ........................................................................................ 10

        1.    *Hurley* requires the dismissal of this case. ................................................. 11

        2.    Defendant engages in protected speech. .................................................... 13

        3.    Plaintiff's requested relief compels Defendant to speak in violation of the First Amendment. .................................................................................. 16

        4.    Plaintiff's requested relief would alter, be triggered by, and award access based on content and viewpoint. ............................................................... 18

    B.    The Act would violate the First Amendment by forcing Defendant to expressively associate. ........................................................................................ 19

        1.    The U.S. Supreme Court's decision in *Dale*, and the federal trial court's decision in *Apilado*, also dictate the dismissal of this case. ...................... 20

        2.    Defendant engages in expression. .............................................................. 24

        3.    The Act significantly affects Defendant's expression. ............................. 24

    C.    The Act fails strict scrutiny if applied as Plaintiff requests. ................................ 26

D.     Forcing Defendant to speak and associate endangers speakers of all different viewpoints. ...................................................................................... 28

III.     The Act would also violate the Oregon Constitution by restraining Defendant's expression. ...................................................................................... 30

A.     Defendant engages in protected communication. ................................. 30

B.     The Act burdens Defendant's expression. ........................................... 31

C.     The Act impermissibly burdens Defendant's expression. .................... 32

CONCLUSION ................................................................................................... 32

## Table of Authorities

### Cases

*Abukhalaf v. Morrison Child & Family Servs.,*
  2009 WL 4067274 (D. Or. Nov. 20, 2009)..............................................................8

*Animal Legal Defense Fund v. Wasden,*
  878 F.3d 1184 (9th Cir. 2018) ..........................................................................27

*Apilado v. North American Gay Amateur Athletic Alliance,*
  792 F. Supp. 2d 1151 (W.D. Wash. 2011)................................. 7, 11, 20, 22, 23, 24, 25, 26, 29

*Berger v. City of Seattle,*
  569 F.3d 1029 (9th Cir. 2009) ..........................................................................14

*Boy Scouts of America v. Dale,*
  530 U.S. 640 (2000).................................... 1, 7, 10, 11, 19, 20, 21, 22, 23, 24, 25, 26

*Brown v. Louisiana,*
  383 U.S. 131 (1966)........................................................................................14

*Brush & Nib Studio, LC v. City of Phoenix,*
  448 P.3d 890 (Ariz. 2019)................................................................................26

*Buckley v. Valeo,*
  424 U.S. 1 (1976)............................................................................................17

*Cervantes v. Countrywide Home Loans, Inc.,*
  656 F.3d 1034 (9th Cir. 2011) ............................................................................6

*Cinevision Corp. v. City of Burbank,*
  745 F.2d 560 (9th Cir. 1984) ............................................................................14

*City of Eugene v. Miller,*
  871 P.2d 454 (Or 1994) ...............................................................................30, 31

*Claybrooks v. Am. Broad. Cos., Inc.,*
  898 F. Supp. 2d 986 (M.D. Tenn. 2012)................................................... 15, 16, 17

*Daniels-Hall v. Nat'l Educ. Ass'n,*
  629 F.3d 992 (9th Cir. 2010) ..............................................................................3

*Deras v. Myers,*
  535 P.2d 541 (Or 1975) ...................................................................................32

*Downtown Soup Kitchen v. Municipality of Anchorage,*
  406 F. Supp. 3d 776 (D. Alaska 2019) ..............................................................29

*Fidanque v. State ex rel. Or. Gov't Standards and Practices Comm'n,*
  969 P.2d 376 (Or 1998) ...................................................................................32

*Foley v. Wells Fargo Bank, N.A.,*
  772 F.3d 63 (1st Cir 2014)..................................................................................7

*Gathright v. City of Portland*,
439 F.3d 573 (9th Cir. 2006) ............................................................ 16

*Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*,
546 U.S. 418 (2006) .......................................................................... 26

*Harrington v. Airbnb, Inc.*,
348 F. Supp. 3d 1085 (D Or 2018) ...................................................... 9

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
515 U.S. 557 (1995) ................................... 1, 7, 10, 11, 12, 13, 14, 15, 16, 18, 20, 23, 25, 26

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 386 (4th Cir. 1993) ............................................................ 14

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*,
138 S. Ct. 2448 (2018) ................................................................. 10, 27

*Jian Zhang v. Baidu.com Inc.*,
10 F. Supp. 3d 433 (S.D.N.Y. 2014) .................................................... 10

*Johnson v. Fed. Home Loan Mortg. Corp.*,
793 F.3d 1005 (9th Cir. 2015) ......................................................... 3, 8

*Kaahumanu v. Hawaii*,
682 F.3d 789 (9th Cir. 2012) ............................................................ 14

*King v. Greyhound Lines*,
656 P 2d 349 (Or App 1982) ............................................................... 9

*Klein v. Oregon Bureau of Labor & Indus.*,
410 P3d 1051 (Or App 2017) .................................................... 9, 18, 29

*Kristie v. City of Oklahoma City*,
572 F Supp 88 (D Ok 1983) ...................................................... 23, 24, 28

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ............................................................. 1

*Marder v. Lopez*,
450 F.3d 445 (9th Cir. 2006) ............................................................... 3

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*,
138 S. Ct. 1719 (2018) ............................................................... 27, 29

*McDermott v. Ampersand Pub., LLC*,
593 F.3d 950 (9th Cir. 2010) ............................................................ 17

*Merrick v. Board of Higher Education*,
841 P.2d 646 (Or App 1992) ............................................................. 31

*Miami Herald Publishing Co. v. Tornillo*,
418 U.S. 241 (1974) .......................................................................... 31

*Miller v. Texas State Bd. of Barber Examiners*,
615 F.2d 650 (5th Cir. 1980) ............................................................ 17

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ................................................................................ 14

*National Socialist Party of America v. Skokie*,
  432 U.S. 43 (1977) .................................................................................. 14

*Norma Kristie, Inc. v. City of Okla. City*,
  572 F. Supp. 88 (W.D. Okla. 1983) ....................................................... 14

*Our Lady's Inn v. City of St. Louis*,
  349 F. Supp. 3d 805 (E.D. Mo. 2018) .................................................... 25

*Outdoor Media Dimensions, Inc. v. Department of Transportation*,
  132 P.3d 5 (Or 2006) .............................................................................. 32

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*,
  475 U.S. 1 (1986) ........................................................................ 10, 18, 19

*Parrino v. FHP, Inc.*,
  146 F.3d 699 (9th Cir. 1998) .................................................................... 5

*Patton v. Thomas*,
  2011 WL 4544072 (D Or 2011) ................................................................ 6

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) ....................................................................... 18, 26

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
  487 U.S. 781 (1988) ................................................................................ 18

*Roberts v. United States Jaycees*,
  468 U.S. 609 (1984) ................................................................................ 19

*Rogers v. New York City Bd. of Elections*,
  988 F. Supp. 409 (S.D.N.Y. 1997) ........................................................... 9

*Schad v. Borough of Mt. Ephraim*,
  452 U.S. 61 (1981) .................................................................................. 14

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975) ................................................................................ 14

*State v. Babson*,
  326 P.3d 559 (Or 2014) ........................................................................... 32

*State v. Ciancanelli*,
  121 P.3d 613 (Or 2005) ..................................................................... 30, 31

*State v. Henry*,
  732 P.2d 9 (Or 1987) .............................................................................. 30

*Telescope Media Grp. v. Lucero*,
  936 F.3d 740, (8th Cir. 2019) ........................................................... 26, 28

*Terminiello v. City of Chicago*,
  337 U.S. 1 (1949) .................................................................................... 29

*Treanor v. Washington Post Company*,
    826 F. Supp. 568 (D.D.C. 1993) .................................................................. 28

*Unigestion Holdings, S.A. v. UPM Technology, Inc.*,
    412 F.Supp.3d 1273 (D Or 2019) ................................................................ 7

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ........................................................................ 3

*Victory Processing, LLC v. Fox*,
    937 F.3d 1218 (9th Cir. 2019) .................................................................... 18

*Warden v. Miranda*,
    751 F. App'x 1030 (9th Cir. 2019) ............................................................ 16

*White v. City of Sparks*,
    500 F.3d 953 (9th Cir. 2007) ...................................................................... 14

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .................................................................................... 10

## Statutes

ORS 174.100(7) ................................................................................................ 6

ORS 659A.875(4) ............................................................................................. 8

ORS 659A.885(8) ......................................................................................... 6, 31

## Other Authorities

*Complete MGA Handbook*, Miss Gay America, http://www.missgayamerica.com/complete-mga-handbook.html .................................................................................... 28

*Eligibility*, Miss Black USA, https://www.missblackusa.org/eligibility ..................... 29

*Register*, Miss Native American Pageant,
    http://www.missnativeamericanusa.com/register.html ...................................... 29

## Rules

Federal Rules of Civil Procedure 12(b)(6) ............................................................ 1, 6, 7

Oregon Administrative Rule 839-003-0020(5) ........................................................ 8

## Constitutional Provisions

Ore. Const. art. I § 8 ..................................................................................... 2, 30

U.S. Const. amend. I ................................... 1, 2, 7, 10, 11, 13, 14, 16, 17, 19, 23, 26, 30

## LOCAL RULE 7-1 COMPLIANCE

In compliance with this Rule, the parties made a good faith effort through telephone conferences to resolve the dispute and have been unable to do so.

## MOTION

This is a civil action for alleged gender identity discrimination brought under ORS 659A.403, Oregon's Public Accommodations Act— "the Act." Plaintiff is a biological male who identifies as female and claims she was wrongly discriminated against because defendant did not allow her to enter its beauty pageant, which is limited to natural born biological females.

Under Fed. R. Civ. P. 12(b)(6), Defendant moves to dismiss Plaintiff's Complaint with prejudice for failing to state a claim. That is because holding Defendant liable would, as a matter of law, violate its rights of free association and free expression contained in the First Amendment to the United States Constitution as interpreted in the controlling U.S. Supreme Court cases Defendant discusses below—*Hurley* and *Dale*. As the caption of the Complaint shows, defendant and its pageant are called "*Miss* United States of America. That simple, undisputed fact, and the First Amendment rights of free association and expression—and *Hurley* and *Dale* holding that those constitutional rights preclude liability through a state public accommodations act under similar facts, dictates the dismissal of this case.

Also, holding defendant liable would violate the same, but even broader, Free expression and free association rights in Oregon's Constitution. Dismissal is appropriate because Plaintiff cannot cure the complaint by alleging additional facts. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).

**INTRODUCTION**

Defendant promotes, celebrates, and encourages biological, natural born women by performing pageants across the country that give women confidence-building opportunities. Its motto is to empower women, inspire others, and uplift everyone. To achieve its mission and to promote its message of biological female empowerment, Defendant has eligibility rules for contestants, including application deadlines and the requirement that contestants be "*natural* born female[s]." These rules are essential to create an equal playing field for all female contestants and to promote Defendant's message of what it means to be a woman—a *biological* female.

But according to Plaintiff, a man who identifies as a woman, Defendant *must* accept Plaintiff—even though Plaintiff missed the application deadline—and any other man who identifies as a woman, into its biological female-only competition—or Defendant discriminates based on gender identity, violates the Act, and faces crippling damages, attorneys' fees, mandatory training, and injunctions. *See* Complaint.

Thus, Plaintiff does not seek equal access, but seeks to fundamentally change Defendant's mission, alter its core message, and take away a level playing field from biological women competing for the pageant's crown. Oregon law does not allow this. Plaintiff cannot use it to co-opt Defendant's message, undermine its vision, or violate its constitutional free speech or free association rights.

Plaintiff's Complaint fails as a matter of law. Plaintiff filed this lawsuit too late, and the First Amendment to the United States Constitution, and the corresponding provision of the Oregon Constitution, (Article I § 8), protect Defendant's freedom to express the message of its choosing—not the message Plaintiff demands and can easily express elsewhere. Thus, the Court should dismiss Plaintiff's Complaint with prejudice.

## ALLEGED FACTS

Defendant showcases "beauty pageants for females" throughout the United States. (Complaint at ¶ 6.) It does so to "encourage *women* to strive to achieve their hopes, dreams, goals of, and aspirations, while making them feel confident and beautiful inside and out." *Id.* at ¶15 (emphasis added). And Defendant promotes "women empowerment, promoting positive self-image and advocating a platform of community service, which allows [its] contestants to rise by lifting others." Ex. A at 1; Complaint at ¶15.[1] Defendant's "motto is to empower women, inspire others, & uplift everyone!" Ex. A at 1. In all of this, Defendant promotes "community and '*sisterhood*" among pageant participants." Complaint at ¶ 15) (emphasis added).

To convey these messages of female empowerment, body-positivity, and community involvement, Defendant has eligibility requirements for its contestants. (Complaint at ¶ 20; Ex. A at ¶¶ 1-3.) One rule is that contestants be "*natural* born female[s]." *Id.* at ¶ 21; Ex. A at 1-3 (emphasis added). Other rules bolster Defendant's message. For example, Defendant forbids applicants who have "posed nude in film or print media." (Complaint at ¶ 20; Ex. A at 2-3.) Defendant also has age, residency, marital status, and maternity requirements which place the applicants into particular divisions (*i.e.* "Ms." division, "Mrs." division). Complaint at ¶ 20; Ex. A at 2-3.

---

[1] Exhibit A is a copy of Defendant's Oregon webpage. When a complaint "necessarily relies" on an outside document, a court may consider it if "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions" the document's authenticity. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). This Court may accept Exhibit A as part of the complaint because the complaint refers to and relies on Defendant's website and on Defendant's rules, located on that website. (Complaint at ¶¶ 2, 11, 15, 20; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (considering website referenced in a Complaint). When a document is incorporated by reference, a court can accept the contents of the incorporated document as true, *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003), and reject complaint allegations that are contradicted by the incorporated document, *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1008 (9th Cir. 2015).

After Defendant selects contestants and places them into relevant divisions, the contestants compete in several competitions: private and on-stage interviews, a sportswear or swimsuit competition, and an evening gown competition. Complaint at ¶ 11; Ex. A at 2-3. The winner is crowned a "titleholder." (Complaint at ¶ 13) And throughout, "beauty and *femininity* remain central" themes to Defendant's pageants. *Id.* at ¶ 1 (emphasis added).

Not only does Defendant convey its own messages, but it provides contestants with "speaking platforms." *Id.* at ¶ 19. These platforms give contestants the chance to "improve their public speaking skills" and "have a voice in a public forum." *Id.* at ¶ 17. Contestants' opinions often reach a vast audience because they "gain public and media exposure." *Id.*

Along with speaking platforms, Defendant provides contestants with other benefits designed to build self-confidence. *Id.* Contestants "engage in social and civic benefits, build their resume, earn scholarships, and travel." *Id.*

In speaking a particular view, Defendant is not unusual. While it conveys the message that being a "natural born female" is fundamental to what it means to be a woman, other pageants disagree. The Miss Universe pageant, for example, allows men who identify as women to compete and encourages them "to be viewed as equally feminine and as beautiful as their cisgender peers." *Id.* at ¶ 24. Other pageants also permit men who identify as women to compete. *Id.* at ¶¶ 24, 27-28.

In other words, different pageants promote and express *different* ideas about "womanhood." While Defendant defines and celebrates women based on their biological sex (*i.e.* their gender "assigned at birth"), other pageants define and promote women based on how they currently "identify." *Id.* at ¶¶ 3-4, 26.

On December 7, 2018, Plaintiff reached out to Ms. Tanice Smith (Defendant's Executive Director) through Facebook. Ex. B.[2] Plaintiff "inquired about participating in"

---

[2] The complaint "refers to" Exhibit B, Complaint at ¶¶ 14, 31-33, and it is "central to the plaintiff's claim" against Defendant, *id.* at ¶¶ 14, 32-33, 39. *See supra n*ote 1.

Defendant's programs. Complaint at ¶ 31. At Plaintiff's request, Ms. Smith gave Plaintiff a copy of Defendant's rules. Ex. B. After learning about the natural-born-female rule, Plaintiff told her that Plaintiff is "transgender." *Id.* Ms. Smith twice offered to help Plaintiff find another pageant, but Plaintiff declined. *Id.* Plaintiff then ended the conversation, saying Plaintiff would "talk to my attorney about this." *Id.*

Plaintiff began participating in pageants as an "openly transgender contestant" in 2017. (Complaint at ¶ 27. ) Since then, Plaintiff has competed in pageants in Montana, Oregon, and Nevada. *Id.* at ¶¶ 27-28. In 2019, Plaintiff became the Oregon Miss Earth Elite titleholder, which qualified Plaintiff to compete in the 2019 National Miss Earth Elite pageant. *Id.* at ¶ 28. Plaintiff participates in pageants to improve "public speaking skills," to obtain "a public *platform* in which to discuss important social issues," and to be "a positive and inspiring example…." *Id.* at ¶ 29 (emphasis added).

On January 29, 2019, Plaintiff submitted an entry fee and application to participate in one of Defendant's 2019 pageants. Ex. C.[3] Defendant declined that application because the "entry deadline for [the] 2019 pageant has passed" and Defendant was "not currently taking applications for [the] 2020 pageant." Ex. C.

Plaintiff then filed this lawsuit on December 17, 2019. Plaintiff accuses Defendant of violating the Act by only allowing pageant contestants who are biological women. (Complaint at ¶¶ 2, 35-40.) According to Plaintiff, the Act requires "public accommodation[s]" to provide "full and equal accommodations … without any distinction … on account of … sexual orientation" (defined to include gender identity), and, therefore, the Act requires Defendant to admit, promote, and celebrate biological men who identify as

---

[3] The complaint "refers to" Exhibit C (Complaint at ¶ 34), and it is "central to the plaintiff's claim" against Defendant, *id.* at ¶¶ 34, 39; *see supra n*ote 1; *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) (courts may consider documents upon which a plaintiff's claims are predicated). Likewise, the complaint alleges Defendant rejected the application on January 19, 2019, a date Exhibit C contradicts.

women because it does so for biological women. *Id*.; ORS 659A.403; ORS 174.100(7) "sexual orientation" means, among other things, "gender identity").

If someone violates the Act, they are subject to crippling damages and attorneys' fees. *See* ORS 659A.885(8) (outlining remedies). Indeed, Plaintiff seeks more than $75,000 from Defendant, plus fees and costs. (Prayer for Relief, ¶ 4(a)-(c).)

But Plaintiff wants more than damages. Plaintiff wants to change Defendant's *expression* by *forcing* it to remove the "natural born female" rule, allow biological men to freely participate and promote their definition of womanhood through Defendant, and to force Defendant's employees to undergo "training" to be reeducated. *Id*.

## ARGUMENT

The Court should dismiss Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(6) for failing to state a claim. To survive a 12(b)(6) motion to dismiss, a Complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). And though this Court must accept all factual allegations as true, it need not accept mere labels and legal conclusions. *Id*. This Court may also consider documents incorporated into the Complaint by reference. *See supra* notes 1 & 3. "To survive a Rule 12(b)(6) motion to dismiss, a Complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. "The plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully;" and "a court need not accept as true legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Patton v. Thomas*, 2011 WL 4544072 at *1 (D Or 2011) (Judge Mosman) (citations and internal quotations omitted). "A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and

continued litigation." *Unigestion Holdings, S.A. v. UPM Technology, Inc.*, 412 F.Supp.3d 1273, 1279 (D Or 2019) (Judge Simon citing a 9th Circuit case and granting the defendants' FRCP 2(b)(6) motion to dismiss). See also *Foley v. Wells Fargo Bank, N*.A., 772 F.3d 63, 72 (1st Cir 2014) ("A primary purpose of a Rule 12(b)(6) motion is to weed out cases that do not warrant reaching the oftentimes laborious and expensive discovery process because, based on the factual scenario on which the case rests, the plaintiff could never win.").

Plaintiff's Complaint fails to meet this standard for three reasons.

First, timeliness. Plaintiff complains about conduct that occurred more than a year before Plaintiff filed this lawsuit—after the Act's statute of limitations. And Plaintiff fails to allege that Defendant rejected the 2019 application on account of gender identity rather than because Plaintiff filed the application after Defendant's deadline.

Second, the First Amendment. It protects Defendant's speech and expressive association, and bars the Act from compelling Defendant to speak messages or to engage in associations that undermine Defendant's message. Plaintiff's requested relief would force Defendant to speak and associate in ways that undermine Defendant's message about empowering only *biological* women. That is unconstitutional as a matter of law according to the U.S. Supreme Court decisions in *Hurley* and *Dale*, and the decision of the Western District of Washington in *Apilado*, which applies *Hurley*, and other related cases discussed below.

Third, the Oregon Constitution protects Defendant's freedom to control its message even more broadly than the First Amendment. Plaintiff's requested relief would force Defendant to speak and associate in ways that undermine Defendant's message about empowering biologically born women in violation of the Oregon Constitution.

I.      **The Complaint fails to state a claim under the Act.**

   A.      **Plaintiff filed the Complaint more than a year after the alleged conduct occurred.**

Claims under the Act "must be commenced within one year of the occurrence of the unlawful practice." ORS 659A.875(4); OAR 839-003-0020(5). Plaintiff filed the Complaint on December 17, 2019. So, Plaintiff cannot state a claim based on anything before December 17, 2018.

But Plaintiff's claim partially relies on Facebook messages with Ms. Smith, Defendant's Executive Director. (Complaint at ¶¶ 31-33.) And though Plaintiff says these communications occurred on December 20, 2018 (Complaint at ¶ 31), they really occurred on December 7, 2018, as the Facebook messages show. Ex. B at 1. Because Exhibit B refutes Plaintiff's allegations, the Court should accept December 7, 2018 as the conclusive date of the Facebook communications. *See Johnson*, 793 F.3d at 1007-08 (ignoring breach of contract allegations contradicted by a deed of trust). Exhibit B also proves that Plaintiff had notice of any alleged Act violations on December 7, 2018: and Plaintiff rejected Ms. Smith's offer to help Plaintiff find another pageant by threatening to talk to an "attorney about this then because discrimination is unacceptable." Ex. B.

Because December 7, 2018 is more than a year before Plaintiff filed this Complaint, and because Plaintiff had notice of any possible claim at that time, Plaintiff's claim based on the Facebook messages is time-barred as a matter of law. *See Abukhalaf v. Morrison Child & Family Servs.*, 2009 WL 4067274, at *4-6 (D Or 2009) (applying one-year statute of limitations). Plaintiff should not be excused from violating the time limit set by the Oregon legislature.

   B.      **Plaintiff never alleges that Defendant declined Plaintiff's application because of "gender identity."**

The Court should also dismiss the Complaint because it fails to allege that Defendant rejected Plaintiff's 2019 application on account of gender identity.

The Act requires public accommodations to provide "full and equal" access "without any distinction, discrimination or restriction on account of" certain characteristics, including gender identity. ORS 659A.403(1). "On account of" means "by reason of" or "because of." *Klein v. Oregon Bureau of Labor & Indus.*, 410 P3d 1051, 1061 (Or App 2017), *vacated and remanded on other grounds,* 139 S. Ct. 2713 (2019). "Distinction, discrimination or restriction" means denial or unequal treatment. *King v. Greyhound Lines*, 656 P 2d 349, 351 (Or App 1982). Taken together, Plaintiff must allege Defendant denied Plaintiff access or treated Plaintiff unequally "because of" Plaintiff's gender identity. *Harrington v. Airbnb, Inc.*, 348 F. Supp. 3d 1085, 1089-90 (D Or 2018). Plaintiff fails to do that.

Although Plaintiff alleges Defendant denied Plaintiff's application, Plaintiff never alleges Defendant did so "on account of" gender identity.

And for good reason. Ms. Smith politely declined Plaintiff's application because Defendant's "entry deadline for our 2019 pageant ha[d] passed" before Plaintiff applied. Ex. C.[4] This had *nothing* to do with Plaintiff's gender identity. *See Rogers v. New York City Bd. of Elections*, 988 F. Supp. 409, 412 (S.D.N.Y. 1997) (mayoral candidate's exclusion from televised debate not discrimination when "he missed the deadline for inclusion in the program"). Defendant declined Plaintiff's application because it was late, *not* because of Plaintiff's gender identity.

Application deadlines are a necessity for Defendant. It operates "throughout the United States," organizes competitions for four divisions, and provides winners with prizes worth thousands of dollars. (Complaint at ¶¶ 6, 11, 16.) With so much to coordinate, and to be fair to applicants who comply with the rules, Defendant needs to apply administrative rules to function properly. That is all that happened here.

---

[4] Because Exhibit C is incorporated into the complaint by reference, the Court may "assume that its contents are true." *Ritchie*, 342 F.3d at 908; *see also supra* note 1.

**II.**     **Applying the Act to Defendant would violate its First Amendment free speech and free association rights under the U.S. Supreme Court's holdings in *Hurley* and *Dale*.**

   **A.**     **The Act would violate the First Amendment by compelling Defendant to speak a message it disagrees with.**

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018). In other words, the First Amendment protects a "fundamental rule"— "that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston.*, 515 U.S. 557, 573 (1995).

But Plaintiff seeks to violate this fundamental rule of constitutional law by forcing Defendant to speak messages about women it disagrees with. Specifically, Defendant (1) engages in protected speech through its pageant, and (2) Plaintiff demands access to this pageant, which thereby *force* Defendant to convey messages about women it disagrees with. This is forbidden compelled speech. *See Hurley*, 515 U.S. at 572-73 (analyzing these two factors to find compelled speech).[5]

And compelled speech like this must overcome strict scrutiny. *See Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.* (*Pacific Gas*), 475 U.S. 1, 19 (1986) (plurality) (applying strict scrutiny to a law compelling speech).

*Hurley* controls and thus deserves a full review before turning to the controlling test.

---

[5] Defendant can invoke a First Amendment affirmative defense against Plaintiff (a private party) because Plaintiff tries to use the Act and an order from this Court to regulate speech. *See Hurley*, 515 U.S. at 568-81 (deciding First Amendment defense in civil suit brought by private party); *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 436–37 (S.D.N.Y. 2014) (collecting cases justifying this usage).

**1.** ***Hurley* requires the dismissal of this case.**

*Hurley*—along with the *Dale* and *Apilado* cases (discussed below)—dictate the dismissal of this case based on the First Amendment.

In *Hurley*, the issue was "whether Massachusetts may require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey"—supporting the LGBTQ agenda. *Hurley*, 515 U.S. at 559. The Supreme Court held the First Amendment prohibited Massachusetts—through its very similar public accommodations antidiscrimination statute—from doing this. *Id*. So, this Court should reach the same result here and dismiss this case.

In *Hurley*, the petitioners were the South Boston Allied war Veterans Council, "an unincorporated association of individuals elected from various South Boston veterans groups," who had organized a parade since the 1940s. *Id*. at 560. The respondents were an LGBTQ organization (GLIB) that, like the transgender Plaintiff here asking to participate in defendant's pageant, wanted "to march in the parade as a way to express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals, to demonstrate that there are such men and women among those so descended, and to express their solidarity with like individuals who sought to march in New York's St. Patrick's Day Parade." *Id*. at 561.

After being refused access to the parade, GLIB filed suit in state court alleging violations of the state public accommodations law, which like Oregon's, prohibits "any distinction, discrimination or restriction on account of ... sexual orientation ... relative to the admission of any person to, or treatment in any place of public accommodation, resort or amusement." *Id*. The state court held the parade organizers violated the law by excluding GLIB based on its members' sexual orientation. *Id*. at 562. The state court also "rejected the notion that GLIB's admission would trample on the [parade organizers'] First Amendment rights." *Id*. at 563. The state supreme court affirmed. *Id*. at 564.

The U.S. Supreme Court in *Hurley* framed the disagreement between the parade organizers and GLIB as follows:

> [T]he disagreement goes to the admission of GLIB as its own parade unit carrying its own banner. Since every participating unit affects the message conveyed by the private organizers, the state courts' application of the statute produced an order essentially *requiring* petitioners to *alter* the expressive content of their parade. Although the state courts spoke of the parade as a place of public accommodation, once the *expressive* character of both the parade and the marching GLIB contingent is understood, it becomes apparent that the state courts' application of the statute had the effect of declaring the sponsors' speech itself to be the public accommodation. Under this approach any contingent of protected individuals with a message would have the right to participate in petitioners' speech, so that the communication produced by the private organizers would be shaped by all those protected by the law who wished to join in with some expressive demonstration of their own. But this use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his *own* message.

*Hurley*, 515 U.S. at 572-73 (internal citations omitted; emphasis added). The Court went on to explain how the parade "speaks":

> Rather like a composer, the Council selects the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in the Council's eyes comports with what merits celebration on that day. Even if this view gives the Council credit for a more considered judgment than it actively made, the Council clearly decided to *exclude* [an LGBTQ] message it did not like from the communication it chose to make, and that is enough to invoke its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another. The message it disfavored is not difficult to identify. Although GLIB's point (like the Council's) is not wholly articulate, a contingent marching behind the organization's banner would at least bear witness to the fact that some Irish are gay, lesbian, or bisexual, and the presence of the organized marchers would suggest their view that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals and indeed as members of parade units organized around other identifying characteristics. The parade's organizers may not believe these facts about Irish sexuality to be so, or they may object to unqualified social acceptance of gays and lesbians or have some other reason for wishing to keep GLIB's message out of the parade. But whatever the reason, it boils down to the choice of a speaker *not* to propound a particular point of view, and that choice is presumed to lie *beyond* the government's power to control.

*Id.* at 574-75 (emphasis added).

Applying the state public accommodations law to the parade violated its First Amendment rights. This was so because even though the law was "a piece of protective legislation that announces no purpose beyond the object both expressed and apparent in its provisions, which is to prevent any denial of access to (or discriminatory treatment in) public accommodations on proscribed grounds, including sexual orientation," when the law was applied to expressive activity (the parade) "its apparent object is simply to require speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with messages of their own." *Id.* at 578. But this object was unconstitutional because it merely "allow[ed] exactly what the general rule of speaker's autonomy forbids." *Id.*

The Court went even further in its criticism of this application of the law:

> The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis. While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government.

*Id.* at 579.

For all of these reasons, the Court reversed the state court's decision, and concluded that the parade could not be forced to include LGBTQ marchers who violated the parade organizers' "autonomy to choose the content" of their message. *Id.* at 566, 572-573. This Court must follow *Hurley* and should dismiss this case.

**2. Defendant engages in protected speech.**

Defendant engages in protected speech because it communicates a message of biological, natural born female empowerment through its pageant.

Defendant's Motion to Dismiss and Supporting Memorandum of Law                                          13

While its pageant is not a pamphlet or a political oration, "the Constitution looks beyond written or spoken words as mediums of expression." *Hurley*, 515 U.S. at 569. The First Amendment routinely protects efforts of groups to publicly convey messages, such as in parades (*Hurley*, 515 U.S. at 569), marches (*National Socialist Party of America v. Skokie*, 432 U.S. 43 (1977)), stage productions (*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)), sit-ins (*Brown v. Louisiana*, 383 U.S. 131 (1966)), concerts (*Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 566 (9th Cir. 1984)), weddings (*Kaahumanu v. Hawaii*, 682 F.3d 789, 799 (9th Cir. 2012)), and political boycotts (*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)).

Likewise, "live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee." *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981). *See also Berger v. City of Seattle*, 569 F.3d 1029, 1036 n.4 (9th Cir. 2009) (en banc) (street performances are "performance art" protected by First Amendment); *White v. City of Sparks*, 500 F.3d 953, 955 (9th Cir. 2007) ("[T]he Supreme Court has been clear that the arts and entertainment constitute protected forms of expression under the First Amendment…"); *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 389 (4th Cir. 1993) ("First Amendment principles governing live entertainment are relatively clear: short of obscenity, it is generally protected.").

Pageants fall within this framework. Pageants are simultaneously a competition, live-entertainment show, group production, and televised event. Like a parade or a play, beauty pageants exist to communicate messages to audiences. *See Norma Kristie, Inc. v. City of Okla. City*, 572 F. Supp. 88, 91 (W.D. Okla. 1983) (pageant for men impersonating women was protected speech); Complaint at ¶ 1 ("comparisons of beauty and femininity remain central to the theme of pageants").

Through its "*Miss* United States of America" pageant, Defendant encourages *biological* women, promotes positive self-images, advocates community service, and provides contestants with a network of support. Complaint at ¶¶ 15, 17; Ex. A. Defendant also speaks through its contestants by giving them "a voice in a public forum" and an opportunity to "gain public and media exposure." (Complaint at ¶ 17.) While "a narrow, succinctly articulable message is not a condition of constitutional protection," *Hurley*, 515 U.S. at 569, the Complaint's allegations underscore the message and expressive nature of Defendant's pageant.

Because Defendant's pageant is protected speech, like the *Hurley* parade, "[t]he selection of" contestants "to make" this pageant "is entitled to similar protection." *Hurley*, 515 U.S. at 570. Like a television or film producer, Defendant can cast who performs in its entertainment event because that casting decision affects the content of its production. As a federal court held about the reality-television show, *The Bachelor*, "casting decisions are part and parcel of the creative process behind a television program … thereby meriting First Amendment protection …" *Claybrooks v. Am. Broad. Cos., Inc.*, 898 F. Supp. 2d 986, 993 (M.D. Tenn. 2012).

Like a film or television show, Defendant shapes its message of biological female empowerment by choosing contestants through its eligibility rules. For example, to communicate that women are biological females, Defendant only allows *natural born* females to participate in its pageant, compete for Defendant's title, and be promoted through Defendant's platform. Likewise, to promote body positivity and pageant contestants as community role models, Defendant excludes applicants who have "posed nude in film or print media." (Complaint at ¶ 20; Ex. A at 2-3.) To signify that womanhood is not tied to citizenship, marital status, or childbearing, Defendant accepts U.S. citizens and residents, unwed women, women in opposite-sex marriages, women in same-sex marriages, and

women with and without children. Ex. A at 2-3. In all these ways, Defendant engages in protected speech.

**3. Plaintiff's requested relief compels Defendant to speak in violation of the First Amendment.**

Because Defendant speaks through its pageant and through selecting who participates in it, Plaintiff's requested relief would change Defendant's speech and alter the content of that speech by compelling Defendant to accept and promote Plaintiff as a female contestant.

According to Plaintiff, Defendant *must* allow Plaintiff and other biological men who identify as women to participate in Defendant's pageant or Defendant violates the Act. Complaint at ¶¶ 2, 22-23.) But this compulsion would force Defendant to promote the message that biological men who identify as women are "women," and that such men can be and should be considered women and celebrated as women.

Under *Hurley*, that unconstitutionally compels Defendant to speak.

Since *Hurley*, courts have repeatedly applied it to preserve speakers' autonomy to select who may participate in their expressive events, recognizing that participation affects expression. *Warden v. Miranda*, 751 F. App'x 1030, 1031 (9th Cir. 2019) (rally properly excluded protester "seeking to spread his discordant message"); *Claybrooks*, 898 F. Supp. 2d at 990 (applying *Hurley* to conclude that television producers could not be compelled to allow and promote particular participants in reality-television show); *Gathright v. City of Portland*, 439 F.3d 573, 577-78 (9th Cir. 2006) (*Hurley* protects right to choose who participates in speech).

These cases apply here. Like a parade, festival, television show, theater production, or film, a pageant conveys its message in part based on who the pageant allows to compete, who the pageant promotes on stage, what messages those contestants speak, and what their participation conveys to the public. *Thelma & Louise* would convey a much different message if it starred men instead of women. *See also Miller v. Texas State Bd. of Barber*

*Examiners*, 615 F.2d 650, 654 (5th Cir. 1980) ("[I]t is likely that a black actor could not appropriately portray George Wallace, and a white actor could not appropriately portray Martin Luther King, Jr.").

So too with Defendant's pageant. Defendant cannot convey its message of empowering, encouraging, and celebrating *biological* women if it is forced to allow biological men to participate in, compete in, and be promoted as women in Defendant's pageant. Plaintiff's participation would radically transform *Defendant's* message: from celebrating biological women as women to celebrating biological men as women.

Indeed, Plaintiff's entire lawsuit is premised on *changing* Defendant's message. Plaintiff seeks to access Defendant's "speaking platforms" and "media exposure." (Complaint at ¶ 19.) Plaintiff intends to use these privileges and to use access to Defendant's pageant to "be a positive and inspiring example to all women." *Id.* at ¶ 29. To be sure, many may consider Plaintiff's goals and message "laudable." *Claybrooks*, 898 F. Supp. 2d at 1000. But "the First Amendment prevents [Plaintiff] from effectuating these goals by forcing" Defendant "to 'showcase' a more progressive message." *Id.* (granting a motion to dismiss an anti-discrimination claim because forcing a reality television show to cast particular contestants would violate First Amendment). "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment…" *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976).

Many courts agree. Speakers have the right to control *who* competes in, affects, and delivers their expressive content. *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 962 (9th Cir. 2010) (newspaper could select its writers because "[t]o the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice").

**4. Plaintiff's requested relief would alter, be triggered by, and award access based on content and viewpoint.**

Although Defendant meets the *Hurley* test for compelled speech, the Act compels Defendant's speech in a particularly troubling way: based on content and viewpoint. Content and viewpoint regulations also trigger strict scrutiny. *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019).

Plaintiff's requested relief regulates based on content and viewpoint in numerous ways. For one, Plaintiff forces Defendant to change the content of its pageant and to speak a message it does not want to. *See supra* § II.A.2. And "mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). *See also Klein*, 410 P.3d at 1069 (affirming same point).

Next, Plaintiff's requested application "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). Plaintiff does not seek to impose the Act if Defendant promotes only women of a certain height or political party. It is *only* because Defendant seeks to promote *biological* women that Plaintiff invokes the Act to punish Defendant. *See* Complaint at ¶ 24 (admitting that the Act does not affect the "Miss Universe pageant franchise" because it includes men who identify as women).

In this way, Defendant's "expression of a particular viewpoint [promoting biological females] triggered an obligation to permit other speakers [men who identify as women], with whom [Defendant] disagreed, to use [Defendant's pageant] to spread their own message." *Pacific Gas*, 475 U.S. at 12-14. That imposes a "content-based penalty" and makes the regulation "content based." *Id.* at 13.

Finally, Plaintiff's requested relief regulates based on viewpoint because it only awards access to those expressing particular views. Indeed, Plaintiff does not seek to force

Defendant to open its pageant to the "public at large" or to Republicans or Democrats. Plaintiff's demanded "[a]ccess is limited to persons or groups … who disagree with [Defendant's] views…"and who seek to "disseminate hostile views"—*i.e.,* the view that men who identify as women are women. *Pacific Gas*, 475 U.S. at 10. The natural result is that Defendant will be deterred from speaking its preferred view in order to avoid violating the Act. *Id*. That result makes Plaintiff's requested relief a viewpoint-based regulation. *Id*.

### B.    The Act would violate the First Amendment by forcing Defendant to expressively associate.

Not only would Plaintiff's requested relief compel Defendant to "speak," it would also compel it to expressively "associate." The First Amendment protects the right "to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). And the government may not infringe this right by, for example, forcing "inclusion of an unwanted person in a group" if doing so affects "the group's ability to advocate public or private viewpoints." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).

In other words, the "[f]reedom of association ... plainly presupposes a freedom *not* to associate." *Roberts*, 468 U.S. at 623 (emphasis added).

The Supreme Court uses a three-step test to make this determination: (1) the group must "engage in some form of expression," *Dale*, 530 U.S. at 648; (2) "the forced inclusion" must "significantly affect the [organization's] ability to advocate public or private viewpoints," *id.* at 650; and (3) the application in question must satisfy strict scrutiny, *id*. at 656-657. Defendant satisfies each of these factors, and the Court should dismiss this case. *See infra* §§ II.B.2-3 (discussing first two factors); § II.C (discussing strict scrutiny for both compelling speech and association).

But before reviewing that test, a summary of *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), and *Apilado v. North American Gay Amateur Athletic Alliance*, 792 F. Supp. 2d

1151 (W.D. Wash. 2011), which applies *Hurley* and *Dale*, shows how these cases are also dispositive of this one.

1. **The U.S. Supreme Court's decision in *Dale*, and the federal trial court's decision in *Apilado*, also dictate the dismissal of this case.**

The Supreme Court's decision in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), relying heavily on *Hurley*, also supports the Court holding that Plaintiff's lawsuit seeks to improperly infringe on Defendant's First Amendment rights. So, the Court should dismiss this case.

In *Dale*, the petitioners were the Boy Scouts of America and one of its councils, a division of the Boy Scouts of America. *Dale*, 530 U.S. at 643. "The Boy Scouts asserts that homosexual conduct is inconsistent with the values it seeks to instill." *Id.* at 644. The respondent was James Dale, "a former Eagle Scout whose adult membership in the Boy Scouts was revoked when the Boy Scouts learned that he is an avowed homosexual and gay rights activist." *Id.* Dale filed a discrimination complaint against the Boy Scouts, complaining—just like plaintiff here— that the Boy Scouts had violated New Jersey's public accommodations statute by revoking Dale's membership based solely on his sexual orientation. *Id.* at 645. New Jersey's public accommodations statute, like Oregon's, prohibits discrimination on the basis of sexual orientation in places of public accommodation. *Id.* Like here*,* the issue was whether applying New Jersey's public accommodations law to force the Boy Scouts to readmit Dale violated the Boy Scouts' First Amendment right of expressive association. *Id.* at 644.

The Supreme Court said that "[f]orcing a group to accept certain members may impair the ability of the group to express those views, and *only* those views, that *it* intends to express." *Id.* at 648 (emphasis added). The Boy Scouts engaged in expressive association because they sought to "to transmit … a system of values." *Id.* at 650.

Because "the Boy Scouts engages in expressive activity" the Court had to decide "whether the *forced inclusion* of Dale as an assistant scoutmaster would significantly affect the Boy Scouts' ability to advocate public or private viewpoints." *Id.* (emphasis added).

The Boy Scouts asserted that "homosexual conduct is inconsistent with the values" of being "'morally straight' and 'clean,'" its teachings "that homosexual conduct is not morally straight," and its desire not "to promote homosexual conduct as a legitimate form of behavior." *Id.* at 650-651. After giving "deference to" the Boy Scouts' "assertions regarding the nature of its expression," the Court then had to "determine whether Dale's presence as an assistant scoutmaster would significantly burden the Boy Scouts' desire to 'not promote homosexual conduct as a legitimate form of behavior.'" *Id.* at 653.

Dale was "one of a group of gay Scouts" who had "'become leaders in their community and are open and honest about their sexual orientation.'" *Id.* Therefore, Dale's "presence in the Boy Scouts would" have forced the Boy Scouts "to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id.*

That message was "inconsistent with the values" the Boy Scouts seek to instill in its members, and "the presence of Dale as an assistant scoutmaster would surely interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs." *Id.* at 654.

In reaching this conclusion, the Supreme Court observed that associations "do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment." *Id.* at 655. Instead, an "association must merely engage in expressive activity that could be impaired in order to be entitled to protection." *Id.*

Because the inclusion of Dale "would significantly affect" the Boy Scouts' expression, the Court finally looked into "whether the application of New Jersey's public

accommodations law to require that the Boy Scouts accept Dale as an assistant scoutmaster runs afoul of the Scouts' freedom of expressive association."

New Jersey's public accommodations law "does not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association." *Id.* at 659.

Next, because it applies *Dale* to similar facts—but with the "tables turned," the Court should consider the decision of its sister court in *Apilado v. North American Gay Amateur Athletic Alliance.*, 792 F. Supp. 2d 1151 (W.D. Wash. 2011).

*Apilado* "arises from the disqualification of a softball team from the 2008 Gay Softball World Series" by North American Gay Amateur Athletic Alliance (NAGAAA), because the team violated its rule limiting each team to a maximum of two heterosexual players. *Id.* at 1155. Plaintiffs, two straight members of the team, asked the court to rule that NAGAAA "unlawfully discriminated against Plaintiffs based on their actual or perceived sexual orientation." *Id.* at 1156.

NAGAAA was an expressive association "well within the wide boundaries that the Supreme Court has drawn." *Id.* at 1161. NAGAAA's mission was to "promote amateur sports competition, particularly softball, for all persons regardless of age, sexual orientation or preference, with special emphasis on the participation of members of the gay, lesbian, bisexual and transgender (GLBT) community." *Id.*

In *Apilado*, like here, the question was, under *Dale*, "whether *forcing* NAGAAA to *include* an unlimited number of heterosexual players would significantly affect its expressive activity." *Id.* at 1162 (emphasis added) The court held it "would be difficult for NAGAAA to effectively emphasize a vision of the gay lifestyle rooted in athleticism, competition and sportsmanship if it were prohibited from maintaining a gay identity." *Id.* "NAGAAA's efforts to promote an athletic, competitive, sportsmanlike gay identity, with a unique set of values" are "protected by the First Amendment. " *Id.* Therefore "[f]orced inclusion of

straight athletes would *distract* from and *diminish* those efforts." *Id.* (emphasis added). When deciding whether the admission of someone would interfere with a chosen expressive purpose, "the Supreme Court requires a degree of judicial deference." *Id.* at 1161 (citing *Dale*, 530 U.S. at 653). And courts defer here regardless of the popularity of any view: "'it is not the role of the courts to reject a group's expressed values because they disagree with those values or find them internally inconsistent.'" *Apilado*, 792 F. Supp. 2d at 1162 (quoting *Dale*, 530 U.S. at 650).

For these reasons, NAGAAA could not be compelled to include heterosexuals: The First Amendment protected the league's freedom to exclude heterosexuals because their "membership would negatively impact *[NAGAAA's]* expressive activity." *Id.* at 1156.

The court in A*pilado* finally considered whether "NAGAA's interest in expressive association outweighs the state's interest in eradicating discrimination." *Id.* at 1163. For that, the plaintiffs had failed to show the state had a compelling interest in eradicating discrimination through forcing "heterosexuals to play gay softball." *Id. See also Kristie v. City of Oklahoma City*, 572 F Supp 88, 89-92 (D Ok 1983) (holding that the **"**Miss Gay America Pageant," which involves "men dressing as women," and "the competition is based on the way a person transforms himself through the art of illusion" to "look like a woman" is an "expressive activity" and is "therefore subject to the strictures of the First Amendment," because "the First Amendment is not an art critic. Plaintiff's production includes a talent competition with singing and dance," which is protected, **and** "government officials at all levels must shoulder the responsibility of following the law and upholding the Constitution, even when to do so is unpopular.") (citation omitted).

*Hurley, Dale, Apilado*, and *Kristie* provide the framework for applying *Dale*'s three-part test for First Amendment freedom of association. Applying that framework here, the Court should dismiss plaintiff's Complaint.

### 2. Defendant engages in expression.

At step one, the Supreme Court in *Dale* found the Boy Scouts engaged in expression by looking at its mission statement and how its members instilled certain values, "both expressly and by example," through instruction and activities like camping. *Dale*, 530 U.S. at 649-650. Notably, the First Amendment protects expression of popular and unpopular views, and "the fact that an idea may be embraced and advocated by increasing numbers of people is all the *more* reason to protect the First Amendment rights of those who wish to voice a different view." *Id*. at 660 (emphasis added). Also, *Kristie* specifically holds that a beauty pageant is an "expressive activity" subject to First Amendment protection.

In deciding whether an organization is expressive, courts must "give deference to an association's assertions regarding the nature of its expression." *Id*. at 685. Like the Boy Scouts, a gay softball league, and the pageant in *Kristie*, Defendant satisfies the low bar for expression. As shown above, Defendant engages in expression. *See supra* §II.A.1. And Defendant has a clear mission: to empower, promote self-confidence in, and provide community service platforms for *biological* women. Ex. A at 1 (emphasis added). Defendant helps instill these values by providing contestants with "the opportunity to boost their confidence, improve their public speaking skills, have a voice in a public forum, gain public and media exposure, engage in social and civic benefits, build their resume, earn scholarships, and travel." (Complaint at ¶ 17.) Defendant does this while also encouraging community and "sisterhood" among contestants. *Id*. at ¶ 15; Ex. A at 1. In all of these ways, Defendant engages in expression under *Dale* and *Apilado* ,just like the pageant in *Kristie* was held entitled to First Amendment expressive activity protection.

### 3. The Act significantly affects Defendant's expression.

At step three, "forced inclusion of an unwanted person in a group infringes the groups' freedom of expressive association if the presence of that person affects in a

significant way the group's ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 648. And again, courts "give deference to an association's view of what would impair its expression." *Id.* at 653.

The logic and holdings of *Hurley*, *Dale,* and *Apilado*—which prohibit the forced inclusion of persons who significantly burden an association's expression—apply here. Defendant seeks to empower, encourage, and promote only natural born women. Ex. A at 1. So, if Plaintiff could force men who "identify" as women to compete in, promote themselves in, and speak conflicting messages during Defendant's pageant, that would significantly affect Defendant's message, just like *Dale* holds that the Boy Scouts cannot be forced to accept gay scoutmasters.

 Defendant cannot authentically or persuasively promote its message of empowering biological women if Defendant is forced to celebrate and promote biological men who identify as women. *See Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 820-823 (E.D. Mo. 2018) (prolife group "would be hindered if they were required to employ dissenters from their pro-life message").

This conflict is doubly apparent here because of Plaintiff's activism as a transgender pageant contestant. As *Dale* noted, the gay assistant scoutmaster's presence in the Boy Scouts would have especially affected its expression because he was a "leader[] in [his] community," "open and honest about [his] sexual orientation," "copresident of a gay and lesbian organization at college," and "remains a gay rights activist." *Dale*, 530 U.S. at 653. In the same way, Plaintiff competes as an "openly transgender contestant" and wants to use Defendant to be elevated as "a positive and inspiring example to all women." (Complaint at ¶¶ 27, 29.) Plaintiff cannot undermine Defendant's desired message this way. Doing so would violate the First Amendment, as held in *Hurley*, *Dale*, and *Apilado*.

**C.**    **The Act fails strict scrutiny if applied as Plaintiff requests.**

Because Plaintiff's requested relief violates Defendant's First Amendment rights, this application must survive strict scrutiny. To pass that test, Plaintiff must show the requested relief is narrowly tailored to serve a compelling interest. *Reed*, 135 S. Ct. at 2226; *Dale*, 530 U.S. at 648. Plaintiff cannot do so.

First, Plaintiff will invoke the need to stop gender identity discrimination generally. But strict scrutiny "look[s] beyond broadly formulated interests" to consider "the asserted harm of granting *specific* exemptions to particular … claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (emphasis added).

So, the question is not whether ending status discrimination by restaurants or hotels or businesses *generally* serves compelling interests. Rather, the question is whether a state law serves compelling interests when forcing *one* beauty pageant to speak and expressively associate contrary to its core convictions. *See Apilado*, 792 F. Supp. 2d at 1163.

The answer to this question is "no." Indeed, the Supreme Court has already recognized that state public accommodations laws are not even legitimate interests when compelling speech or expressive association. *Dale*, 530 U.S. at 659 ("The state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association."); *Hurley*, 515 U.S. at 578 (a Massachusetts public accommodations law had no "legitimate end" when applied to "require speakers to modify the content of their expression").

Other courts agree. There is no anti-discrimination exception to the First Amendment. *See Telescope Media Grp. v. Lucero* (*TMG*), 936 F.3d 740, 752-56 (8th Cir. 2019) (anti-discrimination law could not force filmmakers to celebrate same-sex weddings); *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 904, 913-914 (Ariz. 2019) (anti-discrimination law could not compel artists to create same-sex wedding invitations).

This conclusion is particularly apt here because Plaintiff already participates in other pageants in Oregon. (Complaint at ¶ 28.) Indeed, Plaintiff is the 2019 Oregon Miss Earth Elite titleholder. *Id*. And Plaintiff has also competed in pageants in Montana and Nevada, and "other pageant programs include transgender females." *Id*. at ¶¶ 24, 27-28. Plaintiff's participation in these pageants have provided Plaintiff with significant benefits. *Id.* at ¶ 29. Because Plaintiff and others can so easily access these *other* pageants and convey their message elsewhere, there is no reason to violate Defendant's constitutional rights by forcing it to accept plaintiff, particularly because the requested intrusion on Defendant's rights is so severe. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning…" *Janus*, 138 S. Ct. at 2464. *See also Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*, 138 S. Ct. 1719, 1747-1748 (2018) (Justice Thomas, concurring) ("It is one thing to conclude that the Constitution protects a right to same-sex marriage; it is something else to portray everyone who does not share [that view] as bigoted" and unentitled to express a different view, and "in future cases the freedom of *speech* could be *essential*" to preventing the Supreme Court's approval of gay marriage "from being used to stamp out every vestige of dissent" and "vilify Americans who are unwilling to assent to the new orthodoxy.") (emphasis added).

Moving to "narrow tailoring," Plaintiff fails there too. To be narrowly tailored, a requirement cannot be "under-inclusive" or "over-inclusive." *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018). And the requirement must also be the "least restrictive means among available, effective alternatives." *Id* at 1198 (cleaned-up).

But Plaintiff cannot satisfy these requirements because Plaintiff already can (and has) accessed and won other pageants. The narrowly tailored solution is to let Plaintiff promote Plaintiff's message in these other pageants, and let Defendant promote its different message in its own pageant.

Courts frequently allow these expressive choices, either by interpreting public accommodation laws not to cover expressive organizations, or by allowing organizations to make decisions to control their speech and expressive association under these laws. *See, e.g.*, *TMG*, 936 F.3d at 757 (anti-discrimination law could still effectively regulate discriminatory conduct without regulating speech); *Treanor v. Washington Post Company*, 826 F. Supp. 568, 569 (D.D.C. 1993) (refusing to consider a newspaper a public accommodation because a contrary interpretation "requiring newspaper editors to publish certain articles or reviews would likely be inconsistent with the First Amendment.").

Public accommodations typically do not compel speech or expressive association, yet still achieve their goals of stopping discrimination. There is no valid reason to change this general practice here.

### D.    Forcing Defendant to speak and associate endangers speakers of all different viewpoints.

Plaintiff's Complaint seeks to compel Defendant to open its live entertainment event to biological men and thereby *force* Defendant to alter the content of its event, and speak a message Defendant disagrees with. While this lawsuit only seeks relief against Defendant, the legal principle it advances reaches far beyond this case and these parties.

Take the pageant context first. Many pageants select participants to further their message. Ruling for Plaintiff would enable anyone to compel these other pageants to speak messages they disagree with. The Miss Gay America Pageant, for example (which only allows men who impersonate women[6]), could be forced to include anyone regardless of sex. *Kristie,* 572 F. Supp. at 90. Or the Miss Native American Pageant could be forced to accept

---

[6] *Complete MGA Handbook*, Miss Gay America, http://www.missgayamerica.com/complete-mga-handbook.html  (last visited Feb. 4, 2020)

any woman regardless of national origin.[7] And then the Miss Black USA pageant could be compelled to include all Caucasians who "identify" as Black.[8]

But the ramifications do not stop there. Plaintiff's theory would justify forcing a gay softball league designed to "promot[e] athletic competition and physical health in support of the gay lifestyle" to allow heterosexual players. *Apilado*, 792 F. Supp. 2d at 1162. Or force homeless shelters designed to help women suffering from sex-trafficking to allow men to sleep next to those hurting women. *See Downtown Soup Kitchen v. Municipality of Anchorage*, 406 F. Supp. 3d 776 (D. Alaska 2019) (enjoining an attempt to apply public accommodations law this way).

Even individual speakers would lose their freedom. Plaintiff's theory would justify forcing an atheist "whose business is writing commissioned music" to compose music for an Easter service. *Klein*, 410 P.3d at 1069. Or force a Christian painter "who holds strong religious convictions against same-sex marriage" to paint a same-sex "couple kissing at an altar." *Id*. The implications are staggering.

So, in the end, this case is not only about one pageant's ability to express its message of biological, natural born female empowerment. It is about the freedom of *all* speakers to engage in "free debate and free exchange of ideas," and "to speak freely and to promote diversity of ideas" without the fear of being sued for claimed emotional distress damages and attorneys' fees because someone disagrees with their views. *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). After all, this unique feature of American life is what "sets us apart from totalitarian regimes" and protects all viewpoints equally. *Id. See also Masterpiece Cakeshop*, 138 S. Ct. at 1747-1748 (Justice Thomas, concurring) ("It is one thing… to

---

[7] *Register*, Miss Native American Pageant, http://www.missnativeamericanusa.com/register.html (last visited Feb. 4, 2020) (noting contestants must be at least a quarter Native American).

[8] *Eligibility*, Miss Black USA, https://www.missblackusa.org/eligibility (last visited Feb. 4, 2020) (listing eligibility requirements).

conclude that the Constitution protects a right to same-sex marriage; it is something else to portray everyone who does not share [that view] as bigoted" and unentitled to express a different view, and "the freedom of speech could be essential" to preventing the Supreme Court's approval of gay marriage "from being used to "stamp out every vestige of dissent").

### III.   The Act would also violate the Oregon Constitution by restraining Defendant's expression.

Article I § 8 of the Oregon Constitution prohibits laws from "restraining the free expression of opinion, or restricting the right to speak, write or print freely on any subject whatever." Under this clause, a law unconstitutionally applies to expression if (A) it "reach[es] privileged [i.e. protected] communication;" (B) enforcement of the law "burdens [the speaker's] right of free speech;" and (C) the burden on expression is impermissible. *City of Eugene v. Miller*, 871 P.2d 454, 460 (Or 1994) (referencing elements). Defendant satisfies each element.

#### A.   Defendant engages in protected communication.

Article I § 8 is "*broader*" than the First Amendment "and covers *any* expression of opinion." *State v. Henry*, 732 P.2d 9, 11 (Or 1987) (emphasis added). Expression of opinion refers to an "expression that, in some way, appraises or judges an object, person, action, or idea," and even verbal statements, nonverbal cues, or anything "designed to convey something about the communicator's world view." *State v. Ciancanelli*, 121 P.3d 613, 619 (Or 2005)

Because Defendant engages in speech under the First Amendment, it also engages in protected expression under the even broader clause of Oregon's Constitution. *See supra* § II.A.1 (explaining how Defendant communicates a message about biological female empowerment). Indeed, the Oregon Supreme Court holds that "a live public show in which performers engage in certain sexual conduct" is "expression." *Ciancanelli*, 121 P.3d at 636. If this is expression, then, as a matter of law, defendant's pageant is as well.

**B.    The Act burdens Defendant's expression.**

The Act burdens Defendant's expression in three ways.

First, the Act threatens to crush Defendant with alleged damages and attorneys' fees if it continues to promote its desired message of biological female empowerment. *See supra* § II.A.2-3 (explaining this point); ORS 659A.885(8) (outlining remedies for violations). Threatening to punish Defendant for speaking only its desired message in turn discourages Defendant from speaking at all. *Supra* § II.A.2-3 (explaining how compelling speech can also deter speech). *See also Merrick v. Board of Higher Education*, 841 P.2d 646, 651 (Or App 1992) a law is unconstitutional when its "practical effect is to chill speech and other expression"). In this sense, the Act functionally bans Defendant's desired speech. *See Ciancanelli*, 121 P.3d at 634 (law banning certain expression was an unconstitutional restraint); *City of Eugene*, 871 P.2d at 460 (law banning book sales was an unconstitutional restraint). *See also Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256-258 (1974) (law deterred newspaper from publishing desired editorials for fear of being required to publish undesirable responses).

Second, the Act undermines and dilutes Defendant's message by forcing Defendant to allow biological men who "identify" as women to compete in its pageant. Credibility is part of the persuasiveness of any speaker. Defendant's message uplifting biological, natural born women is much less credible if Defendant must also promote men who identify as women.

Third, the Act treats Defendant's speech "more restrictively" than other speakers. *City of Eugene*, 871 P.2d at 460 (this selectivity burdens expression). Specifically, Plaintiff interprets the Act to allow pageants to accept and celebrate biological females, and men who identify as women, but Plaintiff seeks to punish Defendant for promoting only biological women. This disparate treatment turns on the message each pageant promotes. And that is impermissibly burdensome.

**C.    The Act impermissibly burdens Defendant's expression.**

The Act impermissibly burdens Defendant's expression because it (1) is "directed at the content" of Defendant's expression and (2) does not "advance[] legitimate state interests …" *State v. Babson*, 326 P.3d 559, 575 (Or 2014).[9]

First, the Act is directed at the content of Defendant's expression because the law is triggered by (and thereby deters) Defendant's choice to only celebrate natural born females. *See supra* § II.A.4 (explaining this point); *see also Fidanque v. State ex rel. Or. Gov't Standards and Practices Comm'n*, 969 P.2d 376, 379 n.4 (Or 1998) (noting apparently neutral regulation had the effect of restricting political speech). In so doing, the Act treats Defendant's speech "differently on the basis of the content of [its] message." *Outdoor Media Dimensions, Inc. v. Department of Transportation,* 132 P.3d 5, 16 (Or 2006).

Second, the Act does not advance legitimate state interests when it selectively compels and deters Defendant's message about empowering only biological women. *See supra* § II.C (explaining this point); *see also Outdoor Media*, 132 P.3d at 17 (finding no legitimate interest in "prohibit[ing] some expression, while permitting other expression simply because the latter concerns a different subject"); *Deras v. Myers*, 535 P.2d 541, 549 (Or 1975) ("[N]ot even a compelling state interest … can justify infringement of fundamental rights when less drastic means" are available.).

## CONCLUSION

Defendant wants and is allowed to promote, celebrate, and encourage biological, natural born women around the country. If Plaintiff's demands are met, not only Defendant, but speakers of all sorts—from large television and film studios to local theatre groups— would be forced to speak and associate with messages they oppose. Both they and their audiences would lose out on distinctive messages challenging our beliefs and exposing us to

---

[9] A law must also provide alternatives for communication. *Babson*, 326 P.3d at 575. But the Act does not even clear the first two requirements here.

new or different ideas. This Court should not allow that to happen. It should uphold the U.S.

Constitution by following *Hurley* and *Dale*—and Oregon's Constitution, and dismiss

Plaintiff's Complaint with prejudice.

Respectfully submitted this 10th day of February, 2020.


By: s/ John Kaempf   

John Kaempf, OSB No. 925391
**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue, Suite 1414
Portland, Oregon 97204
Phone: (503) 224-5006
john@kaempflawfirm.com

Attorney for Defendant

# EXHIBIT A



UNITED STATES of *America* PAGEANTS are designed to encourage women to strive to ACHIEVE their hopes, dreams, goals, and aspirations, while making them feel CONFIDENT and BEAUTIFUL inside and out! We believe the true definition of beauty is *"The unique set of combinations that make you, You!"* Our motto is to EMPOWER Women, INSPIRE others, & UPLIFT everyone! We focus on women empowerment, promoting positive self-image and advocating a platform of community service, which allows our contestants to rise by lifting others. But more importantly we are an elite sisterhood that gives support and encouragement to inspire each delegate to be the best version of herself!

*"There is no tool for development, more effective than the empowerment of women"* -Kofi Annan

## ELIGIBILITY REQUIREMENTS & AREAS OF COMPETITION
As of January 1, 2020

### UNITED STATES OF AMERICA'S TEEN

**ELIGIBILITY REQUIREMENTS**
1. Is between 13-17 years of age
2. Is a U.S. citizen or has been granted Permanent Residency by the United States
2. Is a resident, works, or goes to school in the state they are competing.
3. Is a natural born female.
4. Has never posed nude in film or print media.
5. Is single, not married, has never been married & has never given birth.

**AREAS OF PRELIMINARY COMPETITION**
Personal Interview- 25%
Sports wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 25%

**AREAS OF FINAL COMPETITION**
Sports wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 50%

### UNITED STATES OF AMERICA'S MISS

**ELIGIBILITY REQUIREMENTS**
1. Is between 18-28 years of age
2. Is a U.S. citizen or has been granted Permanent Residency by the United States
2. Is a resident, works, or goes to school in the state they are competing.
3. Is a natural born female.
4. Has never posed nude in film or print media.
5. Is single, not married, has never been married & has never given birth.

**AREAS OF PRELIMINARY COMPETITION**
Personal Interview- 25%
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 25%

**AREAS OF FINAL COMPETITION**
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 50%

## UNITED STATES OF AMERICA'S MS.

**ELIGIBILITY REQUIREMENTS**
1. Is at least 29 years of age or older
2. Is a U.S. citizen or has been granted Permanent Residency by the United States
2. Is a resident, works, or goes to school in the state they are competing.
3. Is a natural born female.
4. Has never posed nude in film or print media.
5. Is single, divorced, widowed, with or without children

**AREAS OF PRELIMINARY COMPETITION**
Personal Interview- 25%
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question-25%

**AREAS OF FINAL COMPETITION**
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 50%

## UNITED STATES OF AMERICA'S MRS.

**ELIGIBILITY REQUIREMENTS**
1. Is at least 18 years of age or older
2. Is a U.S. citizen, married to a U.S. citizen or has been granted
Permanent Residency by the United States
2. Is a resident, works, or goes to school in the state they are competing.
3. Is a natural born female.
4. Has never posed nude in film or print media.
5. Is legally married and living with her spouse for at least 6 months.

**AREAS OF PRELIMINARY COMPETITION**
Personal Interview- 25%
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question-25%

**AREAS OF FINAL COMPETITION**
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 50%



# EXHIBIT B





**United States of America Pageants**

United States of America's Teen | Miss | Ms. | Mrs. Pageants

unitedstatesofamericapageants.com

if you provide me with your email I can send you more information

**Anita Green**

OPTIONS

Search in Conversation

PRIVACY & SUPPORT

You know I'm transgender, right?

Your rules seem to discriminate against transgender women.

I did not, our rules and regulations allow same sex marriage, however this is a natural pageant. I would be happy to assist you in finding a pageant that you qualify for.

Would you be willing to change the rules to allow transgender women to compete?

**Anita Green**

OPTIONS

Search in Conversation

PRIVACY & SUPPORT

Again we would be happy to help you find an pageant that you would qualify for, however at this time we do not anticipate the rules changing.

PRIVACY & SUPPORT

Well, I'll talk to my attorney about this then because discrimination is unacceptable. This clearly is discrimination.

I am sorry that you feel that way.    December 7, 2018 at 4:08 PM

# EXHIBIT C

Exhibit C to Defendant's Motion To Dismiss

# OFFICIAL APPLICATION

| | |
|---|---|
| **Payment Received** | YES |
| **Payer Name** | Anita Green |
| **Payer Address** | 2317 Leo Avenue, Missoula, MT, 59808 |
| **Payer Email** | anitagreenmt@gmail.com |
| **Total Payment** | 20.00 USD |
| **Quantity** | 1 |
| **NAME:** | Anita Green |
| **DATE OF BIRTH:** | 12/REDACTED |
| **AGE:** | 28 |
| **Email Address** | anitagreenmt@gmail.com |
| **PHONE NUMBER:** | 4063172376 |
| **Address** | 13224 SE 122nd Avenue Apartment REDACTED , Clackamas, Oregon, 97015, US |

| | |
|---|---|
| **Parent or Guardian's Email:** | anitagreenmt@gmail.com |
| **Division** | United States of America's Miss (18-28) |
| **Are you a U.S. citizen or been granted Permanent U.S. Residency?** | Yes |
| **Are you currently married?** | No |
| **Have you been previously married?** | No |
| **Do you have children?** | No |
| **Multiple Choice** | I would like to SCHEDULE AN INTERVIEW by phone to be considered for MY STATE TITLE |

Exhibit C to Defendant's Motion To Dismiss                    Page 1 of 4

| | |
|---|---|
| **Referred by:** | Google |
| **Upload Photo** | Download File <br> View File |
| **I have read the delegate packet** | ✅ |
| **Signature** | View |
| **Locale** | US |
| **Street Address** | 2317 Leo Avenue |
| **City** | Missoula |
| **State / Province** | MT |
| **Zip / Country** | 59808 |
| **Purchase Details** | Paypal checkout: 1x Application Fee for $20.00; Tax: $0.00; Shipping: $0.00; Total: $20.00 |
| **Purchase Type** | One-time Purchase |
| **Confirmation Code** | 42N58763SK5098633 |

Exhibit C to Defendant's Motion To Dismiss                    Page 2 of 4



Exhibit C to Defendant's Motion To Dismiss                    Page 3 of 4



**Payment details**

| | |
|---|---|
| **Gross Amount** | –$20.00 USD |
| **PayPal fee refunded** | –$0.58 USD |

**Fee Refund Policy** ↗

**Net Amount**                          –$19.42 USD

**Contact info**

Anita Green
The receiver of this payment is **Unverified**
anitagreenmt@gmail.com

**Payment Sent to**

info@unitedstatesofamericapageants.com

**Note to Anita Green**

The entry deadline for our 2019 pageant has passed. We are not currently taking applications for our 2020 pageant. So we are issuing you a refund of the application fee.

**Funding details**

Funding Type: PayPal Balance
Funding Source: –$20.00 USD – PayPal Account

Exhibit C to Defendant's Motion To Dismiss                    Page 4 of 4

## CERTIFICATE OF SERVICE

I certify that on February 10, 2020, I electronically filed the above motion with the

Clerk of the Court by the CM/ECF system. The following participant in the case who is a

registered CM/ECF user will be served by the CM/ECF system and email:

      Shenoa L. Payne, OSB No. 084392
      805 SW Broadway, Suite 470
      Portland, Oregon 97205
      (503) 517-8205
      spayne@paynelawpdx.com

      Attorney for Plaintiff

                                  s/ John Kaempf
                                  John Kaempf
                                  Attorney for Defendant