**John Kaempf**, OSB No. 925391
**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue, Suite 1414
Portland, Oregon 97204
Phone: (503) 224-5006
john@kaempflawfirm.com

      Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ANITA NOELLE GREEN**, an individual,<br><br>      Plaintiff,<br><br>    v.<br><br>**MISS UNITED STATES OF AMERICA, LLC**, a Nevada limited liability corporation, d.b.a. United States of America Pageants,<br><br>      Defendant. | Case No. 3:19-cv-02048-MO<br><br>**DEFENDANT MISS UNITED STATES OF AMERICA, LLC'S SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT**<br><br>Request for Oral Argument |

# TABLE OF CONTENTS

Index of Authorities ............................................................................................ iii

LOCAL RULE 7-1 COMPLIANCE ...................................................................... 1

MOTIONS .............................................................................................................. 1

INTRODUCTION ................................................................................................... 1

FACTS ................................................................................................................... 2

ARGUMENT ......................................................................................................... 5

I.    Defendant's conduct is in furtherance of the constitutional right of free speech connected with issues of public interest. ........................................................ 7

    A.    Defendant exercises its freedom of speech under the First Amendment of the United States Constitution and Article I § 8 of the Oregon Constitution. ......... 8

    B.    Defendant's speech is connected to an issue of public interest. ..................... 10

II.   Plaintiff cannot establish a probability of prevailing. .................................. 13

    A.    Plaintiff filed the Complaint more than a year after the alleged conduct occurred. ......................................................................................... 14

    B.    The Act would violate the First Amendment by compelling Defendant to speak a message it disagrees with. ......................................................... 15

        1.    *Hurley* requires the dismissal of this case. ........................................... 16

        2.    Plaintiff's requested relief compels Defendant to speak in violation of the First Amendment. ....................................................................... 19

        3.    Plaintiff's requested relief would alter, be triggered by, and award access based on content and viewpoint. ................................................ 21

    C.    The Act would violate the First Amendment by forcing Defendant to expressively associate. ............................................................................ 22

        1.    The U.S. Supreme Court's decision in *Dale* dictates the dismissal of this case. ........................................................................................... 23

        2.    Defendant engages in expression. ......................................................... 25

        3.    The Act significantly affects Defendant's expression. ......................... 26

D.     The Act fails strict scrutiny if applied as Plaintiff requests............................ 27

E.     The Act would violate the Oregon Constitution by restraining Defendant's expression. ........................................................................................... 30

     1.     The Act burdens Defendant's expression. ........................................... 30

     2.     The Act impermissibly burdens Defendant's expression. ................... 32

F.     Forcing Defendant to speak, express, and associate endangers speakers of all different viewpoints. ........................................................................................ 33

III.     Defendant is entitled to attorney fees and costs because Plaintiff cannot prevail. ...... 34

CONCLUSION.......................................................................................................... 35

# Index of Authorities

## Cases

*Abukhalaf v. Morrison Child & Family Servs.*,
   2009 WL 4067274 (D Or 2009).......................................................................................... 15

*Animal Legal Def. Fund v. Wasden*,
   878 F.3d 1184 (9th Cir. 2018) ....................................................................................... 29

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000)................................................ 16, 22, 23, 24, 25, 26, 27, 28, 35

*Brush & Nib Studio, LC v. City of Phoenix*,
   448 P.3d 890 (Ariz. 2019)............................................................................................ 28

*City of Cleveland v. Nation of Islam*,
   922 F. Supp. 56 (N.D. Ohio 1995)............................................................................... 28

*City of Eugene v. Miller*,
   871 P.2d 454 (Or 1994) ........................................................................................... 30, 31

*Clackamas River Water v. Holloway*,
   322 P.3d 614 (Or App 2014)........................................................................................... 6

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) ......................................................................................... 3

*Deras v. Myers*,
   535 P.2d 541 (Or 1975) ................................................................................................ 32

*Downtown Soup Kitchen v. Municipality of Anchorage*,
   406 F. Supp. 3d 776 (D. Alaska 2019) ................................................................... 13, 34

*Fidanque v. State ex rel. Or. Gov't Standards and Practices Comm'n*,
   969 P.2d 376 (Or 1998) ................................................................................................ 32

*Gardner v. Martino*,
   563 F.3d 981 (9th Cir. 2009) ......................................................................................... 6

*Gathright v. City of Portland*,
   439 F.3d 573 (9th Cir. 2006) ....................................................................................... 20

*Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*,
   546 U.S. 418 (2006).................................................................................................... 28

*Hamilton v. General Mills, Inc.*,
   2016 WL 4060310 (D. Or. July 27, 2016)................................................................... 11

*Handy v. Lane Cty.*,
   385 P.3d 1016 (Or 2016) ............................................................................................... 9

*Hanna v. Plumer*,
   380 U.S. 460, 465 (1965)............................................................................................... 6

*Heliotrope Gen. Inc. v. Ford Motor Co.*,
   189 F.3d 971 (9th Cir. 1999) ....................................................................................... 11

*Higher Balance, LLC v. Quantum Future Grp., Inc.*,
   2009 WL 1743210 (D. Or. July 18, 2009).................................................................. 35

*Hilton v. Hallmark Cards*,
   599 F.3d 894 (9th Cir. 2010) ......................................................................................... 7

*Hunter v. CBS Broadcasting Inc.,*
  221 Cal. App. 4th 1510 (2013) ................................................................. 9
*Hurley v. Irish-Am. Gay Lesbian & Bisexual Grp. of Boston,*
  515 U.S. 557 (1995).......................... 8, 9, 14, 15, 16, 17, 18, 19, 20, 21, 25, 26, 27, 28, 35
*Ingels v. Westwood One Broadcasting Sevs., Inc.,*
  129 Cal. App. 4th 1050 (2005) ............................................................. 10
*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31,*
  138 S. Ct. 2448 (2018) ...................................................................... 15, 29
*Johnson v. Fed. Home Loan Mortg. Corp.,*
  793 F.3d 1005 (9th Cir. 2015) ............................................................ 3, 14
*Marder v. Lopez,*
  450 F.3d 445 (9th Cir. 2006) ................................................................. 3
*McDermott v. Ampersand Pub., LLC,*
  593 F.3d 950 (9th Cir. 2010) ............................................................ 21, 27
*Merrick v. Bd. of Higher Educ.,*
  841 P.2d 646 (Or App 1992)................................................................. 31
*Metabolife Intern., Inc. v. Wornick,*
  264 F.3d 832 (9th Cir. 2001) ................................................................. 5
*Miami Herald Publishing Co. v. Tornillo,*
  418 U.S. 241 (1974)........................................................................... 31
*Mindys Cosmetics, Inc. v. Dakar*
  611 F.3d 590 (9th Cir. 2010) ................................................................. 7
*Mullen v. Meredith Corp.,*
  353 P.3d 598 (Or App. 2015)................................................................. 7
*Neumann v. Liles,*
  369 P.3d 1117 (Or 2016) .................................................................... 11
*Neumann v. Liles,*
  434 P.3d 438 (Or App 2018).................................................................. 10
*Norma Kristie, Inc. v. City of Okla. City,*
  572 F. Supp. 88 (W.D. Okla. 1983) ................................................. 8, 26, 33
*Northon v. Rule,*
  637 F.3d 937 (9th Cir. 2011) ............................................................... 34
*Oregon Educ. Ass'n v. Parks,*
  291 P.3d 789 (Or App 2012)................................................................. 5
*Our Lady's Inn v. City of St. Louis,*
  349 F. Supp. 3d 805 (E.D. Mo. 2018) ..................................................... 27
*Outdoor Media Dimensions, Inc. v. Dep't of Transp.,*
  132 P.3d 5 (Or 2006) ......................................................................... 32
*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.,*
  475 U.S. 1 (1986).......................................................................... 15, 22
*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,*
  890 F.3d 828 (9th Cir. 2018) ................................................................. 6
*Redgrave v. Bos. Symphony Orchestra, Inc.,*
  855 F.2d 888 (1st Cir. 1988)................................................................. 21

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ..................................................................... 21, 29

*Riley v. Nat'l Fed'n of the Blind of N.C, Inc.,*
    487 U.S. 781 (1988) ......................................................................... 9, 21

*Roberts v. United States Jaycees,*
    468 U.S. 609 (1984) ....................................................................... 22, 23

*Schad v. Borough of Mt. Ephraim,*
    452 U.S. 61 (1981) ................................................................................ 8

*Schwern v. Plunkett,*
    845 F.3d 1241 (9th Cir. 2017) .......................................................... 7, 35

*Seelig v. Infinity Broadcasting Corp.,*
    97 Cal App. 4th 798, 807 (2002) ......................................................... 12

*Staehr v. Hartford Fin. Servs. Grp. Inc.,*
    547 F.3d 406 (2d Cir. 2008) ................................................................ 11

*State v. Babson,*
    326 P.3d 559 (Or 2014) ....................................................................... 32

*State v. Ciancanelli,*
    121 P.3d 613 (Or 2005) ................................................................. 10, 31

*State v. Henry,*
    732 P.2d 9 (Or 1987) .......................................................................... 10

*Symmonds v. Mahoney,*
    31 Cal. App. 5th 1096 (2019) ............................................................... 9

*Tamkin v. CBS Broadcasting, Inc.,*
    193 Cal. App. 4th 133 (2011) .............................................................. 12

*Telescope Media Grp. v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) .......................................................... 28, 30

*Terminiello v. City of Chicago,*
    337 U.S. 1 (1949) ............................................................................... 34

*Treanor v. Washington Post Co.,*
    826 F. Supp. 568 (D.D.C. 1993) ......................................................... 30

*United States v. Ritchie,*
    342 F.3d 903 (9th Cir. 2003) ................................................................ 3

*Victory Processing, LLC v. Fox,*
    937 F.3d 1218 (9th Cir. 2019) ............................................................. 21

*Von Saher v. Norton Simon Museum of Art at Pasadena,*
    592 F.3d 954 (9th Cir. 2010) ............................................................... 11

*Warden v. Miranda,*
    751 F. App'x 1030 (9th Cir. 2019) ...................................................... 20

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ........................................................................... 15

*Young v. Davis,*
    314 P.3d 350 (Or App 2013) ................................................................. 6

## Statutes

ORS 174.100 .................................................................................................... 5
ORS 31.150 ...................................................................................................... 1
ORS 31.150(2)(d) ................................................................................. 6, 7, 8, 16
ORS 31.150(3) ............................................................................................. 6, 13
ORS 31.152(3) ........................................................................................... 1, 7, 34
ORS 31.152(4) .................................................................................................. 10
ORS 659A.030(1)(a) ......................................................................................... 29
ORS 659A.403 ............................................................................................. 5, 13
ORS 659A.875(4) .............................................................................................. 14
ORS 659A.885(8) ........................................................................................ 5, 31

## Rules

Code of Federal Regulations, 29 C.F.R. § 1604.2 ................................................ 29
Federal Rule of Civil Procedure 12(b)(6) ........................................................ 6, 7
Federal Rule of Evidence 201 ...................................................................... 11, 12
Oregon Administrative Rule 839-003-0020(5) ................................................... 14

## Constitutional Provisions

Oregon Constitution (Article I § 8) ....................................................... 2, 7, 8, 30
U.S. Constitution Amendment I ............................................................... *passim*

## Other Authorities

*Complete MGA Handbook*, Miss Gay America,
http://www.missgayamerica.com/complete-mga-handbook.html ........................... 33

*Eligibility*, Miss Black USA, https://www.missblackusa.org/eligibility ................ 33

*Register,* Miss Native American Pageant,
http://www.missnativeamericanusa.com/register.html ...................................... 33

## LOCAL RULE 7-1 COMPLIANCE

The parties made a good faith effort through a telephone conference to resolve the disputes and have been unable to do so.

## MOTIONS

Defendant moves to specially strike Plaintiff's Complaint under Oregon's anti-Strategic Lawsuits against Public Participation ("anti-SLAPP") statute. ORS 31.150 et seq. Defendant also moves for an award of its attorney fees and costs as the prevailing party under ORS 31.152(3).

Defendant incorporates by reference its related FRCP 12(b)(6) Motion to Dismiss and accompanying materials.

## INTRODUCTION

Defendant promotes, celebrates, and encourages biological, natural born women by performing pageants across the country that give women confidence-building opportunities. Its motto is to empower women, inspire others, and uplift everyone. To achieve its mission and to promote its message of biological female empowerment, Defendant has eligibility rules for contestants, including application deadlines, and the requirement that contestants be "*natural* born female[s]." These rules are essential to create an equal playing field for all female contestants and to promote Defendant's message of what it means to be a woman—a *biological* female.

But according to Plaintiff, a man who identifies as a woman, Defendant *must* accept Plaintiff—even though Plaintiff missed the application deadline—and any other man who identifies as a woman, into its biological female-only competition, or Defendant discriminates based on gender identity, violates Oregon's public accommodations law "the

Page 1 – Defendant's Special Motion to Strike Plaintiff's Complaint

Act," and faces crippling damages, attorneys' fees, mandatory training, and injunctions. *See* Complaint.

Thus, Plaintiff does not seek equal access but seeks to fundamentally *change* Defendant's mission, alter its core message, and take away a level playing field from those biological women trying to compete for the pageant's crown. Oregon law does not allow this. Plaintiff cannot use it to co-opt Defendant's message, undermine its vision, or violate its constitutional free speech and free association rights.

Plaintiff's Complaint arises out of Defendant's exercise of free speech, and free association, and fails as a matter of law. Plaintiff also filed this lawsuit too late, and the First Amendment to the U.S. Constitution, and the corresponding provision of the Oregon Constitution (Article I § 8), protect Defendant's freedom to express the message of its choosing—not the message Plaintiff demands and can easily express elsewhere. Thus, the Court should dismiss Plaintiff's Complaint under Oregon's anti-SLAPP statute and award Defendant its statutory attorneys' fees and costs.

## FACTS

Defendant showcases "beauty pageants for females" throughout the United States. (Complaint at ¶ 6.) It does so to "encourage *women* to strive to achieve their hopes, dreams, goals, and aspirations, while making them feel confident and beautiful inside and out." *Id.* at ¶15 (emphasis added). And Defendant promotes "women empowerment, promoting positive self-image and advocating a platform of community service, which allows [its] contestants to rise by lifting others." (Ex. A at 1; Complaint at ¶15.)[1] Defendant's "motto is to empower

---

[1] Exhibit A is a copy of Defendant's Oregon webpage. When a complaint "necessarily relies" on an outside document, a court may consider it if "(1) the complaint refers to the

Page 2 – Defendant's Special Motion to Strike Plaintiff's Complaint

women, inspire others, & uplift everyone!" Ex. A at 1. In all of this, Defendant promotes

"community and *'sisterhood'* among pageant participants." (Complaint at ¶ 15) (emphasis

added).

    To convey these messages of female empowerment, body-positivity, and community

involvement, Defendant has eligibility requirements for its contestants. (Complaint at ¶ 20;

Ex. A at 1-3.) One rule is that contestants be "*natural* born female[s]." (Complaint at ¶ 21;

Ex. A at 1-3) (emphasis added). Other rules bolster Defendant's message. For example,

Defendant forbids applicants who have "posed nude in film or print media." (Complaint at ¶

20; Ex. A at 2-3.) Defendant also has age, residency, marital status, and maternity

requirements which place the applicants into particular divisions (*i.e.*, "Ms." division, "Mrs."

division). (Complaint at ¶ 20; Ex. A at 2-3.)

    After Defendant selects contestants and places them into relevant divisions, the

contestants compete in several competitions: private and on-stage interviews, a sportswear or

swimsuit competition, and an evening gown competition. (Complaint at ¶ 11; Ex. A at 2-3.)

The winner is crowned a "titleholder." (Complaint at ¶ 13.) And throughout, "beauty and

*femininity* remain central" themes to Defendant's pageants. *Id.* at ¶ 1 (emphasis added).

---

document; (2) the document is central to the plaintiff's claim; and (3) no party questions"
the document's authenticity. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). This Court
may accept Exhibit A as part of the complaint because the complaint refers to and relies on
Defendant's website and on Defendant's rules, located on that website. *See* Complaint at ¶¶
2, 11, 15, 20; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)
(considering website referenced in a complaint). When a document is incorporated by
reference, a court can accept the contents of the incorporated document as true, *United
States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003), and reject complaint allegations that are
contradicted by the incorporated document, *Johnson v. Fed. Home Loan Mortg. Corp.*, 793
F.3d 1005, 1008 (9th Cir. 2015).

Not only does Defendant convey its own messages, but it provides contestants with "speaking platforms." *Id.* at ¶ 19. These platforms give contestants the chance to "improve their public speaking skills" and "have a voice in a public forum." *Id.* at ¶ 17. Contestants' opinions often reach a vast audience because they "gain public and media exposure." *Id.*

In speaking a particular view, Defendant is not unusual. While Defendant conveys the message that being a "natural born female" is fundamental to what it means to be a woman, other pageants disagree. The Miss Universe pageant, for example, allows men who "identify" as women to compete and encourages them "to be viewed as equally feminine and as beautiful as their cisgender peers." *Id.* ¶ 24. Other pageants also permit men who identify as women to compete. *Id.* at ¶¶ 24, 27-28.

On December 7, 2018, Plaintiff reached out to Tanice Smith (Defendant's Executive Director) through Facebook. (Ex. B.)[2] Plaintiff "inquired about participating in" Defendant's programs. (Complaint at ¶ 31.) At Plaintiff's request, Ms. Smith gave Plaintiff a copy of Defendant's rules. Ex. B. After learning about the natural-born-female rule, Plaintiff told her that Plaintiff is "transgender." *Id.* Ms. Smith twice offered to help Plaintiff find another pageant, but Plaintiff declined. *Id.* Plaintiff then ended the conversation, saying Plaintiff would "talk to my attorney about this." *Id.*

Plaintiff began participating in pageants as an "openly transgender contestant" in 2017. (Complaint at ¶ 27.) Since then, Plaintiff has competed in pageants in Montana, Oregon, and Nevada. *Id.* at ¶¶ 27-28. In 2019, Plaintiff became the Oregon Miss Earth Elite titleholder, which qualified Plaintiff to compete in the 2019 National Miss Earth Elite

---

[2] The complaint "refers to" Exhibit B, Complaint at ¶¶ 14, 31-33, and it is "central to the plaintiff's claim" against Defendant, *id.* at ¶¶ 14, 32-33, 39. *See supra* note 1.

pageant. *Id.* at ¶ 28. Plaintiff participates in pageants to improve "public speaking skills," to obtain "a public platform in which to discuss important social issues," and to be "a positive and inspiring example…." *Id*. at ¶ 29.

Plaintiff filed this lawsuit on December 17, 2019. Plaintiff accuses Defendant of violating ORS 659A.403—the Act— by only allowing contestants who are biological women. (Complaint at ¶¶ 2, 35-40.) According to Plaintiff, the Act requires Defendant to admit, promote, and celebrate men who identify as women because it does so for biological women. *Id.*; ORS 659A.403; ORS 174.100(7)  ("sexual orientation" means, among other things, "gender identity").

If someone violates the Act, they can be subject to crippling damages and attorneys' fees. *See* ORS 659A.885(8) (outlining remedies). Indeed, Plaintiff seeks more than $75,000 from Defendant, plus fees and costs. (Prayer for Relief, ¶ 4(a)-(c).)

But Plaintiff wants more than damages. Plaintiff wants to change Defendant's *expression* by *forcing* it to remove the "natural born female" rule, and forcing Defendant's employees to undergo "training" to be reeducated. *Id*.

## ARGUMENT

Because Plaintiff's requested relief will suppress Defendant's message celebrating biological women, the Court should grant Defendant's special motion to strike and dismiss this "meritless [lawsuit] aimed at chilling expression through costly, time-consuming litigation." *Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). Defendant brings this motion under Oregon's Anti-SLAPP statute. *See Oregon Educ. Ass'n v. Parks*, 291 P.3d 789, 791 n.1 (Or App 2012). The purpose of Oregon's anti-SLAPP statute is to

protect defendants from lawsuits designed to "chill their participation in public affairs" by allowing them to file a motion "to expeditiously obtain dismissal before incurring significant litigation expenses …." *Clackamas River Water v. Holloway*, 322 P.3d 614, 615 n.1 (Or App 2014).

Anti-SLAPP motions are available to defendants in federal court. *See Gardner v. Martino*, 563 F.3d 981, 991 (9th Cir. 2009) (applying Oregon's anti-SLAPP statute); When considering anti-SLAPP motions filed with federal courts sitting in diversity (like here), courts apply state substantive law, and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965).

Substantively, Oregon courts decide anti-SLAPP motions by "engag[ing] in a two-step burden-shifting process." *Young v. Davis*, 314 P.3d 350, 353 (Or App 2013). First, the defendant must show the plaintiff's claim "arises out of" an activity that is protected by the statute. ORS 31.150(3). The relevant protected activity here is "conduct in furtherance of the exercise of … the constitutional right of free speech in connection with a public issue or an issue of public interest." ORS 31.150(2)(d). Second, the plaintiff has the burden to establish "a probability that the plaintiff will prevail on the claim." ORS 31.150(3).

Procedurally, federal courts apply Rule 12(b)(6) to evaluate anti-SLAPP motions when the motion "challenges only the legal sufficiency of a claim." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834-35 (9th Cir. 2018). Because Defendant's anti-SLAPP motion raises purely legal arguments based on the Complaint and

documents that may be considered on motions to dismiss, Rule 12(b)(6) standards govern this anti-SLAPP motion.[3]

Plaintiff's claim arises out of Defendant's message empowering natural born biological females. Plaintiff cannot show a probability of success because the claim is untimely and barred by the First Amendment, and Article I § 8 of Oregon's Constitution. Because Defendant is the prevailing party, it "shall be awarded reasonable attorney fees and costs." ORS 31.152(3).

## I.    Defendant's conduct is in furtherance of the constitutional right of free speech connected with issues of public interest.

At step one of an anti-SLAPP motion, courts assess the plaintiff's claim "broadly" and "more generally"—"is it one that arises out of conduct in furtherance of free speech in connection with an issue of public interest?" *Mullen v. Meredith Corp.*, 353 P.3d 598, 603 (Or App 2015). This step has "two distinct components." *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010).

First, the activity the plaintiff challenges must have been conducted "in furtherance" of free speech. ORS 31.150(2)(d). Plaintiff's only claim arises entirely out of Defendant's message of celebrating and empowering biological, natural born women through its pageants and how Defendant chooses to promote that message. Thus, Defendant's contested conduct is "speech." *See id.*

---

[3] For this reason, Defendant's anti-SLAPP motion repeats many of the arguments raised in Defendant's Rule 12 motion to dismiss. These arguments are also re-raised because denials of Oregon anti-SLAPP motions are immediately appealable and are reviewed de novo. *See Schwern v. Plunkett*, 845 F.3d 1241, 1245 (9th Cir. 2017) (immediate appeal); *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010) (de novo review).

Second, the speech must be "in connection with a public issue or an issue of public interest." *Id.* Defendant's message is an issue of public interest because it contributes to the societal debate over whether biology or "identity" decides whether someone is a woman. For these reasons, Oregon's anti-SLAPP statute applies, and the Court should dismiss Plaintiff's lawsuit.

**A. Defendant exercises its freedom of speech under the First Amendment of the United States Constitution and Article I § 8 of the Oregon Constitution.**

Defendant's conduct is in furtherance of the freedom of speech under the First Amendment and Article I § 8 of the Oregon Constitution because Defendant communicates a message of biological female empowerment through its pageant.

While this pageant is not a pamphlet or a political oration, "the Constitution looks beyond written or spoken words as mediums of expression." *Hurley v. Irish-Am. Gay Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995).

Likewise, "live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981). *See also Norma Kristie, Inc. v. City of Okla. City*, 572 F. Supp. 88, 91 (W.D. Okla. 1983) (pageant for men impersonating women was protected speech); (Complaint at ¶ 1 ("comparisons of beauty and femininity remain central to the theme of pageants")).

Through its pageant, Defendant encourages *biological* women, promotes positive self-images, advocates community service, and provides contestants with a network of support. (Complaint at ¶¶ 15, 17; Ex. A.)

Because Defendant's pageant is protected speech, "[t]he selection of" contestants "to make" this pageant "is entitled to similar protection." *Hurley*, 515 U.S. at 570.

Defendant shapes its message of female empowerment by choosing contestants through its eligibility rules. For example, to communicate that women are biological females, Defendant only allows *natural born* females to participate in its pageant, compete for the Defendant title, and be promoted through the Defendant platform. Likewise, to promote body positivity and pageant contestants as community role models, Defendant excludes applicants who have "posed nude in film or print media." (Complaint at ¶ 20; Ex. A at 2-3.) To signify that womanhood is not tied to citizenship, marital status, or childbearing, Defendant accepts U.S. citizens and residents, unwed women, women in opposite-sex marriages, women in same-sex marriages, and women with and without children. (Ex. A at 2-3.)

Defendant also uses these rules to dictate which messages it will *not* promote. These choices—what *not* to say—are speech just like Defendant's choices of what *to* say. *Riley v. Nat'l Fed'n of the Blind of N.C, Inc.*, 487 U.S. 781, 796-97 (1988) (decisions of "both what to say and what not to say" are protected speech).

Three persuasive anti-SLAPP cases from California confirm this point. *See Handy v. Lane Cty.*, 385 P.3d 1016, 1026 n.12 (Or 2016) (noting California anti-SLAPP decisions have "persuasive value"). For example, the selection of weather anchors is a "form of protected activity" because "casting decisions regarding who was to report the news" advanced or assisted "First Amendment expression." *Hunter v. CBS Broadcasting Inc.*, 221 Cal. App. 4th 1510, 1521 (2013). Likewise, "[a] singer's selection of the musicians that play with him … is an act in furtherance of his exercise of the right of free speech" under the First Amendment. *Symmonds v. Mahoney*, 31 Cal. App. 5th 1096, 1106 (2019). And a public radio

talk show host's "choice of which callers to allow on their air is part of the content of speech." *Ingels v. Westwood One Broadcasting Sevs., Inc.*, 129 Cal. App. 4th 1050, 1074 (2005).

Because Defendant engages in speech under the First Amendment, it also engages in protected speech under the even "*broader*" clause of Article I § 8 of Oregon's Constitution. *State v. Henry*, 732 P.2d 9, 11 (Or 1987) (emphasis added). Oregon's Constitution protects "*any* expression of opinion." *Id.* Expression of opinion refers to an "expression that, in some way, appraises or judges an object, person, action, or idea," and even verbal statements, nonverbal cues, or anything "designed to convey something about the communicator's world view." *State v. Ciancanelli*, 121 P.3d 613, 619 (Or 2005). Indeed, the Oregon Supreme Court holds that "a live public show in which performers engage in certain sexual conduct" is "expression." *Id.* at 636.

### B. Defendant's speech is connected to an issue of public interest.

Defendant's speech promoting the empowerment of biological women also meets the next requirement for an Oregon anti-SLAPP motion: this speech addresses an issue of public interest.

Speech is connected with "an issue of public interest" based on a "common-sense" understanding of the public interest. *Neumann v. Liles*, 434 P.3d 438, 440 (Or App 2018). "Under that common-sense meaning, an 'issue of public interest' is one that is of interest to the public …." *Id.* at 441. And "public interest" should "be liberally construed in favor of the exercise of the rights of expression …." ORS 31.152(4).

Defendant's pageant is connected to issues of public interest. Defendant's pageant "offers women the opportunity" to be involved in the public and their communities by "improv[ing] their public speaking skills, hav[ing] a voice in a public forum, gain[ing] public and media exposure, [and] engag[ing] in social and civil benefits." (Complaint at ¶ 17.) Defendant reaches a broad audience by "operat[ing] or manag[ing] beauty pageants for females throughout the United States." *Id.* at ¶ 6. Winners of state competitions compete in "the national pageant." *Id.* at ¶ 16. For these reasons, Defendant's speech through pageants are matters of public interest, "particularly" to "those members of the public who" compete in pageants. *Neumann v. Liles*, 369 P.3d 1117, 1125 (Or 2016).

And Defendant's specific message of empowering *biological* women is also a topic of public interest. Not even Plaintiff can credibly dispute this point. Since filing this lawsuit, Plaintiff has appeared in the media to bring attention to Defendant's natural born female rule by claiming that "the [Defendant] was saying I am not a woman and I'm not woman enough." Ex. C at 2.[4] Plaintiff's case has gained widespread media attention. For example, *Willamette Week*, The *Daily Caller*, and the Associated Press have written articles about Plaintiff's case and Defendant's message; a host from the Weekend Edition Sunday of National Public Radio interviewed Plaintiff; and Plaintiff has appeared on the local television

---

[4] Exhibit C contains news articles about this case. These articles are judicially noticeable under FRE 201 "as an indication of what information" is in "the public realm." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010). *See also Heliotrope Gen. Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (judicially noticing "information contained in news articles"); *Staehr v. Hartford Fin. Servs. Grp. Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (judicially noticing "the *fact* that press coverage … contained certain information"); *Hamilton v. General Mills, Inc.*, 2016 WL 4060310, at *3 (D. Or. July 27, 2016) (judicially noticing "online news articles" in Rule 12(b)(6) motion to dismiss).

station KGW 8. *See* Ex. C. By itself, this media attention makes Defendant's speech a matter of public interest. *See Tamkin v. CBS Broadcasting, Inc.*, 193 Cal. App. 4th 133, 143 (2011) (defendant's television show was issue of public interest "as shown by the posting of the casting synopses on various Web sites"); *Seelig v. Infinity Broadcasting Corp.*, 97 Cal App. 4th 798, 807 (2002) (finding public interest because issue "generated considerable debate within the media").

Under FRE 201, and through a Google search, the Court should judicially notice the significant national media attention this lawsuit has received. That confirms its status as an issue of "public interest" *See Mattachine Society of Washington, D.C. v. United States Department of Justice*, 267 F.Supp.3d 218, 228 (D DC 2017) ("The Court finds that *public interest* in the implementation and aftermath of" a 1953 executive Order by President Eisenhower, EO 10450, relating to gay and lesbian federal government employees, is "sufficient to warrant the production of an index for cross-referencing persons who are listed in these and other responsive documents produced as a result of" a FOIA request; and "the Court believes that this will sufficiently protect the privacy interests of all parties involved, while also allowing the *public* to better study the effects of EO 10450 on lesbian, gay, bisexual, and *transgender* federal employees.") (emphasis added).

And the reverberations of Defendant's message and this case extend beyond pageants. All across the country, the public is debating when and how biological men who identify as women may compete alongside biological women and gain benefits designed for biological women. *See, e.g.*, Ex. D.[5] For example, schools, parents, and female athletes are grappling

---

[5] Exhibit D contains news articles related to these topics. The articles are judicially noticeable. *See supra* note 4.

with whether to allow biological males to compete against biological females in high school sports, such as track . Exhibit E.[6]

Meanwhile, in Anchorage, Alaska, a women's shelter had to sue to ensure it could operate consistent with its message and mission and provide safe shelter to biological women who have "escaped from sex trafficking or been abused or battered, primarily at the hands of men." *Downtown Soup Kitchen v. Municipality of Anchorage*, 406 F. Supp. 3d 776, 781 (D. Alaska 2019).

Given this context, Defendant's message about what it means to be a woman is an issue of public interest.

## II.   Plaintiff cannot establish a probability of prevailing.

At step two of an anti-SLAPP motion, the plaintiff must prove "a probability that the plaintiff will prevail on the claim." ORS 31.150(3).

Plaintiff's Complaint fails to state a plausible claim for three reasons.

First, timeliness. Plaintiff complains about conduct that occurred more than a year before Plaintiff commenced this lawsuit—after the Act's statute of limitations expired.

Second, the First Amendment protects Defendant's speech and expressive association and bars the Act from compelling Defendant to speak messages or to engage in associations that undermine Defendant's message. Plaintiff's requested relief would force Defendant to speak and associate in ways that undermine Defendant's message about empowering only

---

[6] Exhibit E contains a copy of a news article about high school girls challenging a policy that permits biological boys to compete against them in track and field. The article is judicially noticeable. *See supra* note 4.

biological women. That is unconstitutional according to the U.S. Supreme Court's decisions in *Hurley* and *Dale*.

Third, the Oregon Constitution protects Defendant's freedom to control its message even more broadly than the First Amendment. Plaintiff's requested relief would force Defendant to speak in ways that undermine Defendant's message about empowering *only* biologically born natural women in violation of the Oregon Constitution.

**A.    Plaintiff filed the Complaint more than a year after the alleged conduct occurred.**

A claim under the Act "must be commenced within one year of the occurrence of the unlawful practice." ORS 659A.875(4); OAR 839-003-0020(5). Plaintiff filed the Complaint on December 17, 2019. So, Plaintiff cannot state a claim based on anything that occurred before December 17, 2018.

But Plaintiff's claim partially relies on Facebook messages with Ms. Smith, Defendant's Executive Director. (Complaint at ¶¶ 31-33.) And though Plaintiff says these communications occurred on December 20, 2018 (Complaint at ¶ 31), they really occurred on December 7, 2018, as the Facebook messages show. Ex. B at 1. Because Exhibit B refutes Plaintiff's allegations, the Court should accept December 7, 2018 as the conclusive date of the Facebook communications. *See Johnson*, 793 F.3d at 1007-08 (ignoring breach of contract allegations contradicted by a deed of trust). Exhibit B also proves Plaintiff had notice of any alleged Act violations on December 7, 2018. Plaintiff rejected Ms. Smith's offer to help Plaintiff find another pageant by threatening to talk to an "attorney about this then because discrimination is unacceptable." (Ex. B at 2.)

Because December 7, 2018 is more than a year before Plaintiff filed this Complaint, and Plaintiff had notice of any possible claim at that time, Plaintiff's claim based on the Facebook messages is time-barred as a matter of law. *See Abukhalaf v. Morrison Child & Family Servs.*, 2009 WL 4067274, at *4-6 (D Or 2009) (applying one-year statute of limitations).

**B.    The Act would violate the First Amendment by compelling Defendant to speak a message it disagrees with.**

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018).

But Plaintiff seeks to violate this fundamental rule of constitutional law by forcing Defendant to speak messages about women it disagrees with. Specifically, Defendant (1) engages in protected speech through its pageant, *see supra* § I.A, and (2) Plaintiff demands access to this pageant and thereby forces Defendant to convey messages about women Defendant disagrees with. This is forbidden compelled speech. *See Hurley*, 515 U.S. at 572-73 (analyzing these two factors to find compelled speech).

And compelled speech like this must overcome strict scrutiny. *See Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.* (*Pacific Gas*), 475 U.S. 1, 19 (1986) (plurality) (applying strict scrutiny to law compelling speech); Defendant satisfies each of these factors and the

Court should dismiss this case. *See infra* § II.D (discussing strict scrutiny for both compelling speech and association).

This section (1) provides a review of *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bost.*, 515 U.S. 557 (1995); (2) shows how Plaintiff's requested relief compels Defendant to speak; and (3) explains how Plaintiff's requested relief impermissibly targets Defendant's speech based on content and viewpoint.

### 1.    *Hurley* requires the dismissal of this case.

*Hurley*—along with the *Dale c*ase (discussed below)—dictate the dismissal of this case based on the First Amendment.

In *Hurley*, the issue was "whether Massachusetts may require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey"—supporting the LGBTQ agenda. *Hurley*, 515 U.S. at 559. The Supreme Court held the First Amendment prohibited Massachusetts—through its very similar public accommodations anti-discrimination statute—from doing this. *Id*. So, this Court should reach the same result here and dismiss this case.

In *Hurley*, the petitioners were the South Boston Allied War Veterans Council, "an unincorporated association of individuals elected from various South Boston veterans' groups," who had organized a parade since the 1940s. *Id.* at 560. The respondents were an LGBTQ organization (GLIB) that, like the transgender Plaintiff here asking to participate in defendant's pageant, wanted "to march in the parade as a way to express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals, to demonstrate that there are such

men and women among those so descended, and to express their solidarity with like individuals who sought to march in New York's St. Patrick's Day Parade." *Id.* at 561.

After being refused access to the parade, GLIB filed suit in state court, alleging violations of the state public accommodations law. The state court held the parade organizers violated the law by excluding GLIB based on its members' sexual orientation. *Id.* at 562. The state court also "rejected the notion that GLIB's admission would trample on the [parade organizers'] First Amendment rights." *Id.* at 563. The state supreme court affirmed. *Id.* at 564.

The U.S. Supreme Court in *Hurley* framed the disagreement between the parade organizers and GLIB as follows:

> [T]he disagreement goes to the admission of GLIB as its own parade unit carrying its own banner. Since every participating unit affects the message conveyed by the private organizers, the state courts' application of the statute produced an order essentially *requiring* petitioners to *alter* the expressive content of their parade. Although the state courts spoke of the parade as a place of public accommodation, once the *expressive* character of both the parade and the marching GLIB contingent is understood, it becomes apparent that the state courts' application of the statute had the effect of declaring the sponsors' speech itself to be the public accommodation. Under this approach any contingent of protected individuals with a message would have the right to participate in petitioners' speech, so that the communication produced by the private organizers would be shaped by all those protected by the law who wished to join in with some expressive demonstration of their own. But this use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his *own* message.

*Hurley*, 515 U.S. at 572-73 (internal citations omitted; emphasis added). The Court went on to explain how the parade "speaks":

> Rather like a composer, the Council selects the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in the Council's eyes comports with what merits celebration on that day. Even if this view gives the Council credit for a more considered judgment than it actively made, the Council clearly decided to *exclude* [an LGBTQ] message it did not like from the

communication it chose to make, and that is enough to invoke its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another. The message it disfavored is not difficult to identify. Although GLIB's point (like the Council's) is not wholly articulate, a contingent marching behind the organization's banner would at least bear witness to the fact that some Irish are gay, lesbian, or bisexual, and the presence of the organized marchers would suggest their view that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals and indeed as members of parade units organized around other identifying characteristics. The parade's organizers may not believe these facts about Irish sexuality to be so, or they may object to unqualified social acceptance of gays and lesbians or have some other reason for wishing to keep GLIB's message out of the parade. But whatever the reason, it boils down to the choice of a speaker *not* to propound a particular point of view, and that choice is presumed to lie *beyond* the government's power to control.
*Id.* at 574-75 (emphasis added).

Applying the state public accommodations law to the parade violated its First Amendment rights. This was so because even though the law was "a piece of protective legislation that announces no purpose beyond the object both expressed and apparent in its provisions, which is to prevent any denial of access to (or discriminatory treatment in) public accommodations on proscribed grounds, including sexual orientation," when the law was applied to expressive activity (the parade) "its apparent object is simply to require speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with messages of their own." *Id.* at 578. But this object was unconstitutional because it merely "allow[ed] exactly what the general rule of speaker's autonomy forbids." *Id.*

The Court went even further in its criticism of this application of the law:

The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis. While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason

than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government.

*Id.* at 579.

For all of these reasons, the Court reversed the state court's decision, and concluded that the parade could not be forced to include LGBTQ marchers who violated the parade organizers' "autonomy to choose the content" of their message. *Id.* at 566, 572-73. This Court must follow *Hurley*, and should dismiss this case.

### 2.    Plaintiff's requested relief compels Defendant to speak in violation of the First Amendment.

Because Defendant speaks through its pageant and through selecting who participates in its pageant, Plaintiff's requested relief would change Defendant's speech and alter the content of that speech by compelling Defendant to accept and promote Plaintiff as a female contestant.

According to Plaintiff, Defendant must allow Plaintiff and other men who identify as women to participate in Defendant's pageant or Defendant violates the Act. (Complaint at ¶¶ 2, 22-23.) But this compulsion would force Defendant to promote the message that biological men who identify as women are women and that such men can be and should be considered women and celebrated as women.

This compels Defendant to speak. As explained in *Hurley*, forcing the LGBT group into the parade would force the organizers to speak a "message it disfavored"—to "bear witness to the fact that some Irish are gay, lesbian, or bisexual" and to "suggest … that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals." *Id.* at 574. This in turn would alter the parade's "expressive content," violate

the parade organizers' "autonomy to choose the content" of their message, and

unconstitutionally apply the public accommodation law to "speech itself." *Id.* at 569, 572-73.

Since *Hurley*, courts have repeatedly applied this precedent to preserve speakers'

autonomy to select who may participate in their expressive events, recognizing that

participation affects expression. *See Warden v. Miranda*, 751 F. App'x 1030, 1031 (9th Cir.

2019) (rally properly excluded protester "seeking to spread his discordant message");

*Gathright v. City of Portland*, 439 F.3d 573, 577-78 (9th Cir. 2006) (*Hurley* protects right to

choose who participates in speech).

These cases apply here. Like a parade, a pageant conveys its message in part based on

who the pageant allows to compete, who the pageant promotes on stage, what messages

those contestants speak, and what their participation conveys to the public.

So too with Defendant's pageant. Defendant cannot convey its message of

empowering, encouraging, and celebrating *biological* women if it is forced to allow

biological *men* to participate in, compete in, and be promoted as women in Defendant's

pageant. Plaintiff's participation would radically transform *Defendant's* message: from

celebrating biological women as women to celebrating biological men as women.

Indeed, Plaintiff's entire lawsuit is contingent on *changing* Defendant's message.

Plaintiff seeks to access Defendant's "speaking platforms" and "media exposure."

(Complaint at ¶ 19.) Plaintiff intends to use these privileges and to use access to

Defendant's pageant to "be a positive and inspiring example to all women." *Id*. at ¶ 29.

Many may consider Plaintiff's goals and message "laudable." *Claybrooks*, 898 F. Supp. 2d

at 1000. But "the First Amendment prevents [Plaintiff] from effectuating these goals by

forcing Defendant "to "showcase a more progressive message." *Id*. (granting motion to

dismiss anti-discrimination claim because forcing reality television show to cast particular contestants would violate First Amendment).

Speakers have the right to control who competes in, affects, and delivers their expressive content. *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 962 (9th Cir. 2010) (newspaper could select its writers because "[t]o the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice"); *Redgrave v. Bos. Symphony Orchestra, Inc.*, 855 F.2d 888, 904 n.17 (1st Cir. 1988) (doubting "liability should attach if a performing group replaces a black performer with a white performer (or vice versa) in order to further its expressive interests.").

### 3.    Plaintiff's requested relief would alter, be triggered by, and award access based on content and viewpoint.

Although Defendant meets the *Hurley* test for compelled speech, the Act compels Defendant's speech in a particularly troubling way: based on content and viewpoint. Content and viewpoint regulations also trigger strict scrutiny. *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019).

Plaintiff's requested relief regulates based on content and viewpoint in numerous ways. For one, Plaintiff forces Defendant to change the content of its pageant and to speak a message it does not want to. And "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech." *Riley*, 487 U.S. at 795.

Next, Plaintiff's requested application "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). It is only because Defendant seeks to promote *biological* women that Plaintiff invokes the Act to punish

Defendant. *See* Complaint at ¶ 24 (admitting that the Act does not affect the "Miss Universe pageant franchise" because that pageant includes men who identify as women).)

In this way, Defendant's "expression of a particular viewpoint [promoting biological females] triggered an obligation to permit other speakers [men who identify as women], with whom [Defendant] disagreed, to use [Defendant's pageant] to spread their own message." *Pacific Gas*, 475 U.S. at 12-14. That imposes a "content-based penalty" and makes the regulation "content based." *Id*. at 13.

Finally, Plaintiff's requested relief regulates based on viewpoint because it only awards access to those expressing particular views. Plaintiff's demanded "[a]ccess is limited to persons or groups … who disagree with [Defendant's] views…" and who seek to "disseminate hostile views"—i.e. the view that men who identify as women are women. *Pacific Gas*, 475 U.S. at 10. The natural result is that Defendant will be deterred from speaking its preferred view in order to avoid violating the Act. *Id*. That result makes Plaintiff's requested relief a viewpoint-based regulation. *Id*.

## C.    The Act would violate the First Amendment by forcing Defendant to expressively associate.

Not only would Plaintiff's requested relief compel Defendant to speak, it would also compel Defendant to expressively associate. The First Amendment protects the right "to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). And the government may not infringe this right by, for example, forcing "inclusion of an unwanted person in a group" if doing so affects "the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

In other words, the "[f]reedom of association ... plainly presupposes a freedom *not* to associate." *Jaycees*, 468 U.S. at 623 (emphasis added).

The Supreme Court uses a three-step test to make this determination: (1) the group must "engage in some form of expression," *Dale*, 530 U.S. at 648; (2) "the forced inclusion" must "significantly affect the [organization's] ability to advocate public or private viewpoints," *id*. at 650; and (3) the application in question must satisfy strict scrutiny, *id*. at 656-657. Defendant satisfies each of these factors, and the Court should dismiss this case.

But before reviewing that test, a summary of *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) shows it is dispositive of this case.

**1.    The U.S. Supreme Court's decision in *Dale* dictates the dismissal of this case.**

In *Dale*, the petitioners were the Boy Scouts of America and one of its councils, a division of the Boy Scouts of America. 530 U.S. at 643. "The Boy Scouts asserts that homosexual conduct is inconsistent with the values it seeks to instill." *Id*. at 644. The respondent was James Dale, "whose adult membership in the Boy Scouts was revoked when the Boy Scouts learned that he is an avowed homosexual and gay rights activist." *Id*. Dale filed a discrimination complaint against the Boy Scouts, complaining—just like plaintiff here— that the Boy Scouts violated New Jersey's public accommodations statute by revoking Dale's membership based solely on his sexual orientation. *Id*. at 645. New Jersey's statute also prohibits discrimination on the basis of sexual orientation. Like here, the issue was whether applying New Jersey's public accommodations law to force the Boy Scouts to readmit Dale violated the Boy Scouts' First Amendment right of expressive association. *Id*. at 644.

The Supreme Court said that "[f]orcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express." *Id*. at 648 (emphasis added).

Because "the Boy Scouts engages in expressive activity," the Court had to decide "whether the *forced* inclusion of Dale as an assistant scoutmaster would significantly affect the Boy Scouts' ability to advocate public or private viewpoints." *Id*. (emphasis added).

The Boy Scouts asserted that "homosexual conduct is inconsistent with its "values" of being "morally straight" and "clean." and its desire not "to promote homosexual conduct as a legitimate form of behavior." *Id*. at 650-51. After giving "deference to" the Boy Scouts' "assertions regarding the nature of its expression," the Court then had to "determine whether Dale's presence as an assistant scoutmaster would significantly burden the Boy Scouts' desire to 'not promote homosexual conduct as a legitimate form of behavior.'" *Id*. at 653.

Dale was "one of a group of gay Scouts" who had "'become leaders in their community and are open and honest about their sexual orientation.'" *Id*. Therefore, Dale's "presence in the Boy Scouts would" have forced the Boy Scouts "to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id*.

That message was "inconsistent with the values" the Boy Scouts seek to instill in its members, and "the presence of Dale as an assistant scoutmaster would surely interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs." *Id*. at 654. In reaching this conclusion, the Supreme Court observed that associations "do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the

protections of the First Amendment." *Id*. at 655. Instead, an "association must merely engage in expressive activity that could be impaired in order to be entitled to protection." *Id*.

Because the inclusion of Dale "would significantly affect" the Boy Scouts' expression, the Court finally looked into "whether the application of New Jersey's public accommodations law to require that the Boy Scouts accept Dale as an assistant scoutmaster runs afoul of the Scouts' freedom of expressive association."

New Jersey's public accommodations law "does not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association." *Id*. at 659.

Next, because it applies *Dale* to similar facts, the Court should consider the decision of its sister court in *Apilado v. North American Gay Amateur Athletic Alliance*, 792 F. Supp. 2d 1151 (W.D. Wash. 2011). *Apilado* is the gay softball league freedom of association case discussed at length in Defendant's Rule 12(b)(6) Motion to Dismiss.

*Hurley*, *Dale*, and *Apilado* provide the framework for applying *Dale*'s three-part test for First Amendment freedom of association. Applying that framework here, the Court should dismiss plaintiff's Complaint.

### 2.    Defendant engages in expression.

At step one, the Supreme Court in *Dale* found the Boy Scouts to engage in expression by looking at its mission statement and how its members instilled certain values, "both expressly and by example," through instruction and activities like camping. *Dale*, 530 U.S. at 649-50. Notably, the First Amendment protects expressing popular and unpopular views, and "the fact that an idea may be embraced and advocated by increasing numbers of people is all the *more* reason to protect the First Amendment rights of those who wish to voice a different

view." *Id.* at 660 (emphasis added). Also, *Norma Kristie* specifically holds that a beauty pageant is an "expressive activity" subject to First Amendment protection. 572 F. Supp. at 91.

In deciding whether an organization is expressive, courts must "give deference to an association's assertions regarding the nature of its expression." *Dale*, 530 U.S at 685. Like Boy Scouts and a gay softball league, and the pageant in *Norma Kristie*, Defendant satisfies the low bar for expression.

And Defendant has a clear mission: to empower, promote self-confidence in, and provide community service platforms for *biological* women. (Ex. A at 1) (emphasis added). Defendant does this while also encouraging community and "sisterhood" among contestants. *Id.* at(Complaint at ¶ 15; Ex. A at 2.) In all of these ways, Defendant engages in expression under *Dale* just like the pageant in *Norma Kristie* was held entitled to First Amendment expressive activity protection.

### 3.    The Act significantly affects Defendant's expression.

At step two, "forced inclusion of an unwanted person in a group infringes the groups' freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 648. And again courts "give deference to an association's view of what would impair its expression." *Id.* at 653.

The logic and holdings of *Hurley*, *Dale*, and *Apilado*—which prohibit the forced inclusion of persons who significantly burden an association's expression—apply here. Defendant seeks to empower, encourage, and promote biological women. Ex. A at 1. So, if

Plaintiff could *force* Defendant to accept men who "identify" as women to compete in, promote themselves in, and speak conflicting messages during Defendant's pageant, that would significantly affect Defendant's message, just like *Dale* holds that the Boy Scouts cannot be forced to accept gay scoutmasters. See also *McDermott*, 593 F.3d at 962 (selecting newspaper staff "affects the expressive content of its newspaper"); *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 820-23 (E.D. Mo. 2018) (a prolife group "would be hindered if they were required to employ dissenters from their pro-life message").

This conflict is doubly apparent because of Plaintiff's activism as a transgender contestant. As *Dale* noted, the assistant scoutmaster's presence in the Boy Scouts would have especially affected its expression because he was "open and honest about [his] sexual orientation," "copresident of a gay and lesbian organization at college," and "remains a gay rights activist." 530 U.S. at 653. In the same way, Plaintiff competes as an "openly transgender contestant" and wants to use Defendant to be elevated as "a positive and inspiring example to all women." (Complaint at ¶¶ 27, 29.) Plaintiff cannot undermine Defendant's desired message this way. Doing so would violate the First Amendment, as held in *Hurley*, *Dale*, and *Apilado*.

### D.  The Act fails strict scrutiny if applied as Plaintiff requests.

Because Plaintiff's requested relief violates Defendant's First Amendment rights, this application must survive strict scrutiny. To pass that test, Plaintiff must show the requested relief is narrowly tailored to serve a compelling interest. *Dale*, 530 U.S. at 648. Plaintiff cannot do so.

First, Plaintiff cannot show a compelling interest. Plaintiff will invoke the need to stop gender identity discrimination generally. But strict scrutiny "look[s] beyond broadly formulated interests" to consider "the asserted harm of granting *specific* exemptions to particular … claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (emphasis added).

So, the question is not whether ending status discrimination by restaurants or hotels or businesses *generally* serves compelling interests. Rather, the question is whether a law serves compelling interests when forcing *one* beauty pageant to speak and expressively associate contrary to its core convictions. *See Apilado*, 792 F. Supp. 2d at 1163.

The answer to this question is "no." Indeed, the Supreme Court has already recognized that state public accommodation laws are not even legitimate interests when compelling speech or expressive association. *Dale*, 530 U.S. at 659; *Hurley*, 515 U.S. at 578 (a Massachusetts public accommodations law had no "legitimate end" when applied to "require speakers to modify the content of their expression").

Other courts agree. There is no anti-discrimination exception to the First Amendment. *See Telescope Media Grp. v. Lucero* (*TMG*), 936 F.3d 740, 752-56 (8th Cir. 2019) (anti-discrimination law could not force filmmakers to celebrate same-sex weddings); *Brush & Nib Studio, LC v. City of Phoenix* (*Brush & Nib*), 448 P.3d 890, 904, 913-14 (Ariz. 2019) (anti-discrimination law could not compel artists to create same-sex wedding invitations); *City of Cleveland v. Nation of Islam*, 922 F. Supp. 56, 59-60 (N.D. Ohio 1995) (public accommodation law could not force speaker to admit women to speaker's event).

This conclusion is particularly apt here because Plaintiff already participates in many other pageants. (Complaint at ¶¶ 24, 27-28.) Thus, because Plaintiff and others can easily

access these other pageants and convey their message elsewhere, there is no reason to violate Defendant's constitutional rights. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning…" *Janus*, 138 S. Ct. at 2464.

Moving to "narrow tailoring," Plaintiff fails there too. To be narrowly tailored, a requirement cannot be "under-inclusive" or "over-inclusive." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018). And the requirement must also be the "least restrictive means among available, effective alternatives." *Id* at 1198 (cleaned-up).

But Plaintiff cannot satisfy these requirements because Plaintiff already can (and has) accessed and won other pageants. The narrowly tailored solution is to let Plaintiff promote Plaintiff's message in these other pageants, and let Defendant promote its message in its pageant.

This solution does not undermine the Act generally.

Agencies also frequently make exemptions to protect the expressive choices like the one Defendant wants to exercise here. *See* 29 C.F.R. § 1604.2 (interpreting Title VII to allow production studios to make classifications when "necessary for the purpose of authenticity or genuineness…e.g., [selecting] an actor or actress"). In fact, Oregon law probably protects these expressive choices already in the employment context. *See* ORS 659A.030(1)(a) (recognizing BFOQ exception). Plaintiff cannot possibly explain why Oregon can allow these expressive choices in the employment context but forbids them in the public accommodation context. A "law cannot be regarded as protecting an interest of the highest order … when it leaves appreciable damage to that supposedly vital interest unprohibited …" *Reed*, 135 S. Ct. at 2232.

Courts also frequently allow these expressive choices, either by interpreting public accommodation laws not to cover expressive organizations or by allowing organizations to make decisions to control their speech and expressive association under these laws. *See, e.g.*, *TMG*, 936 F.3d at 757 (anti-discrimination law could still effectively regulate discriminatory conduct without regulating speech); *Treanor v. Washington Post Co.*, 826 F. Supp. 568, 569 (D.D.C. 1993) (refusing to consider newspaper a public accommodation because contrary interpretation "requiring newspaper editors to publish certain articles or reviews would likely be inconsistent with the First Amendment.").

Public accommodations typically do not compel speech or expressive association yet still achieve their goals of stopping discrimination. There is no valid reason to change that general practice here.

### E.  The Act would violate the Oregon Constitution by restraining Defendant's expression.

Article I § 8 of the Oregon Constitution prohibits laws from "restraining the free expression of opinion, or restricting the right to speak, write or print freely on any subject whatever." Under this clause, a law unconstitutionally applies to expression if (A) it "reach[es] privileged [i.e. protected] communication;" (B) enforcement of the law "burdens [the speaker's] right of free speech;" and (C) the burden on expression is impermissible. *City of Eugene v. Miller*, 871 P.2d 454, 460 (Or 1994) (referencing elements). Defendant satisfies each element. *See supra* § I.A (explaining how Defendant's expression is privileged).

#### 1.  The Act burdens Defendant's expression.

The Act burdens Defendant's expression in three ways.

First, the Act threatens to crush Defendant with damages and attorneys' fees if Defendant continues to promote its desired message of female empowerment. *See supra* § II.B.2-3 (explaining this point); ORS 659A.885(8) (outlining remedies for violations). Threatening to punish Defendant for speaking only its desired message in turn discourages Defendant from speaking at all. *Supra* § II.B.2-3 (explaining how compelling speech can also deter speech). *See also Merrick v. Bd. of Higher Educ.*, 841 P.2d 646, 651 (Or App 1992) (law unconstitutional when its "practical effect is to chill speech and other expression"). In this sense, the Act functionally bans Defendant's desired speech. *See Ciancanelli*, 121 P.3d at 634 (law banning certain expression was unconstitutional restraint); *City of Eugene*, 871 P.2d at 460 (law banning book sales was unconstitutional restraint). *See also Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256-258 (1974) (law deterred newspaper form publishing desired editorials for fear of being required to publish undesirable responses).

Second, the Act undermines and dilutes Defendant's message by forcing Defendant to allow men who "identify" as women to compete in its pageant. Credibility is part of the persuasiveness of any speaker. Defendant's message uplifting biological women is much less credible if Defendant must also promote men who identify as women.

Third, the Act treats Defendant's speech "more restrictively" than other speakers. *City of Eugene*, 871 P.2d at 460 (this selectivity burdens expression). Specifically, Plaintiff interprets the Act to allow pageants to accept and celebrate biological females and men who identify as women, but Plaintiff seeks to punish Defendant for promoting only biological women. This disparate treatment turns on the message each pageant promotes. And that is impermissibly burdensome.

## 2.    The Act impermissibly burdens Defendant's expression.

The Act impermissibly burdens Defendant's expression because it (1) is "directed at the content" of Defendant's expression and (2) does not "advance[] legitimate state interests …" *State v. Babson*, 326 P.3d 559, 575 (Or 2014).[7]

First, the Act is directed at the content of Defendant's expression because the law is triggered by (and thereby deters) Defendant's choice to only celebrate natural born females. *See supra* § II.B.3 (explaining this point); *see also Fidanque v. State ex rel. Or. Gov't Standards and Practices Comm'n*, 969 P.2d 376, 379 n.4 (Or 1998) (noting apparently neutral regulation had effect of restricting political speech). In so doing, the Act treats Defendant's speech "differently on the basis of the content of [its] message." *Outdoor Media Dimensions, Inc. v. Dep't of Transp.*, 132 P.3d 5, 16 (Or 2006).

Second, the Act does not advance legitimate state interests when it selectively compels and deters Defendant's message about empowering biological women. *See supra* § II.D (explaining this point); *see also Outdoor Media*, 132 P.3d at 17 (finding no legitimate interest in "prohibit[ing] some expression, while permitting other expression simply because the latter concerns a different subject"); *Deras v. Myers*, 535 P.2d 541, 549 (Or 1975) ("[N]ot even a compelling state interest … can justify infringement of fundamental rights when less drastic means" are available.).

---

[7] A law must also provide alternatives for communication. *Babson*, 326 P.3d at 575. But the Act does not even clear the first two requirements here.

### F.  Forcing Defendant to speak, express, and associate endangers speakers of all different viewpoints.

Plaintiff's lawsuit seeks to compel Defendant to open its live entertainment event to biological men and thereby *force* Defendant to alter the content of its event and speak a message Defendant disagrees with. While this lawsuit only seeks relief against Defendant, the legal principle it advances reaches far beyond this case and these parties.

Take the pageant context first. Many pageants select participants to further their message. Ruling for Plaintiff would enable anyone to compel these other pageants to speak messages they disagree with. The Miss Gay America Pageant, for example (which only allows men who impersonate women[8]), could be forced to include anyone regardless of sex. *Norma Kristie*, 572 F. Supp. at 90. Or the Miss Native American Pageant could be forced to accept any woman regardless of national origin.[9] And then the Miss Black USA pageant could be compelled to include all Caucasians who "identify" as Black.[10]

But the ramifications don't stop there. Plaintiff's theory would justify forcing a gay softball league designed to "promot[e] athletic competition and physical health in support of the gay lifestyle" to allow heterosexual players. *Apilado*, 792 F. Supp. 2d at 1162. Or force homeless shelters designed to help women suffering from sex-trafficking to allow men to

---

[8] *Complete MGA Handbook*, Miss Gay America, http://www.missgayamerica.com/complete-mga-handbook.html (last visited Feb. 26, 2020) (noting contestants must be male).

[9] *Register*, Miss Native American Pageant, http://www.missnativeamericanusa.com/register.html (last visited Feb. 26, 2020) (noting contestants must be at least a quarter Native American).

[10] *Eligibility*, Miss Black USA, https://www.missblackusa.org/eligibility (last visited Feb. 26, 2020) (listing eligibility requirements).

sleep next to those hurting women. *See Downtown Soup Kitchen*, 406 F. Supp. 3d at 794-99 (enjoining attempt to apply public accommodation law this way).

Even individual speakers would lose their freedom. Plaintiff's theory would justify forcing an atheist "whose business is writing commissioned music" to compose music for an Easter service. *Klein*, 410 P.3d at 1069. Or force a Christian painter "who holds strong religious convictions against same-sex marriage" to paint a same-sex "couple kissing at an altar." *Id*. The implications are staggering.

So, in the end, this case is not only about a pageant's ability to express its message of biological female empowerment. It is about the freedom of all speakers to engage in "free debate and free exchange of ideas" and "to speak freely and to promote diversity of ideas" without the fear of being sued for emotional damages and attorneys' fees because someone disagrees with their views. *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). After all, this unique feature of American life is what "sets us apart from totalitarian regimes" and protects all viewpoints equally. *Id*.

## III.    Defendant is entitled to attorney fees and costs because Plaintiff cannot prevail.

Because Plaintiff's claim arises out of Defendant's free speech on a topic of public interest and Plaintiff cannot show a probability of success, Defendant is entitled to attorney fees and costs. ORS 31.152(3). Oregon law governs the award of attorney fees and costs in this case. *Northon v. Rule*, 637 F.3d 937, 938 (9th Cir. 2011). And Oregon's anti-SLAPP statute requires the prevailing defendant "be awarded reasonable attorney fees and costs," ORS 31.152(3), for all fees and costs "reasonably incurred in connection with litigating defendant's reasonably necessary defenses." *Schwern v. Plunkett*, 2017 WL 3709094, at *3

(D. Or. July 5, 2017). If Defendant's anti-SLAPP motion is granted, Defendant respectfully requests the opportunity to file a separate motion to determine the recoverable amount of attorney fees and costs associated with defending Defendant's freedom to uplift and empower biological women. *See Higher Balance, LLC v. Quantum Future Grp., Inc.*, 2009 WL 1743210, at*1 (D. Or. July 18, 2009) (the issue in such motions "is calculating the amount of the award, not whether a defendant is entitled to an award").

## CONCLUSION

Defendant wants to promote, celebrate, and encourage biological, natural born women around the country. The Court should uphold the U.S. Constitution by following *Hurley* and *Dale*—and Oregon's Constitution—and dismissing Plaintiff's Complaint.

Respectfully submitted this 3rd day of March, 2020.

By: s/ John Kaempf

John Kaempf, OSB No. 925391
KAEMPF LAW FIRM PC
1050 SW Sixth Avenue, Suite 1414
Portland, Oregon 97204
Phone: (503) 224-5006
john@kaempflawfirm.com

Attorney for Defendant

# EXHIBIT A



UNITED STATES of *America* PAGEANTS are designed to encourage women to strive to ACHIEVE their hopes, dreams, goals, and aspirations, while making them feel CONFIDENT and BEAUTIFUL inside and out! We believe the true definition of beauty is *"The unique set of combinations that make you, You!"* Our motto is to EMPOWER Women, INSPIRE others, & UPLIFT everyone! We focus on women empowerment, promoting positive self-image and advocating a platform of community service, which allows our contestants to rise by lifting others. But more importantly we are an elite sisterhood that gives support and encouragement to inspire each delegate to be the best version of herself!

*"There is no tool for development, more effective than the empowerment of women"* -Kofi Annan

## ELIGIBILITY REQUIREMENTS & AREAS OF COMPETITION
As of January 1, 2020

## UNITED STATES OF AMERICA'S TEEN

**ELIGIBILITY REQUIREMENTS**
1. Is between 13-17 years of age
2. Is a U.S. citizen or has been granted Permanent Residency by the United States
2. Is a resident, works, or goes to school in the state they are competing.
3. Is a natural born female.
4. Has never posed nude in film or print media.
5. Is single, not married, has never been married & has never given birth.

**AREAS OF PRELIMINARY COMPETITION**
Personal Interview- 25%
Sports wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 25%

**AREAS OF FINAL COMPETITION**
Sports wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 50%

## UNITED STATES OF AMERICA'S MISS

**ELIGIBILITY REQUIREMENTS**
1. Is between 18-28 years of age
2. Is a U.S. citizen or has been granted Permanent Residency by the United States
2. Is a resident, works, or goes to school in the state they are competing.
3. Is a natural born female.
4. Has never posed nude in film or print media.
5. Is single, not married, has never been married & has never given birth.

**AREAS OF PRELIMINARY COMPETITION**
Personal Interview- 25%
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 25%

**AREAS OF FINAL COMPETITION**
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 50%

## UNITED STATES OF AMERICA'S MS.

**ELIGIBILITY REQUIREMENTS**
1. Is at least 29 years of age or older
2. Is a U.S. citizen or has been granted Permanent Residency by the United States
2. Is a resident, works, or goes to school in the state they are competing.
3. Is a natural born female.
4. Has never posed nude in film or print media.
5. Is single, divorced, widowed, with or without children

**AREAS OF PRELIMINARY COMPETITION**
Personal Interview- 25%
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question-25%

**AREAS OF FINAL COMPETITION**
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 50%

## UNITED STATES OF AMERICA'S MRS.

**ELIGIBILITY REQUIREMENTS**
1. Is at least 18 years of age or older
2. Is a U.S. citizen, married to a U.S. citizen or has been granted
Permanent Residency by the United States
2. Is a resident, works, or goes to school in the state they are competing.
3. Is a natural born female.
4. Has never posed nude in film or print media.
5. Is legally married and living with her spouse for at least 6 months.

**AREAS OF PRELIMINARY COMPETITION**
Personal Interview- 25%
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question-25%

**AREAS OF FINAL COMPETITION**
Swim wear Competition- 25%
Evening Gown Competition- 25%
Onstage Question- 50%

Exhibit A - Page 3 of 4



# EXHIBIT B





# EXHIBIT C

2/19/2020                    An Oregon Woman Is Suing a Beauty Pageant that Excludes Transgender Contestants - Willamette Week



# An Oregon Woman Is Suing a Beauty Pageant that Excludes Transgender Contestants

"I felt as though the organization was saying I am not a woman and I'm not woman enough."

**By Elise Herron** | Published December 18, 2019    Updated December 18, 2019

Last January, Anita Green signed up to compete in a Miss Oregon beauty pageant.

Green, 29, is a trailblazer on the pageant circuit. When she competed in her first pageant, the 2017 Miss Montana USA contest, she was only the third openly transgender contestant in the history of the Miss Universe program.

"This is about giving minorities a voice," Green says. "I believe I'm beautiful, and I want to set an example for all women—cisgender and transgender—that beauty doesn't have to fit into specific molds."

United States of America's Miss Oregon pageant organizers didn't agree. (United States of America Pageants is a different organization from the one that operates Miss Montana USA, even though both pageants bear patriotic initials.) They rejected Green's entry the same month she applied, returning her $195 entry fee after the state pageant's director told her it was a "natural" pageant.

Exhibit C - Page 1 of 16



Now she's suing in fe[...]
unspecified monetary [...]

"I felt as though I was being invalidated," Green says. "I felt as though the organization was saying I am not a woman and I'm not woman enough."

United States of America Pageants and its Miss Oregon director, Tanice Smith, declined to comment on the lawsuit.

Green's case appears to be the first of its kind in Oregon. If she wins, it could establish a legal precedent for Oregon and 20 other states with similar nondiscrimination laws, requiring pageant organizers to allow transgender people to compete.

The lawsuit is part of a continued push for equality in the state, says Mikki Gillette, an executive at Basic Rights Oregon, the state's leading LGBTQ advocacy group.

"The last decade or so has seen a real broadening of visibility for transgender people," says Gillette, who is also a transgender woman. "But this kind of message that 'you're not really a woman' is so harmful—for the person it's said to and for young people growing up, trying to understand their place in the world."

United States of America's Miss Oregon pageant, which takes place annually in Corvallis, says on its website it is "designed to encourage women to strive to achieve their hopes, dreams, goals and aspirations, while making them feel confident and beautiful inside and out." State winners qualify to enter the national United States of America Miss pageant and win a prize package valued at more than $2,000.

Green moved to Oregon from Montana in 2018, and in 2019 won Miss Earth USA's Elite Miss Oregon contest. One year ago, she began corresponding on Facebook with United States of America's Oregon pageant director.

According to Facebook messages acquired by *WW*, Green—who works for a video game company—reached out to Smith, asking for more information about the pageant. Smith sent a link with the pageant rules, and after reading them, Green responded, "You know I'm transgender, right?"

"I did not," Smith wrote back. "Our rules and regulations allow same-sex marriage, however this is a natural pageant."

Smith then offered to help Green find another pageant. Green asked if Smith would "be willing to change the rules to allow transgender women to compete."

"Again," Smith wrote, "we would be happy to help you find a pageant that you qualify for, however at this time we do not anticipate the rules changing."

Exhibit C - Page 2 of 16

"Well," Green respond...
is clearly discriminati...



"I am sorry that you feel that way," Smith replied and ended the conversation. Smith declined WW's request for comment on the exchange.

On Dec. 16, Green sued in U.S. District Court. Her lawsuit, filed by Portland lawyer Shenoa Payne, argues United States of America Pageants, which hosts pageants across the nation and is headquartered in Nevada, unlawfully discriminated against Green by excluding her from its Miss Oregon pageant because of her gender identity. It seeks to require the pageant to change its rules; to cease the exclusion of transgender women; to require training of pageant staff on Oregon's public accommodation law; and to award Green damages "in an amount to be determined at trial."

According to United States of America Pageants' rules, which are listed on its website, entrants—in addition to being single and never having "posed nude in film or print media"—are required to be "natural born female."

"This policy" the lawsuit reads, "intentionally designed to exclude the specific class to which the plaintiff [Green] belongs—transgender females—is discriminatory because it denied the plaintiff the full and equal advantages and privileges of the defendant's [United States of America Pageants] services in violation of Oregon's public accommodation law."

The suit argues that because the pageant is open to the public, barring Green from entering is legally the same as a hotel denying her a room or a restaurant refusing to serve her.

It also argues that although the pageant requires entrants to be "natural," it does not exclude women who have undergone plastic surgery.

"Rather," the lawsuit reads, "it is intended only to exclude, and is enforced only against, a specific class of individuals—transgender females."

It's only in the past decade that openly transgender beauty pageant contestants have begun to gain footing among their cisgender peers. In 2012, the Miss Universe program ended its ban on transgender entrants after the threat of a lawsuit. Since then, there has been only one transgender titleholder, Miss Universe Spain in 2015.

Green's desired outcome? She still hopes to compete in United States of America's Miss Oregon pageant.

"This is about justice and it's about righting a wrong," Green says. "No matter what anyone thinks about pageants, trans women should have the choice to compete just like anyone else."

# Become a Friend of Willamette Week.

Exhibit C - Page 3 of 16

≡ Help support l

Support Willamette Week.

TRENDING

COMMENTS

Sponsored



Sponsored

Exhibit C - Page 4 of 16

Case 3:19-cv-02048-MO    Document 15    Filed 03/03/20    Page 56 of 84

**Get Portland stories straight to your inbox.**

Exhibit C - Page 5 of 16



We'll send yo

Enter your emai



THE WIRE



Daily Caller - https://dailycaller.com

⌐ US

# Biological Male Files Lawsuit Demanding Entry Into Female Beauty Pageant



(Screenshot/YouTube)

⌐DAILY CALLER NEWS FOUNDATION⌐

PETER HASSON
EDITOR

December 19, 2019
8:10 PM ET

 **LISTEN TO THIS ARTICLE**

FONT SIZE: 

**A** biological male who identifies as a transgender woman is suing after being denied entry into a female beauty pageant in Oregon.

Lawyers for Anita Green on Tuesday filed suit against United States of America Pageants in the U.S. District Court for the District of Oregon, alleging the organization had unlawfully discriminated against Green by limiting the competition to "natural born females," according to court documents reviewed by the Daily Caller News Foundation.

Green's lawyers contended the requirement that contestants be "natural born females" was "an express discriminatory eligibility policy," arguing the requirement was "intentionally designed" to exclude biological males who identify as transgender women.

Green's lawyers argued the requirement "is discriminatory because it denied [Green] the full and equal advantages and privileges of defendant's services in violation of Oregon's public accommodations law."



Anita Green (Screenshot/YouTube)

Exhibit C - Page 8 of 16

The court issued a summons Thursday giving the pageant organization 21 days to issue a response to Green's complaint. Neither Green's attorney nor United States of America Pageants returned the DCNF's request for comment on the lawsuit.

"I felt as though I was being invalidated. I felt as though the organization was saying I am not a woman and I'm not woman enough." Green told Willamette Week. "This is about justice and it's about righting a wrong. No matter what anyone thinks about pageants, trans women should have the choice to compete just like anyone else."

Green isn't the only biological male seeking to enter female competitions.
**(RELATED: We Spoke With This Former Olympian About Transgender Athletes. Here's What She Said)**

June Eastwood, a biologically male NCAA runner at the University of Montana, was named the Big Sky Conference's female athlete of the week in October. Biologically male cyclist Rachel McKinnon won a women's world championship and set a world record that same month.

Franklin Pierce University runner CeCe Telfer, a biological male who identifies as a transgender woman, won an NCAA Division II women's track and field championship in May. Telfer competed on the men's team before switching to women's events.

Two biologically male runners, both of whom identify as transgender girls, have dominated girls' high school track in Connecticut.

*Content created by The Daily Caller News Foundation is available without charge to any eligible news publisher that can provide a large audience. For licensing opportunities of our original content, please contact licensing@dailycallernewsfoundation.org.*

**AP NEWS**

Click to copy

Click to copy  Top Stories    Topics        Video    Listen

**RELATED TOPICS**

Discrimination

General News

Oregon

Gender discrimination

Portland

Lawsuits

United States

# Oregon transgender woman sues Miss USA pageant

December 18, 2019 GMT

PORTLAND, Ore. (AP) — An Oregon transgender woman is suing Miss USA pageants, saying its rule that limits competition to "natural born female" is a form of gender discrimination.

The Oregonian/OregonLive reports Anita Green of Clackamas, Oregon, holds the title of 2019 Miss Earth Elite Oregon and competed in the 2018 Miss Montana contest. She applied to participate in the Miss United States of America pageant last year but her application was rejected.

**AP NEWS**

This policy is discriminatory because it denied her the full and equal advantages and privileges of the defendant's services in violation of Oregon's public accommodations law, the lawsuit says.

Top Stories    Topics      Video    Listen

The suit was filed Tuesday in U.S. District Court in Portland, Oregon.

Though the Nevada-based pageant is a private business, the suit contends that the way it operates requires it to follow Oregon public accommodation law.

The suit asks a judge to order Miss United State of America pageants to end its alleged discriminatory policy and remove its restriction that prevents transgender candidates from competing.

Messages left for the Nevada-based United States of America pageant weren't immediately returned.

Green was the first openly transgender contestant in the Miss Montana USA pageant and the third openly transgender contestant ever to compete in a Miss Universe pageant program.

# AP NEWS

Top Stor es

V deo

Contact Us

Cook e Sett ngs

## DOWNLOAD THE NEWS   Top cs     Topics        Video     Listen

Connect w th the def n t ve source for g oba  and  oca  news



## MORE FROM AP

ap.org

AP Ins ghts

AP Def n t ve Source

AP Images Spot  ght

AP Exp ore

AP Books

## FOLLOW AP

**THE ASSOCIATED PRESS**

About    Contact    Customer Support    Careers    Terms & Cond t ons    Pr vacy

A   contents © copyr ght 2020 The Assoc ated Press. A   r ghts reserved.

Exhibit C - Page 12 of 16



NATIONAL

# Transgender Woman Sues Miss United States Of America Pageant

December 22, 2019 · 7:48 AM ET
Heard on Weekend Edition Sunday



NPR's Lulu Garcia-Navarro speaks to Anita Green, a transgender woman who is suing The Miss United States of America pageant for barring her from participating in the competition.

**▣ Transcript**

LULU GARCIA-NAVARRO, HOST:

This week in Portland, Ore., a transgender woman filed a federal lawsuit against the Miss United States of America pageant. Her name is Anita Green, and she says the pageant won't let her compete even though she's competed in other pageants like the state-level qualifiers for Miss Universe. She won the elite division of Miss Earth in the state of Oregon in 2019, too.

She joins us now from the studios of OPB in Portland. Anita, thank you so much for being with us.

ANITA GREEN: Hello. Thank you for having me.

GARCIA-NAVARRO: Tell us what happened.

GREEN: Well, I received a Facebook friend request from someone associated with the Miss United States of America pageant. And I was interested in pageants. I was disheartened to see that there was a rule in place that was meant to discriminate against transgender women.

GARCIA-NAVARRO: Explain what that rule is and how you found out about it.

Exhibit C - Page 13 of 16

GREEN: Well, I found out about the rule just by reading the information that was sent to me. I went to their website. And the rules said contestants must be natural-born females. And I then asked them if they would be willing to change that rule, and they declined.

GARCIA-NAVARRO: With your lawsuit, you are saying that this, quote, "natural-born female" rule violates Oregon's public accommodation law. Explain why you believe this is a violation.

GREEN: I believe that this is a violation because I don't think someone shouldn't be allowed to compete simply because they are transgender. I think that that's very arbitrary. Transgender women are equal to cisgender women.

GARCIA-NAVARRO: Do you know how widespread this problem is, banning trans women from not being allowed to compete in pageants?

GREEN: My understanding is that there are a lot of pageant organizations that actually discriminate against transgender women.

GARCIA-NAVARRO: A lot of people see pageants as sort of, you know, something that is not necessarily supportive of women. They criticize them for objectifying women. Why do you want to participate?

GREEN: To me, pageantry isn't just about the way a person looks. To me, it's about giving people a voice. I think that it's important to recognize that pageantry is oftentimes geared mostly towards women. And it's important to have their voices heard.

GARCIA-NAVARRO: Do you have a specific issue that you highlight as your platform when you are competing?

GREEN: I want to show that beauty doesn't have to fit into a certain mold. I want to promote a message of body positivity. And I think it's important to discuss the horrifying things transgender people oftentimes have to go through. There have been at least 27 transgender people who have been murdered in the U.S.

GARCIA-NAVARRO: When you've participated in other pageants, have you felt discriminated against or - how has the pageant world treated you?

Exhibit C - Page 14 of 16

GREEN: Actually, I was welcomed with arms wide open. I thought that the Miss Universe organization treated me wonderfully, as well as the Miss Earth organization. The contestants in both pageant systems were wonderful and accepting of me, and I wasn't sure if they would be.

GARCIA-NAVARRO: Where does this lawsuit go now? What has the Miss United States of America pageant said?

GREEN: We haven't heard anything.

GARCIA-NAVARRO: That's Anita Green, 2019 Elite Miss Oregon. Thank you so much.

GREEN: Thank you.

(SOUNDBITE OF MUSIC)

GARCIA-NAVARRO: We also reached out to the Miss United States of America pageant for comment, and we have not yet heard back.

*Copyright © 2019 NPR. All rights reserved. Visit our website* terms of use *and* permissions *pages at* www.npr.org *for further information.*

*NPR transcripts are created on a rush deadline by* Verb8tm, Inc., *an NPR contractor, and produced using a proprietary transcription process developed with NPR. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

### Correction

**Dec. 22, 2019**

An earlier headline mistakenly said the Miss USA pageant is being sued by a transgender woman. It's actually the Miss United States of America pageant, a separate pageant, that's being sued.

## Sign Up For The NPR Daily Newsletter

Catch up on the latest headlines and unique NPR stories, sent every weekday.

| What's your email? | SUBSCRIBE |

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Exhibit C - Page 15 of 16

  MENU

 WATCH LIVE
On Air 10:56AM

 38°
Portland, OR

**BREAKING NEWS**
Mechanical issues disrupt MAX Blue and Red lines near Washington Park

CLOSE

## Transgender woman sues to compete in beauty pageant



Transgender woman sues to compete in beauty pageant



A transgender woman is suing to compete in the Miss United States of America pageant.

Published: 6:33 PM PST January 2, 2020

Exhibit C - Page 16 of 16

# EXHIBIT D

2/21/2020                                    The Dangerous Denial of Sex - WSJ

MEMBER SURVEY              WSJ wants to hear from you. Take part in this short survey to help shape The Journal. Take Survey          

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
https://www.djreprints.com.

https://www.wsj.com/articles/the-dangerous-denial-of-sex-11581638089

OPINION | COMMENTARY

# The Dangerous Denial of Sex

Transgender ideology harms women, gays—and especially feminine boys and masculine girls.

By Colin M. Wright and Emma N. Hilton

Feb. 13, 2020 6:54 pm ET



**PHOTO:** DAVID KLEIN

Transgender ideology can take on a comical character, as in a recent American Civil Liberties Union commentary objecting to sales tax on tampons and similar products while pondering: "How can we recognize that barriers to menstrual access are a form of sex discrimination without erasing the lived experiences of trans men and non-binary people who menstruate, as well as women who don't?"

Yet it's one thing to claim that a man can "identify" as a woman or vice versa. Increasingly we see a dangerous and antiscientific trend toward the outright denial of biological sex.

"The idea of two sexes is simplistic," an article in the scientific journal Nature declared in 2015. "Biologists now think there is a wider spectrum than that." A 2018 Scientific American piece asserted that "biologists now think there is a larger spectrum than just binary female and male." And an October 2018 New York Times headline promised to explain "Why Sex Is Not Binary."

The argument is that because some people are intersex—they have developmental conditions resulting in ambiguous sex characteristics—the categories male and female

Exhibit D - Page 1 of 9

exist on a "spectrum," and are therefore no more than "social constructs." If male and female are merely arbitrary groupings, it follows that everyone, regardless of genetics or anatomy should be free to choose to identify as male or female, or to reject sex entirely in favor of a new bespoke "gender identity."

To characterize this line of reasoning as having no basis in reality would be an egregious understatement. It is false at every conceivable scale of resolution.

In humans, as in most animals or plants, an organism's biological sex corresponds to one of two distinct types of reproductive anatomy that develop for the production of small or large sex cells—sperm and eggs, respectively—and associated biological functions in sexual reproduction. In humans, reproductive anatomy is unambiguously male or female at birth more than 99.98% of the time. The evolutionary function of these two anatomies is to aid in reproduction via the fusion of sperm and ova. No third type of sex cell exists in humans, and therefore there is no sex "spectrum" or additional sexes beyond male and female. Sex *is* binary.

There is a difference, however, between the statements that there are only two sexes (true) and that everyone can be *neatly* categorized as either male or female (false). The existence of only two sexes does not mean sex is never ambiguous. But intersex individuals are extremely rare, and they are neither a third sex nor proof that sex is a "spectrum" or a "social construct." Not everyone needs to be discretely assignable to one or the other sex in order for biological sex to be functionally binary. To assume otherwise—to confuse secondary sexual traits with biological sex itself—is a category error.

Denying the reality of biological sex and supplanting it with subjective "gender identity" is not merely an eccentric academic theory. It raises serious human-rights concerns for vulnerable groups including women, homosexuals and children.

Women have fought hard for sex-based legal protections. Female-only spaces are necessary due to the pervasive threat of male violence and sexual assault. Separate sporting categories are also necessary to ensure that women and girls don't have to face competitors who have acquired the irreversible performance-enhancing effects conferred by male puberty. The different reproductive roles of males and females require laws to safeguard women from discrimination in the workplace and elsewhere. The falsehood that sex is rooted in subjective identity instead of objective biology renders all these sex-based rights impossible to enforce.

The denial of biological sex also erases homosexuality, as same-sex attraction is meaningless without the distinction between the sexes. Many activists now define homosexuality as attraction to the "same gender identity" rather than the same sex. This view is at odds with the scientific understanding of human sexuality. Lesbians have been denounced as "bigots" for expressing a reluctance to date men who identify as women. The successful normalization of homosexuality could be undermined by miring it in an untenable ideology.

Those most vulnerable to sex denialism are children. When they're taught that sex is grounded in identity instead of biology, sex categories can easily become conflated with regressive stereotypes of masculinity and femininity. Masculine girls and feminine boys may become confused about their own sex. The dramatic rise of "gender

Exhibit D - Page 2 of 9

dysphoric" adolescents—especially young girls—in clinics likely reflects this new cultural confusion.

The large majority of gender-dysphoric youths eventually outgrow their feelings of dysphoria during puberty, and many end up identifying as homosexual adults. "Affirmation" therapies, which insist a child's cross-sex identity should never be questioned, and puberty-blocking drugs, advertised as a way for children to "buy time" to sort out their identities, may only solidify feelings of dysphoria, setting them on a pathway to more invasive medical interventions and permanent infertility. This pathologizing of sex-atypical behavior is extremely worrying and regressive. It is similar to gay "conversion" therapy, except that it's now bodies instead of minds that are being converted to bring children into "proper" alignment with themselves.

The time for politeness on this issue has passed. Biologists and medical professionals need to stand up for the empirical reality of biological sex. When authoritative scientific institutions ignore or deny empirical fact in the name of social accommodation, it is an egregious betrayal to the scientific community they represent. It undermines public trust in science, and it is dangerously harmful to those most vulnerable.

*Mr. Wright is an evolutionary biologist at Penn State. Ms. Hilton is a developmental biologist at the University of Manchester.*

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

Exhibit D - Page 3 of 9

**The New York Times** | https://nyti.ms/2ArrhVF

# Why Sex Is Not Binary

The complexity is more than cultural. It's biological, too.

**By Anne Fausto-Sterling**
Dr. Fausto-Sterling is a professor of biology and gender studies.

Oct. 25, 2018

Two sexes have never been enough to describe human variety. Not in biblical times and not now. Before we knew much about biology, we made social rules to administer sexual diversity. The ancient Jewish rabbinical code known as the Tosefta, for example, sometimes treated people who had male and female parts (such as testes and a vagina) as women — they could not inherit property or serve as priests; at other times, as men — forbidding them to shave or be secluded with women. More brutally, the Romans, seeing people of mixed sex as a bad omen, might kill a person whose body and mind did not conform to a binary sexual classification.

Today, some governments seem to be following the Roman model, if not killing people who do not fit into one of two sex-labeled bins, then at least trying to deny their existence. This month, Prime Minister Viktor Orban of Hungary banned university-level gender studies programs, declaring that "people are born either male or female" and that it is unacceptable "to talk about socially constructed genders, rather than biological sexes." Now the Trump administration's Department of Health and Human Services wants to follow suit by legally defining sex as "a person's status as male or female based on immutable biological traits identifiable by or before birth."

This is wrong in so many ways, morally as well as scientifically. Others will explain the human damage wrought by such a ruling. I will stick to the biological error.

[*The Opinion section is now on Instagram. Follow us at @nytopinion.*]

It has long been known that there is no single biological measure that unassailably places each and every human into one of two categories — male or female. In the 1950s the psychologist John Money and his colleagues studied people born with unusual combinations of sex markers (ovaries and a penis, testes and a vagina, two X chromosomes and a scrotum, and more). Thinking about these people, whom today we would call intersex, Dr. Money developed a multilayered model of sexual development.

He started with chromosomal sex, determined at fertilization when an X- or Y-bearing sperm fuses with an X-bearing egg. At least that's what usually happens. Less commonly, an egg or sperm may lack a sex chromosome or have an extra one. The resultant embryo has an uncommon chromosomal sex — say, XXY, XYY or XO. So even considering only the first layer of sex, there are more than two categories.

And that's just the first layer. Eight to 12 weeks after conception, an embryo acquires fetal gonadal sex: Embryos with a Y chromosome develop embryonic testes; those with two X's form embryonic ovaries. This sets the stage for fetal hormonal sex, when the fetal embryonic testes or ovaries make hormones that further push the embryo's development in either a male or a female direction (depending on which hormones appear). Fetal hormonal sex orchestrates internal reproductive sex (formation of the uterus, cervix and fallopian tubes in females or the vas deferens, prostate and epididymis in males). During the fourth month, fetal hormones complete their job by shaping external genital sex — penis and scrotum in males, vagina and clitoris in females.

By birth, then, a baby has five layers of sex. But as with chromosomal sex, each subsequent layer does not always become strictly binary. Furthermore, the layers can conflict with one another, with one being binary and another not: An XX baby can be born with a penis, an XY person may have a vagina, and so on. These kinds of

inconsistencies throw a monkey wrench into any plan to assign sex as male or female, categorically and in perpetuity, just by looking at a newborn's private parts.

Adding to the complexity, the layering does not stop at birth. The adults surrounding the newborn identify sex based on how they perceive genital sex (at birth or from an ultrasound image) and this begins the process of gender socialization. Fetal hormones also affect brain development, producing yet another layer called brain sex. One aspect of brain sex becomes evident at puberty when, usually, certain brain cells stimulate adult male or adult female levels and patterns of hormones that cause adult sexual maturation.

Dr. Money called these layers pubertal hormonal sex and pubertal morphological sex. But these, too, may vary widely beyond a two-category classification. This fact is the source of continuing disputes about how to decide who can legitimately compete in all-female international sports events.

There has been a lot of new scientific research on this topic since the 1950s. But those looking to biology for an easy-to-administer definition of sex and gender can derive little comfort from the most important of these findings. For example, we now know that rather than developing under the direction of a single gene, the fetal embryonic testes or ovaries develop under the direction of opposing gene networks, one of which represses male development while stimulating female differentiation and the other of which does the opposite. What matters, then, is not the presence or absence of a particular gene but the balance of power among gene networks acting together or in a particular sequence. This undermines the possibility of using a simple genetic test to determine "true" sex.

The policy change proposed by the Department of Health and Human Services marches backward in time. It flies in the face of scientific consensus about sex and gender, and it imperils the freedom of people to live their lives in a way that fits their sex and gender as these develop throughout each individual life cycle.

Anne Fausto-Sterling is an emeritus professor of biology and gender studies at Brown University.

A version of this article appears in print on Oct. 29, 2018, Section A, Page 19 of the New York edition with the headline: Why Sex Is Not Binary

Exhibit D - Page 5 of 9

Case 3:19-cv-02048-MO   Document 15   Filed 03/03/20   Page 74 of 84

**NEWS**

ELECTIONS

# Warren Urges Arizona to Reject 'Cruel' Bill Banning Males from Competing in Female Sports

By **MAIREAD MCARDLE** | February 20, 2020 3:51 PM

 LISTEN TO THIS ARTICLE



Sen. Elizabeth Warren in the spin room after the Democratic presidential candidates debate in Los Angeles, Calif., December 19, 2019. *(Kyle Grillot/Reuters)*

Exhibit D - Page 6 of 9

Arizona bill that would prevent biological males from competing in girls sports, calling the legislation "cruel."

"Trans athletes are not a threat," Warren wrote in a tweet. "We need to protect trans kids—and all LGBTQ+ kids—and ensure they feel safe and welcomed at school. I urge the Arizona legislature to reject this cruel bill."



TOP ARTICLES    1/5

Twitter Considering Tagging Posts in Effort to Combat 'Misinformation'    READ MORE »

The "Save Women's Sports Act" would assign high-school students to interscholastic and intramural leagues by their "biological sex" rather than the gender with which they identify, grouping biological females together and likewise for biological males.

The bill, introduced by state representative Nancy Barto, a Phoenix Republican, and co-sponsored by 22 other GOP state legislators, is intended to protect female athletes from competing against athletes who possess an unfair advantage over them, Barto claims.

Exhibit D - Page 7 of 9

biological males, who possess inherent physiological advantages. When this is allowed, it discourages female participation in athletics and, worse, it can result in women and girls being denied crucial educational and financial opportunities," Barto said.

Both public and private schools, including community colleges and universities, would be bound by the law.

In order for a transgender student to challenge a rejection from a girls sports league based on their male biology, the student must produce a sworn statement from a doctor describing the student's "internal and external reproductive anatomy," genetic makeup, and "normal endogenously produced levels of testosterone."

Advocates for LGBT rights have skewered the bill. The National Center for Lesbian Rights claimed transgender athletes have not caused any issues and accused lawmakers of attempting to "polarize and divide" people.

Transgender students have been allowed to compete in leagues with their preferred gender since 2014.

The bill comes after three female high-school students and their families filed a federal lawsuit seeking to block transgender athletes from competing in girls sports in Connecticut.

---



**MAIREAD MCARDLE** is a news writer for NATIONAL REVIEW ONLINE and a graduate of Thomas Aquinas College. **@johnsonhildy**

Exhibit D - Page 8 of 9

Exhibit D - Page 9 of 9

# EXHIBIT E

3 Connecticut high school girls are suing over a policy that allows trans athletes to compete in girls' sports - CNN

## US

### 3 Connecticut high school girls are suing over a policy that allows trans athletes to compete in girls' sports

By Christina Maxouris, CNN

☐ Updated 9:12 PM ET, Fri February 14, 2020

High school track athletes Alanna Smith, left, Selina Soule, center and and Chelsea Mitchell prepare to speak at a news conference outside the Connecticut State Capitol in Hartford, Connecticut, on February 12.

**(CNN) —** Three Connecticut high school girls, represented by their mothers, have filed a lawsuit over a policy which allows transgender athletes to participate in sports based on their gender identity.

Selina Soule, Chelsea Mitchell, Alanna Smith and their mothers claim in their lawsuit the Connecticut Interscholastic Athletic Conference's (CIAC) policy is a violation of the Title IX act -- which bars discrimination on the basis of sex.

The policy, they say in the suit, results in "boys displacing girls in competitive track events in Connecticut."

Related Article: Complaint says transgender athletes in Connecticut have an unfair competitive advantage

CIAC said in a statement after the lawsuit that the policy was implemented in 2013 and is compliant with both state and federal law.

In a statement earlier this week, the American Civil Liberties Union said it would seek to join the lawsuit to defend the interests of transgender student athletes.

"Efforts to undermine Title IX by claiming it doesn't apply to a subset of girls will ultimately hurt all students and compromise the work of ending the long legacy of sex discrimination in sports," Chase Strangio with the ACLU said in a statement.

CNN reached out to five Connecticut boards of education named as defendants in the lawsuit.

James Thompson, the superintendent of Bloomfield Public Schools said in a statement the school system "adheres to Connecticut Interscholastic Athletic Conference guidelines that allow

transgender high school athletes to compete in CIAC athletic programs without restrictions -- and consistent with their gender identity."

Glastonbury Public Schools Board of Education did not comment.

## 'I am a runner and I will keep running'

The Alliance Defending Freedom (ADF), the conservative nonprofit that is representing the plaintiffs, said in a statement CIAC's policy "robs female athletes of opportunities because of the physical advantages of males."

"Girls deserve to compete on a level playing field," ADF attorney Christiana Holcomb said in a statement. "Forcing them to compete against boys isn't fair, shatters their dreams, and destroys their athletic opportunities."

CNN has reached out to Holcomb for further comment.

As examples, the lawsuit mentions two transgender athletes by name, Terry Miller and Andraya Yearwood, who it says began competing in the 2017 track season and brought home "15 women's state championship titles."

"The more we are told that we don't belong and should be ashamed of who we are, the fewer opportunities we have to participate in sports at all," Miller said in a statement posted on the ACLU website.

Related Article: These trans people made history in 2019

"There is a long history of excluding Black girls from sports and policing our bodies," she said. "I am a runner and I will keep running and keep fighting for my existence, my community, and my rights."

Miller and Yearwood, the suit says, took "more than 85 opportunities to participate in higher-level competitions from female track athletes" from 2017 to 2019.

In her statement also on the ACLU website, Yearwood said it's painful to see people "not only want to tear down my successes, but take down the laws and policies that protect people like

Exhibit E - Page 2 of 5

me."

The lawsuit repeatedly references the two as "male athletes."

"The language of the complaint, which deliberately misgenders transgender youth and demands that high school athletics be organized by chromosomes, is an assault on the basic dignity and humanity of our transgender people," Strangio said in ACLU's statement after the lawsuit.

CNN has reached out to both Miller and Yearwood for further comment.

## What Title IX says

The lawsuit comes nearly eight months after ADF filed a complaint with the US Department of Education on behalf of three athletes -- Soule and two others who were unnamed -- claiming CIAC's policy on transgender athletes violated Title IX.

It called for an investigation into the policy. That investigation is still pending at the Office of Civil Rights, CIAC said in their statement.

Title IX, which became federal law in 1972, says, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

"What Title IX does not require -- or even permit," this week's lawsuit says, "is that recipients blind themselves to students' sex when developing their athletic programs."

Related Article: Georgia school district reverses transgender-friendly bathroom policy after death threats

According to CIAC's reference guide for its transgender policy, school districts should determine a student's participation on sports teams based on the student's gender identity and "daily life activities in the school and community at the time that sports eligibility is determined."

Those rules, the guide says, are compliant both with state law and Title IX.

The guide outlines that in a 2019 consultation with the Office for Civil Rights, part of the US

Department of Education, a federal compliance officer confirmed that Title IX "supports transgender athletic opportunities with the gender of which a person identifies."

"(The compliance officer) further stated that such support does not require hormone therapy nor gender reassignment surgery," the guide says.

In its statement, the CIAC said it also consulted with the Connecticut Commission on Human Rights and Opportunities, the Connecticut State Department of Education and the National Federation of State High School Associations when it first adopted the policy and then reviewed its policy.

*CNN's Giulia McDonnell, Isabelle Lee, Janette Gagnon and Laura Ly contributed to this report.*

**Content by LendingTree** >

Refi rates at 2.994% APR (15 yr). Do you qualify?

Hack your mortgage by refinancing to a 15yr fixed

Homeowners are reducing interest by up to 40%

Search CNN...

US

World

Politics

Business

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Coupons

More

**US**

**FOLLOW CNN**

Terms of Use    Privacy Policy    Accessibility & CC    AdChoices    About Us    CNN Studio Tours    CNN Store    Newsletters

Transcripts    License Footage    CNN Newsource    Sitemap

© 2020 Cable News Network.  Turner Broadcasting System, Inc.  All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Exhibit E - Page 5 of 5

## CERTIFICATE OF SERVICE

I certify that on March 3, 2020, I electronically filed the above motion with the Clerk

of the Court by the CM/ECF system. The following participant in the case who is a registered

CM/ECF user will be served by the CM/ECF system and email:


Shenoa L. Payne, OSB No. 084392
805 SW Broadway, Suite 470
Portland, Oregon 97205
(503) 517-8205
spayne@paynelawpdx.com

Attorney for Plaintiff


s/ John Kaempf
John Kaempf
Attorney for Defendant