John Kaempf, OSB No. 925391
KAEMPF LAW FIRM PC
1050 SW Sixth Avenue, Suite 1414
Portland, Oregon 97204
Phone: (503) 224-5006
john@kaempflawfirm.com

       Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **ANITA NOELLE GREEN**, an individual, <br><br>    Plaintiff, <br><br>v. <br><br>**MISS UNITED STATES OF AMERICA, LLC**, a Nevada limited liability corporation, d.b.a. United States of America Pageants, <br><br>    Defendant. | Case No. 3:19-cv-02048 <br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br>REQUEST FOR ORAL ARGUMENT |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

L.R. 7-1 COMPLIANCE ................................................................................................ 1

MOTION ........................................................................................................................ 1

INTRODUCTION ......................................................................................................... 1

UNDISPUTED MATERIAL FACTS ......................................................................... 2

    Defendant promotes, celebrates, and empowers biological women. ........................... 2

    Defendant ensures that pageant contestants promote Defendant's message
    through its "natural born female" rule and other requirements..................................... 3

    Defendant ensures its pageant and pageant participants promote Defendant's
    message. ...................................................................................................................... 5

    Defendant's pageant is a live production that celebrates biological women
    through interviews, onstage performances, program books, and social media............ 6

    It is undisputed that Plaintiff is a biological male who competes in pageants
    as an "openly transgender" female............................................................................... 9

ARGUMENT.................................................................................................................. 11

I.    The requested relief violates the First Amendment by forcing Defendant to
    expressively associate in a way that undermines its message about biological
    womanhood. .............................................................................................................. 11

    A.    Defendant is a primarily expressive entity. .................................................... 12

    B.    Defendant engages in expression by promoting biological women. ............... 15

    C.    Forcing Defendant to include Plaintiff would affect Defendant's
        expressive association by equating biological men to women.
        That violates the First Amendment. ................................................................ 16

II.    The requested relief violates the First Amendment by compelling Defendant
    to speak a message about womanhood it disagrees with. ........................................... 19

    A.    Plaintiff attempts to leverage the Act to alter Defendant's expressive
        content, the Act is triggered by that content, and the Act must overcome
        strict scrutiny, but does not.............................................................................. 20

    B.    Defendant engages in protected speech through its pageant. .......................... 22

C.     Defendant engages in protected speech by selecting pageant
       contestants.................................................................................................. 22

D.     Plaintiff's requested relief compels Defendant to convey a message
       about women it does not want to speak and cannot be forced to express. ...... 23

E.     Plaintiff's requested relief alters, is triggered by, and awards access
       based on the content and viewpoint of Defendant's speech. ......................... 29

III.   The requested relief fails strict scrutiny because Plaintiff has no compelling
       need to force Defendant to speak and associate in support of Plaintiff's views. ........ 30

IV.    Forcing Defendant to speak and associate endangers speakers of all viewpoints. ..... 32

# TABLE OF AUTHORITIES

## CASES

*Abukhalaf v. Morrison Child & Family Services*,
2009 WL 4067274 (D. Or. 2009) .......................................................................... 32

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) ......................................................... 20, 21, 22, 23

*Animal Legal Defense Fund v. Wasden*,
878 F.3d 1184 (9th Cir. 2018) ...................................................................... 23, 31

*Apilado v. North American Gay Amateur Athletic Alliance*,
792 F. Supp. 2d 1151 (W.D. Wash. 2011).................................................... 15, 17

*Arizona Libertarian Party v. Reagan*,
798 F.3d 723 (9th Cir. 2015) ................................................................................ 18

*Barnett v. E:Space Labs LLC*,
2018 WL 3364660 (D. Or. July 10, 2018).......................................................... 32

*Barr v. American Association of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020)......................................................................................... 29

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000)............................................... 11, 12, 15, 16, 19, 21, 28, 30

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011).................................................................................... 22, 30

*Brush & Nib Studio, LC v. City of Phoenix*,
448 P.3d 890 (Ariz. 2019).................................................................................... 31

*Buckley v. Valeo*,
424 U.S. 1 (1976)................................................................................................. 35

*Cantwell v. Connecticut*,
310 U.S. 296 (1940).............................................................................................. 21

*Celotex v. Catrett*,
477 U.S. 317 (1986).............................................................................................. 11

*Christian Legal Society v. Walker*,
453 F.3d 853 (7th Cir. 2006) ............................................................................... 17

*Citizens United v. Federal Election Commission*,
   558 U.S. 310 (2010) ................................................................................ 12

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) ................................................................................ 21

*Claybrooks v. American Broadcasting Companies, Inc.*,
   898 F. Supp. 2d 986 (M.D. Tenn. 2012) ................................... 23, 24, 32, 33, 34

*Cohen v. California*,
   403 U.S. 15 (1971) .................................................................................. 21

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ................................................................................ 30

*Healy v. James*,
   408 U.S. 169 (1972) ................................................................................ 13

*Hernandez v. Spacelabs Medical, Inc.*,
   343 F.3d 1107 (9th Cir. 2003) ................................................................. 11

*Hess v. Indiana*,
   414 U.S. 105 (1973) ................................................................................ 21

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
   515 U.S. 557 (1995) ................................ 12, 20, 21, 22, 24, 26, 27, 28, 31, 33, 35

*IDK, Inc. v. Clark County*,
   836 F.2d 1185 (9th Cir. 1988) ......................................................... 12, 13, 15

*In re City/Cty. Computer Center*,
   1 BOLI 197 (Apr. 23, 1979) ..................................................................... 34

*Invisible Empire of the Knights of the Ku Klux Klan v. Mayor of Thurmont*,
   700 F. Supp. 281 (D. Md. 1988) ............................................................... 18

*Janus v. American Federation of State, County & Municipal Employees, Council 31*,
   138 S. Ct. 2448 (2018) ............................................................................ 19

*Lahmann v. Grand Aerie of Fraternal Order of Eagles*,
   121 P.3d 671 (Or App 2005) .................................................................... 18

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
   138 S. Ct. 1719 (2018) ............................................................................ 26

*Matal v. Tam*,
   137 S. Ct. 1744 (2017) ............................................................................ 35

*National Institute of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) ................................................................ 29

*New York County Board of Ancient Order of Hibernians v. Dinkins*,
  814 F. Supp. 358 (S.D.N.Y. 1993) .......................................... 23, 25

*Norma Kristie, Inc. v. City of Oklahoma City*,
  572 F. Supp. 88 (W.D. Okla. 1983) .............................................. 22

*Pacific Gas & Electric Company v. Public Utilities Commission of California*,
  475 U.S. 1 (1986) ......................................................... 21, 27, 29

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) ................................................................ 15

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) ......................................................... 29, 30

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
  487 U.S. 781 (1988) ............................................................. 21, 29

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ...................................................... 11, 17, 18

*Schwenk v. Boy Scouts of America*,
  551 P.2d 465 (Or 1976) ............................................................... 32

*Snyder v. Phelps*,
  562 U.S. 443 (2011) .................................................................... 28

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975) .................................................................... 22

*Spence v. Washington*,
  418 U.S. 405 (1974) .................................................................... 21

*United Mine Workers of America, District 12 v. Illinois State Bar Association*,
  389 U.S. 217 (1967) .................................................................... 13

*United States v. O'Brien*,
  391 U.S. 367 (1968) ......................................................... 20, 21, 32

*United States v. Playboy Entertainment Group, Inc.*,
  529 U.S. 803 (2000) .................................................................... 30

*United States v. Rubio*,
  727 F.2d 786 (9th Cir. 1983) ....................................................... 15

*Vejo v. Portland Public Schools*,
204 F. Supp. 3d 1149 (D. Or. 2016) ................................................. 32

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ............................................................ 10

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) ......................................................................... 28

*Wooley v. Maynard*,
430 U.S. 705 (1977) ......................................................................... 19

**STATUTES**

20 U.S.C. § 1681(a)(9) ............................................................................ 31

29 C.F.R. § 1604.2(a)(1)(iii) .................................................................. 32

42 U.S.C. § 2000a(b) .............................................................................. 32

ORS 659A.400(2)(b) .............................................................................. 32

ORS 659A.403 ............................................................................... passim

ORS 659A.403(1) .................................................................................. 34

**RULES**

**Fed. R. Civ. P. 56** ......................................................................... 1, 11

Fed. R. Evid. 801(d)(2) .......................................................................... 10

Fed. R. Evid. 803(8)(A) .......................................................................... 18

Fed. R. Evid. 901(b) ............................................................................... 10

Fed. R. Evid. 902(5) ............................................................................... 18

OAR 839-005-0003(9) ............................................................................ 17

**CONSTITUTIONAL PROVISIONS**

**U.S. Const. amend. XIV** ............................................................. passim

**OTHER AUTHORITIES**

David Horsey, *'Hamilton' gets past race by imagining Founding Fathers with black and brown faces*, L.A. Times (Sept. 18, 2017), https://lat.ms/3hCKK8L ............................... 34

## L.R. 7-1 COMPLIANCE

In compliance with this Rule, the parties made a good faith effort through telephone conferences to resolve the dispute and have been unable to do so.

## MOTION

Under FRCP 56, defendant moves for summary judgment against this civil action. That is because Plaintiff's sole claim is barred by Defendant's First Amendment rights to free speech and free association. This Motion is supported by the following Memorandum of Law; the declaration of Ms. Tanice Smith, Defendant' s National Director; judicially noticeable materials; and the Court's file.

## INTRODUCTION

In a society where women receive fewer opportunities than men, women deserve a platform to compete, to speak, and to be celebrated. Defendant provides this platform through its beauty pageant—a competition where women express themselves, build confidence, and vie for the crown of Miss United States of America before a live audience. But Defendant cannot accept everyone into its pageant to achieve its goals. Instead, Defendant carefully regulates its pageant's contents. Defendant selects contestants based on numerous criteria including character, age, biological sex, and residency. Defendant monitors titleholder's social media posts and public appearances; and Defendant has rejected an advertisement of a man dressed as a woman in its pageant program. Through it all, Defendant seeks to convey a well-crafted message about its vision of what it means to be a woman—and what type of person should be honored as Miss United States of America.

But Plaintiff has a different view and tries to mandate it through ORS 659A.403— Oregon's Public Accommodations Act ("Act")—invoking the Act to forcibly participate in

Defendant's pageant as an "openly transgender" biological male. (Complaint ("Compl.") ¶¶ 2, 5, 27, ECF No. 1.)  But in so doing, Plaintiff seeks to commandeer Defendant's message about womanhood and replace it with Plaintiff's preferred view. (*Id.*, Prayer for Relief, ¶¶ 1-6.)

The Act was never intended for this.  Plaintiff's argument would eliminate speaker autonomy and eviscerate editorial freedom.  It would convert courts and government officials into censorship boards that would have to nitpick every casting decision and then choose winners in the marketplace of ideas.  That violates the First Amendment.

The better, and legal, approach is to protect the free-speech and association rights of *all* different speakers and all different viewpoints.  That approach ensures that those like Plaintiff can produce pageants promoting their view of womanhood just as Defendant can do the same.  And this means that expressive works like motion pictures, plays, and pageants get to pick their messages, not plaintiffs, prosecutors, judges, or politicians.  Society is better off when speakers get to choose what they say and how they associate.  The First Amendment puts this presumption into law.  And it justifies for summary judgment in Defendant's favor.

## UNDISPUTED MATERIAL FACTS

**Defendant promotes, celebrates, and empowers biological women.**

Defendant showcases beauty pageants for women throughout the United States. (Decl. of Tanice Smith in Supp. of Def.'s Mot. for Summ. J. ("Decl."), ¶¶ 4-6.)  It does so to "encourage women to strive to ACHIEVE their hopes, dreams, goals, and aspirations, while making them feel CONFIDENT and BEAUTIFUL inside and out!" (Ex. 2 at 1.)  And Defendant promotes "women empowerment," a "positive self-image," and "a platform of

community service" to enable "contestants to rise by lifting others." (*Id.*)  Defendant's

"motto is to EMPOWER Women, INSPIRE others, & UPLIFT everyone!" (*Id.*)  In all of

this, Defendant empowers pageant participants to form an "elite sisterhood" and "inspire[s]

each delegate to be the best version of herself!" (*Id.*)

**Defendant ensures that pageant contestants promote Defendant's message through its "natural born female" rule and other requirements.**

To convey these messages, Defendant uses eligibility requirements for contestants.

(Ex. 2 at 1-2.)  Under one rule, contestants must be "*natural* born female[s]." (*Id.* (emphasis

added).  Under another rule, contestants may not have ever "posed nude" in media. (*Id.*)

Defendant also has age, residency, marital status, and <u>maternity</u> requirements which slot

contestants into particular divisions (i.e. "Ms." division, "Mrs." division). (*Id.*)

To participate in Defendant's pageant, biological women must apply online to

become a contestant. (Decl. ¶¶ 16-19; Ex. 3.)  The application is reviewed by Defendant's

"selection committee." (Ex. 3 at 1.)  In this application, each applicant must acknowledge she

has "read the delegate packet." (*Id.*)  The delegate packet contains information for

contestants, including Defendant's eligibility requirements and a summary of the competition

areas. (*See* Exs. 6-8.)

Applicants are not selected as contestants if they do not meet Defendant's eligibility

requirements or appear to promote messages inconsistent with Defendant's messages. (Decl.

¶ 41.)  Defendant rejected an Oregon applicant because she had "posed nude for a Private

'sci fi' style photographer 4 1/2 years ago." (*Id.* at ¶¶ 42-45; Ex. 9.)  Defendant also rejected

a Nevada applicant because the "photographs and language used" in her application were

"inconsistent with" Defendant's "vision and message [it] wish[es] to *associate* with and does

not coincide with [Defendant's] efforts to produce community role models." (Decl. ¶ 46-51; Ex. 11; emphasis added.)

After Defendant selects an applicant as a contestant, she must sign a contract ("Agreement") before participating in a pageant. (Decl. ¶ 52; Exs. 12-14.)  Defendant's Agreements regulate contestants' past and future behavior, social media posts, community involvement, and participation in the national pageant. (*See, e.g.*, Ex. 14 at 2-7, 10.)  Each year, Defendant adds more requirements to its Agreement to maintain firm control over its message. (*See* Decl. ¶ 119. *Compare, e.g.*, Ex. 14 *with* Ex. 13 *with* Ex. 12.)

By signing the current Agreement, contestants agree to, among other requirements, "be of good moral character"; to refrain from illegal activities and other behavior "that is, or could be, perceived by" Defendant "as contrary to the mission of the organization"; and to not appear in media "nude" or in "highly suggestive" poses. (Ex. 14 at 3.)

The Agreement also requires contestants to subject their social media to Defendant's scrutiny.  Contestants "consent" to Defendant's "authority to monitor and regulate the content of [their] personal social media accounts." (*Id.* at 4.)  And they agree not to post certain content, including content which may be "sexually explicit," "offensive," or "inconsistent with the positive images and/or good will with which [Defendant] wishes to associate." (*Id.*)

Contestants also agree to appear regularly at events if they become a titleholder, complete a "Year of Service," comply with Defendant's "dress code regulation standards" while appearing as a titleholder, allow Defendant to schedule appearances, and seek approval from Defendant before attending any event as a titleholder. (*Id.* at 5-6.)  And contestants

agree to be "fully engaged participant[s]" during pageant week and be "fully engaged roommate[s]" if they room with another contestant. (*Id.* at 10.)

Defendant enforces these contracts. (Decl. ¶¶ 76-83.)  For example, Defendant revoked the national title from a Miss titleholder after she posted social media pictures of herself displaying inappropriate behavior in revealing clothing. (Ex. 21 at 1-2.)  Defendant found that these photographs were not "in good taste" and did not show her "as a role model." (*Id.*)  And Defendant revoked the state title from Ms. Georgia when she posted a social media picture of herself "in a thong." (Ex. 22 at 1.)  Defendant did so because the photograph was "inconsistent with [Defendant's] vision and message" and "harmed" Defendant's "message of empowering women, promoting positive self-images, and encouraging women to be role models." (*Id.*)

**Defendant ensures its pageant and pageant participants promote Defendant's message.**

In addition to regulating its contestants, Defendant also safeguards its message by requiring pageant emcees, judges, and volunteers to sign contracts to confirm they will speak and act consistent with Defendant's mission. (Decl. ¶¶  62-75.)  Because of their prominent role during the pageant, emcees have added requirements.  They cannot promote "messages inconsistent with [Defendant's] values, message, or ideals," "political, social or economic issues, groups or ideas," or "personal opinions regarding any political, social, or economic issues, groups or ideas" during the pageant. (Ex. 18 at 2.)  Likewise, emcees must "read the script as it is written." (*Id.*)  If an emcee breaches the contract, Defendant may take "legal action." (*Id.*)

**Defendant's pageant is a live production that celebrates biological women through interviews, onstage performances, program books, and social media.**

Since 2019, Defendant has orchestrated an annual national pageant where winners of state pageants or at-large contestants compete to be crowned as a United States of America's Miss. (Decl. ¶ 33.)  National contestants receive benefits for their entry fee, including a custom "embroidered sash," a "tiara," designer clothing, photograph advertisements, meals, and a hotel room. (*See* Ex. 8 at 9.)  During national pageant week, contestants also participate in a mix of activities—from orientation, to group outings, to rehearsals. (Decl. ¶ 89. *See* Ex. 6 at 1-2.)

But the main event is the pageant itself which is performed before a live and live-streamed audience. (Decl. ¶ 91.)  The pageant has preliminary and final rounds where contestants perform in order of their division and alphabetically by state. (*See*  Exs. 24-26.)

In the preliminary round, contestants do an off-stage interview with judges in a round robin format. (Ex. 6 at 6; 7 at 6; Ex. 8 at 5.)  Judges consider contestants' "personality," "voice," and "confidence," and the quality of the contestants' answers "in terms of content and knowledge," how well she can "think on her feet," and her ability to be "articulate." (*See* Ex. 8 at 5; Ex. 27.)  After the interviews, contestants perform onstage in patriotic costumes, fitness attire, and formal gowns. (*See* Ex. 7 at 6-8; 8 at 5-7.)  In these onstage competitions, each contestant performs by herself, with the focus solely on her for a brief time. (*See* Exs. 24-26.)

The costume competition is an independent competition designed to evaluate contestants' "creativity of costume," "modeling," "personality," and "stage presence." (Ex. 8 at 5.)  Contestants showcase their patriotism by wearing red, white, and blue outfits,

and other attire emblematic of American history and pride (like the Statue of Liberty, astronaut, and bald eagle costumes). (*See* Ex. 24 at 9:05-44:04 (fitness prelim).)

For the fitness and gown competitions, each contestant models onstage in her fitness wear, swimsuit, or formal gown. (Ex. 24 at 45:00-1:24:00; Ex. 25 at 8:00-54:14.)  In this phase, judges evaluate elements like attire selection, stage presence, fitness, figure, poise, grace, charm, style, modeling, and movement. (Ex. 8 at 6-7; Ex. 27.)  Contestants receive scores based on their interview, fitness, and gown scores, with the overall score split fifty percent for interviews and fifty percent for fitness and gowns. (Ex. 8 at 8.)

The day after the preliminary rounds, contestants return to the stage for a final round. Before the finalists are announced, contestants come together onstage and perform a choreographed dance with the other women in their division. (Ex. 26 at 2:51-5:49.)  Each woman wears a cocktail dress and Defendant's specialized sash reflecting her division and state. (*Id*.)  After performing as a group, each contestant presents herself individually to the audience by announcing her name and title—again while wearing Defendant's custom sash. (*Id.* at 5:50-11:30.)  All contestants then return to the stage together to await the preliminary round results. (*Id.* at 11:34-13:30.)

The emcees announce the semi-finalists from each division, who then compete against each other with fitness and gown performances. (*Id.*at 13:44-22:26.)  The judges score the semi-finalists according to the same criteria evaluated during the preliminary round. (*See, e.g.*, Ex. 8 at 8; Ex. 27.)

Judges select three semi-finalists to advance to the final round for onstage questioning. (Ex. 26 at 1:34:46-1:41:50; Ex. 8 at 8.)  Questions have included: "What will you do to … promote your platform on a national level?; "Why is the image you portray on

your personal social media accounts important as a title holder?"; and "What does the swimsuit competition mean to you?" (Ex. 26 at 1:43:00-2:01:07.)  Defendant decides which questions the emcees ask. (Decl. ¶ 8.)

After the final scores are tallied—fifty percent for onstage questioning and fifty percent for fitness and gown presentations—the emcees invite all the contestants to return to the stage in their formal wear for final awards. (Ex. 26 at 2:09:30-2:12:10; Ex. 8 at 8.)  The emcees announce the specialty awards—including the patriotic costume competition winners—and then announce the new titleholders for each division. (Ex. 26 at 2:12:10-2:25:00.)  New titleholders are presented with a sash proclaiming them as "United States of America's" Teen, Miss, Ms. or Mrs. and the emcees announce them as United States of America's Teen, Miss, Ms., or Mrs. (Ex. 26 at 2:18:34-56, 2:20:33-2:21:03, 2:22:23-2:23:02, 2:24:04-53.)

Throughout the pageant, Defendant identifies each contestant by division (Teen, Miss, Ms., or Mrs.) and by state (*e.g.* Miss Oregon).  Whenever a contestant performs onstage for the fitness or gown competitions, the contestant's name appears on the stage's backdrop and an emcee announces the contestant. (*See, e.g.*, Ex. 24 at 9:00-1:24:00.)  And when the contestants appear on stage together, Defendant's name, logo, or abbreviation are often displayed, and contestants often wear their custom sashes provided by Defendant. (*See* Ex. 26 at 2:53-11:30.)

Defendant also associates with each contestant in its national program book.  In this book, Defendant's logo appears throughout, and each contestant receives a roster photograph and a one-page spread identifying her as a state titleholder and displaying other inspirational text. (Ex. 28 at 29-35, 39-96; Ex. 29 at 36-106.)

Tanice Smith, Defendant's National Director, produces Defendant's pageant. (Decl. ¶ 7.)  For example, Ms. Smith selects the divisions, categories of competition, eligibility requirements, and judging criteria. (*Id.* at ¶ 8.)  She also writes the emcee's scripts, chooses the pageant's music and backgrounds, helps with choreography, designed the contestants' sashes, and makes decisions about stage lighting. (*Id.*)  Ms. Smith also decides which advertisements to include in the national program book and has *excluded* an advertisement showing a man dressed as a woman because it was inconsistent with Defendant's message. (Decl. ¶¶ 105-06; Ex. 30.)

Defendant continues to communicate its message by promoting its contestants, their community service, and social issues during the year.  For example, Defendant promotes local Oregon title holders by posting photographs of them on social media with their custom-made "Miss" sash in front of Defendant's logo. (Ex. 4 at 22-33.)  Defendant also celebrates its contestants' accomplishments and community involvement for causes like "Flip Flops Around the World," "Casa Hogar," "Millcreek food and supply drive." (Ex. 5.) And Defendant comments on important social issues such as voting, infertility, and race relations. (Ex. 4 at 1, 9-10; Ex. 5 at 4.)  Defendant also advertises its pageant by posting flyers to social media designating the competition categories ("Teen," "Miss," "Ms.," and "Mrs.") and encouraging the public to vote for contestants to benefit their "favorite charity." (Ex. 4 at 13-21.)

**It is undisputed that Plaintiff is a biological male who competes in pageants as an "openly transgender" female.**

Plaintiff began participating in pageants as an "openly transgender contestant" in 2017. (Compl. ¶ 27.)  Since then, Plaintiff has competed in pageants in Montana, Oregon,

and Nevada. (*Id.* at ¶¶ 27-28.)  Plaintiff participates in pageants to improve "public speaking

skills" and to obtain "a public platform in which to discuss important social issues …." (*Id.*

at ¶ 29.)

In fact, Plaintiff wrote an entire article about competing as an "openly transgender"

contestant. (Ex. 40.)[1]  Media follow Plaintiff's pageantry participation as a "transgender

woman." (Exs. 41-42.)[2]  Plaintiff speaks out on social media about believing transgender

women are women, being transgender, and competing in pageants as a transgender

contestant. (Exs. 37-38.)[3]  And Plaintiff maintains a YouTube channel where Plaintiff posts

videos on these same topics[4]

In December 2018, Plaintiff started a Facebook conversation with Ms. Smith. (Ex.

34.)  Plaintiff asked about participating in Defendant's pageant. (*Id.* at 1.)  At Plaintiff's

request, Ms. Smith gave Plaintiff a copy of Defendant's rules. (*Id.*)  After learning about the

natural-born-female rule, Plaintiff volunteered that Plaintiff is "transgender." (*Id.* at 2)  Ms.

Smith twice offered to help Plaintiff find another pageant, but Plaintiff declined. (*Id.*)

Plaintiff ended the conversation declaring an intent to "talk to my attorney about this." (*Id.*)

In January 2019, Plaintiff formally applied to participate in Defendant's 2019 national

pageant. (Ex. 35.)  Defendant declined that application because the "entry deadline for [the]

2019 pageant has passed" and Defendant was "not currently taking applications for [the]

2020 pageant." (*Id.* at 4.)  Plaintiff then filed this lawsuit.

---

[1] This article is admissible (FRE 801(d)(2) and 901(b)), and judicially noticeable (*Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010)).
[2] These articles are admissible (FRE 901(b)), and judicially noticeable. *See supra* n.1.
[3] These posts are admissible and judicially noticeable. *See supra* n.1.
[4] These posts are admissible and judicially noticeable. *See supra* n.1.

## ARGUMENT

Under FRCP 56, the Court should grant Defendant summary judgment against this entire action because "there is no genuine issue of "material fact," and Defendant deserves a "judgment as a matter of law." To survive a summary judgment motion, the nonmoving party must show a "genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324 (1986). To make this showing, Plaintiff cannot rely on "allegations in the complaint," "unsupported conjecture[,] or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

Here, the undisputed facts prove that this action is barred by the First Amendment to the U.S. Constitution because (I) the requested relief alters Defendant's message by compelling expressive association; (II) the requested relief compels speech to which Defendant objects; (III) burdening these rights fails strict scrutiny; and (IV) the requested relief endangers speakers of all viewpoints.

## I.    The requested relief violates the First Amendment by forcing Defendant to expressively associate in a way that undermines its message about biological womanhood.

Plaintiff's requested relief compels Defendant to associate in a way that infringes its expression. The First Amendment protects the right "to associate" or not associate with others for many "political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622-23 (1984). This means the government may not invade an organization's expression by forcing "inclusion of an unwanted person in a group" if doing so affects "the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

To evaluate this, the Supreme Court uses a three-step test: the group (1) must "engage in some form of expression"; (2) "the forced inclusion" must "significantly affect the [organization's] ability to advocate public or private viewpoints"; and (3) the application in question must satisfy strict scrutiny. *Id.* at 648, 650, 656-57. But before engaging this test, the Ninth Circuit asks whether the association is "primarily expressive" or "primarily commercial." *IDK, Inc. v. Clark Cty.*, 836 F.2d 1185, 1195 (9th Cir. 1988). Applying these four prongs, the court should dismiss this action with prejudice because Defendant is a primarily expressive entity (§ I.A) and satisfies the other three *Dale* factors (§§ I.B-C, III).

## A.    Defendant is a primarily expressive entity.

Defendant is a primarily expressive entity because its purpose is to promote, encourage, and empower *biological* women and to communicate its message to its contestants and to the wider public through its pageant.

Defendant's pageant is speech fully protected by the First Amendment. *Compare* § II.A-C (explaining how pageant is protected speech) *with IDK, Inc.*, 836 F.2d at 1195 (noting "escort services" were not "expression"). True, pageantry is not "explicitly mentioned in the first amendment." *Id.* But neither are movies, video games, television shows, parades, paintings, theatre productions, or atonal musical compositions. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). The First Amendment still protects them just as it protects Defendant's pageant.

Also, Defendant operates a for-profit company. (Decl. ¶ 3.) But freedom of speech "extends to corporations." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010). Because the freedom to expressively associate is "implicit in the freedom[] of

speech," *Healy v. James*, 408 U.S. 169, 181 (1972) (Powell, J.), that means for-profit organizations also have the right to freely associate. *See United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 225 (1967) (holding unions have association rights); Indeed, the Ninth Circuit identifies for-profit entities that can invoke expressive-association protections—businesses like publishers, newspaper companies, concert promoters, and television studios. *IDK, Inc.*, 836 F.2d at 1195.

Just as these entities necessarily create speech, "expression is a significant or necessary component of" what Defendant does. *Id*. Defendant's organization exists to put on a pageant, an expressive event that necessarily conveys messages. (Decl. ¶ 4.) That makes Defendant much more like "publishers, concert promoters, and cable television" studios than escort services that do not "ensure that any expression occurs." *IDK, Inc.*, 836 F.2d at 1195.

This point also explains why Defendant—unlike an escort service—exercises "editorial judgment over the messages" its contestants convey and "control[s] the content of" the pageant's "expression." *Id.* Before the pageant begins, Defendant has already shaped its message by selecting contestants. This process sets up significant restrictions—<u>biological</u>, moral, and ethical to name a few—on who can participate in the pageant based on Defendant's editorial judgment so that Defendant's pageant can promote certain views and ideals. (*See* Ex. 2; Exs. 12-14.)

Then, the week of the pageant, contestants perform "group activities" sponsored by Defendant. (Ex. 6 at 1; Ex. 7 at 4.) These activities highlight Defendant's message and have included contestants participating in team-building exercises, and packing lunches for charities. (Decl. ¶ 89.) Defendant even supervises how contestants participate in these events

and with each other by requiring all contestants to be "fully engaged participant[s]" and "fully engaged roommate[s]." (Ex. 14 at 10.)

During the pageant, Defendant puts its stamp of approval on each contestant as Defendant introduces the contestants to the stage under their state titleholder designation, adorns contestants with Defendant's custom sash, and displays Defendant's logo in the background. (Ex. 25 at 9:00-1:24:00; Ex. 26 at 2:53-11:30.)  This all occurs while contestants gain valuable experience and build confidence by expressing themselves on stage through performing in patriotic costumes, fitness and swim wear, and formal gowns. (*See, e.g.*, Ex. 8 at 5-7.)  But public speaking is the most important part of contestants' overall scores, consuming half of their total score. (*Id.* at 8.)[5]

Defendant's control extends to volunteers, judges, and emcees who must read "the script as it is written." (Exs. 16-17, 19-20; Ex. 18 at 2.)  And it extends to Defendant's program book where Defendant promotes its contestants to the pageant audience in full-page promotions featuring Defendant's logo alongside the contestant's name, inspirational quotes, and community service platforms. (*See, e.g.*, Ex. 29 at 43, 54, 68-69, 73, 86, 101.)  Defendant even dictates the sponsors' advertisements in the program book and rejected one advertisement depicting a man dressed as a woman because it contradicted Defendant's message. (Decl. ¶ 106; Ex. 30.)

After the pageant, Defendant continues to editorialize its message by celebrating the titleholder's accomplishments and community service on social media, by requiring titleholders to engage in a "Year of Service" where they must conduct themselves with

---

[5] Plaintiff agrees the personal and on-stage interviews "could" be "expressive." Tr. 25:11-17.

"dignity, grace, and good manners," and by revoking titles from titleholders who fail to live up to Defendant's vision. (*See* Ex. 14 at 5-6; Exs. 21-22.)  And Defendant advertises its pageant and contestants in social media. (Ex. 4 at 1-21.)  *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1735-36 (2017) ("[S]ocial media users employ [websites] to engage in … First Amendment activity ….").

In all of these ways, Defendant touts their contestants' "skills in conversation, advocacy, teaching, [and] community service" and "care[s]" about what contestants "talk about" and "whether they talk at all." *Contra IDK, Inc.*, 836 F.2d at 1195-96.  Indeed, Defendant's pageant is an activity "predominately of the type protected by the First Amendment." *Id.* at 1195.  Defendant is therefore an "association" engaged in primarily "expressive activity." *Dale*, 530 U.S. at 655.

## B.    Defendant engages in expression by promoting biological women.

Turning to the first *Dale* step—engaging in expression—the bar is low.  *See Dale*, 530 U.S. at 650 (instilling "a system of values" is expressive); *United States v. Rubio*, 727 F.2d 786, 791 (9th Cir. 1983) ("Hell's Angels" is protected association); *Apilado v. N. Am. Gay Amateur Athletic All.*, 792 F. Supp. 2d 1151, 1161 (W.D. Wash. 2011) (LGBT sports are expressive).

Defendant easily clears this hurdle.  Defendant's mission is to encourage, empower, and celebrate *biological* women. (Ex. 2.)  Defendant promotes these values in many ways, including through its eligibility rules, contracts, program books, pageant, and social media. (*See* Exs.  2-4, 12-14, 24-26, 28-29.)

Yet Plaintiff still claims Defendant is not expressive because it is "basically silent on anything regarding transgender women, cisgender women." (Official Court Transcript 28:16-17, ECF No. 29 "Tr.".)

Not so. Defendant repeatedly references "natural born females," imposes additional requirements for contestants to compete for the crown, and evaluates contestants based on criteria reflecting the type of message Defendant seeks to convey about women. (*See, e.g.*, Ex. 2; Ex. 14 at 2-5.) Almost everything Defendant does conveys a concept about womanhood and what it means to be female.

In any event, courts defer to "an association's assertions regarding the nature of its expression." *Dale*, 530 U.S. at 653. For example, in *Dale*, the Court "accept[ed] the Boy Scouts' assertion," made in its *briefs*, that "homosexual conduct" conflicted with its expression. *Id.* at 651. The dissent even criticized the Boy Scouts for being "silent on homosexuality." *Id.* at 684 (Stevens, J., dissenting). Defendant's views on women are much more obvious and explicit.

**C.    Forcing Defendant to include Plaintiff would affect Defendant's expressive association by equating biological men to women. That violates the First Amendment.**

For the second *Dale* step, "forced inclusion of an unwanted person in a group infringes the groups' freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." 530 U.S. at 648. Courts defer "to an association's view of what would impair its expression." *Id.* at 653.

Adding biological men to Defendant's pageant significantly affects its message—the message changes from the historically default position that "biological women are women"

to a recent view that "men who "identify" as women and biological women are women."
*See id.* at 654 (admitting gay scoutmaster "interfere[d]" with Boy Scouts' message); *Apilado*,
792 F. Supp. 2d at 1163 ("inclusion of straight athletes" infringed on a gay softball league's
expression).

Even Plaintiff agrees that "permitting men [who identify as men] into the pageant
would interfere" with Defendant's message "for associational reasons." Tr. 17:7-13. And
that makes sense. Defendant would be hypocritical (or at least inconsistent) to claim that
biological women are women if it also presented biological men as women. *Cf. Christian
Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006) (noting difficulty in "convey[ing] a
message of disapproval of certain types of conduct if" an organization "must accept members
who engage in that conduct"). Speakers should be able to define and promote their view of
womanhood and present this as the only viable, historically acceptable definition. Requiring
Defendant to add, change, or nuance that view changes Defendant's message and lessens its
persuasiveness.[6]

Still, relying on *Roberts* and *Lahmann*, Plaintiff denies that Defendant engages in
protected association because it has a "discriminatory membership policy." Tr. 27:24-28:1-7.
But that is wrong for two reasons. First, the exclusionary policies in those cited cases served
*no* expressive purpose because admitting women did not affect the civic organizations'
message. *See Roberts*, 468 U.S. at 626 (including women imposed no "serious burdens" on
members' expression); *Lahmann v. Grand Aerie of Fraternal Order of Eagles*, 121 P.3d 671,

---

[6] Ironically, Plaintiff's theory *justifies* gender-identity discrimination: it allows Defendant to
exclude biological males who identify as men but not biological males who identify as
women. *See* OAR 839-005-0003(9) (defining "gender identity" to include biological sex).

684 (Or App 2005) (including women did not "significantly (or even modestly) impair" expression).

In contrast, Defendant's "**natural** born female" rule *does* affect Defendant's message and purpose.  The whole purpose of Defendant's pageant and organization is to publicly convey certain messages about womanhood and femininity.  The same cannot be said for the organizations in *Roberts* and *Lahmann*.  These organizations excluded applicants from voting and membership in civic organizations whose messages did not depend on the sex of its members, whereas Defendant promotes women through applicants selected to compete and speak in its public event.  These defining characteristics of Defendant's pageant create the unique situation in which the competitors "and the message [are] coextensive." *Invisible Empire of the Knights of the Ku Klux Klan v. Mayor of Thurmont*, 700 F. Supp. 281, 289 (D. Md. 1988).

Second, Plaintiff creates a dichotomy not even Plaintiff sticks to—non-discriminatory exclusions receive protection; but discriminatory exclusions do not.  For example, Plaintiff concedes that "the admission of a non-Native American would interfere with" the message of a pageant celebrating Native American women. Tr. 15:4-10.  But Plaintiff cannot explain why, for example, the Miss Warm Springs pageant can require contestants to be "member[s] of the Confederated Tribes of Warm Springs" (Ex. 47),[7] while Defendant cannot require contestants to be "natural born females."  In reality, the First Amendment protects both pageants equally.

---

[7] Exhibit 47 is admissible (FRE 803(8)(A), 902(5)), and judicially noticeable as a governmental website (*Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 (9th Cir. 2015)).

Moving beyond biological men generally, Plaintiff's participation in particular affects Defendant's message because of Plaintiff's public activism.  (*See* Decl. ¶¶ 129-49; Exs. 36-40.)  Just as the gay scoutmaster's presence in *Dale* would have affected the Boy Scouts' expression because he was "open and honest about [his] sexual orientation" and "remain[ed] a gay rights activist," 530 U.S. at 653, so too would Plaintiff's participation in the pageant as an "openly transgender contestant" change Defendant's expression, (Compl. ¶ 27.)  Plaintiff cannot undermine Defendant's desired message by seeking forced inclusion in its pageant.

## II.    The requested relief violates the First Amendment by compelling Defendant to speak a message about womanhood it disagrees with.

Plaintiff's requested relief also compels Defendant to speak messages it objects to. The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  "Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command" and is "universally condemned" in most contexts. *Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018).

But Plaintiff violates this rule in seeking to force Defendant to speak messages it disagrees with.  While Plaintiff does so through an anti-discrimination law, this chosen method does not matter: (A) courts apply strict scrutiny when a law compels speech or is triggered by speech in application; (B) Defendant engages in protected speech through its pageant; (C) Defendant engages in protected speech through its pageant-selection process; and (D) Plaintiff's requested access transforms Defendant's message: from promoting women as "natural born females" to promoting biological men who "identify" as women. This is *compelled* speech.  To make matters worse, (E) Plaintiff's demanded access alters and

is triggered by the content of Defendant's pageant.  So, in multiple ways, Plaintiff's requested relief compels speech and triggers strict scrutiny.

A.    **Plaintiff attempts to leverage the Act to alter Defendant's expressive content, the Act is triggered by that content, and the Act must overcome strict scrutiny, but does not.**

The Act may regulate discriminatory conduct on its face.  But that does not end the analysis.  Laws that facially regulate conduct can still regulate expressive content as-applied and trigger strict scrutiny.

To determine if a law regulates expressive content as-applied, courts look at the final work produced.  *See Hurley*, 515 U.S. at 575 (analyzing whether a parade is expressive).  As the Ninth Circuit has explained, "[a]lthough writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect *the end product* from the act of creation." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061– 62 (9th Cir. 2010) (emphasis added).  Courts focus on whether the final work is expressive and how a law's proposed application affects that final work.

With that focus in mind, courts apply strict scrutiny in two situations: either when (1) a law alters the final work's "expressive content," *Hurley*, 515 U.S. at 572; or (2) when "the conduct triggering coverage under the statute consists of communicating a message."  Ho*lder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).  Both situations are present here.

This analysis also underscores why strict scrutiny applies here, not the intermediate-scrutiny test from *United States v. O'Brien*, 391 U.S. 367 (1968).  First, the *O'Brien* test only applies to expressive conduct, not to "the process of creating a form of *pure* speech"—such

as Defendant's pageant. *Anderson*, 621 F.3d at 1061.[8]  Second, *O'Brien* does not apply to laws that compel speech, i.e. laws that by definition alter expressive content and regulate based on content.  *See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988) (applying strict scrutiny to law compelling speech because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech" and therefore was "as a content-based regulation of speech."); *Dale*, 530 U.S. at 659 (explaining that *Hurley* applied "traditional First Amendment analysis," not *O'Brien* test).  And third, "*O'Brien* does not provide the applicable standard for reviewing a content-based regulation of speech"—i.*e.* a law whose application is triggered by "communicating a message." *Holder*, 561 U.S. at 27-28.[9]

Because *O'Brien* does not apply here, Plaintiff must overcome strict scrutiny—"the *most* demanding test known to constitutional law"—if the requested relief compels speech or regulates speech based on content. *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997) (emphasis added).  Plaintiff's requested relief does both, as shown below.

---

[8] This point also explains why the *Spence v. Washington* test does not apply here. 418 U.S. 405, 409 (1974). This test is used to determine if "*conduct* … contains an expressive component." *Anderson*, 621 F.3d at 1059-60. In contrast, courts give "entertainment and visual expression" (like pageants) "full constitutional protection without relying on the *Spence* test." *Id.* at 1060.

[9] The Supreme Court has historically applied strict scrutiny to content-based regulations, such as when laws compel speech, *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.* (*Pacific Gas*), 475 U.S. 1, 5-6, 12 (1986) (Powell, J.), or are triggered by expressive content. *See, e.g., Cohen v. California*, 403 U.S. 15, 18 (1971) (breach of peace law applied to words on jacket); *Hess v. Indiana*, 414 U.S. 105, 107 (1973) (disorderly conduct law applied to spoken words); *Cantwell v. Connecticut*, 310 U.S. 296, 303-07 (1940) (breach of peace law applied to playing record).

**B.      Defendant engages in protected speech through its pageant.**

Defendant's pageant is protected speech.  This pageant is "designed to encourage women," to "mak[e] them feel confident and beautiful inside and out," to "empower women," "promot[e] positive self-image," and "advocat[e] a platform of community service." (Ex. 2.)  In all of this, Defendant celebrates "natural born female[s]." (*Id.*)

In these ways, Defendant's pageant "communicate[s] ideas about what it means to be a woman. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011).  While pageants are not pamphlets or prose, "the Constitution looks beyond written or spoken words as mediums of expression." *Hurley*, 515 U.S. at 569.  The First Amendment routinely protects live events conveying messages, like parades (*Hurley*, 515 U.S. at 569), and stage productions (*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975).

Defendant's pageant fits this framework.  The pageant is simultaneously a competition, live-entertainment show, group-stage production, and broadcast event.  (*See* Decl. ¶ 91; Ex. 8 at 5-8; Exs. 24-26.)  Even Plaintiff concedes this.  TR 13:7-8 (Plaintiff's Counsel agreeing "that potentially there is expressive content here ….").  *See also Norma Kristie, Inc. v. City of Okla. City*, 572 F. Supp. 88, 91 (W.D. Okla. 1983) (a pageant is protected speech).

**C.      Defendant engages in protected speech by selecting pageant contestants.**

Because Defendant's pageant is protected speech "[t]he selection of" contestants "to make" up its pageant "is entitled to similar protection." *Hurley*, 515 U.S. at 570.

As noted above, courts look at the "end product" first and decide whether it is speech. *Anderson*, 621 F.3d at 1059-62.  If it is, the process of editing, selecting, and creating that

work also gets protection—whether that process is selecting a color for a painting, a word for a poem, or a person for a pageant. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018) (refusing to "disaggregate the creation of the video from the video or audio recording itself"). And that makes sense because these selection processes are "inextricably intertwined with the purely expressive [final] product." *Anderson*, 621 F.3d at 1062.

When courts start at the "end product" and work backwards, they routinely find that choices like who to include in a pageant involve protected speech. *See, e.g.*, *Claybrooks v. Am. Broad. Companies, Inc.*, 898 F. Supp. 2d 986, 999 (M.D. Tenn. 2012) ("[C]asting decisions are part and parcel of the Shows' creative content."); *New York Cty. Bd. of Ancient Order of Hibernians v. Dinkins*, 814 F. Supp. 358, 369 (S.D.N.Y. 1993) (forcing "inclusion of" members of a gay organization in parade impermissibly "dictate[s] how … sponsors would express their thoughts").

Defendant's pageant is no different. Defendant's eligibility requirements—like its rule requiring "a natural born female"—shape Defendant's message. (Ex. 2.)

This message-cultivating process is just as protected as "writing words down on paper" for a poem, "painting" for a picture, or "playing an instrument" for a symphony because the process produces the pageant. *Anderson*, 621 F.3d at 1062.

## D.    Plaintiff's requested relief compels Defendant to convey a message about women it does not want to speak and cannot be forced to express.

Because Defendant speaks through its pageant and selection process, Plaintiff's requested relief would alter the content of that speech. Specifically, Plaintiff would require Defendant to accept Plaintiff—a *biological* male—to compete in Defendant's pageant—a

pageant made for biological women and promoting womanhood. (*See* Compl. ¶ 42 (seeking this relief).)  And granting Plaintiff's requested relief would affect Defendant's message for three reasons.

First, Plaintiff's requested participation changes Defendant's expression because of the nature of beauty pageants.  Unlike parades, pageants give each individual contestant a *singular* voice on stage before a live audience. (*Compare* Exs. 24-26 *with Hurley*, 515 U.S. at 560 (analyzing parade with "20,000 marchers" in groups).)  By their nature, pageants promote particular individuals, enable those individuals to speak to a large audience, and depend on each individual's participation more than parades do. (Exs. 2, 24-27.)  Each pageant contestant is "the expressive unit[;]" each individual acts as the "parade float." *Hurley*, 515 U.S. at 574.  This means that "every participating" individual "affects the message conveyed by" a pageant. *Id.* at 572.

In this respect, a beauty pageant is more like a television show, movie, musical, or play than a parade because the overall message of the former is embodied in and composed of the discrete choices about which *individuals* to include as contestants or actors.  *See Claybrooks*, 898 F. Supp. 2d at 999-1000 (highlighting the centrality of a producer's "casting decisions" to "support whatever expressive message the Shows convey.").

Second, Plaintiff's participation changes Defendant's message because of the nature of Defendant's *female* beauty pageant.  Through its selection criteria, Defendant has already crafted a clear message about "what merits celebration" about women, *Hurley*, 515 U.S. at 574, and who women are—women are "natural born female[s]," are "of good moral character," and conduct themselves "with dignity, grace, and good manners." (Ex. 14 at 2-5.)

On stage, beauty and *femininity* in the forms of physical fitness, confidence, poise, style, presence, and voice are all central themes of Defendant's pageant. (*See, e.g.*, Decl. ¶ 97-99; Ex. 27.)  Judges evaluate contestants on these criteria and consider contestants' "style and grace," "technique and elegance," "choice of gown," and answers to onstage questions "in terms of content and knowledge." (Ex. 8 at 5-7; Ex. 27.)  Given this, pageants inevitably speak about beauty and femininity in general and about each individual contestant's beauty and femininity in particular.

Thus, forcing a female-only pageant to accept males fundamentally transforms the pageant's message about femininity.  Allowing biological males to speak and compete alongside biological females would alter Defendant's message.  It would convey the message that <u>men</u> can and should be "*Miss* Oregon"; that men—even those who "identify" as women—can and should be viewed as equally feminine and beautiful as biological women in Defendant's pageant.  This problem is particularly acute here where Defendant would  be compelled to introduce Plaintiff as "*Miss* Oregon," create a custom sash identifying Plaintiff as "Miss Oregon," and permit Plaintiff to parade under the pageant's banner. (Ex. 4 at 22-33; Ex. 8 at 12; Exs. 24-26); emphasis added).)

In response, Plaintiff argues that Plaintiff's participation would not "interfere with" Defendant's message because (i) Defendant's message is "promoting or uplifting women;" (ii) Plaintiff's message is to "promote all women;" and (iii) if Defendant's message was to "promot[e] biological women or cisgender women," it should "more appropriately describe[]" that message. Tr. 12:9-13; 13:7-10; 21:6-11.

But this turns the First Amendment on its head.  <u>Defendant</u> has the First Amendment right to decide how to "appropriately" convey its message, not *Plaintiff*.  *See, e.g.*, *Dinkins*,

814 F. Supp. at 369 ("[T]elling citizens … how they must express themselves[] is something one would expect from the 'Thought Police' described by George Orwell."). Courts defer to speakers when evaluating how their message is affected, not those wishing to speak a different view. *See Hurley*, 515 U.S. at 574 (LGBT group's participation affected parade's message "[a]lthough GLIB's point (like the Council's) is not wholly articulate…").

Plaintiff's argument also misses the point. Plaintiff's participation changes Defendant's message because it *forces* Defendant to promote a redefined and expanded notion of womanhood. That's why Defendant does not call its pageant "Miss 'Biological' Oregon." The whole debate here is over the definition of womanhood—which definition (biology or professed "identity") deserves the default position. When Plaintiff says that Defendant can still promote "women" by including men who identify as women, Plaintiff just assumes Plaintiff's *own* view—that men who identify as women are truly women. But Defendant wants to offer another perspective in this debate—one that defines womanhood differently.

And in this debate, Defendant cannot be compelled to say something that "would at least bear witness to the fact that some" biological men are women or that women who "identify" as men "have as much claim to unqualified social acceptance" to womanhood as other women. *Hurley*, 515 U.S. at 574. *See also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1744 (2018) (Thomas, J., concurring) (the state cannot force someone to "acknowledge that same-sex weddings are 'weddings' and suggest that they should be celebrated…").

Defendant need only show that Plaintiff's participation "affects" its message (i.*e.* "alter[s] the expressive content"), not that Plaintiff's participation affects Defendant's *core*

message or *contradicts* Defendant's message. *Hurley*, 515 U.S. at 574. After all, the parade in *Hurley* did not explicitly promote heterosexual activity or heterosexual lifestyles. It just promoted St. Patrick's Day. But the Supreme Court still let the parade organizers exclude the LGBT group because the organizers "decided to *exclude* a message it did not like from the communication it chose to make." *Hurley*, 515 U.S. at 572 (emphasis added).

In other words, the First Amendment protects the right to remain silent—the right to *not* addresses the debate over gender identity, whether Defendant takes a position or not. *See Hurley*, 515 U.S. at 574 (noting the right to speak "on one subject while remaining silent on another").

For example, in *Pacific Gas*, the Supreme Court stopped "a forced access rule" which required a utility company to provide space in its newsletter to another speaker. 475 U.S. at 6, 12. The problem was not the specific content of that speaker's writing. Indeed, the speaker had not yet specified what it would print in the newsletter. So, no one knew what the speaker would actually write, and the utility company "*may*" have "disagree[d]" with those views. *Id*. at 15 (emphasis added). The problem was the utility company would have felt "compelled to respond" or "to speak where it would prefer to remain silent." *Id.* at 16, 18. Forcing Plaintiff into Defendant's pageant would do the same.

Third, Plaintiff's participation changes Defendant's message because news articles, social media posts, and online videos show that Plaintiff is *publicly* known as a transgender contestant. (Exs. 36-42.) If anyone would draw attention to a particular view about sex, gender identity, and womanhood, it is Plaintiff. So, Plaintiff's participation in Defendant's pageant alters, interferes with, and even contradicts Defendant's message.

The First Amendment simply does not allow Plaintiff to "co-opt" Defendant's "own conduits for speech" in this way. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 457 n.10 (2008).

Plaintiff argues that Defendant's exclusion is an unprotected "status-based" exclusion, not a protected message-based one. Tr. 19:12-19.  But that is  a false dichotomy.  Courts regularly protect the right to speak (or not speak) about someone's status.  *See Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (protecting signs at a  person's funeral saying "God Hates Fags" and "Fags Doom Nations").

Plaintiff relies on the fact that "in *Hurley*, LGBT people were allowed to participate in the parade." Tr. 19:20-21.  But that distinction mattered because "every participating unit [*i.e.* float] affects the message conveyed by the private organizers…." *Hurley*, 515 U.S. at 572.  Floats affected the parade's message; individuals did not.  But here, each individual contestant *does* affect the message.  And *Hurley* never declared a universal person/message distinction.  What mattered in *Hurley* was whether the requested access affected the speaker's expressive content, not the form the access took.

Plaintiff's person/message dichotomy often makes sense when the medium does not physically contain people—as in "cake-baking cases." Tr. 18:5-6.  But sometimes individuals physically participate in another's speech.  And sometimes an individual and a message are intertwined.  So sometimes an individual's presence affects another's expression.  When it does, the First Amendment kicks in.  *See Dale*, 530 U.S. 640, 654 (2000) (comparing presence of LGBT group in the *Hurley* parade to the presence of an individual gay scoutmaster in Boy Scouts).

**E.    Plaintiff's requested relief alters, is triggered by, and awards access based on the content and viewpoint of Defendant's speech.**

Plaintiff's requested relief also compels Defendant to speak in a particularly troubling way: based on content and viewpoint.

For starters, the requested relief forces Defendant to change the content of its pageant by including men" identifying" as woman as contestants. *Nat. Inst. of Family & Life Advocates v. Becerra,* 138 S. Ct. 2361, 2371 (2018) ("[R]equiring petitioners to inform women how they can obtain state-subsidized abortions" as "petitioners try to dissuade women from choosing that option" is content-based regulating speech.).  This requires Defendant to speak a message that it "would not otherwise make" and "alters the content of the speech." *Riley*, 487 U.S. at 795.

Next, Plaintiff's requested application "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).  A pageant promoting transgender *and* biological women is legal under Plaintiff's view—but a pageant promoting only biological women is illegal.  "That is about as content-based as it gets." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020).

Likewise, the Act is triggered because of Defendant's inclusion of only "*natural* born females."

In these ways, the requested relief imposes a "content-based penalty" and makes the relief "content based." *Pacific Gas*,  475 U.S. at 13.

Finally, Plaintiff's requested relief regulates based on viewpoint because it only awards access to those "who disagree with [Defendant's] views…" and who seek to "disseminate hostile views." *Id.* at 14.  Plaintiff's theory does not require Defendant to accept

every applicant or applicant of every gender identity (*e.g.* biological men who identify as men).  Plaintiff's relief only requires Defendant to accept contestants who will inevitably promote and model the view that men who identify as women are women.  In turn, Defendant will be deterred from speaking its preferred view to avoid violating the Act and get out of the pageant industry altogether, which makes Plaintiff's requested relief a viewpoint-based regulation. *Id*. at 10, 14.

### III.  The requested relief fails strict scrutiny because Plaintiff has no compelling need to force Defendant to speak and associate in support of Plaintiff's views.

Plaintiff must overcome strict scrutiny because the requested relief compels Defendant's speech, alters Defendant's speech based on its content and viewpoint, and forces Defendant to expressively associate. *Supra* § II.A (explaining these points).  To pass that demanding test, Plaintiff must show the requested relief is narrowly tailored to serve a compelling interest.  *Reed*, 135 S. Ct. at 2226; *Dale*, 530 U.S. at 648.  Plaintiff cannot do so.

Plaintiff will raise the general interest in stopping gender identity discrimination.  But a law passes strict scrutiny only when it "specifically identif[ies] an actual problem in need of solving" and limits speech as "necessary to the solution." *Entm't Merchants Ass'n*, 564 U.S. at 799 (quotation marks omitted).  This requires "more than anecdote and supposition." *United States v. Playboy Entm't Grp., Inc*., 529 U.S. 803, 822 (2000).  Instead, courts must evaluate "the asserted harm of granting specific exemptions." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006).

In other words, the question is not whether the Act serves compelling interests by ending status discrimination by restaurants, hotels, or businesses *generally*.  Rather, the question is, does the Act serve compelling interests by forcing *one* pageant to speak and

expressively associate contrary to its core convictions?  The answer is "no."  The Supreme

Court has already recognized that public accommodation laws serve no "legitimate end"

when compelling speech or expressive association. *Hurley*, 515 U.S. at 578.

Other courts agree.  There is no anti-discrimination exception to the First

Amendment.  *See TMG*, 936 F.3d at 752-56 (protecting filmmakers from celebrating same-

sex weddings); *Brush & Nib Studio, LC v. City of Phoenix* (*B&N*), 448 P.3d 890, 913-14

(Ariz. 2019) (protecting artists from creating same-sex wedding invitations).

Plaintiff's participation in other Oregon pageants—where Plaintiff has "a public

platform in which to discuss important social issues"—further undermines any alleged

interest. (Compl. ¶¶ 27-29.)  Plaintiff's participation there proves no *actual* problem exists,

*i.e.*, Plaintiff has access to pageants regardless of gender identity.

In fact, Plaintiff's requested relief cannot possibly serve a compelling interest when

other non-discrimination laws exempt pageants.  For example, Title IX of the Educational

Amendments Act of 1972 permits sex-based distinctions for awards received for "any

pageant … in which participation is limited to individuals of one sex only …." 20 U.S.C. §

1681(a)(9).  Because sex discrimination under Title IX can include gender-identity

discrimination, Title IX permits pageants to exclude men who identify as women.  Plaintiff

cannot explain why the same approach cannot work under the Act in Oregon.

As for narrow tailoring, Plaintiff fails there, too.  To be narrowly tailored, a

requirement cannot be "under-inclusive" or "over-inclusive." *Wasden*, 878 F.3d at 1204.

And the requirement must also be the "least restrictive means among available, effective

alternatives." *Id*. at 1198 (citations omitted).  But many other alternatives exist besides co-

opting Defendant's expression.

For example, many anti-discrimination laws do not cover pageants or similar expressive organizations.  *See* 42 U.S.C. § 2000a(b) (defining public accommodations narrowly); 29 C.F.R. § 1604.2(a)(1)(iii) (permitting production studios to have sex-based classifications for actors or actresses under Title VII).

And the Act already excludes a host of other businesses and organizations.  *See* ORS 659A.400(2)(b) (state hospitals); *Barnett v. E:Space Labs LLC*, 2018 WL 3364660, at *3-4 (D. Or. July 10, 2018) (technology labs); *Vejo v. Portland Pub. Schs.*, 204 F. Supp. 3d 1149, 1168 (D. Or. 2016) (colleges); *Abukhalaf v. Morrison Child & Family Servs.*, 2009 WL 4067274, at *7 (D. Or. 2009) (foster care recruiters); *Schwenk v. Boy Scouts of Am.*, 551 P.2d 465 (Or 1976) (Boy Scouts).  The Act should not permit these entities to choose clients based on their status but prohibit Defendant from selecting contestants based on its message.

Public accommodations laws rarely compel speech or expressive association, yet still achieve their goals of stopping discrimination.  There is no reason to change this practice here.  The Act fails strict scrutiny as applied to Defendant.[10]

## IV.   Forcing Defendant to speak and associate endangers speakers of all viewpoints.

While Defendant's position reasonably balances the freedom of pageanteers, producers, and playwrights with the need to stop discrimination, Plaintiff's theory presents two unacceptable options that suppress speech and needlessly eliminate diversity.

The first option would be to protect casting decisions only when applicants' "request[] is going to interfere with that expressive content." Tr. 13:4-10.  Under this theory,

---

[10] Applying the Act to Defendant would not even pass intermediate scrutiny under *O'Brien* because it "impose[s] an undue and impermissible incidental restriction on" Defendant's First Amendment freedoms. *Claybrooks*, 898 F. Supp. 2d at 993 n.8.

Defendant must include those who claim their desired message is "consistent with what defendant's message is." *Id.* at 21:3-5, 22:1-7.

But this approach "would embroil courts in questioning the creative process behind any … dramatic work" like movies, plays, or pageants. *Claybrooks*, 898 F. Supp. 2d at 998. Consider a play that needed to cast a minor, non-speaking part playing President Obama. Under Defendant's theory, the play need not cast a white actor in that role because the actor's presence affects the play's content. But in Plaintiff's proposal, the play must accept that white actor unless he tried to add his own speaking lines that explicitly contradicted the play's theme. A court would therefore need to parse the play's intended message, a role's contribution to that message, and how the actor intended to modify that message. This "smacks of censorship." *Id.* at 998 n.15. S*ee Hurley*, 515 U.S. at 562, 569-70 (protecting parade organizers even though they did "not generally inquire into the specific messages or views of each applicant" or "isolate an exact message" in the parade).

As Plaintiff admits, female beauty pageants would have no free-speech defense to males participating in the pageant if they "enhance[d] the message of the pageant to further the cause of women." Tr. 22:1-7. This view requires (1) Miss Christian America to admit atheists; (2) Miss International Queen, which conducts "gay beauty contests and pageants," to admit heterosexuals; (3) Queen USA Pageant, which "conduct[s] annual Transgender beauty pageant[s]," to admit biological women; and (4) Miss Pre-Teen International to admit the elderly. (Exs. 43-46.)[11] And Miss Warm Springs, which requires contestants to be "enrolled" tribal "member[s]," would have to admit Norwegians. (Ex. 47.) Otherwise, these

---

[11] Exhibits 43-46 are admissible and judicially noticeable. *See,e.g.*, *supra* n.7.

pageants would violate the Act's bar on discrimination.  *See* ORS 659A.403(1) (prohibiting these class distinctions).

Consider another implication.  The Act forbids "any distinction" based on protected traits, including sex and sex-stereotyping.  *See In re City/Cty. Computer Ctr.*, 1 BOLI 197, at *3 (Apr. 23, 1979), 1979 WL 422790 (concluding sex-stereotypes based on "a speculative presumption of [a woman's] physical limitations" are unlawful employment practices).  If the Act overrides a pageant's right to control its message and forbids pageants from making any distinction about any protected trait, then female beauty pageants could not make any distinction or judge contestants based on a contestant's beauty or femininity—that would be sex discrimination.  Likewise, pageants could no longer have age divisions, divisions for married and unmarried couples, or use sex-specific awards, like *Miss* America.  Pageants would simply cease to exist.

Outside of pageants, Plaintiff's theory would weaponize "anti-discrimination laws" to "require a playwright to consider white actors to play Othello, black actors to play Macbeth, or a male to play Lady Macbeth[.]" *Claybrooks*, 898 F. Supp. 2d at 998.  The musical *Hamilton* would need to cast Caucasians, undermining its message about the historical difficulty facing racial minorities.[12]  The list goes on.  In the end, Plaintiff's vision for free speech is too cramped.

Plaintiff's theory for free association fares no better because it picks winners and losers.  Pageants "openly celebrating Native American women" can exclude non-Native American women, but Defendant's pageant celebrating biological women cannot exclude

---

[12] David Horsey, *'Hamilton' gets past race by imagining Founding Fathers with black and brown faces*, L.A. Times (Sept. 18, 2017), https://lat.ms/3hCKK8L.

men identifying as women. Tr. 15:4-10.  Meanwhile, pageants promoting women can

exclude men who identify as men, but Defendant's pageant cannot exclude men who identify

as women. *Id.* at 16:25-17:13.  On Plaintiff's theory, every pageant can select its contestants

except those espousing views Plaintiff considers too distasteful.

This upends the First Amendment by playing favorites with constitutional freedoms.

The First Amendment gives all speakers "the autonomy to choose the content of" their

"message." *Hurley*, 515 U.S. at 573.  This even extends to "offensive" speech. *Matal v. Tam*,

137 S. Ct. 1744, 1763 (2017).  By protecting views equally, the government is banned from

"interfer[ing] with speech for no better reason than promoting an approved message or

discouraging a disfavored one." *Hurley*, 515 U.S. at 579.  In this way, neither plaintiffs nor

the polity have the power to pick and choose.  "[T]he concept that government may restrict

the speech of some elements of our society in order to enhance the relative voice of others is

wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976).  It

should stay that way.  The Court should grant this Motion.

Respectfully submitted in September 14, 2020.


By: s/ John Kaempf

John Kaempf, OSB No. 925391
**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue, Suite 1414
Portland, Oregon 97204
Phone: (503) 224-5006
john@kaempflawfirm.com

Attorney for Defendant

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 9,579 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.


s/ John Kaempf

John Kaempf, OSB No. 925391
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2020, I electronically filed the foregoing paper with the Clerk of the Court by using the CM/ECF system. The following participant in the case who is a registered CM/ECF user will be served by the CM/ECF system.

In addition, I will cause the following participant to receive video exhibits 24, 25 and 26 via a secure download September 13, 2020, as well as on a flash drive by U.S. Mail on September 15, 2020.

Shenoa L. Payne, OSB No. 084392
65 S.W. Yamhill Street, Suite 300
Portland, Oregon 97204
(503) 914-2500
spayne@paynelawpdx.com

Attorney for Plaintiff

s/ John Kaempf
John Kaempf
Attorney for Defendant