**Shenoa L. Payne,** OSB No. 084392
**SHENOA PAYNE ATTORNEY AT LAW PC**
65 SW Yamhill St, Ste 300
Portland, Oregon 97204
Phone: (503) 914-2500
spayne@paynelawpdx.com

      Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ANITA NOELLE GREEN,** an individual,<br><br>      Plaintiff,<br>v.<br><br>**MISS UNITED STATES OF AMERICA, LLC**, a Nevada limited liability corporation, d.b.a. United States of America Pageants;<br><br>      Defendants. | Case No.: 3:19-CV-02048-MO<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Oral Argument Requested |

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

**<u>TABLE OF CONTENTS</u>**                                    **Page(s)**

I.   INTRODUCTION ...............................................................................................1

II.  OREGON'S PUBLIC ACCOMMODATIONS ACT .....................................................1

III. FACTUAL BACKGROUND ....................................................................................2

    A.  Historical Discrimination in the Pageant Industry .................................................2

    B.  The USOA Pageant System ...............................................................................3

        1.  Defendant's evidence involves its *national* pageant –
           not its *Miss Oregon* pageant .......................................................................3

        2.  The USOA Miss Oregon pageant ...................................................................4

           a.  Defendant's express mission is to promote
              *all* women and uplift *everyone*........................................................6

           b.  Outside of its discriminatory eligibility rule, defendant
              expresses no values or beliefs related to transgender women.......................6

           c.  Defendant's public actions in celebrating and including
              drag queens as part of its Miss Oregon pageant contradict
              its purported message.......................................................................7

           d.  Defendant is a for-profit corporation in the business of retail
              sales and promotions.......................................................................8

    C.  Plaintiff is a Natural Born, Biological Female...........................................................9

    D.  Plaintiff is an Experienced Pageant Contestant Who Successfully has
       Participated in Pageants Similar to USOA – Pageant Intended to
       Promote Women .............................................................................................10

    E.  Plaintiff Applied for and was Denied Entry into Defendant's Miss Oregon
       Pageant Based on Her Status as a Transgender Woman............................................11

IV. ARGUMENT ...................................................................................................13

    A.  Standard of Review............................................................................................13

    B.  Because Defendant Fails to Present *Any Evidence* Relevant to
       Defendant's *Miss Oregon* Pageant, Defendant Fails to Meet Its Burden..................14

C.  Plaintiff is a Natural Born Female ........................................................................14

D.  Defendant Fails to Prove as a Matter of Law that Defendant has a
    Constitutional Right to Discriminate Against Plaintiff..................................17

    1.  Enforcement of the OPAA to permit plaintiff to participate in the
        Miss Oregon pageant does not violate defendant's right to
        freely associate...........................................................................................17

        a)  Defendant is not an expressive association, group, or membership
            entitled to constitutional protection ...............................................18

            i)  Defendant's contestants are not an association or group
                that regularly gathers for expressive purposes.........................18

            ii) Defendant is a commercial organization...................................19

        b)  Even if defendant is an expressive association, defendant
            has not demonstrated that plaintiff's participation in its pageant
            imposes any serious burden on its existing contestants'
            freedom of expressive association ..................................................23

    2.  Enforcement of the OPAA to permit plaintiff to participate in defendant's
        Miss Oregon pageant does not compel defendant to speak
        in violation of the First Amendment..........................................................30

        a)  *Hurley* does not apply when a public accommodation
            excludes an entire class of individuals
            *regardless of their message*............................................................30

        b)  The OPAA does not regulate defendant's expressive conduct ........................36

            i)  Regulating discrimination is *conduct*-based, not speech ........................37

            ii) The OPAA does not regulate any expressive activity of
                defendant's – but event if it did, such expressive activity is
                *the contestant's*, not defendant's..................................................39

            iii) Defendant does not make casting decisions in a manner that a
                 affects its "creative content." ...................................................40

    3.  Given the minimal burden on defendant and Oregon's
        compelling interest in protecting the LGBT community
        from discrimination, the OPAA passes *any* level of scrutiny.............................42

4.   Application of the OPAA to defendant will not endanger
     speakers of all viewpoints ................................................................................43

V. CONCLUSION .................................................................................................................44

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States Supreme Court*

*Bd. of Dir. of Rotary Intl. v. Rotary Club of Duarte*,
    481 U.S. 537 (1987)...................................................................................................17, 23, 24,

*Bostock v. Clayton Cty., GA.*,
    140 S. Ct. 1731 (2020)...................................................................................................16

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000)...................................................................................................17, 26, 27, 29

*City of Dallas v. Stanglin*,
    490 U.S. 19 (1989)...................................................................................................19, 37

*Christian Legal Soc. Chapter of the Univ. of Cal.,
Hastings College of Law v. Martinez*,
    561 U.S. 661 (2010)...................................................................................................34

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984)...................................................................................................40

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995)...................................................................................................30, 31

*In re Primus*,
    436 U.S. 412 (1978)...................................................................................................21

*Knox v. Serv. Emp. Intern. Union*,
    567 U.S. 298 (2012)...................................................................................................18

*Lawrence v. Texas*,
    539 U.S. 558 (2003)...................................................................................................34

*Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Com'n*,
    138 S. Ct. 1719 (2018)...................................................................................................32, 34, 38

*NAACP v. Button*,
    371 U.S. 415 (1963)...................................................................................................18

*New York State Club Ass'n, Inc. v. City of New York*,
    487 U.S. 1 (1988) ................................................................................................26

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ............................................................................................40

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) ............................................................................................41

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ..........................................................................19, 20, 21, 23,

*Rumsfeld v. Forum for Academic and Inst. Rights, Inc.*,
    547 U.S. 47 (2006) ..................................................................................32, 37, 38

*Runyon v. McCrary*,
    427 U.S. 160 (1976) ............................................................................................26

*Ry. Mail Ass'n v. Corsi*,
    326 U.S. 88 (1945) ..............................................................................................40

*Spence v. Washington*,
    418 U.S. 405 (1974) ............................................................................................37

*United Steelworkers of Am., AFL-CIO-CLC v. Weber*,
    443 US 193 (1979) ..............................................................................................44

**United States Courts of Appeal**

*Anderson v. City of Hermosa Beach*,
    621 F.3d 1051 (9th Cir. 2010) ...........................................................................39

*Boardman v. Inslee*,
    --- F.3d ---, 2020 WL 6194466 (9th Cir. Oct 22, 2020) ....................................36

*Brown v. Zavaras*,
    63 F.3d 967 (10th Cir. 1995) .............................................................................16

*Fontenot v. Upjohn Co.*,
    780 F.2d 1190 (5th Cir. 1986) ...........................................................................13

*Gathright v. City of Portland*,
    439 F.3d 573 (9th Cir. 2006) .............................................................................32

*Hamilton Cnty. Educ. Assoc. v. Hamilton Cnty. Bd. of Educ.*,
    822 F.3d 831 (6th Cir. 2016) .............................................................................29

*Houghton v. South*,
    965 F.2d 1532 (9th Cir. 1992) ........................................................13

*IDK, Inc. v. Clark County*,
    836 F.2d 1185 (9th Cir. 1988) ................................................13, 20

*International Shortstop, Inc. v. Rally's, Inc.*,
    939 F.2d 125 (5th Cir. 1991) ........................................................13

*Interpipe Contracting, Inc. v. Becera*,
    898 F.3d 879 (9th Cir. 2018) ........................................................35

*Kewanee Oil & Gas Co. v. Mosshamer*,
    58 F.2d 711 (10th Cir. 1932) ........................................................13

*Lee v. City of Los Angeles*,
    250 F.3d 668, 688 (9th Cir. 2001) ..................................................5

*McDermott v. Ampersand Publ'g, LCC*,
    593 F.3d 950 (9th Cir. 2010) ........................................................41

*Telescope Media Group v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) ................................................19, 39

***United States District Courts***

*Apilado v. N. Am. Gay Amateur Athletic Alliance*,
    792 F.Supp.2d 1151 (W.D. Wash. 2011).................................27, 29

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Kane*,
    No. C 04-04484 JSW, 2006 WL 997217 (May 19, 2006),
    *aff'd*, 319 Fed.Appx. 645 (2009), *aff'd*, 561 U.S. 661 (2010) ..............32

*Claybrooks v. Am. Broad. Cos., Inc.*,
    898 F.Supp.2d 986 (M.D. Tenn. 2012)..............................................41

*CompassCare v. Cuomo*,
    --- F.Supp.3d ---, 2020 WL 3035648 (N.D.N.Y. Jun. 5, 2020) ............27

*Fabian v. Hospital of Central Connecticut*,
    172 F.Supp.3d 509 (D. Conn. 2016)................................................16

*Jane Doe v. Donald J. Trump*,
    No. 8:20-cv-00858, 2020 WL 5492994 (C.D. Cal. Sept 2, 2020) ........32

*NAACP by and through Myrtle Beach Branch v. City of Myrtle Beach*,
    --- F.Supp.3d ---, 2020 WL 4482896 (D.S.C. Aug 4, 2020)................................................18

*Schroer v. Billington*,
    424 F.Supp.2d 203 (D.D.C. 2006) .......................................................................................16

*Wildgrass Oil and Gas Committee v. Colorado*,
    447 F.Supp.3d 1051 (D. Colo.),
    *appeal filed*, (10th Cir. 2020).............................................................................................18

**Oregon Courts**

*King v. Greyhound Lines, Inc.*,
    61 Or.App. 197, 656 P.2d 349 (1982)....................................................................................2

*Klein v. Or. Bureau of Labor and Indus.*,
    289 Or.App. 507, 410 P.3d 1051 (2017)*, vacated on other grounds by*
    *Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Com'n*,
    138 S Ct 1719 (2018) .........................................................................................34, 35, 39

*Lahmann v. Grand Aerie of Fraternal Order of Eagles*,
    202 Or.App. 123, 43 P.3d 1130 (2002)....................................................................1, 24, 44

*Lloyd Lions Club of Portland v. Int'l Ass'n of Lions Club*,
    81 Or.App. 151, 724 P.2d 887 (1986)....................................................................................21

*Matter of Hollister*,
    305 Or.App. 368, 470 P.3d 436 (2020)..................................................................................16

**Other State Courts**

*Brush v. Nib Studio, LC v. City of Phoenix*,
    448 P.3d 890 (Ariz. 2019).....................................................................................................32

*Catholic Charities of Sacramento, Inc. v. Superior Court*,
    85 P.3d 67 (Cal. 2004) .........................................................................................................40

*Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272 (Col. App. 2015),
    *overruled on other grounds by Masterpiece Cakeshop Ltd. v.*
    *Colorado Civil Rights Com'n*, 138 S Ct 1719 (2018) .........................................35, 36, 39, 40

*Elane Photography, LLC v. Willock*,
    309 P.3d 53 (N.M. 2013) ......................................................................................................36

*Gifford v. McCarthy*,
    137 A.D.3d 30 (N.Y. App. Div. 2016) ..................................................................................36

*Hunter v. CBS Broad., Inc.*,
    221 Cal. App. 4th 1510 (2013) ........................................................................41

*In re Heilig*,
    372 Md. 692 (2003) ........................................................................................16

*State v. Arlene's Flowers, Inc.*,
    193 Wash.2d 469 (2019), *petition for cert. filed*, (No. 19-333).....................20, 38

*Symmonds v. Mahoney*,
    31 Cal.App.5th 1096 (2019) ...........................................................................41

**Statutes and Rules**

Fed. R. Civ. P. 8(c) ...............................................................................................13

O.R.S. 174.100(7) ...................................................................................................1

O.R.S. 659A.403(1) .................................................................................................1

O.R.S. 659A.403(3) .................................................................................................1

**Other Authorities**

Executive Order No. 19-08, *available at*
    https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=3477 .......................43

Madelein Foreman, Lauren Hare, Kate York *et al.*, *Genetic Link Between*
    *Gender Dysphoria and Sex Hormone Signaling*,
    104 J. of Clinical Endocrinology & Metabolism 390 (Sept 2018),
    *available at* https://academic.oup.com/jcem/article/104/2/390/5104458 ............................15

Katherine M. Franke, *The Central Mistake of Sex Discrimination Law:*
    *The Disaggregation of Sex From Gender*,
    144 U. Pa. L. Rev. 1 (1995) ...........................................................................15

Hilary Levey Friedman, *Here She Is: The Complicated Reign of the Beauty*
    *Pageant in America* (Beacon Press 2020) ..................................................2, 3, 44

Julia A. Greenburg and Marybeth Herald, *You Can't Take it With You:*
    *Constitutional Consequences of Interstate Gender-Identity Rulings*,
    80 Wash. L. Rev. 819 (2005) ..........................................................................15

M. Dru Levasseur, Esq., *Gender Identity Defines Sex: Updating the Law*
    *to Reflect Modern Medical Science is Key to Transgender Rights*,
    39 Vermont L. Rev. 943 (Sum 2015) ............................................................14, 15

Norman P. Spack, *An Endocrine Perspective
on the Care of Transgender Adolescents*,
13 J. of Gay & Lesbian Mental Health 309 (2009)..............................................................16

## I.     INTRODUCTION

Plaintiff Anita Noelle Green brings this action under Oregon's Public Accommodations Act (OPAA) against defendant, Miss United States of America, LCC, d/b/a United States of America ("USOA") Pageants, which operates the USOA Miss Oregon competition.  Defendant's eligibility rule requiring that participants be "natural born female" constitutes discrimination based on gender identity in violation of Oregon law.  Defendant seeks to avoid liability by arguing that requiring defendant to provide its privileges and services equally to plaintiff, a transgender woman, would violate its federal constitutional rights of free speech and association. Defendant fails to meet its burden to prove its affirmative defenses as a matter of law.

First, its free association affirmative defense fails, because defendant is, at most, a commercial association entitled to *minimal* protection.  Even if defendant was an expressive association, defendant has failed to meet its burden to prove as a matter of law that plaintiff's participation would substantially burden its contestants' expressive rights.

Defendant's free speech affirmative defense also fails, because defendant admittedly excludes from its Miss Oregon pageant an entire class of individuals – transgender women – based solely on their status.  Defendant's exclusion is not *message based*, but *status* based.  For those reasons, defendant's motion fails.

## II.     OREGON PUBLIC ACCOMMODATIONS ACT

The OPAA provides that "all persons within [Oregon] are entitled to the full and equal accommodations, advantages, facilities and privileges of any place of accommodation, without any distinction, discrimination or restriction on account of race, color, religion, sexual orientation, national origin, marital status or age . . . ."  ORS 659A.403(1).  "Sexual orientation" includes an individual's actual or perceived gender identity.  ORS 174.100(7).  It is an unlawful practice "for any person to deny full and equal accommodations, advantages, facilities and privileges of any place of public accommodation in violation of this section."  ORS 659A.403(3).

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

The OPAA applies only to "business or commercial enterprise[s]" that are "so unselective that the organization can fairly be said to offer their services to the public." *Lahmann v. Grand Aerie of Fraternal Order of Eagles*, 180 Or.App. 420, 434, 43 P.3d 1130 (2002).  Defendant does not dispute that it is subject to the OPAA.

Oregon courts have recognized that the OPAA is designed to address the chief harm of the "evil of unequal treatment" by establishments serving the general public, and that injury therefrom "is to the individual's sense of self-worth and personal integrity."  *King v. Greyhound Lines, Inc.*, 61 Or. App. 197, 203, 656 P.2d 349 (1982).

## III.    FACTUAL BACKGROUND

### A.    Historical Discrimination in the Pageant Industry

Beauty pageants in America have a long history of discriminatory practices.  Starting in the 1930s, for example, the Miss America Pageant was explicitly racist and ableist, implementing a rule requiring that all contestants must be "of good health and the white race." Hilary Levey Friedman, *Here She Is: The Complicated Reign of the Beauty Pageant in America*, 6 (Beacon Press 2020) (attached as Exhibit D to the Decl. of Shenoa Payne in Opp. to Def. Mtn. for Summ. J. (Payne Decl.))  Miss America and Miss USA did not crown their first Black winners until 1984 and 1990, respectively.  *Id.* at 107.  Miss Black America and other similar pageants were created out of historical exclusion and lack of ability to participate in mainstream pageants.  *Id.* at 111, 125 ("Asian pageants, like black pageants, were borne out of exclusion"). However, the NAACP kept efforts up to integrate mainstream pageants, such as Miss America and Miss USA.  *Id.* at 111-12.  As a result, in 2019 the winners of Miss America, Miss USA, Miss Teen USA, and Miss Universe were all black women for the first time ever.  *Id.* at 125.

Pageants remain discriminatory for certain groups, including transgender women.  Decl. of Anita Noelle Green in Opp. to Def. Mtn. for Summ J. (Green Decl.) ¶ 14.  There has been minimal progress in this regard.  Although Miss America and Miss USA (Miss Universe) have

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

welcomed transgender women to compete in their pageants, Friedman, *Here She Is* at 177, many pageants continue to have express discriminatory "natural born female" rules such as defendant's rule here. Green Decl. ¶ 14. Like the historic requirement that contestants be of "good health and white race," this rule has no purpose other than to reinforce discriminatory gender, racial, and sexual norms. Friedman, *Here She Is* at 6. As a result, the pageant system remains segregated. Green Decl. ¶ 14. In turn, transgender women like plaintiff have limited options to compete in mainstream pageants and are segregated into transgender-only pageants. *Id.*

> ### B.    The USOA Pageant System
>
> #### 1.    Defendant's evidence involves its *national* pageant – not its *Miss Oregon* pageant.

Defendant is a Nevada corporation that operates or manages beauty pageants throughout the United States, including in Oregon. Payne Decl. ¶ 2, Ex A. Defendant licenses state directors to produce state pageants for women under the direction of its National Director, Tanice Smith. Decl. of Tanice Smith in Supp. Def. Mtn. Summ. J., Dkt. 33 (Sept 14, 2020) (Smith Decl.) ¶ 6. Defendant formed its business in June 2017 and started holding its annual Miss Oregon pageant in 2018. Decl. of Kaylene Rogers in Opp. to Def. Mtn. for Summ. J. (Rogers Decl.) ¶ 3; Decl. of Marsha Lawson in Opp. to Def. Mtn. Summ J. (Lawson Decl.) ¶ 10; Payne Decl. Ex. A at 5-8. The titleholders of each division in the USOA Miss Oregon competition advance to the national USOA competition in Las Vegas, Nevada the following February. Smith Decl., Ex 6. Because Oregon has a preliminary state-wide competition, Oregon residents *must* compete in the USOA Miss Oregon pageant and win a division title to compete in the USOA national competition. *See* Smith Decl. ¶ 33 (Contestants in the national pageant come from winners of state pageants and at-large contestants *without a stage pageant*).

:::

:::

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

Despite that this action involves Oregon state law and its application to defendant's *Oregon* pageant, all of the evidence submitted by defendant in support of its motion relates to how defendant conducts its *national* competition in Las Vegas, Nevada, not its *Miss Oregon* competition.  For example, and particularly relevant, defendant submits the following evidence:

- Defendant exercises control over all aspects of the *national* competition, Smith Decl. ¶ 7-8;

- Defendant rejected an advertisement in the pageant book for the *national* competition, *Id.* ¶ 106;

- State titleholders and contestants for the *national* pageant are required to sign a contract, *Id.* ¶ 52 & Ex 12;

- Defendant enforces its contract with state titleholders and has disciplined or revoked titles, *Id.* ¶ 76-88.

- Defendant started requiring approval of platforms for its *national* contestants in 2020, *Id.* ¶ 59;

- Defendant requires that pageant judges, emcees, and volunteers for its *national* pageant sign contracts,  *Id.* ¶ 62 & Exs. 16-19;

- Participants in the *national* pageant participated in group outings or group activities, *Id.* ¶ 89.

Plaintiff presents the following relevant evidence that creates disputed issues of fact that precludes summary judgment related to defendant's discrimination in its *Miss Oregon* pageant:

### 2.    The USOA Miss Oregon Pageant

At all relevant times, Amber McMullen was the state director for the USOA Miss Oregon pageant.  Smith Decl. ¶ 6 & Exs. 31-33; Lawson Decl. ¶ 9; Rogers Decl., Ex B at 9.

Unlike in other pageant systems, defendant does not hold preliminary pageants to qualify for the Miss Oregon competition.  Lawson Decl. ¶ 11.  Instead, contestants simply "purchase" a local title by paying the entry fee.  *Id.*; Rogers Decl. ¶¶ 5-6. The contestant even chooses their own local title – for example, "Miss Baker County." Lawson Decl. ¶ 11; Rogers Decl. ¶ 5. Because the USOA pageant system is in its infancy, in 2019, defendant engaged an Oregon

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

promotions director, Marsha Lawson, to assist in heavily recruiting new contestants and increasing business.  Lawson Decl. ¶¶ 4-5, 10; Rogers Decl. ¶ 15.

In 2018, defendant had no formal application process to compete in Miss Oregon. Rogers Decl. ¶ 5.  In 2019, defendant had a short, one-page application.  Lawson Decl. ¶ 7. However, not all applicants had to submit a formal application.  Rogers Decl. ¶ 6.  Furthermore, there was no requirement to submit a video, audition to compete, or engage in an interview.  *Id.*

The deadline to register for the 2019 USOA Miss Oregon competition was August 20, 2019.  Lawson Decl. ¶ 8; Rogers Decl. ¶ 6 & Ex A at 8.  Several individuals became contestants throughout the Spring and Summer of 2019, and one individual became a contestant merely weeks before pageant weekend and after the August deadline.  Lawson Decl. ¶ 8.

The 2018 USOA Miss Oregon competition was held on August 24-26, 2018, in Springfield and Eugene, Oregon.  Rogers Decl. ¶ 3 & Ex B.  The 2019 USOA Miss Oregon competition was held on September 20-22, 2019 in Springfield and Eugene, Oregon.  Lawson Decl. ¶ 6; Rogers Decl. ¶ 4 & Ex. A at 2.  The 2020 USOA Miss Oregon competition was held jointly with the USOA Miss Washington competition on October 17-18th in Salem, Oregon. Payne Decl. Ex C at 1-4.

The USOA Miss Oregon competition is comprised of a personal interview, an opening dance number, a swimsuit (or fitness wear for teens) competition, an evening gown competition, and an on-stage question.  *Id.*, Ex. C at 6-7; Rogers Decl. ¶ 9 & Ex. A at 6;

The Miss Oregon pageant first and foremost is a *competition*.  Each contestant chooses her own gown and swimsuit and expresses her own self on stage in order to stand out for the judges.  Rogers Decl. ¶ 10.  Contestants have ultimate creative freedom over their gown and swimsuit choices.  *Id.*  In fact, the contestants' "choice" of gown and swimsuit is part of the criteria in which they are judged.  Rogers Decl. ¶ 10 & Ex. A at 7 (Judging Criteria including "choice" of swimsuit and evening gown"); Payne Decl., Ex. C at 6-7 (same).  Furthermore, the

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

contestants' answers to the on-stage questions are a central aspect for which the contestants are judged. Rogers Decl. ¶ 10. The judges consider the knowledge, spontaneity, personality, vocabulary, voice, confidence, how well and quickly the contestants answer the question, and how articulate they are. Rogers Decl. Ex. A at 7; Payne Decl. Ex. C at 7.

> ### a.  Defendant's express mission is to promote *all* women and uplift *everyone*.

The USOA Miss Oregon pageant

> is designed to help women ACHIEVE their dreams and make them feel
> BEAUTIFUL inside and out! Our motto is to EMPOWER Women, INSPIRE
> others, and UPLIFT everyone! We focus on empowering women, promoting
> positive self-image and providing an avenue of achievement for today's modern
> woman. But more importantly we are an elite sisterhood that provides support and
> encouragement to inspire each delegate to be the best version of herself!

Rogers Decl., Ex A at 1, Ex. B at 3; Payne Decl., Ex. C at 1.

> ### b.  Outside of its discriminatory eligibility rule, defendant expresses no values or beliefs related to transgender women.

The USOA Miss Oregon pageant has four divisions: Teen (ages 13-17), Miss (ages 18-28, never married, no kids), Ms. (29+), and Mrs. (18+ Married). Rogers Decl., Ex. A at 5; Payne Decl., Ex. C at 5. In order to be eligible to compete in *any* division, a contestant must: (1) be a U.S. citizen, naturalized, or granted permanent residency; (2) be a resident, work or go to school in the state; (3) *be "a natural born female"*; and (4) have never posed nude in film or print media. Rogers Decl., Ex. A at 5; Payne Decl., Ex. C at 5.

Other than its "natural born" female eligibility rule, defendant conveys no private or public message, values, or beliefs, regarding the meaning of womanhood, beauty, or femininity related to or being born a cisgender female. Lawson Decl. ¶¶ 19-20; Rogers Decl. ¶ 20-21. Defendant also does not require its state directors to engage in any messaging or teachings to contestants or to the public regarding the meaning of "womanhood," being dependent on being born cisgender. *See* Smith Decl., Exs. 31-33.

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

Defendant's 2019 Miss Oregon staff and contestants also never had any such values or beliefs conveyed to them by any USOA employee and were never told to convey such values or beliefs to contestants or the public.  Lawson Decl. ¶¶ 19-20; Rogers Decl. ¶¶ 20-21.  In fact, it wasn't until this legal action that they even became aware that there was a "natural born" eligibility rule.  Lawson Decl. ¶ 20; Rogers Decl. ¶ 21.  When they learned of the eligibility rule, they were surprised and shocked, and several other Oregon state delegates also expressed surprise as well.  Lawson Decl. ¶20; Rogers Decl. ¶ 21.  This is because the eligibility requirement is not emphasized or promoted, nor is it central to the purpose, meaning, or mission of the Miss Oregon competition. Lawson Decl. ¶ 20; Rogers Decl. ¶ 21.

> c.    **Defendant's public actions in celebrating and including drag queens as part of its Miss Oregon pageant contradict its purported message.**

Defendant's public actions specifically contradict any purported message that femininity and beauty are confined only to people born cisgender females.  At defendant's 2019 Miss Oregon competition, defendant promoted to the public acceptance of the idea that beauty and femininity can exist and be celebrated outside of cisgender bodies.  Defendant featured a drag queen as one of the judges, who appeared at the pageant dressed as a woman.  Lawson Decl. ¶ 23; Rogers Decl. ¶ 22.  Defendant publicly stated on its Miss Oregon public Facebook page how proud it was to have a drag queen serve as one of its judges.  Rogers Decl. ¶ 22 & Ex. G. The pageant's choreographer for the last three years is an openly gay male who at the Miss Oregon 2019 pageant wore high heels, long painted nails, and feminine jewelry.  Lawson Decl. ¶ 23; Rogers Decl. ¶ 22 & Exs. B at 5, C, E, F.  The choreographer's guest of honor at the red-carpet event also was a drag queen who attended dressed as a woman and sat next to the choreographer during the pageant competition.  Lawson Decl. ¶ 23; Rogers Decl. ¶ 22 & Exs. D, F.

Furthermore, USOA does not strictly adhere to a message that its Miss Oregon contestants are of good and moral character.  USOA served alcohol at its 2019 Miss Oregon

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

event to minors to the point they were visibly intoxicated.  Rogers Decl. ¶ 28.  One of 2019 contestants was embarrassed to have her child at the event, as it set an example she did not want for her child.  *Id.*

### d.    Defendant is a for-profit corporation in the business of retail sales and promotions.

Defendant is a for-profit limited liability corporation.  Payne Decl. Ex. A at 6; Lawson Decl. ¶ 13.  Defendant is licensed to conduct business for "general retail sales" of "program book sales" and to *promote* pageants.  Payne Decl. Ex. A at 1-2.  Defendant charges its state directors to run its state pageants, charging a base price of $2500 and $1000 for each additional division.  Smith Decl. ¶ 109 & Exs 31 at 1, 32 at 1, 33 at 1.  Defendant also receives a royalty of $125 per contestant for every additional division.  *Id.*, Exs 31 at 1, 32 at 1, 33 at 1.  Here, Ms. McMullen paid defendant $6,875.00 from the 2018 Miss Oregon pageant, and $7,265.00 from the 2019 Miss Oregon pageant.  Payne Decl. Ex. B.

In addition, defendant heavily relies on its contestants to raise financial revenue and recruit new contestants.  Lawson Decl. ¶ 13; Rogers Decl. ¶¶ 12-18.  Defendant *requires* its Oregon contestants to sell at least one full-page color advertisement for the Miss Oregon pageant book, which costs $299.  Lawson Decl. ¶ 13; Rogers Decl. ¶ 12 & Ex. A at 9; Payne Decl., Ex C at 9.  If contestants don't or can't sell the page advertisements, they have to personally pay defendant $299.  Lawson Decl. ¶ 13; Rogers Decl. ¶ 12.  In addition, defendant incentivizes its contestants to sell additional advertisements for the program book.  This is done by offsetting contestant expenses and awarding contestants who sell the most advertisements.  Lawson Decl. ¶ 14; Rogers Decl. ¶ 13 & Ex A at 9.

Defendant also *requires* its contestants to promote the pageant and recruit new contestants.  Rogers Decl. ¶ 14.  Defendant creates Facebook pages for the local titleholders so they can promote the pageant and recruit new contestants.  Contestants are incentivized to recruit

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

as many contestants as possible by earning $100 for every new contestant recruited to the Miss Oregon pageant. *Id.*

Oregon contestants also pay defendant a $595 entry fee to participate in defendant's Miss Oregon pageant.  Lawson Decl. ¶ 15; Rogers Decl. ¶ 16 & Ex. A at 8; Payne Decl., Ex. C at 8. Furthermore, Oregon contestants also are required to pay out-of-pocket for their own evening gown, swimsuit, hair, photography, and makeup, often costing over a thousand dollars.  Lawson Decl. ¶ 15; Rogers Decl. ¶ 18.  Oregon contestants are required to obtain professional photos and to pay particular hair, makeup, and photography vendors that financially support defendant through sponsorships.  Lawson Decl. ¶ 15; Rogers Decl. ¶ 18.

The only times USOA gathers its Miss Oregon contestants outside of the pageant weekend itself is for *commercial* activities.  In 2019, contestants were asked twice to ride in a parade in order to promote the upcoming Miss Oregon competition.  Lawson Decl. ¶ 16; Rogers Decl. ¶ 19.  Contestants also were asked to attend two workshops held to assist them in learning how to sell advertisement pages and create sponsorship letters.  Lawson Decl. ¶ 16; Rogers Decl. ¶ 19.  USOA held no other group gatherings for Oregon contestants outside of the pageant weekend.  Lawson Decl. ¶ 17; Rogers Decl. ¶ 19.

### C.    Plaintiff is a Natural Born, Biological Female.

Plaintiff Anita Noelle Green is an openly transgender female – a person whose gender identity as female differs from the gender she was assigned at birth.  Green Decl. ¶ 2.  Although Ms. Green was *assigned* the gender of male at birth, an action outside of her control, she has always been a woman.  *Id.*  In her teens, plaintiff realized she was transgender, only because she previously lacked information to fully understand that was who she was.  *Id.* Plaintiff came out at the age of 17 and began hormone therapy at the age of 18 to affirm her female gender.  *Id.*  At the age of 19, plaintiff began living fulltime as Anita, the woman she is.  *Id.*  Ag age 24, plaintiff had gender-affirming surgery.  *Id.*  Plaintiff did not alter her sex but, rather, affirmed her

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

underlying gender identity based on a realization of who she deeply is. *Id.* Since her gender affirming surgery, plaintiff's anatomical traits also have aligned with her female gender. *Id.* Plaintiff is a physical, anatomical, hormonal, biological, and naturally born woman. *Id.*

Plaintiff also legally is a woman. Her birth certificate, passport, and state driver's license all identify plaintiff by her female gender. *Id.* ¶ 3 & Ex. A.

**D.    Plaintiff is an Experienced Pageant Contestant Who Successfully has Participated in Pageants Similar to USOA – Pageants Intended to Promote Women.**

Ms. Green is an experienced pageant participant. *Id.* ¶ 4. In 2017, Ms. Green participated in the Miss Montana USA® pageant, which is part of the Miss Universe® Organization (MUO). *Id.* MUO banned transgender women from its organization until 2012. At the time plaintiff participated in 2017, she was only the third openly transgender contestant to participated in the MUO. *Id.* The MUO "creates and advances opportunities for women around the world through its network of relationships across entertainment, fashion and philanthropy." *Id.* ¶ 4 & Ex. B at 2. The MUO "encourages every woman to challenge herself, find her unique voice, and embody the organization's mission of being Confidently Beautiful." *Id.* ¶ 4 & Ex B at 2. Ms. Green was extremely dedicated to participating in her first pageant. *Id.* ¶ 4. She hired a pageant coach, lost 50 pounds, changed her diet and exercise, and took her pageant duties very seriously. *Id.* Ms. Green participated in the Miss Montana USA® competition again in 2018. Ms. Green no longer qualifies to participate in the MUO due to her age. *Id.* ¶ 14.

In September 2018, Ms. Green moved to Oregon and was crowned the 2018 Miss Earth® USA Elite Oregon titleholder. Green Decl. ¶ 5. The mission of Miss Earth® is "to provide a platform for America's women to be a voice for environmental responsibility, while featuring these beauties for a cause in fashion, media and leadership opportunities." *Id.* ¶ 5 & Ex. C. The Miss Earth® competition "is a search for the most beautiful women of the Earth to serve as role models to uphold the advocacy to preserve and restore Mother Earth." *Id.* ¶ 5 & Ex. C.

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

In 2019, Ms. Green participated in the Miss Earth® Elite National competition in Las Vegas, Nevada. *Id.* ¶ 6 & Ex. E.  Although she did not place in the finals, she won "best evening gown" for a non-finalist. *Id.* ¶ 6 & Ex. D.

In all of the pageants that Ms. Green has participated in, she has had a positive experience and the contestants have been very welcoming and supportive of her involvement. *Id.* ¶ 8.  Ms. Green participates in pageants because she observed her sister participating in pageants when Ms. Green was growing up. *Id.* ¶ 9.  Ms. Green always was so impressed with how articulate and confident her sister was on stage. *Id.* Ms. Green wants to participate in pageantry for the same reasons as every female contestant – to gain a sense of confident and poise, and to feel beautiful and glamorous. *Id.*  Ms. Green desires to promote and uplift her fellow women and participate in pageantry in the same means and manner as other women. *Id.*

### E.    Plaintiff Applied for and was Denied Entry into Defendant's Miss Oregon Pageant Based on her Status as a Transgender Woman

Sometime before December 2018, Ms. Smith sent Ms. Green a friend request on Facebook, which Ms. Green accepted. *Id.* ¶ 10.  Ms. Green noticed that Ms. Smith was the director of the USOA pageants so on December 7, 2018, Ms. Green messaged Ms. Smith to inquire further.  Green Decl. ¶ 10; Smith Decl., Ex. 34.  Ms. Smith responded that she would "be happy to give more information" about defendant's program.  Smith Decl. Ex. 34 at 1.  Ms. Smith confirmed that Ms. Green was an Oregon resident and informed Ms. Green that although the Oregon pageant for 2018 had already occurred, Ms. Green could participate in "next year's" Oregon pageant. *Id.*  Ms. Smith also asked for Ms. Green's email so that Ms. Smith could provide Ms. Green more information about the pageant.  Smith Decl., Ex 34 at 2.

Ms. Green asked for defendant's rules, which Ms. Smith provided.  Smith Decl., Ex 34 at 1-2.  Ms. Green then asked whether Ms. Smith knew Ms. Green was transgender, to which Ms. Smith responded "*I did not*, our rules and regulations allow same sex marriage, however this is a

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

natural pageant. I would be happy to assist you in finding a pageant that you qualify for." Smith Decl., Ex 34 at 2 (emphasis added). Ms. Green asked if defendant would be willing to change the rules, and Smith stated that "at this time we do not anticipate the rules changing." *Id.*

Based on Ms. Smith's statement to Ms. Green that she could participate in the 2019 Oregon pageant, Ms. Green decided to apply to the 2019 Miss Oregon pageant. Green Decl. ¶ 11. She hoped that defendant would change its discriminatory policy and accept her application. *Id.* She went to defendant's website. On January 29, 2019, Ms. Green clicked on the "Apply Now" tab and filled out defendant's online application to become a contestant in Oregon. *Id.* Based on defendant's website materials and Ms. Green's prior Facebook conversation with Ms. Smith, Ms. Green understood she would first need to compete in the preliminary Oregon state-wide competition. *Id.* Plaintiff paid the application fee and submitted her application. Smith Dec., Ex. 35 at 1. Plaintiff's application specifically requested that Ms. Green be considered for Oregon's "state title." *Id.*[1]

Defendant immediately rejected plaintiff's application and refunded plaintiff's entry fee. Green Decl. ¶ 12 & Ex. F. Defendant did not provide Ms. Green any reason for the denial of her application at the time her money was refunded or at any other time. Green Decl. ¶ 12 & Ex. F. Nor was Ms. Green provided with any information that her application was deficient in any way. Green Decl. ¶ 12 & Ex. F.

:::

:::

:::

---

[1]    As noted above, as an Oregon resident, plaintiff could not directly apply to compete in the national competition. Because Oregon had a state-wide competition, she first was required to compete in and become a titleholder in Oregon before she ever could compete in the national competition.

Page 12 – MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

## IV.    ARGUMENT

### A.    Standard of Review

Defendant makes an as-applied constitutional challenge to the OPAA, arguing that applying the OPAA to require defendant to provide its privileges and services equally to plaintiff, a transgender woman, would violate defendant's free speech and free association rights under the First Amendment to the United States Constitution.  The contention that a statute relied on by plaintiff is unconstitutional is an affirmative defense that must be pleaded *and proved* by defendant.  Fed. R. Civ. P. 8(c); *Kewanee Oil & Gas Co. v. Mosshamer*, 58 F.2d 711, 712 (10th Cir. 1932).

Where, as here, the *moving party* bears the burden of proof at trial, defendant bears the initial burden of establishing the absence of a genuine issue of fact on each issue material to its affirmative defense.  *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).  That means that defendant "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *Id.* (citing *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 125, 1264-65 (5th Cir. 1991)).  This requires defendant to establish beyond controversy every essential element of its affirmative defense.  *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

It is undesirable to resolve as-applied constitutional challenges on a motion for summary judgment, because "a court benefits from a well-developed record when deciding complex and important questions."  *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1189 (9th Cir. 1988).[2]

---

[2]    Granting defendant's motion is even less appropriate here, where the parties have not had the opportunity of full discovery.  Furthermore, plaintiff has discovered that defendant has taken actions to expressly interfere with plaintiff's ability to obtain relevant discovery.  Lawson Decl. ¶ 18 & Ex A (Tanice Smith directing USOA 2020 contestants not to speak to plaintiff's attorney); Payne Decl. ¶ 7 (after Ms. Smith's message, plaintiff's counsel could not obtain cooperation from Oregon titleholders).  Given the limited factual record, there is even more reason not to decide these complex issues on the limited factual record before the court.

Page 13 – MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

**B.    Because Defendant Fails to Present *Any Evidence* Relevant to Defendant's *Miss Oregon* Pageant, Defendant Fails to Meet Its Burden.**

All of the evidence submitted by defendant in support of its motion addresses only to its *national* competition, not its *Miss Oregon* competition. For that reason alone, defendant fails to meet its burden on summary judgment to prove its affirmative defenses. As stated above, the national competition is held in Las Vegas, Nevada for titleholders of states with pageants, or at large competitors *without state-wide pageants*. Plaintiff does not allege that she would have *won* the Oregon competition and should have been permitted to compete in Nevada at the national competition. Rather, she only claims she was denied the ability to compete in the USOA Miss Oregon competition. Because defendant has the burden to prove its affirmative defense "beyond peradventure," defendant's lack of evidence relevant to the way it conducts its *Oregon* pageant is fatal to its motion. Furthermore, as demonstrated below, plaintiff's evidence regarding the Oregon pageant creates disputed issues of fact that preclude summary judgment.

**C.    Plaintiff is a Natural Born Female.**

Defendant's motion is premised on the fact that plaintiff does not qualify for its pageant because Ms. Green is a "biological male" (defendant not only argues plaintiff was assigned the gender of male at birth – but that plaintiff currently *is* a "biological" man or simply a man). *See* Def. Mtn. at 23-24. Defendant's contention is factually, medically, and scientifically incorrect.

It is medically and scientifically incorrect to separate plaintiff's gender identity from her biological sex and refer to her as a biological male or of the male "sex." Medical science supports the fact that gender identity is the *most important* determinant of a person's sex. *See* M. Dru Levasseaur, Esq., *Gender Identity Defines Sex: Updating the Law to Reflect Modern Medical Science is Key to Transgender Rights*, 39 Vermont L. Rev. 943, 980-86 (Sum 2015); Katherine M. Franke, *The Central Mistake of Sex Discrimination Law: The Disaggregation of Sex From Gender*, 144 U. Pa. L. Rev. 1, 38 (1995) (except at that special moment when the birth

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

attendant exclaims, 'It's a boy,' or 'It's a girl,' real, physical body parts play an insignificant role in
. . . gender attribution).  Other components of sex include chromosomes, hormones, internal
reproductive organs, external genitalia, and secondary sex characteristics.  *See* Levasseaur,
*Gender Identity Defines Sex*, 39 Vermont L. Rev. at 980-81 (explaining that the community of
scientific experts have recognized nine elements that comprise one's sex).  Recent studies show
that gender-identity may be more dependent upon brain function and hormonal influences than
on the appearance of the genitalia.  Julia A. Greenburg and Marybeth Herald, *You Can't Take it
With You:  Constitutional Consequences of Interstate Gender-Identity Rulings*, 80 Wash. L. Rev.
819, 830-32 (2005) (outlining medical studies demonstrating that gender identity is dependent on
brain function and developed in the womb); Madelein Foreman, Lauren Hare, Kate York *et al.*,
*Genetic Link Between Gender Dysphoria and Sex Hormone Signaling*, 104 J. of Clinical
Endocrinology & Metabolism 390 (Sept 2018), *available at*
https://academic.oup.com/jcem/article/104/2/390/5104458 (genes and polymorphism may alter
the sexual differentiation of the brain *in utero*).

　　　　A person's gender identity, regardless of whether it matches certain components of
biological sex, such as external sex characteristics, is innate and fixed at an early age, is not
subject to voluntary control, and cannot be changed by therapy or other means.  *See*
ScienceDaily, *Gene variants provide insight into brain, body incongruence in transgender*, (Feb.
5, 2020), *available at* https://www.sciencedaily.com/releases/2020/02/200205084203.htm ("It
doesn't matter what sex organs you have, it's whether estrogen, or androgen, which is converted
to estrogen in the brain, masculinizes the brain during this critical period").  Thus, any physical
interventions that a transgender person may undergo – such as hormone blockers, cross-hormone
therapy, and surgeries, simply assist the transgender person to live congruently with the person's
gender identity – they do not change it.  Norman P. Spack, *An Endocrine Perspective on the
Care of Transgender Adolescents*, 13 J. of Gay & Lesbian Mental Health 309, 312-13 (2009)

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

(attached as Ex E to Payne Decl.). That is, the treatment does not make a woman into a man, or a man into a woman. A transgender woman is already a woman because that is her gender identity. *Id.*

Consistently with medical science, several courts have recognized that gender identity and sex are related concepts. In *Bostock v. Clayton Cty., GA.*, 140 S. Ct. 1731, 1741-42 (2020), the Supreme Court held that transgender individuals are protected under Title VI because an employee's sex plays an "unmistakable role" in discrimination against a transgender employee. "Sex is not a cut-and-dried matter of chromosomes." *Schroer v. Billington*, 424 F.Supp.2d 203 (D.D.C. 2006); *see also Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995) (noting recent research concluding that sexual identity may be biological). That is, "male or female" is a relatively weak definition of "sex" and gender identity is "related to sex or having something to do with sex." *Fabian v. Hospital of Central Connecticut*, 172 F.Supp.3d 509, 525 (D. Conn. 2016); *see also In re Heilig*, 372 Md. 692, 710 (2003) (current medical thinking supports that external genitalia is not the sole medially recognized determinant of gender). Most recently, the Oregon Court of Appeals recognized that the relationship between "sex" and "gender" is complicated and that limiting sex to the traditional binary of "male" and "female" does not reflect the well-documented biological variations that occur in individuals. *Matter of Hollister*, 305 Or.App. 368, 375-76, 470 P.3d 436 (2020).

Here, defendant's position that plaintiff is male contradicts both medical science and the law. Using *one* characteristic of biological sex to define Ms. Green's "natural born" sex – anatomical physical traits that Ms. Green had when she was born. As demonstrated above, there are several traits beyond anatomical physical traits that define "sex," – *the primary* one being gender identity. Ms. Green was born a woman and currently is a woman. Although Ms. Green was *assigned* the gender of male at birth, an action outside of her control, she has always been a woman. Plaintiff's gender identity was formed in the womb based on her brain function and

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

hormone levels and was not dependent on her genitalia.  Any actions plaintiff took, such as gender-affirming surgery, simply aligned her anatomy with her existing sex and gender, which was defined by other traits.  Plaintiff also *legally* is a woman under Oregon law, as demonstrated on her birth certificate, passport, and Oregon driver's license.  Green Decl., Ex. A.  Simply put, plaintiff's *is* a "natural born female."[3]

### D.    Defendant Fails to Prove as a Matter of Law that Defendant has a Constitutional Right to Discriminate Against Plaintiff.

#### 1.    Enforcement of the OPAA to permit plaintiff to participate in the Miss Oregon pageant does not violate defendant's right to freely associate.

Defendant contends that it is an expressive association, group, or membership protected by the First Amendment.[4]  Whether a group's expressive association rights are protected by the constitution requires a three-step analysis:  (1) whether defendant is an expressive association; (2) whether the group's ability to advocate its viewpoints are affected in a significant way by inclusion of the unwanted person in the group; and (3) whether the application of the state's law requires the organization to include the unwanted person runs afoul of the group's freedom of expressive association.  *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648-56 (2000).

:::

:::

:::

---

[3]    Although defendant may be entitled to its own moral beliefs about transgender women, Oregon law does not allow it to refer to plaintiff as male in contradiction to Oregon law and medical science, and plaintiff's status as a woman particularly is relevant to whether plaintiff's participation in defendant's pageant actually interferes with defendant's asserted constitutional rights.

[4]    Defendant does not argue that it is entitled to protection as an intimate association.  *See Bd. of Dir. of Rotary Intl. v. Rotary Club of Duarte*, 481 U.S. 537, 545-46 (1987) (associations must be sufficiently personal or private to warrant constitutional protection as an intimate association).

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

a) **Defendant is not an expressive association, group, or membership entitled to constitutional protection.**

i) **Defendant's contestants are not an association or group that regularly gathers for expressive purposes.**

First, defendant is not the type of "association, group, or membership" entitled to First Amendment protection. A necessary element for application of the First Amendment's protection for freedom of association is membership *within a group*. *See NAACP v. Button*, 371 U.S. 415, 430 (1963); *Knox v. Serv. Emp. Intern. Union*, 567 U.S. 298, 309 (2012) ("the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed").

But the Miss Oregon pageant contestants are not the type of association or group generally entitled to First Amendment protections. They are not like the Boy Scouts of America, the Eagles, or the Jaycees. *See Wildgrass Oil and Gas Committee v. Colorado*, 447 F.Supp.3d 1051, 1067 (D. Colo.), *appeal filed*, (10th Cir. 2020) ("Almost all expressive association cases involve groups formed for associational purposes – for example, boy scout troops . . . or religious organizations . . . ). They are first and foremost individual competitors. They do not regularly associate with each other *for a common purpose*. They simply are an aggregation of persons who pay to compete with one another as *individuals*. They speak their *own* various and individualized messages through their choice of gown and swimsuit, answers to on-stage questions, and individualized platforms. The contestants simply don't come together for a common goal or purpose. *NAACP by and through Myrtle Beach Branch v. City of Myrtle Beach*, --- F.Supp.3d ---, 2020 WL 4482896, *7 (D.S.C. Aug 4, 2020) (evidence rendered unreasonable any inference that participants of Bikefest, as an aggregate associate of persons, intended to express a *particular* message).

In fact, the Miss Oregon contestants come together *only one time* for any purpose other than for business or commercial purposes (see below), and that purpose is to compete with each

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

other for a title.  For many contestants, once the pageant is over, unless they win the pageant and become a titleholder, they move on and no longer associate at all with USOA.  Thus, any requirement that defendant allow transgender females as contestants would require them merely to *interact* with transgender females – not accept them as "members" of any association or group to which defendant belongs.  *Telescope Media Group v. Lucero*, 936 F.3d 740, 760 (8th Cir. 2019); *see also City of Dallas v. Stanglin*, 490 U.S. 19, 24-25 (1989) (patrons of dance hall were not members of any organized association, as they were strangers to one another and the dance hall admitted all who were willing to pay); *NYC C.L.A.S.H., Inc. v. City of New York*, 315 F.Supp. 461, 475 (S.D.N.Y. 2004) (smokers challenging municipal bans upon smoking in bars and restaurants possessed no associational rights because they do not regularly gather in bars and/or restaurants as an organization of smokers in pursuit of a common goal). Defendant's contestants simply are not members of a "group" or association and are not entitled to First Amendment protection as such.

### ii)    Defendant is a commercial organization.

There is only "minimal constitutional protection of the freedom of commercial association."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 633 (1984) (O'Conner, J., concurring). Commercial speech – speech intended and used to promote a commercial transaction, is protected, but a state is free to impose any rational regulation on the commercial transaction itself.  *Id.*  That is

> "the Constitution does not guarantee a right to choose employees, customers, suppliers, or those with whom one engages in simple commercial transactions without restraint from the State.  A shopkeeper has no constitutional right to deal with persons of one sex."

*Id.*  Thus, an organization engaged in commercial activity enjoys only minimal constitutional protection of its "recruitment, training, and solicitation activities."  *Id.*  In turn, regulations of commercial recruitment of new members, customers, or employees is valid if it is rationally

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

related to the government's ends.  *Id.* The Supreme Court has never held that a commercial

enterprise, open to the general public, is an "expressive association" for purposes of First

Amendment protections.  *State v. Arlene's Flowers, Inc.*, 193 Wash.2d. 469, 533 (2019), *petition*

*for cert. filed*, (No. 19-333).

Distinguishing between associations that primarily are expressive or primarily

commercial will not always be easy.  *IDK, Inc.*, 836 F.2d at 1195.  However, an association must

choose its market.  Once it enters into the marketplace of commerce *in any substantial degree* it

"loses the complete control over its membership that it would otherwise enjoy if it confined its

affairs to the marketplace of ideas."  *Roberts*, 468 U.S. at 633 (O'Conner, J., concurring).

For example, Justice O'Connor in her concurrence in *Roberts*, explained that the Jaycees'

"[r]ecruitment and selling are commercial activities, even when conducted for training rather

than for profit."  *Id.* at 640.  She reasoned that a good deal of what the Jaycees did indisputably

came within the right of association in pursuance of the specific ends of speech.

Notwithstanding, however, it was first and foremost an organization that promoted and practiced

the "art of solicitation and management."  *Id.* at 639.  It was in the business of selling

memberships and dedicated a substantial time to recruitment of new members.  The organization

encouraged record-breaking performance in selling memberships.  *Id.*

In *IDK, Inc.*, the Ninth Circuit followed Justice O'Connor's concurrence to determine that

a dating association was not a primarily expressive association, but instead was a commercial

association.  836 F.2d at 1195-96.  The court reasoned that unlike publishers, concert promoters,

and cable television franchisers, the escort services did not control the content of expression or

ensure that any expression occurs.  They exercised no editorial judgment over the messages

conveyed and did not insist that they convey any.  *Id.*

In *Lloyd Lions Club of Portland v. Int'l Ass'n of Lions Club*, 81 Or.App. 151, 154-157,

724 P.2d 887 (1986), the Oregon Court of Appeals considered whether the Lions Club was a

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

"business or commercial enterprise" subject to the OPAA.  The Lions Club constantly encouraged members to solicit and recruit new members, provided membership kits, and provided awards for successful recruitment.  *Id.* at 154. The court concluded that the Lions Club was a "business which sells memberships and substantial concomitant business advantages to the male public throughout the state."  *Id.* at 157.[5]

Courts routinely have held that when a party engages in "associational activity" not "for the advancement of beliefs and ideas" but for "the advancement of his own commercial interests" the First Amendment will not protect him."  *In re Primus*, 436 U.S. 412, 438 n.32 (1978).  Thus, the profit-seeking motives of a party will take it outside the protection of the First Amendment when little of its business constitutes protected expression on political, economic, cultural, or social affairs.  *Roberts*, 468 U.S. at 626.

Here, defendant is a for-profit business whose primary purpose is to conduct "general retail sales" of "program book sales" and to *promote* pageants.  Payne Decl. Ex. A at 1-2. Recruiting, sales, and promotion – defendant's primary activities -- are commercial activities. *Roberts*, 468 U.S. at 638 (O'Connor, J., concurring) ("Recruiting and selling are commercial activities . . . )."

In order to aid in its profit-earning goals, defendant engaged a promotions director to heavily recruit new contestants and train its contestants in advertisement sales.  Lawson Decl. ¶¶ 4-5, 13, 16; Rogers Decl. ¶ 15.  Defendant is *not* selective, Lawson Decl. ¶ 10-11; Rogers Decl. ¶ 14, for the very reason that the more Oregon contestants it has, the more royalties and profit it earns.  Smith Decl., Exs. 31 at 1, 32 at 1, 33 at 1. Furthermore, Oregon contestants are *required* to sell advertisements, promote the pageant, and recruit new contestants through promotional

---

[5]    Again, as noted above, defendant does not challenge that it is a business or commercial enterprise subject to the OPAA.

Page 21 – MEMORANDUM IN OPPOSITION TO
         DEFENDANT'S MOTION FOR SUMMARY
         JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

events and social media.  Rogers Decl. ¶¶ 12-15.  Selling advertisements is a *significant* portion of a contestant's time leading up to pageant weekend.  Lawson Decl. ¶ 13; Rogers Decl. ¶ 12.

In fact, contestants gather outside of pageant weekend only to further defendant's commercial purposes – promoting the pageant and improving skills in selling advertisements. Lawson Decl ¶¶ 16-17; Rogers Decl. ¶ 19.  The Miss Oregon contestants hardly can be said to be associating primarily for expressive purposes when the majority of their limited time gathering is solely for promotional and fundraising purposes.

Nonetheless, defendant contends that its corporation associates primarily for expressive purposes and that, like publishers, concert promoters, and cable television franchisers, it controls the expressive content of its pageants.  First, defendant relies solely on evidence of how it controls its state titleholders as national contestants for its *national* pageant.  Defendant presents *no evidence* that it controls *any aspect* of the messaging of the Miss Oregon pageant or its contestants.  For that reason alone, defendant's argument fails.

Second, even if gathering *one time a year* for expressive purposes could make persons an association or group, defendant still fails to establish as a matter of law that defendant exercises any control over their expression.  It is the contestants that have ultimate creative choice of their gowns and swimsuits – defendant does not exercise editorial control over those choices.  Rogers Decl. ¶ 10.  Thus, defendant exercises *zero* editorial judgment or control over the content of the Oregon contestants' expression – at least not until a contestant actually *wins* one of the divisions of the Miss Oregon competition and becomes a contestant for the national competition – something plaintiff never alleges she would have done.

In conclusion, because defendant is primarily a *commercial* organization, defendant is incorrect that application of the OPAA to defendant infringes on any right of association. Oregon's regulations of defendant's commercial recruitment of its contestants is valid if it is rationally related to the state's ends.  *Roberts*, 468 U.S. at 633 (O'Conner, J., concurring).

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

**b)**    **Even if defendant is an expressive association, defendant has not demonstrated that plaintiff's participation in its pageant imposes any serious burden on its existing contestants' freedom of expressive association.**

Even if the Miss Oregon pageant could be described as an expressive association, that does not end the inquiry.  Defendant's free association defense still fails because defendant cannot demonstrate as a matter of law that allowing Ms. Green to compete in the Miss Oregon pageant "will affect in any significant way the existing member's ability to carry out their various purposes,"  *Bd. of Dir. of Rotary Intl. v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987).[6]

This case is controlled by *Roberts*.  There, the Supreme Court recognized that the Jaycees had expressive activities worthy of protection, because they had taken "public positions on a number of diverse issues" and engaged in a variety of "civic, charitable, lobbying fundraising, and other activities." Nonetheless, the court held that the Jaycees failed to demonstrate that admitting women imposed any serious burdens on the male members' freedom of expressive association.  *Id.* at 626.  The court rejected the notion that admission of women could violate any *symbolic message* created *solely by the group's discriminatory membership policy*:  "Any claim that admission of women as full voting members will impair a symbolic message conveyed by the very fact that women are not permitted to vote is attenuated at best."  *Id.*

The court also explained that the mission of *promoting and fostering the growth and development of young men* and *developing true friendship and understanding among young men* was not substantially impaired by admitting women. *Id.* at 612-13.  The court reasoned that there was no basis in the record "for concluding that admission of women as full voting members will

---

[6]    Defendant does not raise a *facial* challenge to the OPAA.  Thus, any argument that application of the OPAA *in this case* could require pageants to include *men* or women who do not conform to traditional gender stereotypes is irrelevant.  This court need only decide whether including *plaintiff* in defendant's pageant would significantly burden defendant's contestant's from carrying out their various purposes.

Page 23 – MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

impede the organization's ability to engage in these protected activities or to disseminate its preferred views." *Id.* at 627. The Minnesota law required "no change in the Jaycees' creed of *promoting the interests of young men*, and it imposed no restrictions on the organization's ability to exclude individuals with ideologies or philosophies different from those of its existing members." *Id.* (emphasis added).

Similarly, in *Bd. of Dir. of Rotary Intl.*, the Supreme Court held that the California's Unruh Civil Rights Act requiring the Rotary Club, which was open only to men, to admit women members did not violate the club's freedom of association under the First Amendment. The Rotary Club's mission was to "encourage high ethical standards in all vocations and help build goodwill and peace in the world." *Id.* at 539. The Court rejected the defendant's argument that admitting women would affect in any significant way the existing members' ability to carry out their various purposes – specifically, their basic goals of humanitarian service, high ethical standards in vocations, good will, and peace. *Id.* at 548-49.

The Oregon Court of Appeals, in *Lahmann*, 202 Or.App. 123, similarly determined that enforcement of the OPAA to require the Eagles to admit women into its all-male fraternal organization did not violate the organization's freedom of association under the First Amendment. The court explained that "application of an antidiscrimination law does not impermissibly abridge a group's right to expressive association *when the expression resides principally in a membership policy that discriminates based on sex*." *Id.* at 146 (emphasis added). "Moreover, a preference for male company alone does not amount to a "significant" burden on a group's expressive association. The Eagles had not demonstrated that enforcement of the OPAA in requiring the Eagles to accept women would materially interfere with its effort or goals – "liberty, truth, justice, equality, for home, for country, and for God." *Id.* at 147. The court further held that, in any case, "even if the application of the act worked a significant impairment on the Eagles' association right, the state's compelling interest in remedying gender

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

discrimination by means of the [OPAA] far exceeds any harm to the Eagles' expressive association." *Id.* The court therefore held that "a business or commercial enterprise in Oregon that is otherwise open to the public does not have a constitutional right to discriminate on the basis of gender, and that, in fact, such discrimination violates the [OPAA]." *Id.* at 147.

This case cannot be meaningfully distinguished from *Roberts, Bd. of Dir. of Rotary Intl.*, or *Lahmann*. Defendant's asserted expression resides solely in its discriminatory membership policy. Furthermore, as in *Roberts*, where the Jaycees' mission was to *promote young men*, defendant simply seeks to *promote women*.[7] And yet here, even more so than in *Roberts*, permitting Ms. Green to participate in the Miss Oregon competition certainly requires no change in that mission and imposes no restrictions on the ability of defendant's contestants to continue their expressive activities as part of defendant's pageant.

That is because plaintiff is in fact a woman – legally, biologically, hormonally, anatomically, and physically. Plaintiff fulfills all the missions and goals of defendant's Miss Oregon pageant. She also presents in a manner that conforms to traditional female gender stereotypes. *See* Green Decl., Ex. E. She has successfully and positively participated in pageants with similar mission statements as defendant. She seeks to uplift and promote women and to further defendant's mission as well. Ms. Green desires to participate in pageantry *in the same means and manner* as every other woman and for the same reasons as other female contestants – to gain confidence and to feel beautiful and glamorous.

The only difference between plaintiff and the other female contestants is that Ms. Green was assigned an incorrect gender at birth. Defendant simply cannot explain how having been incorrectly assigned the gender of male *at birth*, but being a woman in the same manner as every

---

[7] Defendant attempts to argue that the mission or expression in *Roberts* was not dependent on the sex of its members. But the mission statement in *Roberts* is nearly identical to defendant's – to promote young men through public civil and social engagements.

Page 25 – MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

other contestant, substantially interferes with the other contestant's ability to express themselves as part of the Miss Oregon pageant.  *See* Rogers Decl. ¶ 29 (as a former contestant and former runner-up of USOA Ms. Oregon, it is my opinion that transgender women who seek to participate in the USOA Miss Oregon competition in *any division* on the same terms and in the same manner as every other woman does not substantially interfere with the mission and values of USOA Miss Oregon, but enhances and promotes them").

Furthermore, there simply is no substantial burden on defendant's existing expression – defendant can teach or express whatever values or viewpoints it wants.  *See Dale*, 530 U.S. at 649 (test is whether the group's ability *to advocate its viewpoints* are affected in a significant way by inclusion of the unwanted person in the group).  Instead, defendant is simply prohibited from using gender identity in defining its eligibility criteria. *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988) (New York's Human Rights Law did not pose substantial burden on right of association because association was not prohibited from excluding individuals who did not share views that the association's members wished to promote; rather, the law merely prevented association from using race, sex, and other specified characteristics as a shorthand measure in place of . .. more legitimate criteria for determining membership); *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (no free expression claim when failed to show that discontinuance of discriminatory admission practices would inhibit in any way the schools' teaching of any idea or dogma); *CompassCare v. Cuomo*, --- F.Supp.3d ---, 2020 WL 3035648, *13 (N.D.N.Y. Jun. 5, 2020) (defendant's free association rights not substantially burdened by being required to hire employees who actions indicate they do not share defendant's view on abortion, because defendant not limited on ability to advocate against abortion, contraception, or other viewpoints related to human sexuality).

Defendant disagrees and relies on *Dale*, in which the Supreme Court held that application of New Jersey's public accommodations law to require the Boy Scouts to retain a gay scout

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

master violated the Boy Scout's expressive association rights.  530 U.S. 640.  *Dale* is distinguishable.  In contrast to *Roberts* and *Lahman*, where the association's expression resided solely in a discriminatory eligibility rule, in *Dale*, the Boy Scouts presented specific evidence that it had a central mission of imparting and transmitting the value to its youth *that being gay was immoral and unclean*. 530 U.S. at 651.  The Scout Oath and Law provided "a positive moral code for living" that included values of living "morally straight" and "clean" and the Boy Scouts specifically taught those values to its youth.  *Id.* The Boy Scouts asserted that *they teach that being gay is not morally straight*.  In fact, they presented specific evidence of an internal position statement from 1978 regarding an "official position" that the Boy Scouts believed that being gay and leadership in Scouting was not "appropriate."  *Id.* at 651-52.  The Boy Scouts also promulgated a similar position statement in 1991.  *Id.* at 652. The Boy Scouts also publicly expressed its views with respect to being gay by its assertions in prior litigation.  *Id.* at 652.  Thus, the court held that accepting an openly gay man as a scout leader would send a message of acceptance that was contrary to the Boy Scout's long-held central value, and such acceptance would significantly interfere with the organization's ability to express its message.  *Id.* at 654-66.

Defendant also relies on *Apilado v. N. Am. Gay Amateur Athletic Alliance*, 792 F.Supp.2d 1151 (W.D. Wash. 2011).  There, plaintiffs, a group of straight athletes, sought to play in a softball league run by the North American Gay Amateur Athletic Alliance (NAGAA).  The court held that NAGAA had a right to exclude the plaintiffs because including them would negatively impact NAGAA's expressive activity.  There, again, the NAGGA's values were embodied outside of its discriminatory membership policy.  The court expressly found that NAGAA's mission placed an emphasis on the participation in its league of members *of the LGBT community* and helping that community.  *Id.* at 1161.  NAGAA distributed a public brochure that promoted the idea of athletic competition and good physical health *in support of the gay lifestyle*."  *Id.*  The court explained that it would be difficult for NAGAA to effectively

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

emphasize its vision of gay lifestyle rooted in athleticism, competition and sportsmanship if it were prohibited from maintaining a gay identity. *Id.* at 1162. The court also emphasized that "[t]his does not mean, of course, that any group seeking to discriminate against an entire group of people can do so by hiding behind the First Amendment." *Id.*

Here, unlike the Boy Scouts and NAGAA, defendant has failed to present any evidence that its asserted expression – that beauty and womanhood is confined to only those who are born cisgender women – is a central, value or belief *other than was is in its discriminatory membership policy*. Defendant makes broad and vague conclusions in its brief that it promotes only cisgender women in its eligibility rules, contracts, program books, pageant, and social media, and that everything it does conveys a concept about womanhood. Def. Mtn. at 15-16.[8] But defendant does not support its assertions with evidence. Nor can it. Defendant submitted hundreds of pages of documents, and not one mentions the words "biological" or "cisgender" or defines the word woman or "womanhood." Not one document makes a statement either privately or publicly regarding cisgender women or transgender women. Defendant also presents no evidence that it *teaches* any values related to cisgender women to its contestants or the public.

In fact, there are disputed issues of fact as to whether defendant ever conveyed any such values or that such values were ever understood by its own staff or contestants. Lawson Decl. ¶¶ 19-20; Rogers Decl. ¶¶ 20-21. Rather, defendant simply expects this court to give it deference that by promoting "women," – everyone (including the public, contestants, staff, and volunteers) – must have *necessarily* understood that defendant *intended* to promote only cisgender women despite defendant's complete silence on the issue.

:::

---

[8]    Defendant later also appears to concede that it has said nothing on the issue, arguing that it has a right to remain silent regarding the debate over gender identity. Def. Mtn. at 27.

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

While the court must give deference to defendant's assertions regarding the nature of its expression, *see Dale*, 530 U.S. at 685, "such deference has its limits."  *Hamilton Cnty. Educ. Assoc. v. Hamilton Cnty. Bd. of Educ.*, 822 F.3d 831, 841 (6th Cir. 2016); *see also Apilado*, 792 F.Supp.2d at 1161 (Deference under *Dale* "not absolute").  "A group claiming infringement of its right to expressive association may not rely on generalizations to show a burden on its expression, but rather must support that claim of burden by evidence in the record."  *Hamilton Cnty. Educ. Association*, 822 F.3d at 841. That is, an expressive association cannot erect a shield against antidiscrimination laws "simply by asserting that a mere acceptance of a member from a particular group would impair its message." *Dale*, 530 U.S. at 653.

More importantly, this court need not give deference to defendant's assertions when the record establishes that its conduct contradicts those assertions.  Defendant's express mission contradicts its purported message by stating to the public that that it seeks to "UPLIFT *everyone*!" and "inspire each delegate to be the *best version of herself*."  More importantly, at its 2019 USOA Miss Oregon competition, defendant conveyed an opposite message – that it *promotes* womanhood and beauty as *including* the expression and celebration of traditional femininity *by people with male bodies*.  Defendant published on its Miss Oregon Facebook page how proud it was to have a drag queen as one of its 2019 judges.  That judge attended the pageant dressed as a woman.  Furthermore, defendant's choreographer is an openly gay male who wears high heels, long painted nails, and feminine jewelry, and who attended the 2019 Miss Oregon pageant with another drag queen as his guest of honor, who sat next to him during the pageant.

Furthermore, defendant contradicts even its more generalized purported message that its contestants are of "good moral character" who conduct themselves "with dignity, grace, and good manners."  At the 2019 Miss Oregon competition, defendant served alcohol to minors to the point of intoxication.  This embarrassed one of its contestants, whose child accompanied her

Page 29 – MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

to the event.

This court therefore should decline to give deference to defendant's assertions when the record so clearly demonstrates that defendant has communicated an inclusive – not exclusive – message regarding beauty and womanhood.

Finally, the fact that plaintiff is openly transgender does not change the analysis. Not only would the OPAA cease to protect anyone if individuals were required to remain silent about their status to gain protection, the question is whether plaintiff's participation as a woman who complies with traditional female gender stereotypes substantially interferes with other female contestants' participation in the pageant. The answer simply is – no.

In conclusion, defendant fails to meet its burden and this Court should deny defendant's motion for summary judgment on defendant's Freedom of Association affirmative defense.

> **2.      Enforcement of the OPAA to permit plaintiff to participate in defendant's Miss Oregon pageant does not compel defendant to speak in violation of the First Amendment.**

Defendant contends that applying the OPAA to defendant would compel it to speak a message it disagrees with in violation of the First Amendment. As explained below, defendant's argument fails.

> **a)      *Hurley* does not apply when a public accommodation excludes an entire class of individuals *regardless of their message*.**

In support of its compelled speech argument, defendant relies on *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995). In *Hurley*, the issue before the Supreme Court was "whether Massachusetts could require private citizens who organize a parade to include among the marchers a group *imparting a message* the organizers did not wish to convey." *Id.* at 559 (emphasis added). The plaintiffs were a group of LGBT Irish immigrants who wished to march in the defendant's parade to express *a particular message* – pride in their Irish heritage as openly gay, lesbian, and bisexual individuals, to demonstrate that

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

there are such men and women among those who descended, and to express their solidarity with like individuals who sought to march in the St. Patrick's Day Parade.  *Id.* at 561; 570.  They marched behind a banner with the inscription "Irish American Gay, Lesbian and Bisexual Group of Boston" and sought to communicate ideas as part of the existing parade.  *Id.* at 570.

Importantly, the parade owners did not exclude *all* LGBT persons as a class – in fact other LGBT individuals were permitted to march as parts of other groups in the parade that did not have an objectionable message.   *Id.* at 572.  Instead, they excluded plaintiffs only *on the basis of their message*.  The *Hurley* court was careful to distinguish the right to exclude a group based on the fact that their *message* would impinge on the rights of the speaker, in contrast to excluding a group solely based on status:

> Petitioners disclaim any intent to exclude homosexuals as such, and no individual member of GLIB claims to have been excluded from parading as a member of any group that the Council has approved to march.  Instead, the disagreement goes to the admission of GLIB *as its own parade unit carrying its own banner*.

*Id.* at 572 (emphasis added).

It was this fact that ultimately constituted compelled speech – that is, that the plaintiff group "wish[ed] to join with some expressive demonstration of their own." *Id.* at 573.  Because the defendant parade organizer disagreed with *the message that [the plaintiffs] wished to express*, it was beyond Massachusetts's power to control, and violated the parade organizer's free speech rights. *Id.* at 574-580.

*Hurley* does not apply here.  The First Amendment free speech clause protects against compelling individuals to endorse *ideas* – not groups of people.  *See Rumsfeld v. Forum for Academic and Inst. Rights, Inc.*, 547 U.S. 47, 63 (2006) (*FAIR*) (compelled speech violations result only from the fact that the complaining speaker's own message is affected by *the speech* it is forced to accommodate); *Jane Doe v. Donald J. Trump*, No. 8:20-cv-00858, 2020 WL

Page 31 – MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

5492994, *3 (C.D. Cal. Sept 2, 2020) (the protection against compelled speech is only applicable where the government compels a particular political or ideological message").

Hurley does not give defendant the ability to exclude an entire class of individuals based simply on *who* they are, rather than the content of their message. *See Gathright v. City of Portland*, 439 F.3d 573, 578 (9th Cir. 2006) (*Hurley* does not give unfettered discretion to exclude class of persons on any (or no) basis and in particular where speaker does not seek to have speech included or confused with another's); *Christian Legal Soc'y Chapter of Univ. of Cal. v. Kane*, No. C 04-04484 JSW, 2006 WL 997217, *6 (May 19, 2006), *aff'd*, 319 Fed.Appx. 645 (2009), *aff'd*, 561 U.S. 661 (2010) (it was significant to the *Hurley* court's analysis that the dispute did not concern an attempt to exclude participation of *all* openly gay, lesbian or bisexual individuals from marching); *Brush v. Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 910 (Ariz. 2019) (noting that in *Hurley* the impact was based on *message*, not *status*, and finding First Amendment violation when refusal to create custom wedding cake for same-sex marriage was "message-based" and that owners did not refuse serve to customers based only on the customer's sexual orientation). *Cf. Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Com'n*, 138 S. Ct. 1719, 1723 (2018) (noting that it might make a difference in a free speech claim if the baker refused to sell any cake *at all* rather than refusing to design a special cake *with words or images* celebrating a particular message).

Yet here, that is exactly what defendant has done. Defendant's eligibility requirements expressly exclude an entire class of people based solely *on their status* as transgender – *regardless* of any message they intend to convey. Rogers Decl., Ex A at 5. This was played out in the fact that defendant informed plaintiff it would find a pageant she "qualified for" and then later denied her application, both absent any inquiry into plaintiff's potential platform or message. Although Ms. Smith contends she looked at Ms. Green's social media before denying Ms. Green's application, this at most could only have confirmed Ms. Green's *status* as an openly

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

transgender person (something Ms. Smith already knew from her conversation with Ms. Green), not any *message* or platform that Ms. Green intended to express as part of the USOA Miss Oregon pageant.[9]

Defendant also contends that plaintiff's status *is a message*.  However, it belies common sense that a person's *status* as gay, black, transgender, Asian, etc. is synonymous with some sort of message intended to be conveyed by that person.  If defendant truly was concerned about its messaging, defendant would ask all applicants about their proposed platforms or messaging.  But defendant does *not*.  *See* Rogers Decl. ¶ 7.  In fact, defendant doesn't control its Oregon contestants' platforms *at all*.  *Id.*[10] If defendant wants to limit the messages spoken by its contestants, it must do so for *all* contestants, not just its transgender ones.  That is, if a cisgender contestant wanted to use defendant's pageant to speak about the inclusion of transgender women in pageantry – defendant must also exclude that cisgender contestant based on *message* – but defendant does not.  Thus, defendant's argument that it cares about its contestants' message is disingenuous at best – it cares only about the status of *who* is speaking.

The Supreme Court repeatedly has rejected the attempt to recharacterize a person's *status* as speech or conduct.  *See Christian Legal Soc. Chapter of Univ. of Cal., Hastings College of Law v. Martinez*, 561 U.S. 661, 689 (2010) ("[Christian Legal Society] contends that it does not exclude individuals because of sexual orientation, but rather on the basis of a conjunction of

---

[9]    Although Tanice Smith states that she reviewed plaintiff's social media at the time she rejected plaintiff's application, plaintiff's application was immediately rejected and much of the social media evidence submitted is dated after plaintiff's application was submitted.  Therefore, it is after-acquired evidence and the court should not consider it.

[10]    Even for its national competition, defendant only started requiring that platforms be approved in August of 2020, *after* this lawsuit was filed.  Smith Decl. ¶¶ 59-61 & Ex. 15.  However, defendant presented no evidence that it made as similar change for its Oregon competition.

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

conduct and the belief that the conduct is not wrong. Our decisions have declined to distinguish between status and conduct in this context." (Citation and internal quotation marks omitted.)); *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres.").  A person's protected status itself is not expression, and defendant's argument fails.

*Klein v. Or. Bureau of Labor and Indus.*, 289 Or.App. 507, 410 P.3d 1051 (2017)*, vacated on other grounds by Masterpiece Cakeshop*, 138 S Ct 1719 (2018),[11] -- not *Hurley* – controls this case.  There, under facts similar to this case, the Oregon Court of Appeals held that application of the OPAA did not compel the defendant to speak another's message in violation of the First Amendment.  In *Klein*, the defendant, Sweetcakes by Melissa, an Oregon bakery business, refused to serve a lesbian couple who sought to have a cake made for their same-sex wedding.  *Id.* at 512.  The defendants contended that application of the OPAA to them would violate their First Amendment free speech rights by compelling them to speak or promote a message with which they did not agree – that same-sex marriages were worthy of celebration. *Id.* at 530.  The court rejected that contention, and explained that *Hurley* did not apply under such circumstances because, rather than being "forced to decorate a cake with a specific message requested by a customer that they found offensive or contrary to their beliefs, defendants "refused to provide their wedding-cake service to [the plaintiffs] altogether."  *Id.* at 539.  In turn, plaintiff's request to be served equally was not a situation where the defendants were asked "to

---

[11]    *Klein* was vacated in part by *Masterpiece Cakeshop*, 138 S Ct 1719.  That case was a narrow ruling addressing only the free exercise of religion defense raised by the cakeshop.  The Court expressly declined to reach the free speech defense, apparently due to disagreements regarding the record.  138 S Ct at 1723; 1740 (Thomas, J., dissenting) (explaining that the Court did not address the free-speech claim "because it ha[d] some uncertainties about the record").  Thus, the Supreme Court's ruling in *Masterpiece Cakeshop* does not affect the free speech analysis in *Klein* or other cases.

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

articulate, host, or accommodate a specific message that they found offensive." *Id.*

Other courts agree that state laws requiring businesses to serve a class of clients equally do not constitute compelled speech in violation of the First Amendment. In *Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272 (Col. App. 2015), *overruled on other grounds by Masterpiece Cakeshop*, 138 S Ct 1719, a gay couple was denied a cake for their same-sex wedding by defendant Masterpiece Cakeshop. Masterpiece Cakeshop declined to make them a cake based on the religious beliefs of its owners. Plaintiffs promptly left the shop "without discussing . . . any details of their wedding cake." *Id.* at 276. Plaintiffs alleged that defendants violated Colorado's Anti-Discrimination Act (CADA). The Colorado's Civil Rights Commission issued a cease and desist order requiring Masterpiece Cakeshop to take remedial measures, train staff, and file quarterly compliance reports. *Id.* at 277.

Defendant's appealed, arguing that the Commission's order compelled speech in violation of the First Amendment by requiring it to convey a celebratory message about same-sex weddings that conflict with its religious beliefs. *Id.* at 283. The Colorado Court of Appeals disagreed, holding that the order "merely requires Masterpiece not to discriminate against potential customers in violation of CADA." *Id.* The court distinguished *Hurley*, explaining that it recognized that

> a wedding cake, in some circumstances, may convey a particularized message celebrating same-sex marriage and, in such cases, First Amendment protections may be implicated. However, we need not reach this issue. We note . . . that [defendants] denied [plaintiffs'] request without any discussion regarding the wedding cake's design or any possible written inscriptions.

*Id.* at 288. The court ultimately concluded that the Commission's order requiring Masterpiece not to discriminate against potential customers did not force it to engage in compelled expressive conduct in violation of the First Amendment. *Id.*

:::

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

Similarly, in *Elane Photography, LLC v. Willock*, 309 P.3d 53 (N.M. 2013), the Supreme Court of New Mexico held that a photography company's free speech rights were not violated by having to comply with the New Mexico Human Rights Act (NMHRA).  In particular, the court held that requiring a photography company to accept a client who was having a same-sex wedding did not compel the photography company to speak any message.  *Id.* at 65-66.  The court explained that although New Mexico could not regulate the *content* of the photographs themselves, it could mandate that so long as the photography company provides photography services to the public, New Mexico's discrimination law could require that it perform the same services for a same-sex couple as it would for an opposite-sex couple.  *Id.* at 66.  *See also Gifford v. McCarthy*, 137 A.D.3d 30, 41-42 (N.Y. Div. 2016) (state did not compel wedding venue to speak by requiring it to offer same goods and services to same-sex couples that they offer to other couples).

In conclusion, because defendant admittedly and by its *express policy* excludes transgender women as a class based on their *status* and *regardless of their message*, *Hurley* does not apply.  For this reason alone, defendant's compelled speech defense fails.

**b)**     **The OPAA does not regulate defendant's expressive conduct.**

Because defendant's exclusion is status based – not *message*-based, this court need not determine whether defendant's pageant is pure speech or expressive *conduct*.  Either way, defendant's argument fails.  Nonetheless, as explained below, the OPAA is no way regulates the *content* of any of defendant's expressive content – rather, the OPAA merely prohibits defendant from using gender identity as a basis for selecting its contestants.  *See Boardman v. Inslee*, --- F.3d ---, 2020 WL 6194466, * 14 (9th Cir. Oct 22, 2020) (a facially neutral statute does not discriminate on the basis of viewpoint merely because it *affects* some groups more than others).

:::

:::

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

i)        **Regulating discrimination is *conduct*-based, not speech.**

Defendant contends that it engages in protected speech because it "celebrates 'natural born female[s].'"  Def Mot. at 22.  Although defendant may engage in some expression through its mission statement of promoting women, the OPAA regulates defendant's *conduct* in excluding transgender women is *conduct* – not the content of defendant's speech.

Although *conduct* may constitute symbolic speech, it may do so only if there is a high likelihood that the speaker's intended message would actually be understood by those receiving it.  *Spence v. Washington*, 418 U.S. 405, 410 (1974).  Simply because defendant's discriminatory *conduct* of excluding transgender women is memorialized in an express policy does not transform it into speech.  *See FAIR*, 547 U.S. at 66 ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it.").

If defendant's position were correct, any public accommodation could claim exemption from the discrimination laws by contending that its discrimination is a "message" – for example, by "expressing" that its business only serves white people or men.  But even though "[i]t is possible to find some kernel of expression in almost every activity a person undertakes," *Stanglin*, 490 U.S. at 25, the Supreme Court consistently has rejected that invidious discrimination itself – merely because it is spoken or written – constitutes protected speech.  *See FAIR*, 547 U.S. at 62 (Congress can prohibit employers from discriminating in hiring on the basis of race.  The fact that this will require an employer to take down a sign reading "White Applicants Only" hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct."); *Masterpiece Cake Shop*, 138 S Ct. at 1728-29 (cautioning that allowing cake baker to refuse service to all gay persons would in effect allow business owner to put up signs saying "no goods or services will be sold if they will be used for gay marriages," something that would impose a serious stigma on gay persons.").

Page 37 – MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

Here, for the reasons stated above, *see* Discussion *supra* Section D(1)(a)(ii), defendant cannot establish that there is a high likelihood that the public would understand that by defendant's admitted *silence* on the meaning of "woman" and gender identity, that its *symbolic* message would be understood by others. Thus, *absent additional speech from defendant*, the viewing public could not possibly understand defendant's intended message. *See FAIR*, 547 U.S. at 66 (The expressive component of the speaker's actions is "not created by the conduct itself, but by the speech that accompanies it. The fact that such explanatory conduct is necessary is strong evidence that the conduct as issue here is not so inherently expressive that it warrants protection.").

Furthermore, courts consistently have held that the bare preference for *one class* of persons over another is not protected activity. In *Arlene's Flowers*, 193 Wash.2d 469,[12] the Washington Supreme Court held that requiring a floral shop owner to make floral arrangements for same-sex couples' weddings in compliance with Washington's public accommodations law did not violate the owner's free speech rights. The court determined that the owner's *conduct* of refusing to provide flowers for a wedding to same-sex couples was not an expressive activity, because it "does not inherently express a message" about that particular wedding. *Id.* at 513. Because the act of refusing to provide flowers was not inherently expressive, and did not constitute expressive activity, the Court held the shop owner's speech rights were not violated. *See also Craig*, 370 P.3d at 286 (the act of designing and selling a wedding cake *to all customers free of discrimination* does not convey a celebratory message about same-sex weddings likely to be understood by those who view it.) *Compare with Telescope Media Group*, 936 F.3d at 747-51 (finding free speech violation when defendant exercised *substantial* editorial control and

---

[12]   *Arlene Flowers* was decided on remand after the United States Supreme Court decided *Masterpiece Cake Shop v. Colorado Civil Rights Com'n*, 138 S Ct 1719 (2018).

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

judgment over content of wedding videos, including who the videographer would accept as clients). In conclusion, by prohibiting discrimination on the basis of gender identity, the OPAA regulates *conduct* – not speech.

> ii) **The OPAA does not regulate any expressive activity of defendant – but even if it did, such expressive activity is *the contestant's*, not defendant's.**

Defendant argues that the OPAA regulates the content of its pageant, which it argues is pure speech. Defendant asserts that its pageant is a live-entertainment show, group-stage production, and broadcast event. Def. Mtn. at 22. The OPAA does not regulate the content of defendant's pageant – it merely prohibits it from refusing to provide its privileges and services on a discriminatory basis. Nonetheless, even if it did regulate the content of expressive components of the pageant, for the reasons explained above, *see* discussion *supra* Section D(1)(a)(ii), defendant has failed to demonstrate that it exercises *any control* over the Oregon contestants' expressive activity or that it even participates in the contestant's creative process. *See Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010) (tattoos were express activity even though customer had ultimate control over the design, because there was no dispute that the tattooist applied his creative talents as well").

Furthermore, defendant has not demonstrated a nonspeculative possibility that anyone would understand that the individual contestants' participation equated some sort of endorsement of any message by defendant. *See Klein*, 289 Or.App. at 539 (even if the defendant's wedding cakes were expressive, they did not reflect the defendant's expression, because they were a collaborative process in which the defendant's artistic execution was subservient to the customer's wishes and preferences); *Craig*, 370 P.3d at 286 ("to the extent the public infers from a Masterpiece wedding cake a message celebrating same-sex marriage, that message is more likely to be attributed to the customer than to Masterpiece"); *Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 88 (Cal. 2004) ("For purposes of the free speech clause,

Page 39 – MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

simple obedience to a law that does not require one to convey a verbal or symbolic message cannot reasonably be seen as a statement of support for the law or its purpose.").  There are at least disputed questions of fact that preclude summary judgment as to whether any expression in the pageant is the *individual* contestant's expression and not defendant's expression.

> iii)    **Defendant does not make casting decisions in a manner that affects its "creative content."**

Finally, defendant contends that regulating how it selects its contestants is regulating speech, but the selection of its contestants is itself protected speech.  Def. Mot. at 16-17.  Defendant's argument fails because defendant has failed to meet its burden of establishing as a matter of law that it selects contestants in a manner that advances an artistic work or creative content.

There is no protected right to discriminate in a selection process. In *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984), an employer was accused of discriminating against female candidates in the selection of partners in its law firm.  The employer contended it had a First Amendment right to select its partners.  The Supreme Court disagreed, explaining that "invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections."  (quoting *Norwood v. Harrison*, 413 U.S. 455, 469 (1973)).  *See also Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 93-94 (1945) (labor union did not have constitutional right to select its membership in a discriminatory manner and there was "no constitutional basis for the contention that a state cannot protect workers from exclusion solely on the basis of race, color or creed").  Furthermore, even if a business has some expressive nature to it, that does not give the business *carte blanch* to discriminate in its selection process.  *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385-88, 390-91 (1973) (while the First Amendment protected the content of articles published by a newspaper, it did not protect the newspaper's

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

facilitation of illegal hiring practices by publishing gender-specific employment advertisements).

Rather, the First Amendment protects a defendant's selection process only if such selection "affects the expressive content" of its protected activity. *McDermott v. Ampersand Publ'g, LCC*, 593 F.3d 950, 962 (9th Cir. 2010). *Cf. Symmonds v. Mahoney*, 31 Cal.App.5th 1096, 1106 (2019) (selection of musician in furtherance of free speech because it advanced or assisted the creation and performance of artistic works); *Hunter v. CBS Broad., Inc.*, 221 Cal. App. 4th 1510, 1515-16, 1521 (2013) (where broadcasting company exercised substantial control over selection of on-air news personnel, who were "local celebrities," selection process was in furtherance of rights of free speech); *Claybrooks v. Am. Broad. Cos., Inc.*, 898 F.Supp.2d 986 (M.D. Tenn. 2012) (defendant ABC had a First Amendment right to make casting decisions that *affected the creative content* of its television show "The Bachelor"). Thus, a defendant must establish through evidence that its discrimination is required *in order to preserve the expressive integrity of its creative content*.

Here, in contrast, there are disputed issues of fact that preclude summary judgment on the issue of whether defendant exercises creative control over the selection of its contestants. At most, defendant appears to exercise *some* enforcement of its eligibility rules. However, defendant also bends those rules at will and at its convenience. Lawson Decl. ¶ 12; Rogers Decl. ¶ 8. Further, as discussed above, defendant is *not selective*, but heavily recruits Oregon contestants in order to further its commercial goals. *See* discussion *supra* Section D(1)(A)(ii). And defendant does not engage in any interview process, audition, video submission, or other type of application process that could *possibly* contribute to an exercise of creative control over the selection of its contestants. Rogers Decl. ¶ 6.

In conclusion, defendant fails to meet its burden to establish *as a matter of law* that it engages in a selection process that affects any creative content. Thus, defendant fails to establish that applying the OPAA to require it to provide its services to plaintiff, would regulate any

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

protected activity.

    **3.**     **Given the minimal burden on defendant and Oregon's compelling interest in protecting the LGBT community from discrimination, the OPAA passes *any* level of scrutiny.**

Plaintiff relies on and specifically incorporates her argument made in opposition to defendant's Motion to Dismiss regarding the following:

    (1)     The OPAA need only meet "rational-basis" scrutiny;

    (2)     Alternatively, the OPAA survives intermediate scrutiny under the *O'Brien* test;

    (3)     Alternatively, Oregon has a compelling interest in protecting transgender individuals from discrimination in public accommodations.

Pl Mem. Opp. Mtn. Dismiss at 33-44, Dkt 21 (Mar 30, 2020).  Plaintiff also relies on and specifically incorporates herein the Appendix submitted in support of those arguments. Appendix, Dkt 21-1 (Mar 30, 2020).

Plaintiff also supplements those arguments with the following:

•    The Supreme Court recently recognized that even deeply held religious objections to the LGBTQ community "do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law."  *Masterpiece Cake Shop*, 138 Sup Ct at 1727.

•    In addition to the many other protections for transgender individuals, *see* Pl Opp'n to Mtn Dismiss at 41-42, in 2019, Oregon's governor issued Executive Order No. 19-08, prohibiting discrimination in employment on the basis of a person's sexual orientation and gender identity, and requiring treatment consistent with a person's gender identity, and requiring access to gender-designated facilities.  Executive Order No. 19-08, *available at* https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=3477.

•    In regard to defendant's argument that plaintiff can participate in *other* non-discriminatory pageants, Ms. Green can no longer participate in Miss America or the MUO,

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

because they have age limits and she no longer qualifies.  The majority of mainstream pageants exclude transgender women, and she therefore primarily is segregated to transgender-only pageants.  Green Decl. ¶ 14.  The pageant industry has had segregated pageants for long enough.  Segregation clearly was not the intent of the OPAA.

**4.    Application of the OPAA to defendant will not endanger speakers of all viewpoints**

Defendant's argument that the application of the OPAA *to defendant* would somehow broadly dismantle diversity in pageantry and other organizations should summarily be rejected. Defendant itself is advocating for exclusion and segregated systems – not diversity and inclusion. Furthermore, defendant's *as applied* challenge requires this Court to focus on whether *plaintiff's* participation in *defendant's* pageant would pose a substantial burden on *defendant's* expressive rights – not how the OPAA would apply to every possible legal challenge that is not presented before this Court.

*Apilado* is a good explanation as to why defendant's argument is misleading.  NAGAA was a gay softball league born of the fact that many members of the LGBT community come from backgrounds where team sports have been environments of ridicule and humiliation.  792 F.Supp.2d at 1163.  The exclusivity was in responsive to a particular need based on historical discrimination, *id.*, and the court expressly found that "given the history of gay exclusion for sports," that NAGAA believed that "the only way to promote competition for *all* persons was to ensure that gay athletes have the same opportunities as straight athletes, is to create an exclusively gay community with exceptions for a small number of straight players."  *Id.* at 1162.  Importantly, the court also specifically determined that there was no compelling interest in allowing heterosexuals to join NAGAA's gay softball league.  *Id.* at 1163.

The OPAA applies equally and makes no distinction based on majority or minority groups. Public accommodations are prohibited from discriminating on the basis of *race* or

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

*gender*, and the law doesn't differentiate based on what that race or gender is.  However, defendant's argument ignores relevant historical discrimination and why certain groups exist. Like NAGAA, Miss Black America, Miss Gay America, and other marginalized group pageants were born out of *exclusion*. Hilary Levey Friedman, *Here She Is* at 125.

The Supreme court has recognized that there might be valid reasons to consider protected classes in order to alleviate or address historic discrimination and segregation.  *See, e.g.*, *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 US 193, 208 (1979) (voluntary affirmative action program did not violate Title VII when intended to eliminate a manifest racial imbalance in traditionally segregated job categories).  And in considering whether those purposes would be substantially burdened, the analysis would fair differently than in this case.  Furthermore, as in *NAGAA*, it would be difficult to demonstrate a compelling interest in having a straight person join the Miss Gay pageant, or a white person join the Miss Black America pageant, as such persons have not suffered the type of historic discrimination in public accommodations that the state was attempting to remedy through its anti-discrimination laws.  In contrast, for the reasons stated above, transgender women have been the subject of historical discrimination and have been excluded from the majority of mainstream pageants.  There is a compelling governmental interest in preventing further discrimination in public accommodations, and Oregon has already recognized a compelling interest in ending discrimination in public accommodations.  *Lahmann*, 202 Or. App. at 147.

Simply put, this Court's decision to apply the OPAA to require defendant to provide its benefits and services equally to *plaintiff* would not impair speech of all kinds and does not have the broad implications defendant contends.

## V.    CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court deny defendant's motion for summary judgment

Page 44 – MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com

DATED this 26th day of October, 2020.

SHENOA PAYNE ATTORNEY AT LAW PC

By: */s/ Shenoa L. Payne*
    Shenoa L. Payne, OSB No. 084392
    65 SW Yamhill, Ste 300
    Portland, Oregon 97204
    (503) 914-2500
    spayne@paynelawpdx.com

    *Attorney for Plaintiff*

Page 45 – MEMORANDUM IN OPPOSITION TO
             DEFENDANT'S MOTION FOR SUMMARY
             JUDGMENT

SHENOA PAYNE
ATTORNEY AT LAW
65 SW YAMHILL, SUITE 300
PORTLAND, OR 97204
(503) 914-2500
www.paynelawpdx.com