John Kaempf, OSB No. 925391
KAEMPF LAW FIRM PC
1050 SW Sixth Avenue, Suite 1414
Portland, Oregon 97204
Phone: (503) 224-5006
john@kaempflawfirm.com

Attorney for Defendant


## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **ANITA NOELLE GREEN**, an individual,<br><br>Plaintiff,<br><br>v.<br><br>**MISS UNITED STATES OF AMERICA, LLC**, a Nevada limited liability corporation, d.b.a. United States of America Pageants,<br><br>Defendant. | Case No. 3:19-cv-02048-MO<br><br><br>**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ........................................................................................... 1

REPLY ARGUMENT ...................................................................................... 2

I.  The Court should grant summary judgment because there are no disputes of material fact about Defendant's First Amendment freedoms. .................................... 2

    A.  Defendant properly raised its constitutional defenses, and Plaintiff failed procedurally to object to any disputed fact. ......................................... 3

    B.  Plaintiff alleges "disputes" that are not disputes, and are not "material." ......... 5

        i.  The material facts concern Defendant's views on who is a "natural born female," no matter how Plaintiff defines that matter. ................... 5

        ii.  The material facts concern Defendant's national pageant because Plaintiff only applied to participate in this national pageant. ............... 7

        iii.  The material facts concern Defendant's national pageant because Plaintiff only alleges harm and seeks relief about this national pageant. ............................................................................. 10

II.  This Court should exclude Plaintiff's inadmissible evidence. .............................. 13

    A.  Kaylene Rogers' and Marsha Lawson's declarations violate the Courts' discovery order. .......................................................................... 13

    B.  Declarations submitted by Plaintiff lack foundation and personal knowledge. ................................................................................ 13

    C.  Declarations submitted by Plaintiff are based on improper legal conclusions and opinions. ............................................................................. 15

    D.  Declarations Plaintiff submits contain inadmissible hearsay and unauthenticated documents. .......................................................... 16

III.  The requested relief violates the First Amendment by forcing Defendant to associate expressively in a way that changes its message about womanhood. ................... 16

    A.  Even as a for-profit entity, Defendant is a primarily expressive association because its commercial activities promote the pageant. ........................ 17

    B.  Defendant engages in expression by celebrating biological women. .............. 19

Page i – DEFENDANT'S REPLY IN SUPPORT OF MOTION
        FOR SUMMARY JUDGMENT

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

C.   Forcing Defendant to include Plaintiff would affect Defendant's expressive association by requiring Defendant to promote transgender females as "natural born females." .................................................................. 21

D.   Alternatively, Plaintiff's requested relief violates the First Amendment by forcing the Oregon pageant producers to associate expressively in a way that changes its message about womanhood. ........................................................ 26

IV.   The requested relief violates the First Amendment by compelling Defendant to speak a message about womanhood it disagrees with.......................................................... 28

A.   Defendant engages in protected speech by communicating through its pageant.................................................................................................. 28

B.   Defendant engages in protected speech—not expressive conduct—by selecting contestants to shape its message................................................... 30

C.   Plaintiff's requested relief compels Defendant to convey a message about women it does not want to speak and cannot be forced to express. ............... 34

D.   Plaintiff confirms that the requested relief alters, is triggered by, and awards access based on content and viewpoint. ........................................... 37

E.   Alternatively, the requested relief violates the First Amendment by compelling the Oregon pageant producers to speak a message about womanhood they disagree with. ...................................................................... 38

V.   The requested relief fails strict scrutiny because Plaintiff has no compelling need to force Defendant to speak and associate in support of Plaintiff's contrary views. ...... 39

VI.   Forcing Defendant to speak and associate endangers speakers of all viewpoints. ..... 41

CONCLUSION.................................................................................................... 45

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

# TABLE OF AUTHORITIES

## CASES

*Anderson v. City of Hermosa Beach*,
   621 F.3d 1051 (9th Cir. 2010) .......................................................... 29, 30, 31, 32

*Apilado v. N. Am. Gay Amateur Athletic All.*,
   792 F. Supp. 2d 1151 (W.D. Wash. 2011)......................................................... 20

*Assocs. & Aldrich Co. v. Times Mirror Co.*,
   440 F.2d 133 (9th Cir. 1971) ............................................................................. 7

*Biro v. Conde Nast*,
   883 F.Supp.2d 441 (S.D. NY 2012) ................................................................ 43

*Bostock v. Clayton Cnty.*,
   140 S.Ct. 1731 (2020)........................................................................................ 6

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000) ................................................................................. passim

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)......................................................................................... 13

*Claybrooks v. Am. Broad. Cos., Inc.*,
   898 F. Supp. 2d 986 (M.D. Tenn. 2012)............................................................ 33

*CompassCare v. Cuomo*,
   465 F. Supp. 3d 122 (N.D.N.Y. 2020).............................................................. 23

*Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018) .............................................................................. 6

*E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*,
   547 F.3d 1095 (9th Cir. 2008) ........................................................................... 3

*Fed. Deposit Ins. Corp. v. New Hampshire Ins. Co.*,
   953 F.2d 478 (9th Cir. 1991) ............................................................................. 3

*Frudden v. Pilling*,
   742 F.3d 1199 (9th Cir. 2014) .................................................................... 30, 39

*Hart v. Massanari*,
   266 F.3d 1155 (9th Cir. 2001) ......................................................................... 42

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
   627 F.2d 919 (9th Cir. 1980) ........................................................................... 15

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*,
   515 U.S. 557 (2005)................................................................................. passim

*Iancu v. Brunetti*,
   139 S. Ct. 2294 (2019)............................................................................... 38, 44

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

*IDK, Inc. v. Clark Cnty.*,
   836 F.2d 1185 (9th Cir. 1988) ................................................................ passim

*Invisible Empire of the Knights of the Ku Klux Klan v. Mayor of Thurmont*,
   700 F. Supp. 281 (D. Md. 1988) ........................................................................ 21

*Jane Doe v. Donald J. Trump*,
   2020 WL 5492994 (C.D. Cal. Sept. 2, 2020) .................................................... 38

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
   138 S. Ct. 2448 (2018) ........................................................................................ 6

*Kesey, LLC v. Francis*,
   2009 WL 909530 (D. Or. Apr. 3, 2009) ............................................................ 16

*Klein v. TAP Pharm. Prod., Inc.*,
   518 F. App'x 583 (9th Cir. 2013) ...................................................................... 16

*Krislov v. Rednour*,
   226 F.3d 851 (7th Cir. 2000) ............................................................................. 20

*L. Barber Gems, Inc. v. Brink's Diamond & Jewelry N. Am.*,
   43 F. App'x 164, (9th Cir. 2002) ......................................................................... 9

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010) ........................................................................... 10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................... 12

*Masonry Bldg. Owners of Or. v. Wheeler*,
   394 F.Supp.3d 1279 (D. Or. 2019) .................................................................... 41

*Matal v. Tam*,
   137 S.Ct. 1744 (2017) ........................................................................................ 44

*Mattos v. Walmart, Inc.*,
   2020 WL 4805433 (D. Or. Aug. 18, 2020) ........................................................ 14

*McDermott v. Ampersand Publ'g., LLC*,
   593 F.3d 950 (9th Cir. 2010) ............................................................................. 20

*Mitchell v. Toledo Hosp.*,
   964 F.2d 577 (6th Cir. 1992) ............................................................................... 9

*New York State Club Ass'n, Inc. v. City of New York*,
   487 U.S. 1 (1988) ............................................................................................... 21

*Next Commc'ns. Inc. v. Viber Media, Inc.*,
   758 F. App'x 46 (2d Cir. 2018) ........................................................................... 4

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ............................................................................................. 7

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

*Orr v. Bank of America, NT & SA*,
    285 F.3d 764 (9th Cir. 2002) ........................................................ 16

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
    961 F.3d 1062 (9th Cir. 2020) ..................................................... 38

*Plott v. Gen. Motors Corp.*,
    71 F.3d 1190 (6th Cir. 1995) ......................................................... 4

*Pree v. Farmers Ins. Ex.*,
    552 F. App'x 385 (5th Cir. 2014) .................................................. 3

*Preferred Commc'ns, Inc. v. City of Los Angeles*,
    754 F.2d 1396 (9th Cir. 1985) ..................................................... 29

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ............................................................... 44, 45

*R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*,
    2019 WL 4034606 ......................................................................... 6

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ...................................................... 38, 39, 41

*Revels v. Miss Am. Org.*,
    2002 WL 31190934 (E.D.N.C. Oct. 2, 2002) ........................... 19, 20

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
    487 U.S. 781 (1988) .................................................................... 36

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) .............................................................. 18, 23

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ................................................................ 20, 31

*S. Bos. Allied War Veterans Council v. City of Bos.*,
    875 F. Supp. 891 (D. Mass. 1995) .......................................... 21, 23

*Schuler v. Chronicle Broad. Co. Inc.*,
    793 F.2d 1010 (9th Cir. 1986) ..................................................... 15

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir, 2009) ..................................................... 17

*Sullivan v. Dollar Tree Stores, Inc.*,
    623 F.3d 770 (9th Cir. 2010) ....................................................... 15

*Vannatta v. Keisling*,
    899 F. Supp. 488 (D. Or. 1995) .................................................. 16

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ................................................................. 6, 44

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
   435 F.3d 989 (9th Cir. 2006) ........................................................... 10

*Wheeler v. City of Santa Clara*,
   894 F.3d 1046 (9th Cir. 2018) ....................................................... 12

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ......................................................................... 6

**STATUTES**

ORS 659A.403(1) ................................................................... passim

**RULES**

D. Or. R. 56-1 ....................................................................................... 3

Fed. R. Civ. P. 56 ........................................................... 2, 3, 4, 13

Fed. R. Evid. 602 ............................................................................. 13

Fed. R. Evid. 701(a) ...................................................................... 15

Fed. R. Evid. 801 ............................................................................. 16

Fed. R. Evid. 802 ............................................................................. 16

Or. Admin. R. 839-005-0003(9) ............................................... 42

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I ............................................................ passim

**OTHER AUTHORITIES**

Robby Soave, *School District Decides Asians Aren't Students of Color*,
   Reason (Nov. 16, 2020, 1:25 PM),
   https://reason.com/2020/11/16/equity-report-north-thurston-asian-students-of-color/. ..... 44

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

# INTRODUCTION

Defendant produces a national pageant and licenses state pageants to promote a particular message about womanhood—that women are "*natural* born females."  Plaintiff never disputes that Defendant's pageant is expressive.  Plaintiff admits that Defendant "exercises control" over its pageants in numerous ways.  Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Opp. to MSJ") at 4.  And Plaintiff also admits to being an "openly transgender female" who only applied to and only seeks relief from Defendant.  These undisputed facts prove that Plaintiff's request to apply Oregon's Public Accommodations Act (the "Act") to Defendant violates Defendant's First Amendment right to promote its own views of womanhood.

But Plaintiff's summary judgment response ignores these undisputed material facts and instead presses two points.  First, Plaintiff says the Oregon state pageant—not Defendant's national pageant—is the relevant pageant.  Plaintiff is incorrect.  Plaintiff only applied to and seeks relief against the *national* pageant.  Defendant and the Oregon pageant producers each exercise enough control over the content of Oregon's state pageant to trigger First Amendment protection.  So, no matter how Plaintiff tries to slice it, Plaintiff's *forced* participation in either pageant infringes on Defendant's ability to associate and speak its message about *natural* womanhood.

Second, Plaintiff argues that only pageants honoring groups subject to "historic discrimination" may select contestants who promote those pageants' messages.  Opp. to MSJ at 43-44.  But this approach unconstitutionally picks winners and losers by protecting some groups over others.  Under this theory, the government could prefer speech celebrating gay

Page 1 – DEFENDANT'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

men over speech praising biological women.  This test is unworkable and further highlights how Plaintiff's application of the Act against Defendant violates the First Amendment.

In the end, Plaintiff's attempt to manufacture disputed facts fails.  This Court should grant Defendant's summary judgment motion and dismiss this case.[1]

## REPLY ARGUMENT

Under FRCP 56, Defendant has the same burden to prove its First Amendment affirmative defenses as any party moving for summary judgment.  This Court should grant Defendant's summary judgment motion because (I) there are no disputes of material fact; (II) many of Plaintiff's submitted facts should be excluded (and even if they are not, they are immaterial); (III) Defendant is a primarily expressive entity, and the requested relief alters Defendant's message by compelling expressive association; (IV) the requested relief compels speech to which Defendant objects based on Defendant's content and viewpoint; (V) burdening these rights fails strict scrutiny; and (VI) the requested relief unconstitutionally endangers speakers of all viewpoints.

**I.      The Court should grant summary judgment because there are no disputes of material fact about Defendant's First Amendment freedoms.**

There are no disputes of material fact affecting Defendant's First Amendment freedoms to expressively associate or speak.  While Plaintiff tries to manufacture a dispute, Plaintiff fails.  Courts often grant summary judgments for "as-applied" constitutional affirmative defenses in cases like this with unobjected-to evidence and well-developed records.  Though

---

[1] Alternatively, Defendant requests this Court grant one of its other pending motions. *See* Def.'s Mot. to Dismiss and Supp. Mem. of La;  Def.'s Reply in Supp. of Mot. to Dismiss; Def.'s Special Mot. to Strike Pl.'s Compl;  Def's Reply in Supp. of Special Mot. to Strike Pl.'s Compl "Anti-SLAPP Reply."

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

Plaintiff questions the meaning of a "natural born female," the First Amendment protects Defendant's ability to express its *own* message about womanhood no matter Plaintiff's view. Meanwhile, Defendant's pageant is the only relevant pageant because Plaintiff only applied to that pageant, and Plaintiff's Complaint only seeks relief from that pageant.

### A.    Defendant properly raised its constitutional defenses, and Plaintiff failed procedurally to object to any disputed fact.

Defendant's summary judgment motion is appropriate because courts often decide First Amendment affirmative defenses at this stage. *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 645-47, 661 (2000) (holding Boy Scouts established expressive association affirmative defense on "summary judgment"); *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1098-1101 (9th Cir. 2008) (finding video game producer proved First Amendment "affirmative defense[]" at the summary judgment stage in a trademark infringement case).

This is especially true here where there is an "absence of a genuine issue of material fact." *IDK, Inc. v. Clark Cnty.*, 836 F.2d 1185, 1190 (9th Cir. 1988)

And Plaintiff waived any objection to Defendant's evidence supporting its summary judgment motion because Plaintiff did not object to its admissibility. *See Fed. Deposit Ins. Corp. v. New Hampshire Ins. Co.*, 953 F.2d 478, 484–85 (9th Cir. 1991) (failing to object to "[d]efects in evidence" waives any objection to that evidence); L.R. 56-1(b) (non-moving party must raise objection to evidence in "party's response memorandum").

Plaintiff also has not "show[n] by affidavit or declaration that, for specified reasons, [Plaintiff] cannot present facts essential to justify [Plaintiff's] opposition." FRCP 56(d). So, Plaintiff waived any claim need for more discovery before the Court rules. *See Pree v. Farmers Ins. Ex.*, 552 F. App'x 385, 388 (5th Cir. 2014) ("a party waives the issue of

inadequate discovery when it fails to seek relief under Rule 56(d)" (internal quotation marks omitted)); *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196 (6th Cir. 1995) (same).

In addition to the error of stretching Plaintiff's counsel's declaration to be considered a request for more evidence under FRCP 56(d), the declaration does not show how additional discovery would create a genuine issue of material fact. Plaintiff's counsel alleges she was "in contact with one Oregon titleholder" and "reached out to others." (Decl. of Shenoa Payne in Opp. to Def.'s Mot. for Summ. J., ¶ 7.) But she does not reveal the nature of the communications or allege what material information these contestants held or how any material information they might have held would create a dispute of fact.[2] Plus, obtaining testimony from pageant contestants violates this Court's discovery order. Official Court Transcript ("Tr."), 32:9-10, ECF No. 29 ("limiting discovery at this point to written discovery.") Plaintiff never objected to this Order. *See Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 50 n.4 (2d Cir. 2018) (holding plaintiff "waived any argument premised on an objection to the district court's discovery plan" by not raising it).

Likewise, this case presents "a well-developed record." *IDK, Inc.*, 836 F.2d at 1190. The parties have "briefed the issues extensively." *Id.* This Court held oral argument. *See id.* The parties have "submitted numerous exhibits to the district court." *Id.* And Plaintiff produced "the history of the [Act] and the [state's] reasons for enacting it." *Id. See* Appendix, ECF No. 21-1. On this record, summary judgment should now be granted for Defendant.

---

[2] Plaintiff does not explain how Ms. Smith acted improperly by reminding contestants of their non-disclosure agreement.

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

**B.    Plaintiff alleges "disputes" that are not disputes, and are not "material."**

**i.    The material facts concern Defendant's views on who is a "natural born female," no matter how Plaintiff defines that matter.**

Although Plaintiff tries to create a dispute of "material" fact by claiming that Plaintiff is a "naturally born woman" (Opp. to MSJ at 9-10).  But that attempt is irrelevant because Defendant can define and promote womanhood according to its *own* views.

Defendant conveys its message of promoting, celebrating, and empowering "biological" women in many ways, including through contestant eligibility requirements (*See* Decl. of Tanice Smith in Supp. of Def.'s Mot. for Summ. J. ("Smith Decl."), Ex. 2 at 1-2; Exs. 24-26.)  One of the rules requires contestants to be "natural born female[s]." (Ex. 2 at 1-2.)  And according to Defendant, Plaintiff *does not* meet its "natural born female" requirement because Plaintiff was born as a male. (*See* Ex. 34.)

Indeed, Plaintiff is a "transgender female" who was born as a male with male anatomy and male chromosomes and who participates in pageants as "an openly transgender female." (Decl. of Anita Noelle Green in Opp. to Def.'s Mot. for Summ. J. ("Green Decl.") ¶¶ 2, 4.  But Plaintiff believes that Plaintiff is *still* a "naturally born woman" despite being born as a male. (*See id.* at ¶ 2; Opp. to MSJ at 14-16.)

This Court need not decide whose belief about womanhood is "correct" or settle the ongoing scientific and cultural disputes about womanhood.  Instead, the relevant legal issues are (1) whether Defendant may define womanhood as limited to "natural born females" as Defendant conceives it; and (2) whether it can be compelled to associate and speak in ways that alter or affect that definition.  *See infra* §§ III-V (explaining this point).

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

Still, Plaintiff argues that "Oregon law does not allow [Defendant] to refer to plaintiff as male in contradiction to Oregon law and medical science." Opp. to MSJ at 17 n.3.  But that is also irrelevant.  The First Amendment protects all speakers from "adher[ing] to an ideological point of view he [or she] finds unacceptable" even if that view is "different from the majority." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).  These protections for speech "on controversial subjects such as … gender identity" occupy "the *highest* rung of the hierarchy of First Amendment values" and merit "special protection."  *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (internal quotations omitted).  The reason is that "intellectual individualism and the rich cultural diversities" of the United States come "at the price of occasional eccentricity and abnormal attitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641-42 (1943).

That is not to say Defendant defines womanhood unusually.  Science supports Defendant's view that sex is determined at birth.  *See, e.g.*, Br. of National Medical and Policy Groups That Study Sex and Gender Identity Amici in Supp. of Employers at 5, *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, 2019 WL 4034606 (citing and quoting several studies concluding sex "declares itself anatomically in utero and is acknowledged at birth").  So does caselaw.  *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1746-47 (2020) ("We agree that homosexuality and transgender status are *distinct* concepts from sex.") (emphasis added).  *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018) (noting that "sex is determined at birth based on the appearance of external genitalia" and differs from "gender identity").

But the First Amendment protects Defendant's views and advocacy whether scientists, policymakers, or gender-study "professors" agree with it or not.  For this reason,

it is immaterial if Plaintiff's "birth certificate, passport, and Oregon driver's license" indicate Plaintiff is legally a female.  Opp. to MSJ at 17.  Same-sex marriage is legal too, but the First Amendment protects the freedom "to advocate" that "same-sex marriage should not be condoned."  *Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015).  Indeed, there is no "controlling precedent" to "compel" a speaker to say something just because the proposed message is "not … unlawful."  *Assocs. & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 136 (9th Cir. 1971).  Those principles apply here: The First Amendment safeguards Defendant's freedom to promote the view that women are only "natural born female[s]" even if Plaintiff is legally a woman or self-identifies as a woman.

> ### ii.    The material facts concern Defendant's national pageant because Plaintiff only applied to participate in this national pageant.

The undisputed facts establish that Plaintiff only applied to participate in Defendant's national pageant. (Smith Decl. ¶ 123, ECF No. 33.)  That is why "all of the evidence submitted by defendant … relates to how defendant conducts its *national* competition in Las Vegas, Nevada, not its *Miss Oregon* competition." Opp. to MSJ at 4.

During Plaintiff's Facebook conversation with Tanice Smith (Defendant's National Director), Ms. Smith told Plaintiff that she was the "National Director of United States of America's Miss" pageant and "would be happy to give [] more information about" the "national pageant." (Smith Decl., Ex. 34 at 1.)  After noticing Plaintiff lived in Oregon, Ms. Smith told Plaintiff that the Oregon pageant had occurred. (*Id.)*  Normally, prospective contestants apply to Defendant's pageant as either winners of state pageants or as at-large contestants. (Smith Decl. ¶ at 33.)  But Ms. Smith invited Plaintiff to "apply to represent a neighboring state such as Washington or Idaho at this year[']s nationals" as an at-large

contestant.[3] (Smith Decl., Ex. 34 at 1; Supp. Decl. of Tanice Smith in Supp. of Def.'s Mot. for Summ. J. ("Smith Supp. Decl."), ¶¶ 4-5.)

Plaintiff accessed "the USOA pageant's website"—Defendant's website—and filled out "defendant's online application." (Green Decl. ¶ 11. *See* Smith Decl. ¶ 123.) Plaintiff then applied to Defendant's national pageant. (Smith Decl. ¶ 123; Green Decl. ¶ 11.) Plaintiff applied to Defendant's pageant with the "hope[] that USOA would change its ["natural born female"] policy." (Green Decl. ¶ 11.)

When Plaintiff applied, Defendant's online application indicated that submissions would be considered for Defendant's national pageant. (Smith Decl. ¶¶ 16-19.) For example, each prospective contestant had to acknowledge that she had read Defendant's delegate packet before submitting an application through Defendant's website. (Smith Decl. ¶¶ 18-19, 34; Ex. 3 at 1; Exs. 6-8 (delegate packets).) Plaintiff's application affirmed that Plaintiff had "read the delegate packet." (Smith Decl., Ex. 35 at 2; Green Decl. ¶ 11 (Exhibit 35 is "a true and correct copy" of Plaintiff's application.)) And this delegate packet made clear that prospective contestants were applying to Defendant's national pageant. (*See* Smith Decl., Ex. 6 at 4, 6-7; Smith Decl. ¶ 127 (Exhibit 6 was the relevant delegate packet governing Plaintiff's application.)) The schedule of events contained a travel day. (Ex. 6 at 1.) The proposed pageant schedule included interview times for contestants from across the country. (*Id.* at 3.)

---

3 Plaintiff's suggestion that "Plaintiff could not directly apply to compete in the national competition" is false. Opp. to MSJ at 12 n.1. The parties agree that Ms. Smith told Plaintiff that Plaintiff could apply to the national pageant as a representative of a nearby state. (*See* Ex. 34 at 1; Green Decl. ¶ 9 (agreeing Exhibit 34 "is a true and accurate copy of the Facebook Message between myself and Tanice Smith on December 7, 2018.")

The pageant took place in "Las Vegas, Nevada." (*Id.* at 4.)  The entry fee included "4 Nights Hotel Accommodations at the South Point Hotel" in Las Vegas, Nevada. (*Id.* at 7.)

Ms. Smith receives applications submitted to Defendant's national pageant. (Smith Decl. ¶¶ 123-25.)  Ms. Smith received Plaintiff's application. (*Id.)*  Ms. Smith received Plaintiff's payment. (Ex. 35 at 3-4.)  Defendant rejected Plaintiff's application. (*See, e.g.*, Ex. 35 at 4.)  Defendant refunded Plaintiff's application fee. (Green Decl., Ex. F at 1.)

What Plaintiff may have "understood" about Plaintiff's application cannot create a dispute of fact. (Green Decl. ¶ 11.)  *See infra* § II.C (subjective beliefs are immaterial); *L. Barber Gems, Inc. v. Brink's Diamond & Jewelry N. Am.*, 43 F. App'x 164, 166 (9th Cir. 2002) ("alleged belief" about insurance coverage was "immaterial"); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) ("[S]ubjective beliefs … are wholly insufficient evidence to establish a claim of discrimination as a matter of law.")  Plaintiff never disputes that Plaintiff applied to Defendant's national pageant. (Smith Decl. ¶ 123.)

In contrast, prospective contestants who wanted to participate in Oregon's pageant applied to that pageant directly, not through Defendant.  Kaylene Rogers communicated with Oregon's state director (Amber McMullen) to participate in Oregon's 2018 pageant. (Decl. of Kaylene Rogers in Opp. to Def.'s Mot. for Summ. J. ("Rogers Decl."), ¶ 5, ECF No. 40.) Ms. Rogers and other Oregon contestants applied to "the USOA 2019 Miss Oregon pageant" to compete in that pageant.[4] (*Id.* at ¶ 6; Decl. of Marsha Lawson in Opp. to Def.'s Mot. for Summ. J. ("Lawson Decl."), ¶ 7, ECF No. 41.)  The Oregon pageant maintains a *separate*

---

[4] Ms. Rogers' and Ms. Lawson's declarations should not be admitted. *See infra* § II. Defendant addresses these declarations and other objected-to declarations and documents in Sections I and III-VI in the alternative that the Court admits any objectionable evidence.

online application through which prospective contestants apply. (Smith Supp. Decl., Ex. 48.) And all Oregon contestants submit payment directly to Ms. McMullen instead of Ms. Smith. (*Compare* Rogers Decl. Ex. A at 8 (checks payable to Ms. McMullen or PayPal via Oregon's email address) *with* Smith Decl., Ex. 6 (checks payable to Ms. Smith, through Defendant's "Delegate Login," or mailed to a Las Vegas address.))

Thus, Defendant's national pageant is the relevant pageant because Plaintiff never applied to participate in Oregon's pageant.

### iii. The material facts concern Defendant's national pageant because Plaintiff only alleges harm and seeks relief about this national pageant.

Defendant's national pageant is the relevant pageant for the additional reasons that Plaintiff only alleges harm caused by Defendant and only seeks relief from Defendant. Based on these allegations and claims for relief, Defendant's summary judgment evidence logically focuses on Defendant's pageant.

But now, after conceding that Defendant "exercises control over all aspects of the *national* competition," (Opp. to MSJ at 4), Plaintiff attempts to effectively amend the Complaint by shifting the focus from Defendant's pageant to Oregon's pageant. That is improper and prejudicial. "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006). A plaintiff may not "rais[e] a new theory … in its response to a motion for summary judgment." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010). And Plaintiff's amendments are not minor: they seek a total re-write, adding (1) new parties and (2) new claims.

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

All of Plaintiff's allegations of harm target Defendant.  Plaintiff names "Miss United States of America, LLC [] a Nevada Limited Liability corporation" as the defendant. (Complaint ("Compl."), ¶ 6.  Plaintiff alleges that Plaintiff applied to participate in "defendant's pageants," Defendant "rejected plaintiff's application," and "Defendant intentionally enacted [the "natural born female" rule] to exclude and prevent transgender females from participating in defendant's pageants …." (*Id.* at ¶¶ 22, 34.)  Plaintiff alleges "Defendant is a place of public accommodation," "Defendant unlawfully discriminated," and "Defendant's conduct has caused plaintiff noneconomic damages." (*Id.* at ¶¶ 38-41.) Plaintiff never even alleges the Oregon pageant is a public accommodation under the Act.

By now roping in the Oregon pageant producers, Plaintiff asks to add a new party to this lawsuit.  Defendant licenses Ms. McMullen to produce pageants in Oregon as an "independent contractor." (Smith Decl., Ex. 31 at 2; Ex. 32 at 2; Ex. 33 at 1.)  The licensing agreement between Defendant and Ms. McMullen does not "create a partnership, joint venture or agency." (*See, e.g.*, Ex. 31 at 2.)  Likewise, the agreement does not create an employer-employee relationship.  Defendant cannot "hire or fire" Oregon's employees, and Oregon cannot "obligate" Defendant. (*Id.*)  Ms. McMullen now produces the Oregon state pageant through her own limited liability company, West Coast Pageant Production. (*See* Ex. 34 at 26. *See also* Ex. 49) Ms. McMullen is not a member of Defendant's limited liability company. (Smith Decl. ¶ 2.)  In other words, a different person and a different entity—not Ms. Smith or Defendant—produce Oregon's pageant.  If Plaintiff intended to sue the producers of Oregon's pageant, Plaintiff should have named them as defendants.

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

All Plaintiff's claims request relief from Defendant, too. Plaintiff asks for a declaration that "defendant's policy [is] unlawful," an award for "noneconomic damages" allegedly caused by Defendant, and an order requiring "defendant to remove[] its discriminatory eligibility policy," "defendant to cease discrimination and exclusion of transgender females," and defendant to "train[] … all employees and/or agents on compliance with Oregon public accommodations law." (Compl., Prayer for Relief, ¶¶ 1-4.)

In other words, Plaintiff's Complaint contains no allegations that Plaintiff applied to participate in Oregon's pageant or that the Oregon pageant producers rejected Plaintiff's application. So, Plaintiff cannot demonstrate that the Oregon pageant producers caused Plaintiff any harm sufficient to show compensable damages.[5] (*Id.* at ¶ 2.) *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (Article III causation requires that an injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party …." (internal quotations omitted)).

Plaintiff should not be allowed to sue and seek relief from Defendant, then admit that Defendant "exercises control" over its pageant (Opp. to MSJ at 4), and then change focus mid-litigation to oppose Defendant's summary judgment motion with evidence from the Oregon pageant. Defendant's pageant is the proper focus here because Plaintiff has targeted that pageant all along.

But even by improperly focusing on the Oregon pageant, Defendant's summary judgment should be granted regardless. Defendant and the Oregon pageant producers still

---

[5] For that reason, Plaintiff should not now be allowed to add the Oregon pageant as a defendant—any such amendment would be "futile." *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018).

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

exercise enough editorial control over the Oregon pageant to engage in protected association and speech.  *See infra* §§ III.D, IV.E.

## II.    This Court should exclude Plaintiff's inadmissible evidence.

Defendant demonstrated "the absence of a genuine issue of material fact" in its summary judgment motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  So, Plaintiff's opposing evidence needed to "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the … declarant is competent to testify on the matters stated."  FRCP 56(c)(4).  Defendant objects to Plaintiff's evidence that does not meet this standard or that is otherwise improper.  FRCP 56(c)(2); L.R. 56-1(b).

### A.    Kaylene Rogers' and Marsha Lawson's declarations violate the Courts' discovery order.

This Court "limited discovery to gather the facts necessary to resolve whether *Defendant* Miss USA should be considered an expressive association under the expressive association doctrine."  *See Minute Entry*, ECF No. 28 (emphasis added).  Kaylene Rogers' and Marsha Lawson's declarations should not be admitted because they violate this order.  These declarations only contain facts related to Oregon's state pageant operated by the Oregon pageant producers.

### B.    Declarations submitted by Plaintiff lack foundation and personal knowledge.

A declaration offered to oppose a summary judgment motion "must be made on personal knowledge."  FRCP 56(c)(4).  A witness must introduce evidence "sufficient to support a finding that the witness has personal knowledge of the matter."  FRE 602.  The following evidence fails to do so.

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

*Anita Green Declaration,* ¶ 14.  Plaintiff cannot demonstrate personal knowledge of the history of pageants or the eligibility requirements for "[m]ost beauty pageant systems" Plaintiff has not participated in.

*Kaylene Rogers Declaration* and *Marsha Lawson Declaration,* in their entirety.  The declarants lack personal knowledge of any fact related to Defendant's national pageant (the relevant pageant here) because they never participated in Defendant's pageant.

*Kaylene Rogers Declaration,* ¶ 8, and *Marsha Lawson Declaration*, ¶ 12.  The declarants lack personal knowledge of when (if ever) the Oregon pageant "bends or breaks" its rules because they were not responsible for admitting contestants. (*See* Lawson Decl. ¶ 5 (listing responsibilities.)) Ms. Rogers does not know other participants' residencies.  The declarants lack personal knowledge about the reasons for Ms. McMullen's decisions.

*Kaylene Rogers Declaration,* ¶ 10.  Ms. Rogers lacks personal knowledge of why or when other participants made their wardrobe choices.

*Kaylene Rogers Declaration,* ¶ 22, and *Marsha Lawson Declaration*, ¶ 22.  The declarants cannot demonstrate they have personal knowledge or a sufficient reason to believe what "the public" would "understand" Defendant's message to be.

*Kaylene Rogers Declaration,* ¶ 28.  Ms. Rogers lacks personal knowledge of alcohol consumption at a 2019 Miss Oregon event because she did not see any official from the Oregon pageant serve alcohol to minors or see any minors consuming alcohol.  *See Mattos v. Walmart, Inc.*, 2020 WL 4805433, at *3 (D. Or. Aug. 18, 2020) (excluding interpretation of video surveillance when witness "did not see" the event in the video).

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

**C.**    **Declarations submitted by Plaintiff are based on improper legal conclusions and opinions.**

A lay witness opinion testimony must be "rationally based on the witness's perception."  FRE 701(a).  This means "speculative, conclusory, and unqualified opinion testimony" is inadmissible.  *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 928 (9th Cir. 1980).  So are legal conclusions.  *See Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 777 (9th Cir. 2010) ("Pure legal conclusions are not admissible as factual findings.") And "subjective personal judgments do not raise a genuine issue of material fact." *Schuler v. Chronicle Broad. Co. Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986).  For these reasons, Defendant objects to the following evidence.

*Anita Green Declaration,* ¶ 11.  What Plaintiff "understood" about Defendant's application process is an immaterial fact.  *See, e.g., Hickey v. Capital Cities/ABC, Inc.*, 792 F. Supp. 1195, 1197 (D. Or. 1992) ("What [a witness's] belief is with respect to plaintiff's business operation is immaterial to this motion" for summary judgment).

*Kaylene Rogers Declaration,* ¶ 20, 22 and *Marsha Lawson Declaration,* ¶¶ 19, 22. The declarants' subjective beliefs about what they "understood" as Defendant's message is an immaterial fact.  The declarants' speculative, conclusory, and subjective beliefs about what "the public" would understand and what Oregon's pageant "public conduct … appears to promote" are inadmissible and immaterial.

*Marsha Lawson Declaration,* ¶ 21.  Ms. Lawson's subjective belief about the "mission and core purpose" of the Oregon pageant is an immaterial fact.

*Kaylene Rogers Declaration,* ¶ 28, *and Marsha Lawson Declaration,* ¶ 24.  The declarants' subjective "opinion" that allowing transgender women to compete in Oregon's

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

pageant "does not substantially interfere with the mission and values of USOA Miss

Oregon" is inadmissible as a legal conclusion and immaterial as subjective beliefs.

**D.    Declarations Plaintiff submits contain inadmissible hearsay and unauthenticated documents.**

Hearsay statements—out of court statements offered to prove the truth of the matter

asserted—are inadmissible.  FRE 801 and 802.  Documents that are "not properly

authenticated will not be considered by the court when reviewing a motion for summary

judgment."  *Kesey, LLC v. Francis*, 2009 WL 909530, at *2 (D. Or. Apr. 3, 2009).  The

following evidence is unauthenticated, inadmissible hearsay.

*Shenoa Payne Declaration*, ¶¶ 5-6, *Exhibits D-E*, and *law review articles and*

*scientific journals cited in Plaintiff's Memorandum in Opposition to Defendant's Motion for*

*Summary Judgment*, 15-16.  These articles are hearsay because they are offered to establish

the history of pageants and facts about sex and gender identity.  *See Klein v. TAP Pharm.*

*Prod., Inc.*, 518 F. App'x 583, 584 (9th Cir. 2013) ("excluding the scientific articles on

hearsay grounds"); *Vannatta v. Keisling*, 899 F. Supp. 488, 491 (D. Or. 1995) (newspaper

articles are hearsay).  And the excerpts are not properly authenticated because there is no

"evidence sufficient to support a finding that" the excerpts are what Ms. Payne claims they

are.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

**III.    The requested relief violates the First Amendment by forcing Defendant to associate expressively in a way that changes its message about womanhood.**

Plaintiff's forced inclusion in Defendant's pageant would violate Defendant's

freedom to expressively associate.  Plaintiff agrees that the three-step test in *Dale* controls

the expressive-association analysis.  Opp. to MSJ at 17.  Under that test, Defendant's

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

summary judgment motion should be granted because (A) Defendant is a "primarily expressive" association, and all of its commercial activities promote the pageant; (B) Defendant engages in expression by promoting and celebrating biological women; and (C) Plaintiff's participation in Defendant's pageant would significantly affect Defendant's ability to advocate its views on "natural born females." And, in the alternative, (D) Plaintiff's forced inclusion in the Oregon state pageant would violate the Oregon pageant producers' freedoms to expressively associate. For these reasons, the Act as applied to Defendant's pageant cannot pass strict scrutiny. *See infra* § V (analyzing strict scrutiny).

**A.**    **Even as a for-profit entity, Defendant is a primarily expressive association because its commercial activities promote the pageant.**

Defendant is a primarily expressive entity that produces a pageant promoting, celebrating, and empowering "*natural* born females" because all of its commercial activities promote an expressive event—the pageant. (Smith Decl., Ex. 2 at 1 (emphasis added).)

Plaintiff agrees that for-profit entities, like "publishers, concert promoters, and cable television franchisers," can be "primarily expressive association[s]." Opp. to MSJ at 20. That make sense. After all, the Ninth Circuit agreed in *IDK, Inc. v. Clark County*. 836 F.2d at 1194. And it is consistent with the First Amendment, which does not protect or neglect speakers based on their corporate form or motives. *See* Def.'s Mot. for Summ. J. ("MSJ"), at 12-13, ECF No. 32. *See also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1120 (9th Cir, 2009) (holding that a corporation has standing to assert the free exercise rights of its owners).

Nonetheless, Plaintiff denies that Defendant is a primarily expressive association because its primary activities—"[r]ecruiting, sales, and promot[tion]"—are "commercial activities." Opp. to MSJ at 21. As support, Plaintiff mainly relies on Justice O'Connor's

Page 17 – DEFENDANT'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

concurrence in *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984).  Opp. to MSJ at 19-21.  But no

other member of the court joined the concurrence.  In fact, the concurrence's analysis

admittedly differed from the majority's.  *Roberts*, 468 U.S. at 632-33 (disagreeing with

"Part II-B of" majority of opinion) (O'Connor, concurring).  And *IDK, Inc.* never adopted

this test, instead holding that "[u]nder any test" escort services "are primarily commercial

enterprises."  836 F.2d at 1195.

Plaintiff's argument also ignores that Defendant's primary activity is not recruiting or

sales.  It is the pageant. (*See* Smith Decl. ¶ 4-5.) (Defendant's "primary purpose" is "to

produce pageants"; if Defendant could not do that, it would "cease to exist.")  That is why all

recruiting, sales, and promotion go towards Defendant's expressive activity—the pageant.

Every expense Defendant charges contributes to and promotes its on-stage pageant.

Defendant's contestants pay entry fees to cover their entry into the pageant, pageant attire, a

feature in the pageant's "National Program Book," and pageant meals, lodging, and

memorabilia. (Smith Decl., Ex. 6 at 7; Ex. 7 at 9; Ex. 8 at 9.)  Defendant's other revenue

also comes directly from producing pageants—like payments to view the pageant livestream

or licensing fees from state directors "to conduct state pageants." (Smith Decl. ¶¶ 108-09.)

The advertising "sales" both promote the pageant and make it more affordable for

women to compete.  Contestants must pay for or sell at least one advertisement page for the

pageant's program books. (*See, e.g.*, Smith Decl., Ex. 6 at 8.)  Defendant sells its national

program books at its pageant. (Smith Decl. ¶ 100.)  But after the initial advertising page,

national and state contestants are encouraged to sell additional advertisements "[t]o help

with the associated costs of competition." (Ex. 6 at 8.)  Defendant incorporates contestants

who sell the most advertisements in the pageants' expression by giving those contestants "an onstage award!" (Ex. 6 at 8. *See* Ex. 26 at 2:12 (awarding the "Brand Ambassador."))

To be sure, Defendant "conduct[s] 'general retail sales' of program book[s]" displaying the advertisements. Opp. to MSJ at 21. But Defendant exercises editorial control over which ads to accept or reject in the program book. (Smith Decl. ¶¶ 102, 105.) Defendant rejected an advertisement in its 2020 national program book that "featured an image of a *man* dressed as a *woman*" because it "contradicted USOA Pageants' message of empowering *biological* women." (*Id.* at ¶ 106; Smith Decl., Ex. 3 (emphasis added).)

In the end, Plaintiff's theory that Defendant loses First Amendment protection by selling promotional material guts the freedom of association. Plaintiff's theory would mean that a concert promoter would not be protected if she recruited bands to perform on-stage, the *New York Times* would not be protected if it sold advertisements in its paper, and cable television franchisers would not be protected if they promoted a new series. That is not how freedom of association works. That freedom protects those associations who claim "expression is a significant or necessary component of their activities" even if they also engage in some commerce. *IDK, Inc.*, 836 F.2d at 1195-1196.

### B.    Defendant engages in expression by celebrating biological women.

Turning to *Dale*, Defendant meets the first *Dale* step—engaging in expression—by communicating a message that encourages, empowers, and celebrates biological women through its pageant and related activities. *See* MSJ at 15-16. *Revels v. Miss Am. Org.*, 2002 WL 31190934, at *7-9 (E.D.N.C. Oct. 2, 2002). But Plaintiff argues that Defendant does not engage in expressive association for four reasons. Plaintiff is wrong.

First, Plaintiff alleges that Defendant does not "control[] the expressive content of its pageants." Opp. to MSJ at 22. But Plaintiff admits that Defendant exercises editorial control over its pageant. *Id.* at 4 (listing seven ways Defendant controls its pageant).

Second, Plaintiff claims that Defendant's pageant is "not the type of association" protected by the First Amendment because the contestants "are first and foremost individual competitors." *Id.* at 18. So are softball players. *Apilado v. N. Am. Gay Amateur Athletic All.*, 792 F. Supp. 2d 1151, 1160-61 (W.D. Wash. 2011). Yet a gay softball league is a protected association when it promotes a message. *Id.* And so is Defendant's pageant because Defendant promotes women as "natural born females."

Third, Plaintiff claims that Defendant is not an expressive association because it does not offer "membership within a group.*"* Opp. to MSJ at 18. That is irrelevant. "[T]he freedom of expressive association protects more than just a group's membership decisions." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc*., 547 U.S. 47, 69 (2006). Publishers, concert promoters, and newspapers do not offer memberships, but they have associational freedoms. *IDK, Inc.*, 836 F.2d at 1195-96. *See McDermott v. Ampersand Publ'g., LLC*, 593 F.3d 950, 962 (9th Cir. 2010) (newspaper could select its writers because "[t]o the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice"). So does Defendant.

Finally, Plaintiff claims that pageant participants do not "regularly associate" or "come together only one time." But the First Amendment has no regularity requirement. That is why the freedom of association protects political campaigns, parades, and pageants. *See Krislov v. Rednour*, 226 F.3d 851, 859-66 (7th Cir. 2000) (political campaigns); *Revels*,

2002 WL 31190934, at *7-9 (pageants); *S. Bos. Allied War Veterans Council v. City of Bos.*,

875 F. Supp. 891, 912-17 (D. Mass. 1995) (parade).  And Defendant associates with its

contestants throughout the year by highlighting their accomplishments and public service on

Defendant's social media accounts. (Smith Decl., Exs. 4-5.)  So, Defendant satisfies any

regularity requirement for protection anyway.

### C.    Forcing Defendant to include Plaintiff would affect Defendant's expressive association by requiring Defendant to promote transgender females as "natural born females."

Under the second *Dale* step, forcing Defendant to allow Plaintiff—an "openly

transgender female"—to participate in Defendant's pageant undermines its message of

promoting "natural born females." (Green Decl. ¶ 2.)  Even Plaintiff agrees that if

Defendant "define[s] women the way they assert they want to define it," Plaintiff's

participation would "impact" its association.  *See* Tr. 27:24-25.  Plaintiff also admits that

*other* pageants can exclude pageant participants who interfere with their messages.  *See id.*

at 15:4-10, 17:7-13.  That is correct.  Expressive associations may shape their message by

selecting message participants.  *See New York State Club Ass'n, Inc. v. City of New York*,

487 U.S. 1, 13 (1988) (distinguishing exclusion based on someone's status from exclusion

based on inability communicate "viewpoints"); *Invisible Empire of the Knights of the Ku*

*Klux Klan v. Mayor of Thurmont*, 700 F. Supp. 281, 288-90 (D. Md. 1988) (parade could

exclude participants when they would change the association's "primary message").

Though Plaintiff agrees that other pageants can exclude contestants that change their

message, Plaintiff argues Defendant cannot do so.  Why the difference?

At first, Plaintiff alleges that Defendant's only "asserted expression" is its "*discriminatory membership policy*."  Opp. to MSJ at 28.  Not so.  Defendant crafts its message celebrating biological women with every decision it makes about who competes in the pageant, prospective contestants' social media content, contestant's outfits, and many other choices.  *See infra* ¶ IV.A-.B (explaining Defendant's judgment over its message).

Plaintiff ignores this expression-shaping discretion and instead complains that none of Defendant's evidence "mentions the words 'biological' or 'cisgender' or defines the word woman or 'womanhood.'" Opp. to MSJ at 28.  But even Plaintiff agrees that Defendant's "natural born female" rule communicates a message—that Defendant uses "*one* characteristic of biological sex to define … 'natural born' sex" rather than "several traits beyond anatomical physical traits [to] define 'sex' …."  *Id.* at 16.

In any event, Plaintiff's approach wrongly scrutinizes Defendant's expression rather than deferring to it.  *See* MSJ at 16. And while Plaintiff reads *Dale* as claiming the Boy Scouts taught "*being gay is not morally straight*," (Opp. to MSJ at 27), the Boy Scouts were actually "silent on homosexuality."  MSJ at 16.  *See also* Anti-SLAPP Reply at 24 (explaining this point).  That is why *Dale* held that "associations do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment." 530 U.S. at 655.  Requiring Defendant to define womanhood in these explicit terms would force it to convey an idea it disagrees with—that a category of women exists who are not "natural born females."  The whole debate here is over the definition of "womanhood."

*Dale* makes clear that it is also irrelevant whether pageant "staff or contestants" "understood" Defendant's message about womanhood.  The Boy Scouts' use of "morally

straight" and "clean" were not "self-defining" and "[d]ifferent people would attribute to those terms very different meanings." *Dale*, 530 U.S. at 650. But the Court *deferred* to the Boy Scout's definition of those terms anyway and its belief that a gay Scoutmaster would alter the scout's message. *Id.* at 657-60.

Minimizing *Dale*, Plaintiff relies on cases like *Roberts* involving admission of women into non-expressive associations or students into schools or letters to unions.[6] Opp. to MSJ at 23-29 (collecting cases). But Defendant exercises way more editorial control over their pageants than these organizations exercised over membership. *See* MSJ at 17-18 (countering this point); *S. Bos. Allied War Veterans Council*, 875 F. Supp. at 914 (distinguishing these cases as applied to a parade). *Cf. Roberts*, 468 U.S. at 621 ("[T]he Jaycees are large and basically unselective groups … neither the national organization nor the local chapters employ any criteria for judging applicants for membership … [no] applicant had been denied membership on any basis other than age or sex.").

Still, Plaintiff argues that "the mission statement in *Roberts* is nearly identical to defendant's …" Opp. to MSJ at 25 n.7. But "allowing women to vote" did not "change the content or impact of the organization's speech." *Roberts*, 468 U.S. at 628. Here, allowing "an openly transgender female" to participate in Defendant's pageant would change its message promoting only "natural born females." (Green Decl. ¶ 2.) Female beauty pageants necessarily promote a view of womanhood; membership organizations discussing

---

[6] *CompassCare v. Cuomo* is also distinguishable because the "limitation" there was "not on the speech for which the Plaintiffs contend they associate." 465 F. Supp. 3d 122, 149 (N.D.N.Y. 2020). Here, Defendant's reason for existence is to produce pageants, and Plaintiff seeks to alter the message of that expression. (Smith Decl. ¶¶ 4-5.)

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

views on "the federal budget, school prayer, voting rights, and foreign relations" that have

"nothing to do with sex" do not. *Roberts*, 468 U.S. at 627-28.

Changing gears, Plaintiff also denies that Defendant is an expressive association

because the Oregon pageant conveyed two messages contrary to those communicated by

Defendant.  Opp. to MSJ at 29.  But this argument just concedes that Defendant

communicates a message—otherwise there would be nothing to contradict.

First, Plaintiff argues that Defendant undermined its message celebrating women of

"good moral character" when *the Oregon pageant* allegedly served alcohol to minors at an

event.  Opp. to MSJ at 29.  Through Ms. Rogers' allegations, Ms. Smith learned for the first

time that minor pageant contestants in Oregon's pageant may have been served alcohol at an

event. (Smith Supp. Decl. ¶¶ 21-22.)  Defendant does not condone serving alcohol to

minors.  If the Oregon pageant served alcohol to minors, it would have breached its

licensing agreement and the contestants would have breached their contracts by consuming

alcohol. (*See, e.g.*, Smith Decl., Ex. 31 at 11; Ex. 32 at 13; Ex. 13 at 3 (setting forth these

requirements including that contestant agree not to "consume any illegal or controlled

substances.")) Consistent with her practice of disciplining violations of Defendant's rules,

Ms. Smith will investigate these allegations and impose any necessary changes or penalties.

(Smith Supp. Decl. ¶¶ 21-22.  *See also* Smith Decl. ¶¶ 76-88, 119.)

Second, Plaintiff claims *the Oregon pageant* communicated an opposite message

about "natural born females" by allowing a man dressed as a woman to sit off-stage as a

judge and a "drag queen" to sit in the crowd thereby "*including* the expression and

celebration of traditional femininity *by people with male bodies*."  Opp. to MSJ at 29.

Page 24 – DEFENDANT'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

Again, this just proves that the contestants who compose Defendant's pageant affects its message about womanhood. If, as Plaintiff claims, Defendant "contradicts its purported message" by allowing a judge or audience member to appear in drag, then it would be even more contradictory—and further undermine Defendant's message—to have "an openly transgender female" incorporated on-stage in the pageant itself. (Green Decl. ¶ 2.)

But Defendant's response to the actions of the Oregon pageant actually support Defendant's editorial control over its message. After learning about this situation *and six months before Plaintiff filed any response brief or declarations*, Ms. Smith amended Defendant's licensing agreements as part of her annual review of Defendant's contracts. (Smith Decl. ¶¶ 115-16, 119; Smith Supp. Decl. ¶¶ 12-13. *Compare* Ex. 33 at 11 *with* Ex. 31 at 6-7.) Now all state directors must "agree that persons selected to serve as a judge and/or auditor of the preliminary pageant must be submitted for approval to the National Office …." (Ex. 33 at 11.) And Defendant exercises "sole discretion to approve or deny persons selected by you with or without cause." (*Id.*)

Based on this policy, Ms. Smith recently approved a judge who elsewhere performs as a drag queen so long as the judge does "not appear at the pageant at any event as his 'alter ego'" and the judge's biography in the program book does "not mention his alter ego." (*See* Smith Supp. Decl., Exs. 50-51.) Ms. Smith explained these parameters were "to avoid confusion on what our stance is on what it means to be a woman." (Ex. 51.) Incidentally, the proposed judge is the same man who sat in the audience at Oregon's pageant. (*Compare* Ex. 50 at 2 (identifying proposed judge as Mark Harbaugh) *with* Rogers Decl. ¶ 22 (identifying audience member as Mark Harbaugh)).

Page 25 – DEFENDANT'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

In similar ways, Plaintiff's participation in Defendant's pageant would affect its message because Plaintiff participates in pageants as "an openly transgender female." (Green Decl. ¶ 2.)  And Plaintiff is outspoken about believing transgender females are equivalent to "natural born females."  Take just one example.  Plaintiff advocated on Twitter to not "compare trans women to cis women.  Our femininity and beauty is just as valid."[7] (Smith Decl., Ex. 37 at 3.)  There are many other similar posts. (Exs. 37-38, 40-42.)  According to *Dale*, this activism matters.  530 U.S. at 653.  *Contra* Opp. to MSJ at 30.

And if Plaintiff were allowed to participate in Defendant's pageant, Defendant could not effectively "teach or express whatever values or viewpoints it wants."  Opp. to MSJ at 26.  Defendant's entire message promoting "natural born females" as women would be severely undermined—and likely totally contradicted—if it were also required to celebrate transgender females as women on stage.  *See* MSJ at 17-18.

### D.    Alternatively, Plaintiff's requested relief violates the First Amendment by forcing the Oregon pageant producers to associate expressively in a way that changes its message about womanhood.

The Oregon pageant producers have the same mission and eligibility requirements as Defendant—including the "natural born female" rule. (Rogers Decl. Ex. A at 1, 5).  So, Plaintiff's forced inclusion in the Oregon pageant violates that the Oregon pageant producers' First Amendment freedom to expressively associate too.

---

[7] This evidence is not "after-acquired evidence."  Opp. to MSJ at 33 n.9. True, "at the time she rejected plaintiff's application," Ms. Smith did not consider the statements post-dating Plaintiff's application.  *Id*.  But these statements are relevant to how Plaintiff's future participation in Defendant's pageant affects Defendant's message.

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

The Oregon pageant producers are primarily expressive because all of their "commercial" activities promote the pageant. *See supra* § III.A. All contestant expenses contribute to their participation in the state pageant. (Rogers Decl. Ex. A at 8.) Contestants recruit other contestants "for the pageant," "promote the USOA Miss Oregon pageant and recruit other contestants" on social media, and gather together several times a year to promote the pageant at expressive events, like parades. (Rogers Decl. ¶¶ 14, 19.) Defendant even maintains editorial control over Oregon's program because Oregon must submit a copy of the program book "prior to publication" to Defendant who "reserves the right at its sole discretion to approve or deny content contained within the publication with or without cause." (Smith Decl., Ex. 33 at 11.)

The Oregon pageant producers engage in expression. *See supra* § III.B. The Oregon pageant producers have the same eligibility requirements as Defendant, use Defendant's contracts for their state contestants, reject applicants who do not meet their requirements, and mandate specific wardrobes. (Smith Decl. ¶¶ 41-45, 52-58, 84; Ex. 12-14; Rogers Decl. Ex. A at 6) For these reasons, it is wrong to say there is "*zero* editorial judgment or control over the content of the Oregon contestants' expression." Opp. to MSJ at 22.

And including Plaintiff—an "openly transgender female" (Green Decl. ¶ 2)—in Oregon's pageant—promoting "natural born females" (Rogers Decl. Ex. A at 5)—would affect the Oregon pageant's message celebrating biological women. *See supra* § III.C. This violates the Oregon state pageant producers' freedom to expressively associate.

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

**IV.   The requested relief violates the First Amendment by compelling Defendant to speak a message about womanhood it disagrees with.**

Defendant empowers, promotes, and celebrates "natural born females" through its pageants. (Smith Decl., Ex. 2 at 1-2.)  Plaintiff seeks access to Defendant's pageant as an "openly transgender female" and natural born male. (Green Decl. ¶ 2.)  Granting Plaintiff's relief would unconstitutionally compel Defendant to speak messages it objects to.

This "peculiar" application of the Act, *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (2005), affects Defendant's speech because (A) Defendant speaks a message about womanhood through its pageant and (B) Defendant shapes that message through editorial control over the pageant's contestants.  What's more, Plaintiff's demanded access (C) compels Defendant to speak a message about womanhood it disagrees with and (D) is triggered by the content and viewpoint of Defendant's views on womanhood.  And, in the alternative, (E) Plaintiff's forced inclusion in the Oregon state pageant would violate the Oregon pageant producers' freedom of speech.  For all of these reasons, the Act must satisfy strict scrutiny as applied to Defendant.  *See* MSJ at 20-21.  It does not.  *See infra* § VI (addressing strict scrutiny).

**A.   Defendant engages in protected speech by communicating through its pageant.**

Plaintiff does not dispute that Defendant's pageant is protected speech. (*See* Smith Decl. Exs. 24-26); And for good reason.  Pageants are speech.  MSJ at 22 (collecting cases).

Unable to dispute this, Plaintiff counters that "any expressive activity of defendant" … is the *contestant's*, not defendant's."  Opp. to MSJ at 39.  But that's factually and legally wrong.

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

Factually, Plaintiff agrees that "Defendant exercises control over all aspects of the *national* competition," "require[es] approval of platforms for its *national* contestants," and monitors contestant's expression through contracts and discipline.  Opp. to MSJ at 4.  Those concessions prove that Defendant retains editorial control to speak its own message. Defendant speaks in other ways too.  Ms. Smith writes the pageant script, chooses "the questions to be asked of contestants on stage," selects the music, provides contestants with sashes and cocktail dresses, assists with choreography, and makes decisions about lighting. (Smith Decl. ¶ 8.)  During the pageant, Defendant announces each contestant under her state titleholder designation, adorns contestants with Defendant's custom sash, and displays Defendant's logo in the background. (Smith Decl., Ex. 25 at 9:00-1:24:00; Ex. 26 at 2:53-11:30.)  In all these ways, Defendant crafts its own message and "participates in the contestant's creative process."  *Contra* Opp. to MSJ at 39.

Legally, speakers do not need to create every item contained in a communication. *See* Anti-SLAPP Reply at 8 (explaining this point).  Speech protections are not even "diminished" for speakers who only "distribute or present works created by others." *Preferred Commc'ns, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1410 n.10 (9th Cir. 1985). But Defendant does more than present contestants' speech—it speaks its own message with others' help.  Defendant works in a "collaborative creative process[]" with pageant participants to convey its views on womanhood.  *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010).  Under Plaintiff's theory, the First Amendment would not protect newspapers publishing someone else's op-ed or cable operators distributing someone else's program.  That's wrong.  *Hurley*, 515 U.S. at 569 (collecting cases).

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

And Defendant's right to speak its own message about womanhood does not turn on whether third parties "would understand [Plaintiff's] participation equated some sort of endorsement of any message by defendant." Opp. to MSJ at 39. Compelled speech claims do not depend on what "a bystander would think …." *Frudden v. Pilling*, 742 F.3d 1199, 1204-05 (9th Cir. 2014) (cleaned up). If it did, Democratic ghost writers could be compelled to write auto-biographies celebrating President Trump. This illogical result is why the Supreme Court repeatedly finds compelled speech in situations where no one would think the objector endorsed the message conveyed. *See* Anti-SLAPP Reply at 8-9 (making this point and collecting cases.)

For all of these reasons, the question is not "whether any expression in the pageant is the *individual* contestant's expression." Opp. to MSJ at 40. The question is whether the Defendant and its contestants "are engaged in expressive activity." *Anderson*, 621 F.3d at 1062. Because Defendant and the Oregon pageant producers exercise control over their pageants, the First Amendment covers the pageants.

**B.    Defendant engages in protected speech—not expressive conduct—by selecting contestants to shape its message.**

The expressive nature of pageantry is decisive. When determining what is speech, courts look at the "end product" and work backwards to protect the creative process. MSJ at 20, 23 (making this point). Because it is undisputed that pageants are protected speech, the First Amendment protects contestant selection too. *Id.* at 22-23.

Plaintiff though focuses on Defendant's pageant-selection process, calling it "conduct" that "may constitute symbolic speech." Opp. to MSJ at 37. But this starts in the wrong place. Courts do not deconstruct speech into "constituent acts" and describe those

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

acts "as conduct." *Anderson*, 621 F.3d at 1061.  Courts instead look at "the end product" first, decide whether it is speech, and only then evaluate if the process for creating that final product is protected.  *Id.* at 1060-62.  *See also Rumsfeld*, 547 U.S. at 63 (summarizing compelled speech cases as focusing on the final product, i.e. the parade, newsletter, and newspaper content); Anti-SLAPP Reply at 9-10 (collecting cases).  Reorienting the focus from selecting contestants—the starting point—to the pageant itself—the final product— proves Defendant speaks.

Even Plaintiff agrees.  According to Plaintiff "the First Amendment protects a defendant's selection process only if such selection 'affects the expressive content' of its protected activity."  Opp. to MSJ at 41 (collecting cases).  That is exactly right.  Because Defendant selects contestants "*in order to preserve the expressive integrity of its creative content*," the First Amendment protects Defendant's choices.  *Id.  See also infra* §§ IV.C-D (explaining how contestants affect Defendant's message).

For this reason, Defendant's position does not allow any public accommodation "to claim exemption from discrimination laws by contending that its discrimination is a 'message.'" Opp. to MSJ at 37.  Defendant produces a pageant—an expressive event—and its contestants shape that expression.  A hamburger restaurant produces burgers—an expressionless commodity—and its clientele cannot alter its message.  The same is true of most services offered by public accommodations.[8]  That explains why Plaintiff's cited cases about conduct and expressive conduct do not apply.  Opp. to MSJ at 37-38, 40 (citing cases

---

[8] Defendant has not yet had the opportunity "challenge that it is … subject to the OPAA" because of the procedural posture of the case  (Opp. to MSJ at 21 n.5.) Defendant reserves the right to do so if this Motion is denied.

Page 31 – DEFENDANT'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

about accessing dance halls and empty rooms, wedding cakes, floral arrangements, hiring and firing employees, and labor unions). None of those cases involve attempts to access purely *expressive* works like a pageant. *See Anderson*, 621 F.3d at 1060 (affording "expressive activities full constitutional protection without relying on the [expressive conduct] test."))

Trying to avoid this point, Plaintiff denies that Defendant "exercises creative control over the selection of its contestants." Opp. to MSJ at 41. But of course it does, as Plaintiff admits. *Id.* at 4; *id.* at 41 ("[D]efendant appears to exercise *some* enforcement of its eligibility rules.") Plaintiff's entire lawsuit hinges on this reality and accuses Defendant of being *too* selective. After all, Defendant did not select Plaintiff as a contestant. Defendant's "natural born female" rule is designed to promote its message about womanhood by *only* allowing "natural born females" to participate in Defendant's pageant. Defendant has other eligibility requirements too, embedded in its rules and contract. (*See, e.g.*, Smith Decl., Ex. 2 at 1-2; Ex. 14 at 3.) Defendant rejects applicants who do not meet *Defendant's* vision for femininity. (Smith Decl. ¶¶ 41-51.)

Defendant's creative control over its pageant extends beyond selecting contestants. Ms. Smith directs the pageant, from writing the script to choosing the lights. (Smith Decl. ¶ 8.) Defendant also protects its message by monitoring judges, emcees, and volunteers, disciplining titleholders who violate their contracts, and rejecting program-book advertisements which conflict with its message. Opp. to MSJ at 4.

Contestants do not even have "ultimate creative freedom over their gown and swimsuit choices. Defendant provides contestants with an "[o]pening number dress,"

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

requires contestants to wear "a nice dress or skirt suit" during their interviews, a swimsuit

providing "adequate coverage," and a "floor length formal dress …." (*See* Smith Decl., Ex. 6

at 5.).  The rules also prohibit contestants from wearing "thongs." (*Id.*)

Unable to deny selectivity, Plaintiff accuses Defendant of not enough selectivity—

that Defendant does not "select[] contestants in a manner that advances an artistic work or

creative content."  Opp. to MSJ at 40.  But who Defendant selects as participants alters the

pageant's creative and artistic process, as indicated in the pageant's rules, selection process,

contracts, and rule enforcement. (Smith Decl., Ex. 2 at 1-2; Exs. 12-14, 21-23, 31-33; Smith

Decl. ¶¶ 41-51, 76-82, 129.)  Casting decisions are so central to any show's creative content

that producers "could not effectuate their creative vision, as embodied in the end product

marketed to the public, without signing cast members."  *Claybrooks v. Am. Broad. Cos., Inc.*,

898 F. Supp. 2d 986, 999 (M.D. Tenn. 2012).  Plaintiff has no response to this.

In the end, Plaintiff's view of free speech is too cramped.  Speakers need not be

highly selective for protection.  *Hurley* protected parade organizers who were "rather lenient

in admitting participants" because "a private speaker does not forfeit constitutional

protection simply by combining multifarious voices, or by failing to … isolate an exact

message."  515 U.S. at 569.  Plaintiff echoes the *exact* argument rejected in *Hurley*.  *Id.* at

563 (reversing state court decision that emphasized organizers' "lack of selectivity in

choosing participants").

That argument lost then.  It should again lose now.  Like the parade organizers in

*Hurley*, Defendant is selective in the way that matters: it seeks to "invoke its right as a

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

private speaker to shape its expression" simply by "decid[ing] to exclude a message it did not like from the communication it chose to make." *Hurley*, 515 U.S. at 574.[9]

### C. Plaintiff's requested relief compels Defendant to convey a message about women it does not want to speak and cannot be <u>forced</u> to express.

Defendant cannot be forced to speak by accepting and promoting Plaintiff as a "natural born female"—which Plaintiff undisputedly is not—because Defendant speaks through its pageant and selects contestants to create its pageant.

Plaintiff never addresses any of the three ways Plaintiff's requested relief would affect Defendant's message. Instead, Plaintiff reads *Hurley* as creating a stark dichotomy: that the First Amendment protects individuals from being compelled "to endorse *ideas*—not groups of people." Opp. to MSJ at 31. That dichotomy may make sense when the medium does not physically contain people—like cakes—or when there is no speech involved—like venues. Opp. to MSJ at 34-36. But Defendant already debunked this distinction as applied to pageants and other forms of expression where a person's very participation conveys a message. *See* MSJ at 28, 32-35; Anti-SLAPP Reply at 15-16 & n.4.

And not even Plaintiff sticks to this dichotomy. On one hand, Plaintiff claims it "belies common sense that a person's *status* … is synonymous with some sort of message …." Opp. to MSJ at 33. If this were true, a playwright would have to cast a white actor as President Obama, a male as Lady Macbeth, or a white actor as George Washington in *Hamilton*. MSJ at 33-34 (making this point).

---

[9] This explains why it is immaterial if the Oregon pageant "bends" rules about deadlines, fees, and residencies. *Contra* Opp. to MSJ at 41. Those administrative decisions do not alter the pageants' content. Defendant universally enforces the rules affecting its message. (*See* Smith Decl. ¶¶ 41-51, 76-88.)

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

But on the other hand, Plaintiff agrees that "the Miss Gay pageant" *could* exclude "straight people" and the "Miss Black American pageant" could exclude "a white person." Opp. to MSJ at 44 (emphasis added). Plaintiff agrees that bands, broadcasting companies, and television producers can select musicians, news anchors, and actors based on their status "if such selection 'affects the expressive content'" of their "protected activity." *Id.* at 41. And Plaintiff argues that Defendant "promoted to the public … the idea that beauty and femininity can exist and be celebrated outside of cisgender bodies" because the Oregon pageant "featured a drag queen as one of the judges" and as an audience member. *Id.* at 7. Surely, if a man dressing as a woman affects Defendant's message by sitting passively as a judge or audience member, then so too would Plaintiff's on-stage *participation* as an openly transgender female and well known as a transgender activist. *See supra* § III.C (making this point and how Defendant's response bolters its efforts to control its pageant's message).

So, like the parade organizers in *Hurley*, Defendant does not "exclude an entire class of individuals [from judging or watching] based simply on *who* they are." Opp. to MSJ at 32. The "natural born female" rule does not apply to judges, emcees, volunteers, state directors, audience members, or vendors. (*See* Smith Decl., Exs. 17-20, 31-33.) These individuals just cannot do anything that alters the content of Defendant's message. (*See* Ex. 17 at 1-3 (listing judges' restrictions); Ex. 18 at 1-3 (same as to emcees); Ex. 20 at 1-3 (same as to volunteers); Ex. 33 at 17-18 (same as to state directors.))

In other words, Defendant's "natural born female" rule is limited *to the contestants*— the individuals who compete for the crown of Miss United States and who compose and convey Defendant's *message* by their mere presence in the competition and on stage. MSJ at

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

24, 28 (making this point).  And that makes sense.  Defendant's pageant is all about

declaring what it means to be Miss United States, not about what it means to be a judge or

pageant attendee.  In the same way, television studios control who appears in their shows, not

who watches them or who operates the camera.

Hurley approved Defendant's logic.  MSJ at 28.

And Defendant applies its other eligibility rules affecting its message equally for *all*

contestants.  No contestant may have posed nude or promote messages "inconsistent with

USOA Pageant's message." (Smith Decl. ¶¶ 41-51.)  Ms. Smith reviews the social media

posts for prospective national contestants to ensure they promote a message consistent with

Defendant's pageant. (*Id.* at ¶ 129.)  Defendant even requires all contestants to submit their

platform for approval. (*Id.* at ¶ 59-61; Smith Decl., Ex. 15.)

Plaintiff's reading of the First Amendment as only protecting "against compelling

individuals to endorse *ideas*" fails for another reason too.  Opp. to MSJ at 31.  The "First

Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of

both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S.

781, 796-97 (1988).  That is why the First Amendment protects Defendant's right to *not*

address the gender "identity" debate, whether Defendant takes a position or not (it does.) *See*

MSJ at 27 (citing cases making this point).  This argument does not "concede that"

Defendant "has said nothing on the issue" of womanhood.  Opp. to MSJ at 28 n.8.  Instead,

the argument underscores Plaintiff's incorrectly abridged view of the First Amendment.

True, the First Amendment protects against compelling a speaker to "endorse ideas."  But it

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

also protects against compelling someone to speak on an issue where they would rather remain silent.

All of this explains why television, movie, and theatre producers get to control who they cast. In these mediums, the "who" necessarily affects the "what." So too for pageants. Defendant's message is inseparable from the contestants who compete. Admitting a biological male would alter Defendant's ability to define and promote one view of womanhood by at least implying acceptance of the idea that men who "identify" as women can actually *be* women.

Admitting Plaintiff specifically would change Defendant's message about womanhood. Plaintiff participates in pageants as "an openly transgender female." (Green Decl. ¶ 2; Smith Decl., Ex. 37 at 10.) Plaintiff has explained on social media that "[m]y number one issue I fight for is queer rights." (Ex. 38 at 2.) And Plaintiff has published articles and been profiled in news articles as a transgender female. (Exs. 40-42.) All of this exacerbates how Plaintiff's forced inclusion in Defendant's message impairs its message of promoting and celebrating women as "natural born females."

> **D.    Plaintiff confirms that the requested relief alters, is triggered by, and awards access based on content and viewpoint.**

Plaintiff's requested relief compels Defendant to speak based on content and viewpoint by changing Defendant's message, by being triggered by Defendant's message, and by awarding access to those who oppose Defendant's message.

Far from disputing this point, Plaintiff confirms it. Plaintiff concedes that a "Miss Gay pageant" could exclude "a straight person" and the "Miss Black America pageant" could exclude "a white person." Opp. to MSJ at 44. The reason? The Miss Gay pageant and the

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

Miss Black America pageant address "historic discrimination in public accommodations."

*Id.*  And pageants like the "Miss America or the MUO" can legitimately exclude prospective

contestants based on "age limits."  *Id.* at 42-43.

These concessions demonstrate that the Act as applied to Defendant or Oregon's

pageant "regulates the *content*" expression in a content-based and viewpoint-based manner.

They also explain how the Act "'compels a particular political or ideological message….'"

*Contra* Opp. to MSJ at 32 (quoting *Jane Doe v. Donald J. Trump*, 2020 WL 5492994, at *3

(C.D. Cal. Sept. 2, 2020).  Under Plaintiff's view, promoting homosexuality, racial

minorities, or persons based on their age is legal; promoting biological women is illegal.

That is textbook content-based regulation because it "draws distinctions based on the

message a speaker conveys."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).  *See

also Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1071 (9th Cir. 2020)

(a law distinguishing between golfing and horseshoeing lessons was content based).  And it

draws classic viewpoint-based lines because it "discriminate[s] against speech based on the

ideas or opinions it conveys."  *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).

### E.    Alternatively, the requested relief violates the First Amendment by compelling the Oregon pageant producers to speak a message about womanhood they disagree with.

The Oregon pageant producers also speak a message protected by the First

Amendment because they celebrate "natural born females" through operating a pageant.  *See

supra* § IV.A. (*See also* Rogers Decl. ¶ 9 (confirming Oregon contestants participate in an

on-stage "opening dance number, a swimsuit competition, an evening gown competition, and

an on-stage question.")  The Oregon state pageant producers' contestant selection contributes

to their expression.  For example, the Oregon pageant producers have the same eligibility and wardrobe requirements, use the same contracts, and discipline contestants who violate their contract. (*See* Rogers Decl. Ex. A at 5-6; Smith Decl. ¶ 84; Smith Decl., Ex. 23 at 1, 3.)  The Oregon pageant also employs a choreographer to orchestrate the on-stage production and excludes contestants who do not meet the eligibility requirements. (Smith Decl. ¶ 42-45; Rogers Decl. ¶ 22.)  Because the Oregon pageant producers engage in protected speech by promoting and celebrating "natural born females" through pageantry, Plaintiff's participation in Oregon's state pageant would also compel the producers to speak an objectionable message based on the pageant's content and viewpoint.  *See supra* § IV.C-D.  That violates the Oregon pageant producers' First Amendment liberty to speak freely—and to not speak at all.

## V.    The requested relief fails strict scrutiny because Plaintiff has no compelling need to force Defendant to speak and associate in support of Plaintiff's contrary views.

Strict scrutiny applies here.  MSJ at 12, 20-21 (explaining why strict scrutiny applies to Defendant's First Amendment defenses).  And applying the Act to Defendant's pageant fails strict scrutiny because Plaintiff cannot show that the requested relief is narrowly tailored to serve a compelling interest.  *Reed*, 135 S. Ct. at 2226; *Dale*, 530 U.S. at 648.

As for compelling interest, Plaintiff predictably raises Oregon's general interest in stopping gender identity discrimination.  *See* Opp. to MSJ at 42 (incorporating Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss ("Opp. to MTD"), 33-44.).  But Plaintiff cannot resort to generalities to survive strict scrutiny.  *See Frudden*, 877 F.3d at 829 (finding government failed strict scrutiny when government "provide[d] no specific explanation of how this

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

[compelled] motto and student achievement are connected"). Instead, Plaintiff needed to point to a specific problem. Plaintiff has not done so. *See* Anti-SLAPP Reply at 27 (no evidence anyone in Oregon lacked access to a pageant because of gender identity).

Taking the problem from the general to the specific confirms the lack of a compelling interest: The Act's application compels speech and expressive association. Public accommodations laws do not serve even legitimate interests doing this. Indeed, even Plaintiff agrees. There is no compelling interest in forcing the "Miss Gay pageant" to admit "a straight person" or the "Miss Black America pageant" to admit "a white person." Opp. to MSJ at 44. The same is true in admitting a transgender "female" into Defendant's pageant for "natural born females."

Plaintiff's participation in other Oregon pageants—including winning Miss Earth USA Elite Oregon and having a "positive experience"—further undermines the State's interest. (Green Decl. ¶¶ 5, 8.) And Plaintiff remains eligible to compete in that pageant. (Plaintiff's participation and continued eligibility there proves that no actual problem exists. Plaintiff has access to pageants regardless of gender identity.

As to narrow tailoring, Plaintiff claims this is satisfied only by "mandating compliance" with the Act. Opp. to MTD at 43. But that cannot be the rule because even general non-discrimination laws must allow exemptions for the free speech and association when the law burdens those freedoms. *See, e.g.*, *Dale*, 530 U.S. at 659; *Hurley*, 515 U.S. at 578. That is why, to support this rule, Plaintiff can only rely on inapplicable cases involving laws regulating employment and non-expressive conduct.

Page 40 – DEFENDANT'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

This across-the-board rule also fails because the Act already exempts many businesses and organizations. *See* MSJ at 32. Plaintiff cannot explain why these entities <u>can</u> discriminate, but Defendant must promote objectionable ideas and engage in disagreeable association. This under-inclusiveness cuts against any basis for compelling Defendant. *See Reed*, 135 S. Ct. at 2232 (finding a law is underinclusive if it "leaves appreciable damage to that supposedly vital interest unprohibited") (citation omitted).

Nor can Plaintiff explain how the Act serves a compelling interest as applied to Defendant's pageant when other non-discrimination laws specifically exempt pageants and casting decisions with no problems. MSJ at 31-32 (citing examples). The failure to demonstrate the ineffectiveness of "other plausible, less restrictive means of" preventing discrimination proves the Act is not narrowly tailored as applied to Defendant. *Masonry Bldg. Owners of Or. v. Wheeler*, 394 F.Supp.3d 1279, 1308-09 (D. Or. 2019).

Ultimately, Defendant merely requests the freedom to choose its message without the threat of being *punished* by those who disagree. This protection appropriately balances the First Amendment freedoms of the rare public accommodations who engage in expressive association and speech with the Act applying to public accommodations in all other contexts.

## VI.    Forcing Defendant to speak and associate endangers speakers of all viewpoints.

Defendant notes the severe and dangerous consequences of Plaintiff's legal theory. MSJ at 32-35. Rather than meaningfully engage these consequences—or better yet, refute them—Plaintiff dismisses them because Plaintiff raises an as-applied challenge and because Plaintiff would allow groups subject to "historic discrimination" to promote their messages.

Page 41 – DEFENDANT'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

But these contentions are really admissions that Plaintiff's theory *does* suppress speech and compel conformity.

Plaintiff's "as-applied" argument falters for at least two reasons.  First, the Act governs public accommodations throughout Oregon.  ORS 659A.403(1) (applying to "all persons within the jurisdiction of this state").  The legal principles established by this case will affect the expressive association and free speech rights of all future Oregon public accommodations cases.  *See Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001) ("Using the techniques developed at common law, a court … must parse the precedent in light of the facts presented and the rule announced.")

Second, even as applied only to Oregon pageants, Plaintiff's theory invalidates any in-state pageant that maintains categories based on characteristics covered by the Act.  Take gender identity as an example.  Oregon law defines "gender identity" to include biological men who identify as men.  OAR 839-005-0003(9).  Under Plaintiff's "narrow" challenge, pageants could not limit contestants to transgender women—that would be gender-identity discrimination by excluding men who identify as men.  Likewise, pageants could not limit contestants to transgender women who "present[] in a manner that conforms to traditional female gender stereotypes."  That would also be gender-identity discrimination.

Indeed, a pageant applicant who identifies as a woman filed a complaint against a Canadian pageant that allows transgender women.  The applicant complained that the Canadian pageant asked whether the applicant had "fully transitioned" or "had your sex

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

reassignment surgery." (Decl. of John Kaempf in Supp. of Def.'s Mot. for Summ. J., Ex. 1 at 10).[10]

Shifting tactics, Plaintiff next tries to cabin this theory by picking winners based on viewpoint: those who have suffered "historical discrimination in public accommodations" get freedom to advance their missions but those without this background—like "a straight person" and "a white person"—do not.  Opp. to MSJ at 44.  This has even *more* flaws.

To begin, Plaintiff's theory assumes that biological women—the group Defendant wishes to promote—have not suffered discrimination, historically or presently.  But that ignores (and discounts) the history of hardship suffered by biological women.  *See* Anti-SLAPP Reply at 30-31 (explaining women's historical and current hardships).  In this context, Defendant's pageant proclaims an especially powerful message promoting, celebrating, and empowering *biological* women through its pageant, its pageant-related activities, and its social media and by monitoring titleholder's public appearance. (*See, e.g.*, Smith Decl. ¶¶ 23-32, 41-51, 77-82, 89; Exs. 2, 24-26.)  So, Defendant should have the freedom to speak and associate even under Plaintiff's distorted rule—which asks this Court to declare that the world's *largest* marginalized group has never suffered and no longer suffers *any* discrimination.  Indeed, women in the United States were not even allowed to vote until the passage of the 19th amendment in 1920.

---

[10] Under FRE 201, Defendant asks the Court to judicially notice the Complaint from Canada.  *See Biro v. Conde Nast*, 883 F.Supp.2d 441, 478 (S.D. NY 2012): "Defendants submit court records from these lawsuits—all of which took place in Canada," asking "the Court to take judicial notice of these proceedings, " and "the Court may take judicial notice of these records" to "establish the fact of such litigation and related filings."

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

Setting aside this point, Plaintiff's theory has even more First Amendment problems. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in … matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642.  Plaintiff's theory makes this promise hollow.  Today Plaintiff's legal theory may require the Miss Christian America pageant to admit atheists; tomorrow the same theory may require the "Miss Gay pageant" to admit straight contestants affecting its message.  After all, how does Plaintiff's "historic discrimination" test work? Does it depend on the length or severity of the historical discrimination of the particular group?  Could the "Miss Black America" pageant exclude "a white person" (Opp. to MSJ at 44), but not a Native American if a court found that Native Americans have suffered longer and worse discrimination than African Americans?  Or could those pageants exclude Asians who often prosper more than Caucasians?[11]

Rather than getting trapped in this maelstrom, it is better for the Court to return to bedrock First Amendment principles.  These principles protect speech and associations of all views, regardless of their popularity and even if they express "views on disfavored subjects," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992), "immoral and scandalous ideas," *Iancu*, 139 S. at 2302, or "offensive" opinions, *Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017).

As a last resort, Plaintiff tries to buttress the "historic discrimination" theory by claiming there may be an "affirmative action" exception to the First Amendment. Opp. to MSJ at 44.  The Supreme Court rejects this argument.  There is no compelling interest in

---

[11] *See* Robby Soave, *School District Decides Asians Aren't Students of Color*, Reason (Nov. 16, 2020, 1:25 PM), https://reason.com/2020/11/16/equity-report-north-thurston-asian-students-of-color/.

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

elevating, enforcing, or eliminating speech related to "groups that have historically been subjected to discrimination." *R.A.V.*, 505 U.S. at 395. The First Amendment protects all speakers equally.

## CONCLUSION

Diversity is a good thing. In the midst of nationwide disputes over gender "identity" and womanhood, Defendant celebrates biological women through a unique medium, its pageant for "natural born females." In conveying its message, Defendant is no different from a pageant designed for Native Americans, a playwright who writes parts for male actors, or a producer who casts Latina women. But granting Plaintiff's requested relief strips Defendant and other speakers of their freedom to make message-shaping decisions and deprives the public of their distinct viewpoints. Defendant respectfully asks this Court to grant its motion for summary judgment and dismiss the Complaint to avoid these harmful results, and to uphold its fundamental First Amendment rights as in *Hurley* and *Dale*.

Respectfully submitted on November 30, 2020.


By: s/ John Kaempf
John Kaempf, OSB No. 925391

KAEMPF LAW FIRM PC
1050 SW Sixth Avenue, Suite 1414
Portland, Oregon 97204
Phone: (503) 224-5006
john@kaempflawfirm.com

Attorney for Defendant

Page 45 – DEFENDANT'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon 97204
Telephone: 503-224-5006

CERTIFICATE OF COMPLIANCE

This Brief does not exceed 45 pages of argument in compliance with the approved

stipulation of the parties.

s/ John Kaempf
John Kaempf
Attorney for Defendant

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006

CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2020, I electronically filed the foregoing paper

with the Clerk of the Court by using the CM/ECF system.  The following participant in the

case who is a registered CM/ECF user will be served by the CM/ECF system and email.

Shenoa L. Payne, OSB No. 084392
65 S.W. Yamhill Street, Suite 300
Portland, Oregon 97204
(503) 914-2500
spayne@paynelawpdx.com

Attorney for Plaintiff


s/ John Kaempf
John Kaempf
Attorney for Defendant

**KAEMPF LAW FIRM PC**
1050 SW Sixth Avenue Suite 1414
Portland, Oregon  97204
Telephone: 503-224-5006