IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**ANITA NOELLE GREEN**,

       Plaintiff,

       v.

**MISS UNITED STATES OF AMERICA,
LLC**, a Nevada limited liability corporation
*d/b/a* United States of America Pageants,

       Defendant.

No. 3:19-cv-02048-MO

OPINION AND ORDER

**MOSMAN, J.,**

       In June 2020, this case came before me on Defendant Miss United States of America,

LLC's ("Miss USA") Motion to Dismiss [ECF 8] and Motion to Strike [ECF 15]. The subject of

both motions is an identical as-applied challenge to the Oregon Public Accommodations Act

("OPAA") as a violation of Miss USA's rights under the First Amendment of the United States

Constitution and Article I, Section 8 of the Oregon Constitution. The analysis of those

constitutional questions is the same under either motion. After hearing oral argument, I ordered

the parties to engage in limited discovery and to submit supplemental briefing on the question of

whether Miss USA is an "expressive association" under First Amendment doctrine, thus

converting the motions to a summary judgment posture. Min. of Proceedings [ECF 28]. Miss

USA's Motion for Summary Judgment [ECF 32] is now before me. For the reasons explained

below, I GRANT Miss USA's motion.

## BACKGROUND

Plaintiff Anita Noelle Green is "an openly transgender female—a person whose gender

identity as female differs from the gender [she] was assigned at birth." Anita Noelle Green Decl.

[ECF 39] ¶ 2. Ms. Green frequently participates in beauty pageants. *Id.* ¶¶ 4–6. To her, beauty

pageants "play a vital role in boosting her confidence, improving her public speaking skills,

making her feel heard, giving her a public platform in which to discuss important social issues,

and allowing her to be a positive and inspiring example to all women." Compl. [ECF 1] ¶ 29.

Defendant Miss USA produces female beauty pageants throughout the country, including

in Oregon, "to encourage women to strive to ACHIEVE their hopes, dreams, goals, and

aspirations, while making them feel CONFIDENT and BEAUTIFUL inside and out!" Tanice

Smith Decl. [ECF 33] Ex. 2, at 1. Miss USA "focus[es] on women empowerment, promoting

positive self-image and advocating a platform of community service, which allows [its]

contestants to rise by lifting others." *Id.* While Miss USA is generally unselective in choosing

participants for its pageants, it does have some eligibly requirements. Relevant here, Miss USA

limits its contestant pool to "natural born female[s]." *Id.* Ex. 2, at 1–2. As defined by Miss USA,

that category does not include transgender women.

Ms. Green alleges that she applied to participate as a contestant in Miss USA's Oregon

pageant but that her application was denied on account of her status as a transgender woman, due

to the "natural born female" rule. Compl. [ECF 1] ¶¶ 2, 30–34. She argues that her exclusion

from Miss USA's pageant on account of her gender identity violates the OPAA, which makes it

unlawful "for any person to deny full and equal accommodations, advantages, facilities and privileges of any place of public accommodation" to an individual based on a protected status, including an individual's gender identity. Or. Rev. Stat. § 659A.403; Or. Rev. Stat. § 174.100(7).

Miss USA does not dispute that it is a place of public accommodation under OPAA or that its "natural born female" rule denies Ms. Green a privilege because of her gender identity. Instead, Miss USA argues that the forced inclusion of Ms. Green in its pageant would compel it to express a message with which it disagrees: Ms. Green is a natural-born female. And it argues that it is protected from such compelled expression by both the First Amendment of the United States Constitution and Article I, Section 8 of the Oregon Constitution.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

Although Miss USA makes its argument under the Oregon Constitution in rather brief fashion in its Motion to Dismiss [ECF 8] and Motion to Strike [ECF 15], and it does not raise the argument at all in its Motion for Summary Judgment [ECF 32], principles of constitutional avoidance require me to address any potentially dispositive state constitutional question before turning to alleged violations of the federal constitution. *Ellis v. City of La Mesa*, 990 F.2d 1518, 1524 (9th Cir. 1993). I thus begin with Article I, Section 8 of the Oregon Constitution. But because I hold that Miss USA's argument there fails, I then turn to Miss USA's arguments under the First Amendment.

Miss USA makes two independent arguments under the First Amendment, relying on two overlapping but distinct doctrines. First, it argues that OPAA, as applied here, violates its free speech rights under traditional First Amendment compelled-speech doctrine. Mot. Summ. J. [ECF 32] at 19. Second, it argues that OPAA violates its right to freedom of association under the "expressive association" doctrine. *Id.* at 11. For the reasons explained below, I hold that Miss USA's free speech rights do not trump application of OPAA here, but its freedom-of-association rights do.

## I.    Article I, Section 8 of the Oregon Constitution

When a law is challenged as violating Article I, Section 8, the analysis begins by categorizing the law, on its face, into one of three categories. *City of Eugene v. Miller*, 871 P.2d 454, 458–59 (Or. 1994). The parties do not dispute that OPAA belongs in the third category: "laws that 'focus on forbidden effects, but without referring to expression at all.'" *Id.* at 459 (alteration accepted) (quoting *State v. Plowman*, 838 P.2d 558, 563 (Or. 1992)).

To prove a violation, an as-applied challenge to a law in the third category must show that the law (1) reaches privileged communications in a way that (2) impermissibly burdens the protected expression. *City of Eugene*, 871 P.2d at 460. A claimant's free speech rights are not impermissibly burdened by "a permissible restriction on the time, place, and manner of their expression." *State v. Babson*, 326 P.3d 559, 575 (Or. 2014) (en banc). Oregon courts consider three factors to determine whether restrictions are "reasonable limits" on the time, place, and manner of expression: (1) whether the law discriminates on the basis of the speech's content; (2) whether the restriction advances a legitimate state interest without restricting substantially more speech than necessary; and (3) whether ample alternative opportunities exist to communicate the intended message. *Id.*

Here, on the question of whether OPAA reaches privileged communications, Miss USA argues that "[b]ecause [it] engages in speech under the First Amendment, it also engages in protected expression under the even broader clause of Oregon's Constitution." Mot. to Dismiss [ECF 8] at 30. It then argues that Article I, Section 8 is broader than the First Amendment because it covers "any" expression of opinion. *Id.* (quoting *State v. Henry*, 732 P.2d 9, 11 (Or. 1987)).

Miss USA's derivative argument is a problem for two reasons. First, Oregon courts have held that they will not accept Article I, Section 8 claims that are purely derivative of First Amendment claims. *See Klein v. Or. Bureau of Labor and Indus.*, 410 P.3d 1051, 1074 (Or. App. 2017), *vacated on other grounds*, 138 S. Ct. 2713 (2019) (mem.). Miss USA's *a fortiori* argument that the Oregon Constitution necessarily protects everything protected by the First Amendment is exactly the sort of derivative argument prohibited by *Klein*. Second, to accept Miss USA's argument I would have to conclude that the application of OPAA here reaches expression protected by the First Amendment. To do that at this juncture would completely undermine the requirements of constitutional avoidance which mandate that I adjudicate a state constitutional claim before reaching any federal constitutional question. I will therefore defer my analysis of this issue until I address Miss USA's First Amendment argument *infra*.

But assuming *arguendo* that OPAA does reach privileged communications as applied here, I also hold that OPAA does not impermissibly burden Miss USA's expression as all three "reasonable limits" factors weigh in Ms. Green's favor. With respect to the first factor—whether the law discriminates based on the speech's content—the Oregon Supreme Court has clarified that the inquiry is "whether the application [of the law] was directed at the content or the expressive nature of an individual's activities." *Babson*, 326 P.3d at 575. That question is

generally asked when the state is seeking to enforce a criminal or regulatory code that affects expression, and the concern is that the state is selectively enforcing the law because it disfavors the defendant's expression. *See id.* at 577. Thus, this factor is a bit inapposite here, where Ms. Green is a private party seeking the enforcement of a state statute that is neutral on its face. Regardless, Miss USA has not demonstrated that the operation or enforcement of OPAA discriminates against it because of the content or subject of its speech; any impact on Miss USA's expression here is incidental.

With respect to the second factor, Miss USA makes only a conclusory argument that the state's interest in preventing discrimination based on gender identity is illegitimate under Oregon law. Mot. to Dismiss [ECF 8] at 32. Oregon courts have held that OPAA serves a "compelling interest both in ensuring equal access to publicly available goods and services and in preventing the dignitary harm that results from discriminatory denials of service." *See Klein*, 410 P.3d at 1073. They have also held that the state's "interest is no less compelling with respect to the provision of services for same-sex weddings." *Id.* Miss USA has provided no authority that suggests Oregon courts would treat discrimination based on gender-identity as less than compelling, let alone illegitimate. Nor have they argued that, under Oregon law, OPAA restricts "substantially more speech than necessary" to achieve its legitimate end in preventing gender-identity discrimination in accessing places of public accommodation.

Finally, the third factor also weighs in Ms. Green's favor. Even if Miss USA must include Ms. Green in its pageant, it retains "ample avenues to communicate" its message despite OPAA's restrictions. *Babson*, 326 P.3d at 575 (quoting *Outdoor Media Dimension, Inc. v. Dep't of Transp.*, 132 P.3d 5, 14 (Or. 2006)). For example, it could hang banners and distribute

pamphlets that describe its belief that transgender women are not women, and which represent that the messages and viewpoints expressed by the pageant contestants belong to the contestants.

In sum, Miss USA's claim under Article I, Section 8 of the Oregon Constitution fails for two reasons. First, Miss USA's claim under the state constitution is purely derivative of its claim under the federal constitution, and this sort of argument is prohibited by *Klein*. Second, OPAA, as applied here, does not impermissibly burden Miss USA's protected expression, and therefore does not violate Miss USA's rights under Article I, Section 8 of the Oregon Constitution.

## II.    Compelled Speech Under the First Amendment

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The government cannot compel someone to speak and if someone chooses to speak, the speaker "has the autonomy to choose the content of his own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). These protections apply not just to traditional forms of communication; rather, "the Constitution looks beyond written or spoken words as mediums of expression." *Id.* at 569. Accordingly, conduct that is sufficiently expressive of an idea can receive First Amendment protection. *See id.*; *infra* at 8–9.

In enforcing these principles, courts reserve their most exacting scrutiny for laws that regulate speech based on "disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Courts thus apply strict scrutiny "to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). By contrast, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny." *Id.*

This distinction is crucial when the government regulates a course of conduct which can be used to express an idea. In *O'Brien v. United States*, the Supreme Court considered the constitutionality of a law which made it a crime to knowingly destroy a draft registration card. 391 U.S. 367 (1968). The challenger, David Paul O'Brien, was convicted under that law after he burned his draft card to protest the Vietnam War. *Id.* at 369–70. He argued that the law, as applied to him, was unconstitutional because his act of burning the draft card constituted protected speech under the First Amendment. *Id.* at 376.

The Court rejected his argument and held that, in certain circumstances, the government may regulate conduct even when that conduct is sufficiently expressive to fall within the ambit of the First Amendment. Specifically, it articulated that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* The Court further described that:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377. After setting out this test, the Court held that the law prohibiting destruction of draft cards passed muster because it served legitimate and substantial governmental interests that were unrelated to the suppression of expression, such as the facilitation of military mobilization. *Id.* at 378–80.

Of course, the government does not have to survive the *O'Brien* test every time it enacts or enforces a conduct-regulating law. Any challenger must first show, as a threshold matter, that their regulated conduct is sufficiently expressive to implicate the First Amendment. Because "[i]t

is possible to find some kernel of expression in almost every activity a person undertakes," *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989), the Supreme Court has developed a two-prong test to determine when conduct meets this expressive threshold. *See Spence v. Washington*, 418 U.S. 405, 410–11 (1974) (per curiam); *Texas v. Johnson*, 491 U.S. 397, 403–04 (1989). In examining the relevant conduct, a court should determine if (1) "[a]n intent to convey a particularized message was present," and (2) "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence*, 418 U.S. at 410–11. In *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, the Court appeared to soften the first prong of this test, holding that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message' would never reach the unquestionably shielded painting of Jackson Pollock . . . ." 515 U.S. at 569 (internal citation omitted).[1] Conduct that passes this test—what I will call the *Spence* test—is often labeled "expressive conduct." *See, e.g.*, *Johnson*, 491 U.S. at 403.

Importantly, in evaluating conduct under the *Spence* test, a court must ignore any accompanying speech that purports to explain the conduct. *Rumsfeld v. Forum for Acad. and Institutional Rights (FAIR)*, 547 U.S. 47, 66 (2006) ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into

---

[1] The Courts of Appeals have differed on the exact effect *Hurley* had on the *Spence* test. *See Cressman v. Thompson*, 719 F.3d 1139, 1150 (10th Cir. 2013) (collecting authority). As *Cressman* notes, these differences seemingly extend to panels within the Ninth Circuit. *Id.* (referencing *Kaahumanu v. Hawaii*, 682 F.3d 789, 798 (9th Cir. 2012), and *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010)). Here, I will apply *Hurley* as a gloss on the *Spence* test that softens the particularized message requirement such that the specificity of the message is less important. *Cf. Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004).

'speech' simply by talking about it."). For example, consider someone who refuses to pay his income taxes. Would that conduct—refusing to pay taxes—pass the *Spence* test? Hardly. There is no way to know whether that person is trying to send a message by refusing to pay his taxes, let alone what that message might be. It is possible he just wants some extra cash to buy a new car. But even if the reason he refuses to pay his income taxes is because he wants to express disapproval of the IRS, he cannot transform his conduct into expressive conduct by announcing his intentions. *Id.*

In sum, when a conduct-regulating law is challenged by a litigant under the theory that its proper application interferes with expression in violation of the First Amendment, the Supreme Court has laid out a framework for analyzing such a claim. First, a court should determine whether the regulated conduct, as applied, qualifies as "expressive conduct" under the *Spence* test such that it is subject to First Amendment protection. If it does, then the court should analyze the constitutionality of the law by applying the *O'Brien* test. If the law passes *O'Brien*, then it is constitutional even if its application incidentally affects protected First Amendment expression.

Here, Miss USA's challenge fits neatly under this framework. OPAA—like other state public accommodations laws throughout the country—"does not, on its face, target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds." *Hurley*, 515 U.S. at 572. In other words, it regulates conduct, not speech. *Cf. FAIR*, 547 U.S. at 60 ("[T]he Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*."). Thus, the question here is whether the particular conduct that

OPAA prohibits or requires of Miss USA is expressive conduct, and if so, whether *O'Brien* is satisfied or not.

But before analyzing the facts of this case under the above-described framework, I want to address Miss USA's main argument: the application of *Hurley* to this case changes everything. *See* Mot. Summ. J. [ECF 32] at 20–21, 31 (arguing that strict scrutiny should apply here under *Hurley*). It does not.

In *Hurley*, "a number of gay, lesbian, and bisexual descendants of the Irish immigrants joined together with other supporters" to form an organization named GLIB. *Hurley*, 515 U.S. at 561. The members of GLIB wished to participate in Boston's St. Patrick's Day parade as a distinct parade contingent carrying its own banner. *Id.* at 572, 574. The organizers of the parade refused to admit GLIB into the parade as its own contingent, ostensibly because they disagreed with GLIB's message of inclusion. *Id.* at 561, 574–75. GLIB sued under the state's public accommodations law, arguing that the parade organizers had excluded GLIB because of its members' sexual orientation. *Id.* at 561–63. The state court ruled for GLIB. *Id.*

The Supreme Court reversed. *Id.* at 566. In a key passage explaining its decision, the Court stated:

> In the case before us . . . the [public accommodations] law has been applied in a peculiar way. **Its enforcement does not address any dispute about the participation of openly gay, lesbian, or bisexual individuals in various units admitted to the parade**. Petitioners disclaim any intent to exclude homosexuals as such, and no individual member of GLIB claims to have been excluded from parading as a member of any group that the Council has approved to march. **Instead, the disagreement goes to the admission of GLIB as its own parade unit carrying its own banner.** Since every participating unit affects the message conveyed by the private organizers, the state courts' application of the statute produced an order essentially requiring petitioners to alter the expressive content of their parade.

*Id.* at 572–73 (emphasis added) (internal citations omitted). This "peculiar" application of the public accommodations law, the Court continued, "violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573.

Understanding what was "peculiar" about *Hurley* distinguishes it from this case and reinforces—rather than upends—traditional First Amendment doctrine. The state court's application of the public accommodations law was peculiar because it was *not* applied to redress a circumstance where individuals had been denied privileges because of their protected status; rather, it was applied to *directly* require a speaker to host a particular message because of that message's *content*.

Consider an analogy. A group of people, mainly comprised of Black individuals, wishes to participate in a similar parade. They name their group "Black Lives Matter" and request to participate in the parade as a distinct unit to express their support for racial equality and criminal justice reform. The parade organizers, for whatever reason, object to the message that the Black Lives Matter group wishes to express, and they deny their application to participate in the parade as a distinct unit. The organizers do not, however, exclude Black individuals or any other racial group from participating in any of the approved parade units (nor treat anyone differently at all on account of their race). If the Black Lives Matter group sued the parade organizers under a similar public accommodations law, then the case would be on all fours with *Hurley* and the parade organizers would likely prevail. To the contrary, if the parade organizers tried to prohibit Black persons from participating in the parade on an equal footing with individuals of other racial identities, then the public accommodations law would squarely apply, and *Hurley* would not be the most relevant precedent.

In short, the state court in *Hurley* misapplied the public accommodations law in a way that transformed it from a conduct-regulating, content-neutral law that did not target speech into a law that directly regulated speech based on its content. It was as if the state court, rather than applying the text of the public accommodations law, applied a different law that stated: "Any place of public accommodation which includes others in expressive activities cannot exclude a message that is supportive of gay, lesbian, and bisexual rights." Such a law would target speech based on its content and would have to survive strict scrutiny. By contrast, a public accommodations law like OPAA, applied in the manner contemplated by its text, affects expression only incidentally, if at all. Such laws face the lesser scrutiny of *O'Brien*.

This understanding of *Hurley* preserves longstanding First Amendment doctrine, explained above, which separates content-based laws that specifically target speech from content-neutral and conduct-regulating laws. When applied as written, the former receives strict scrutiny, while the latter receives a lesser, intermediate form of scrutiny. The *Hurley* Court did not directly state that it was applying strict scrutiny, nor did it discuss *O'Brien*, but I interpret its holding as affirming traditional First Amendment framework, rather than significantly modifying it without ever saying so.

That being said, it is not necessarily the case that the proper application of a public accommodations law will never implicate the First Amendment expression of a regulated entity. It is theoretically possible, in certain contexts, that the conduct of including or excluding an individual of a particular status can express a message or an idea. Miss USA argues that this is such a case. The presence of Ms. Green in a pageant expressly reserved for females, it argues, sends a very specific message: Ms. Green—a transgender women—is female. Maybe so. But if application of OPAA compels such a message, it does so only incidentally because of its

regulation of nonspeech conduct. Thus, the proper First Amendment framework for such a scenario is the two-step analysis of *Spence* and *O'Brien*, which I will now apply.[2]

### A. The *Spence* Test

Stated here again, the *Spence* test is as follows. To determine if regulated conduct is "expressive conduct," a court should examine the conduct and ask whether (1) "[a]n intent to convey a particularized message was present," and (2) "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence*, 418 U.S. at 410–11. As described above, *Hurley* appeared to water-down the "particularized message" requirement such that the specificity of the message is less important, and *FAIR* cautioned that the relevant conduct must be understood on its own terms, ignoring any accompanying speech which would explain the expressive purpose of the conduct. *See supra* at 9–10.

---

[2] Miss USA's particular argument is that its conduct of selecting contestants is a constituent part of its pageant, which is itself "pure speech." Mot. Summ. J. [ECF 32] at 20–23. It thus reasons that its selection of contestants should be treated as purely expressive activity, rather than expressive conduct. *Id.* at 20–21 (citing *Anderson*, 621 F.3d at 1061–62 (9th Cir. 2010)). The implication is that as a purported regulation of purely expressive activity, the application of OPAA here is subject to strict scrutiny, rather than intermediate or *O'Brien* scrutiny. *Id.* But Miss USA misapplies *Anderson*. *Anderson* considered a facial challenge to a municipal zoning ordinance which directly prohibited the operation of tattoo parlors. 621 F.3d at 1057. The court held that because the business and process of tattooing were constituent acts of creating tattoos, which the court likened to pure speech, the zoning ordinances had to be analyzed as a time, place, or manner restriction on the means of speech. *Id.* at 1060–64. In doing so, it rejected the lower court's application of rational basis review. *Id.* at 1058. Nothing in *Anderson* would change the analysis, under *O'Brien*, of a conduct-regulating law that incidentally affected the process of tattooing, such as a law that generally regulated the safe disposal of needles that had been contaminated with blood.

Here, the conduct being regulated is the exclusion[3] of Ms. Green as a contestant in Miss USA's pageant. There is no real dispute that through excluding Ms. Green and other transgender women from its pageant, Miss USA intends to send a message about its views on womanhood, that only "natural born females," as it defines that phrase, are to be considered female. Thus, the first prong of *Spence* is satisfied.

I also think the second prong is met here. Someone viewing the decision to exclude transgender women (and cisgender males) from a beauty pageant would likely understand that the pageant organizers wished to convey some message about the meaning of gender and femininity, and would probably also grasp the specific implication that the pageant organizers did not believe transgender women qualified as female. Although, given *Hurley*'s dismissal of the "particularized message" requirement, it is probably enough just that the observer understands that a more general message about gender norms or sexual identity is being expressed.

Key to my reasoning here is that I think beauty pageants are commonly understood to be bound up with notions of gender and sexual identity. No doubt, the variety of pageants in existence has expanded to encapsulate a wide range of ideas about gender, sexuality, and other conceptions of identity, moving beyond the traditional norms that more exclusively shaped the agendas of pageants in the past. *See, e.g.*, Mot. to Dismiss [ECF 8] at 28–29 (describing other types of pageants). But pageants remain a particular sort of institution, and I think they supply the context—"the surrounding circumstances"—which make it likely that someone viewing Miss USA's decision here would understand the intended message.

---

[3] The effect of OPAA here can be expressed as either prohibiting Miss USA from excluding Ms. Green, or as compelling Miss USA to include Ms. Green. Whether OPAA prohibits or compels expressive conduct is merely two sides of the same coin.

To be clear, in applying the second prong of *Spence* here, I have ignored Miss USA's eligibility rules and statements which describe that it limits its pageants to "natural born females." I agree with Ms. Green that to consider such statements as explanatory context would run afoul of *FAIR*'s admonition that speech cannot be used to explain the expressive nature of conduct. Resp. to Mot. to Dismiss [ECF 21] at 21. For example, it would be less apparent that a message is being expressed by a café owner's refusal to serve transgender women. There is nothing in the surrounding circumstances that make it likely that someone viewing that decision would understand the café owner to be expressing a message, let alone what that message might generally be. And the café owner cannot solve this problem for purposes of the *Spence* test by hanging a sign in the window that says he serves only "natural born females."

In short, I think Miss USA's conduct of excluding Ms. Green from its beauty pageant qualifies as "expressive conduct" under the *Spence* test. Therefore, the next step is to apply *O'Brien*.

### B. *O'Brien*

As explained above, "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376. Specifically, the regulation must (1) be within the constitutional powers of the government, (2) further an important or substantial governmental interest, and (3) be unrelated to the suppression of free expression. *Id.* at 377. Additionally, (4) any "incidental restriction on alleged First Amendment freedoms" must be "no greater than is essential to the furtherance of that interest." *Id.*

Here, the regulated conduct—the exclusion of Ms. Green from the pageant—has both speech and nonspeech elements. As just described above, Miss USA's act of excluding Ms. Green is expressive conduct that sends a message about womanhood. But that same act also contains a nonspeech element which OPAA is designed to regulate: the denial of the privileges guaranteed to all Oregonians in places of public accommodation based on a variety of protected categories, including gender identity. Thus, this is the type of regulation of conduct that *O'Brien* contemplates. And the government's interest in regulating the nonspeech element of the conduct meets all four of the requirements of *O'Brien*.

First, the Supreme Court has held that public accommodations laws like OPAA "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination." *Hurley*, 515 U.S. at 572. Here, Ms. Green has provided ample evidence that LGBTQ persons, including transgender individuals, have historically faced discrimination in Oregon, and that history motivated the Oregon legislature to enact OPAA and include protections based on gender identity. Resp. to Mot. to Dismiss [ECF 21] at 38–42.

Second, the Court has also held that eliminating discrimination based on race or sex is a compelling state interest, *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984), and it has appeared to implicitly support the idea that there is a strong state interest in eliminating discrimination based on sexual orientation, *see* Paul M. Secunda, *The Solomon Amendment, Expressive Associations, and Public Employment*, 51 UCLA L. Rev. 1767, 1795 n.182 (2007) ("Although *Dale* appears to imply that the state has a strong interest in eradicating sexual orientation discrimination, the Court did not come out and say so explicitly, as it did in previous cases dealing with gender discrimination.") (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 658 (2000)). Given these rulings, and the evidence of historical discrimination against individuals

based on gender identity, I think the state's interest in ending gender-identity discrimination in places of public accommodation is at least important or substantial.

Third, OPAA is unrelated to the suppression of free expression. *See Hurley*, 515 U.S. at 572 (holding that Massachusetts' similar public accommodations law "does not, on its face, target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds").

And fourth, OPAA incidentally restricts Miss USA's expressive conduct in a way no further than essential to achieve its interest in eliminating discrimination based on gender identity. The facts here present a binary choice. Either Ms. Green participates in the pageant, or she doesn't. To achieve Oregon's interest in making sure individuals have equal access to the privileges of a place of public accommodation without regard for their gender identity, OPAA compels Miss USA to include Ms. Green. That has the incidental but unavoidable effect of affecting Miss USA's expressive conduct.

In sum, although the application of OPAA to include Ms. Green in Miss USA's pageant will incidentally affect Miss USA's expressive conduct, it is permissible under *O'Brien*.

### III.    Expressive Association under the First Amendment

Separate from the right to free speech, the freedom of association is a fundamental right also protected by the First Amendment. *See NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). Its protection includes what has come to be called the right to "expressive association." *Roberts*, 468 U.S. at 621–22. In explaining that right, the Supreme Court has described that "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of

expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 648.

For a group to show that it has a constitutional right to exclude someone under the expressive association doctrine, it must show the following: (1) the group is an "expressive association," (2) the forced inclusion of an unwanted member would affect the group's "ability to express its viewpoints," and (3) the group's "interest in expressive association outweighs the state's interest in eradicating discrimination." *See Apilado v. N. Am. Gay Amateur Athletic All.*, 792 F. Supp. 2d 1151, 1160 (W.D. Wash 2011) (citing *Dale*, 530 U.S. at 648–59).

Here, Miss USA argues that the inclusion of Ms. Green in its pageant would violate its right to expressive association. I therefore must consider whether Miss USA has made all three of the above showings. I take each question in turn.

### A. Whether Miss USA is an Expressive Association

According to the Supreme Court:

> To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in "expressive association." The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private.

*Dale*, 530 U.S. at 648.

In *Dale*, the Boy Scouts of America ("BSA") wished to exclude an openly gay assistant scoutmaster, in violation of New Jersey's public accommodations law. *Id.* at 644–45. In determining whether BSA was an expressive association, the Court focused on the fact that BSA sought to "instill values in young people" and that scoutmasters "inculcate" scouts with the scout values "both expressly and by example." *Id.* at 649–50. The Court concluded that "[i]t seems indisputable that an association that seeks to transmit such a system of values engages in

expressive activity." *Id.* at 650. In stating its conclusion, the Court cited Justice Sandra Day

O'Connor's concurrence in *Roberts*, which described that "[e]ven the training of outdoor

survival skills or participation in community service might become expressive when the activity

is intended to develop good morals, reverence, patriotism, and a desire for self-improvement."

*Roberts*, 468 U.S. at 636 (O'Connor, J., concurring in part and concurring in the judgment).

While the Court's discussion on this first question is brief, it is hard to read *Dale* as doing

anything other than drawing a wide boundary around what it means to "engage in some form of

expression." 530 U.S. at 648. And here, Miss USA seems to clear that relatively low bar. Miss

USA seeks "to encourage women to strive to ACHIEVE their hopes, dreams, goals, and

aspirations, while making them feel CONFIDENT and BEAUTIFUL inside and out!" Smith

Decl. [ECF 33] Ex. 2, at 1. Miss USA focuses on "women empowerment, promoting positive

self-image and advocating a platform of community service, which allows our contestants to rise

by lifting others." *Id.* These goals appear similar to BSA's goals of instilling values and

promoting self-improvement, and they qualify as private (if not public) expression. Furthermore,

as discussed in more detail below, Miss USA actively works to protect its message by ensuring

that contestants act consistent with the competition's message and mission. *E.g.*, *id.* ¶ 129 (Miss

USA "regularly review[s] the prospective contestants' social media pages to evaluate whether

the prospective contestant communicates messages consistent with [Miss USA's] rules, goals,

mission, and message."); *id.* Ex. 22, at 1–2 (revoking contestant's title for posting photograph

"inconsistent with [Miss USA's] vision and message").

Thus, were the analysis to stop with *Dale*, I would consider Miss USA an "expressive

association" because it quite clearly engages in expressive activity. There is, however, another

consideration in play here that was not at issue in *Dale*. In her same concurrence in *Roberts* that

was cited by the *Dale* majority, Justice O'Connor set forth a distinction between *expressive*

associations and *commercial* associations, the latter of which do not enjoy the same associational

rights. *Roberts*, 468 U.S. at 634–35 (O'Connor, J., concurring in part and concurring in the

judgment). While Supreme Court concurrences generally lack precedential effect, the Ninth

Circuit has adopted the expressive–commercial distinction as described by Justice O'Connor, as

have most other circuits. *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1195 (9th Cir. 1988); *see*

*also* James D. Nelson, *The Freedom of Business Association*, 115 Colum. L. Rev. 461, 464

(2015) ("Although the Supreme Court has never explicitly endorsed the distinction between

expressive associations and commercial associations, that basic dichotomy is commonly

accepted in the law.").

Put simply, the distinction holds that groups that engage in a certain level of commercial

activity have a diminished right to control their membership, even if they engage in expressive

activities. But while the principle is simply stated, the test for separating commercial from

expressive associations is not. As described by Justice O'Connor:

> Many associations cannot readily be described as purely expressive or
> purely commercial. No association is likely ever to be exclusively engaged in
> expressive activities . . . . And innumerable commercial associations also engage in
> some incidental protected speech or advocacy. The standard for deciding just how
> much of an association's involvement in commercial activity is enough to suspend
> the association's First Amendment right to control its membership cannot,
> therefore, be articulated with simple precision. Clearly the standard must accept the
> reality that even the most expressive of associations is likely to touch, in some way
> or other, matters of commerce. The standard must nevertheless give substance to
> the ideal of complete protection for purely expressive association, even while it
> readily permits state regulation of commercial affairs.

*Roberts*, 468 U.S. at 635 (O'Connor, J., concurring in part and concurring in the judgment).

After articulating the difficulty in drawing clean lines, Justice O'Connor went on to

describe how she would go about parsing the distinction:

      In my view, an association should be characterized as commercial, and therefore subject to rationally related state regulation of its membership and other associational activities, when, and only when, the association's activities are not predominantly of the type protected by the First Amendment. It is only when the association is predominantly engaged in protected expression that state regulation of its membership will necessarily affect, change, dilute, or silence one collective voice that would otherwise be heard. An association must choose its market. Once it enters the marketplace of commerce in any substantial degree it loses the complete control over its membership that it would otherwise enjoy if it confined its affairs to the marketplace of ideas.

*Id.* at 635–36.

      Justice O'Connor describes a fact-intensive inquiry, aimed at determining whether an association is "predominantly engaged" in expressive activity. In *IDK, Inc.*, the Ninth Circuit "concede[d] that distinguishing between associations that are primarily expressive and those that are primarily commercial will not always be easy." 836 F.2d at 1195. There, the court held that the escort services before it were primarily commercial enterprises for three reasons. First, the court made the rather obvious point that escort services and dating are not expressly mentioned in the First Amendment. *Id.* Second, as compared to associations that are clearly expressive, such as political parties, a "couple out on the town is not an overtly expressive association." *Id.* "Third, and most important, the escort services ma[d]e no claim that expression is a significant or necessary component of their activities." *Id.* "Unlike publishers, concert promoters, and cable television franchisers, the escort services do not control the content of expression or ensure that any expression occurs." *Id.*

      I did not think that the complaint and the factual lay of the land at the motion-to-dismiss stage provided sufficient information to conduct such a granular inquiry. I thus ordered the parties to engage in limited discovery and to submit additional briefing on the question of whether Miss USA should be treated as a primarily expressive association or as a commercial

association. Tr. [ECF 29] at 32. The parties have completed that process, and I now have sufficient facts at hand to make the appropriate determination.

Like many associations, Miss USA cannot be described as purely expressive or purely commercial. Below, I describe first the commercial aspects of the group, then its expressive aspects. I conclude that Miss USA is predominantly engaged in expressive activity.

### i. Commercial Aspects

Miss USA, a for-profit organization, "receives revenue from its national pageant in the form of contestant entries, advertisements, ticket admissions, [and] payments to view the pageant livestreamed." Smith Decl. [ECF 33] ¶ 108. Miss USA also receives revenue from "People's Choice voting where members of the public can pay to vote for a contestant with a portion of those proceeds going to the top getters charity of choice and the remaining portion going to [Miss USA]." *Id.* Miss USA "also receives licensing fees from state directors who purchase a license . . . to conduct state pageants." *Id.* ¶ 109.

In Oregon, Miss USA charges contestants a $595 entry fee. Kaylene Rogers Decl. [ECF 40] Ex. A, at 8. Miss USA requires contestants to sell full-page advertisements for the program book. *Id.* Ex. A, at 9. If a contestant fails to sell a full-page advertisement, worth $299, then the contestant must come up with the money on her own. *Id.* ¶ 12. Miss USA encourages contestants to sell more advertisements by offsetting expenses and awarding the contestant who sells the most. *Id.* Ex. A, at 9. Miss USA also incentivizes contestants to recruit new competitors, growing the pageant and increasing revenue. *Id.*; *see also id.* ¶ 14.

There is evidence that, at least in its early years and at least in Oregon, Miss USA was not overly selective on who could compete but was mainly focused on growth. *See, e.g.*, Marsha Lawson Decl. [ECF 41] ¶¶ 7, 10–12. To that end, Miss USA hired a promotions director, Marsha

Lawson, in Oregon, whose responsibilities included "recruiting new contestants, coaching and teaching contestants to sell advertisement pages, [and] getting businesses to sponsor the pageant." *Id.* ¶ 5.

Clearly, there is a commercial component to the Miss USA pageants.

### ii. Expressive Aspects

Miss USA is also concerned about its message. Tanice Smith, Miss USA's national director and sole managing member, has ordered state directors to reject would-be contestants for having posed nude in the past or submitting material contrary to Miss USA's message. Smith Decl. [ECF 33] Exs. 9–10. Accepted applicants at both the state and national level must sign contracts guaranteeing they are a "natural born female," promising "to be of good moral character," and agreeing that they "have not been involved at any time in any act of moral turpitude or behavior that is, or could be, perceived by [Miss USA] as contrary to the mission of the organization." *Id.* Ex. 14, at 2–3; *see also id.* ¶ 84 (noting that state directors use these contracts). The applicants also agree to let Miss USA "monitor and regulate the content of [their] personal social media accounts." *Id.* Ex. 14, at 4. The applicants promise to avoid "messages or images inconsistent with the positive images and/or good will with which [Miss USA] wishes to associate." *Id.*

Ms. Smith "regularly review[s] the prospective contestants' social media pages to evaluate whether the prospective contestant communicates messages consistent with [Miss USA's] rules, goals, mission, and message." *Id.* ¶ 129. She reviews and approves the platforms of national contestants. *Id.* ¶ 59; *id.* Ex. 15. She has revoked the titles from two former winners for acting contrary to the pageant's message. *Id.* ¶¶ 76–82. She revoked the title of one national winner for social media posts that "caused irrevocable damage to our brand which have tarnished

and impugned our integrity within the pageant community and the general public." *Id.* Ex. 21, at 1. She revoked the title of a state winner in part for posting a picture of herself on social media in a thong. *Id.* Ex. 22, at 1–2. In the revocation letter, Miss USA wrote: "This photograph is inconsistent with [our] vision and message and does not coincide with [Miss USA's] efforts to promote body positivity and positive self-images and produce community role models and leaders who can encourage others and inspire women to be confident." *Id.* State directors have also disciplined contestants for, among other things, posting content on social media that contained profanity or promoted alcohol. *Id.* Ex. 23, at 2.

Additionally, Ms. Smith has prohibited a judge from appearing as his female alter ego "to avoid confusion on what [Miss USA's] stance is on what it means to be a woman." Smith Suppl. Decl. [ECF 49] Ex. 51. Similarly, Ms. Smith once rejected an advertisement "because it featured an image of a man dressed as a woman which contradicted [Miss USA's] message of empowering biological women." Smith Decl. [ECF 33] ¶ 106; *id.* Ex. 30.

### iii. Conclusion

I find that Miss USA is predominantly engaged in expressive activity. Unlike the escort services in *IDK, Inc.*, Miss USA claims that expression is a significant and necessary component of its activities, and it seeks to control the content of expression in those activities. The record adequately supports those claims. Miss USA surveils and polices its contestants from the moment they sign up for a pageant, and, at least for the winners, even after the pageant is over. If a potential contestant has acted inconsistent with Miss USA's message, that contestant is barred from competing. If a winner acts inconsistent, she is stripped of her title. National contestants must have their platforms approved. Miss USA also tailors other aspects of its pageant to reflect its message, rejecting advertisements and controlling the conduct of judges. Put simply, Miss

USA "is predominantly engaged in protected expression [such] that state regulation of its membership will necessarily affect, change, dilute, or silence one collective voice that would otherwise be heard." *Roberts*, 468 U.S. at 635–36 (O'Connor, J., concurring in part and concurring in the judgment).

Although Miss USA certainly has some commercial aspects, I do not believe it has entered the marketplace of commerce to such a "substantial degree" it has lost "the complete control over its membership that it would otherwise enjoy if it confined its affairs to the marketplace of ideas." *Id.* at 636. Miss USA's focus on growth does not convince me otherwise, as it cuts both ways. On the one hand, growth increases revenue, helping Miss USA, a for-profit company, achieve profit. On the other hand, a desire for growth is not inconsistent with Miss USA's expressive goals: growth allows Miss USA to spread its message further. Although Miss USA has actively worked to grow its pageant, it appears to work even harder to protect its message—sometimes undercutting its bottom line to do so. For example, Miss USA has rejected potential contestants who have acted inconsistent with its message, thereby losing out on the entry fee and other contestant-driven revenue.

At bottom, Miss USA is predominantly engaged in expressive activity. As I explained above, beauty pageants are commonly understood to be bound up with notions of gender and sexual identity, and someone viewing a Miss USA pageant would be hard pressed to miss the intended message, at least broadly speaking. *See supra* at 15. Miss USA's stance on who is a "natural born female" might be subtle to a casual viewer, but, according to Miss USA, its stance is an important component of its overarching message, and it works hard to protect that message. Its efforts are at least the equivalent of BSA's efforts in *Dale*. I find that the record supports Miss USA's assertions.

**B. Whether the forced inclusion of Ms. Green in Miss USA's pageant would significantly affect Miss USA's ability to advocate its viewpoints**

Because Miss USA is an expressive association, the next question is whether the forced inclusion of Ms. Green in Miss USA's pageant would significantly affect Miss USA's ability to advocate its public or private viewpoints. *Dale*, 530 U.S. at 650.

In *Dale*, the court divided that larger question into two parts: (1) what was the nature of BSA's expression, specifically with respect to its teachings on homosexuality; and (2) whether Dale's inclusion as an openly gay assistant scoutmaster "significantly burden[ed]" that expression. *Id.* at 650–54. In answering those questions, the Court showed substantial deference to BSA's own representations of what constituted their expression *and* what might impair that expression. The Court accepted BSA's assertion in its briefing that BSA did "not want to promote homosexual conduct as a legitimate form of behavior," *id.* at 651 (quoting Pet'r's Reply Br. at 5), and stated that it "need not inquire further to determine the nature of the Boy Scouts' expression with respect to homosexuality," *id.* And, in addition to deferring to the association's representations on what its expressive views were, the Court further held that it would "give deference to an association's view of what would impair its expression." *Id.* at 653. With this deference in the background, the Court examined the nature of Dale's role in BSA and concluded that his "presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id.* Ultimately, the Court concluded "that the forced inclusion of Dale would significantly affect [BSA's] expression." *Id.* at 656.

Here, Miss USA has been unequivocal both in its briefing for this case and in its eligibility rules for its pageants that it views the concept of womanhood to be limited to "natural born" or "biological" women, which does not include transgender women like Ms. Green. *See,*

*e.g.*, Mot. to Dismiss [ECF 8] at 15 ("[T]o communicate that women are biological females, [Miss USA] only allows *natural born* females to participate in its pageant, compete for [its] title, and be promoted through [its] platform."). That is the nature of its expression which it claims is affected by Ms. Green's inclusion. In Miss USA's words, it "cannot authentically or persuasively promote its message of empowering biological women if [Miss USA] is forced to celebrate and promote biological men who identify as women." *Id.* at 25.

Simply put, Miss USA, through its pageant, seeks to promote a particular conception of female identity which does not include transgender women. It does not require much deference to understand that including contestants at odds with that concept of womanhood—perhaps crowning such a contestant champion—would burden Miss USA's chosen expression. But especially in light of the deference I must give to Miss USA under *Dale*, I hold that the forced inclusion of Ms. Green would significantly affect Miss USA's ability to advocate its viewpoints on female identity and womanhood, which is the core expressive purpose of its pageants.

### C. Miss USA's interest in expressive association versus the state's interest in preventing discrimination based on gender-identity

Because Miss USA is an expressive association and because the forced inclusion of Ms. Green in its pageant would significantly affect its ability to express its viewpoints, the only remaining question is whether Miss USA's interest in expressive association outweighs Oregon's interest in preventing discrimination based on gender identity.

The Supreme Court has long held that the freedom of expressive association "could be overridden 'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Dale*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623). In other

words, courts traditionally were to apply something like strict or heightened scrutiny to a state

law that interfered with a group's expressive association.[4]

The *Dale* Court, however, described this scrutiny as more akin to a balancing test. It

stated that "after finding a compelling state interest," a court should go on "to examine whether

or not the application of the state law would impose any 'serious burden' on the organization's

rights of expressive association." *Id.* at 658. "[T]he associational interest in freedom of

expression has been set on one side of the scale, and the State's interest on the other." *Id.* at 658–

59.

But while the *Dale* Court describes the interests to be balanced, it provides very little

guidance on how to go about balancing them. In *Dale*, the Court explained only that:

> We have already concluded that a state requirement that the Boy Scouts retain Dale
> as an assistant scoutmaster would significantly burden the organization's right to
> oppose or disfavor homosexual conduct. The state interests embodied in New
> Jersey's public accommodations law do not justify such a severe intrusion on the
> Boy Scouts' rights to freedom of expressive association. That being the case, we
> hold that the First Amendment prohibits the State from imposing such a
> requirement through the application of its public accommodations law.

*Id.* at 659. It is unclear if the balancing test came out in BSA's favor because (1) the state's

interest in prohibiting discrimination on the basis of sexual orientation was less than compelling

(the Court never explicitly stated how substantial it found the state's interest to be in this

respect); (2) the state could achieve its compelling interest through significantly less restrictive

means; or (3) whenever there is a "serious burden" on expressive associational rights, the interest

in those rights will outweigh the state's interest, even if it is compelling.

---

[4] In *Dale*, the Court specifically rejected application of *O'Brien* in the expressive
association context because it held that the "public accommodations law directly and
immediately affects associational rights." *Dale*, 530 U.S. at 659.

Lacking guidance on how to apply this balancing test, the best course here is to closely analogize the facts of this case to the facts of *Dale*. When doing so, I see no way to distinguish the circumstances here from those in *Dale* that would result in the balancing test coming out in Ms. Green's favor. First, however significant the state's interest is in preventing discrimination based on sexual orientation, Ms. Green has supplied no authority which would suggest that preventing discrimination based on gender identity commands a higher state interest than eliminating discrimination based on sexual orientation. Second, given that the application of the New Jersey public accommodations law in *Dale* and the application of OPAA here are materially similar in that they both enforce a blanket prohibition against discrimination based on a protected status, it is hard to see how one or the other is more or less restrictive in achieving the state's interest in preventing discrimination. Third, and finally, I do not think there is a meaningful difference between the "significant burden" that Dale's inclusion placed on BSA's expressive association and the burden that Ms. Green's inclusion would place on Miss USA's expressive association.

Because this case cannot be distinguished from *Dale* in these key respects, I hold that Miss USA's interest in expressive association outweighs Oregon's interest in preventing gender-identity discrimination in places of public accommodation, as applied to the facts of this case.

//

//

//

//

//

//

**CONCLUSION**

For the reasons stated herein, I GRANT Miss USA's Motion for Summary Judgment

[ECF 32]. I DENY as moot all other pending motions.

IT IS SO ORDERED.

DATED this ___8th___ day of April, 2021.

MICHAEL W. MOSMAN
United States District Judge